UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Bjorn Iverson,

Plaintiff,

vs.

City of Brooklyn Center; Hennepin County;
Brooklyn Center Mayor Mike Elliot, *in his
individual and official capacity*; Brooklyn Center
Police Department Interim Chief Tony Gruenig,
*in his individual and official capacity*; Hennepin
County Sheriff David P. Hutchinson, *in his
official and individual capacity*; Hennepin
County Sheriff's Office Chief Deputy Tracey
Martin, *in her official and individual capacity*;
Minnesota Department of Public Safety
Commissioner John Harrington, *in his individual
capacity*; Minnesota Department of Public Safety
Assistant Commissioner Booker Hodges, *in his
individual capacity*; Minnesota State Patrol
Colonel Matthew Langer, *in his individual
capacity*; Minnesota State Patrol Major Joseph
Dwyer, *in his individual capacity*; Crystal Police
Chief Stephanie Revering, *in her official and
individual capacity*; John Does #1-100, *in their
official and individual capacities*,

Defendants.

Case No. 23-CV-0917 (NEB/LIB)

RECEIVED
BY MAIL
JUL 20 2023

CLERK
U.S. DISTRICT COURT
MINNEAPOLIS, MINNESOTA

**FIRST**

**AMENDED COMPLAINT**

**DEMAND FOR JURY TRIAL**

---

SCANNED
JUL 20 2023
U.S. DISTRICT COURT MPLS

## TABLE *of* CONTENTS

I. **INTRODUCTION** . . . . . . . . . . . . . . . . . . .3

II. **PARTIES** . . . . . . . . . . . . . . . . . . . . . . . . 4

III. **JURISDICTION** *and* **VENUE** . . . . . . . .11

IV. **FACTUAL BACKGROUND** . . . . . . . . 11
A. Police officer murders George Floyd and the
public response . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

B. Minnesota Governor establishes curfews by
executive order exempting the press . . . . . . . . . . . . .14

C. State and County Defendants' unconstitutional
actions against the press covering the George Floyd
protests . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
   May 26, 2020 . . . . . . . . . . . . . . . . . . . . . . . . 20
   May 27, 2020 . . . . . . . . . . . . . . . . . . . . . . . . 20
   May 28, 2020 . . . . . . . . . . . . . . . . . . . . . . . . 21
   May 29, 2020 . . . . . . . . . . . . . . . . . . . . . . . . 22
   May 30, 2020 . . . . . . . . . . . . . . . . . . . . . . . . 24
   May 31, 2020 . . . . . . . . . . . . . . . . . . . . . . . . 37

D. Defendants' inadequate response to law
enforcement misconduct during the George Floyd
protests . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

E. Minnesota law enforcement agencies once
again join forces in MACC and execute MACC's
"Operation Safety Net" . . . . . . . . . . . . . . . . . . . . . . .45

F. Daunte Wright's killing . . . . . . . . . . . . . . . . . . .47

G. The ensuing civil unrest and response by
the City . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .47

H. MACC Defendants' widespread pattern of
unconstitutional conduct against the press covering
the Daunte Wright protests . . . . . . . . . . . . . . . . . . . . .55
   April 11, 2021 . . . . . . . . . . . . . . . . . . . . . . . . 56
   April 12, 2021 . . . . . . . . . . . . . . . . . . . . . . . . 59
   April 13, 2021 . . . . . . . . . . . . . . . . . . . . . . . . 66
   April 14, 2021 . . . . . . . . . . . . . . . . . . . . . . . . 75
   April 15, 2021 . . . . . . . . . . . . . . . . . . . . . . . . 80
   April 16, 2021 . . . . . . . . . . . . . . . . . . . . . . . . 82
   April 17, 2021 . . . . . . . . . . . . . . . . . . . . . . . . 95

V. **ALLEGATIONS** . . . . . . . . . . . . . . . . . . . .97
A. Plaintiff Bjorn Iverson. . . . . . . . . . . . . . . . . . . . . 97

B. Defendant City of Brooklyn Center . . . . . . . . . . 129

C. Defendant Mayor Elliot . . . . . . . . . . . . . . . . . . . 135

D. Defendant Interim Chief Gruenig . . . . . . . . . . . 145

E. Defendant Hennepin County . . . . . . . . . . . . . . . 152

F. Defendant Sheriff Hutchinson. . . . . . . . . . . . . . .157

G. Defendant Chief Deputy Martin . . . . . . . . . . . 168

H. Defendant Commissioner Harrington . . . . . . . . 175

I. Defendant Assistant Commissioner Hodges . . . . 187

J. Defendant Matthew Langer . . . . . . . . . . . . . . . . 195

K. Defendant Major Dwyer . . . . . . . . . . . . . . . . 204

L. Defendant Chief Revering . . . . . . . . . . . . . . . . . 216

M. State Defendants . . . . . . . . . . . . . . . . . . . . . . . .224

N. MACC and MACC Defendants . . . . . . . . . . . . .233

VI. **CAUSES** *of* **ACTION** . . . . . . . . . . . . . . 254
   Count I (First Amendment). . . . . . . . . . . . . . . 254
   Count II (Retaliation). . . . . . . . . . . . . . . . . . . 265
   Count III (Fourth Amendment). . . . . . . . . . . . 276
   Count IV (Fourteenth Amendment) . . . . . . . . 293
   Count V (Failure to Intervene) . . . . . . . . . . . . 299
   Count VI (Failure to Train/Supervise) . . . . . . 304
   Count VII (Monell Policy/Practice/Custom). . 312
   Count VIII (Civil Conspiracy) . . . . . . . . . . . . 318
   Count IX (State-created Danger) . . . . . . . . . . 323
   Count X (Negligence/Negligence Per Se) . . . . 326
   Count XI (Assault) . . . . . . . . . . . . . . . . . . . . . 328
   Count XII (Battery) . . . . . . . . . . . . . . . . . . . . . 331
   Count XIII (IIED) . . . . . . . . . . . . . . . . . . . . . 334

VII. **PRAYER** *for* **RELIEF** . . . . . . . . . . . . . . 337

## I. **INTRODUCTION**

Law enforcement in Minnesota has a longstanding track record of retaliating against members of the press, by intentionally targeting them time and time again, in a variety of ways, during episodes of civil unrest.

The protections owed to the press under the First Amendment—designed to prevent abhorrent, shocking, and thuggish behavior in the form of intimidation, unlawful arrests, assaults, batteries, use of chemical sprays, and less-lethal projectiles—was tossed aside and completely ignored in May 2020, and again in April 2021, when journalists arrived on scene to report on matters of public concern: protests, civil unrest, and the response by law enforcement. Without journalists present to document these newsworthy events, both public accountability and informed public debate are severely limited.

Defendants acted in concert to carry out continuing, widespread, and persistent unconstitutional abuses against members of the press. An unimaginable combination—including conspiracy, misconduct, assaults, batteries, failure to intervene, negligence, and the deliberate indifference to it all—was made complete with a total failure of training, supervision, and the discipline necessary to rein in the misconduct purported by the very people sworn to protect and serve. All of these actions, occurring under the color of law, are made worse by the fact there was ample opportunity and multiple points in time where these incidents of misconduct could have been—but was not—prevented by the Defendants.

Tacit authorization of this misconduct by policymakers, command staff, and supervisors directly contributed to unconstitutional polices-in-practice and customs that

3

directed law enforcement agents as they worked together, in coordinated fashion, through a cohesive singular operating unit known as MACC, the Multi-Agency Command Center.

After the George Floyd protests, MACC planned and executed a joint law enforcement operation called "Operation Safety Net" with a mission to quell any future civil unrest and protect property at any and all costs; this included the right to be free from excessive force, the right of due process, and freedom of the press.

Law enforcement agents abandoned their department policies, and instead conformed to MACC's customs and *de facto* policies that were established during the George Floyd protests in 2020. To facilitate their mission goals, without pesky constitutional rights getting in the way, MACC was designed to act as a cloak, masking each participant, and created an inability to easily identify which agency is involved in a particular instance of misconduct. This cloak allows MACC participants to point fingers, deny responsibility, and assists MACC participants in the prevention of justice for their victims.

The perverse and conscious-shocking law enforcement response was allowed to exist by Defendants and led to the deprivation of civil rights and cruel abuse that directly caused serious injuries, pain, suffering, and mental harm to the Plaintiff.

## II. PARTIES

1.      Plaintiff Bjorn Iverson ("Plaintiff") is, at all times relevant to this Complaint, a freelance independent photojournalist, and a Minnesota resident.

4

2. Plaintiff is, at all times relevant to this Complaint, part of a limited, precisely identifiable group—journalists, reporters, news media, photojournalists, and videojournalists—which are collectively identified as "members of the press" in this Complaint.

3. Defendant City of Brooklyn Center ("City") is a municipality duly incorporated under laws of the State of Minnesota and located in Hennepin County. The Brooklyn Center Police Department ("BCPD") is an agency of the City of Brooklyn Center.

4. Defendant Mike Elliot is, at all times relevant to this Complaint, the Mayor of Brooklyn Center ("Mayor Elliot"). Mayor Elliot is a Minnesota citizen, sued in his individual and official capacity for his misconduct under color of law.

5. Defendant Tony Gruenig is, at all times relevant to this Complaint, the Interim Chief of the Brooklyn Center Police Department ("Interim Chief Gruenig"), with supervisory responsibility over the Brooklyn Center Police Department. Interim Chief Gruenig is a Minnesota citizen, sued in his individual and official capacity for his misconduct under color of law.

6. Collectively, the City of Brooklyn Center, Mayor Elliot, and Interim Chief Gruenig are referred to as "City Defendants" in this Complaint.

7. Defendant Hennepin County ("County") is a municipality duly incorporated under the laws of the State of Minnesota. The Hennepin County Sheriff's Office ("HCSO") is an agency of Hennepin County.

5

8.    Defendant David P. Hutchinson is, at all times relevant to this Complaint, the Hennepin County Sheriff ("Sheriff Hutchinson") with supervisory responsibility over HCSO. Sheriff Hutchinson is a Minnesota citizen, sued in his individual and official capacity for his misconduct under color of law.

9.    Defendant Tracey Martin is, at all times relevant to this Complaint, the Hennepin County Sheriff's Office Chief Deputy ("Chief Deputy Martin") and shares supervisory responsibility with Sheriff Hutchinson over HCSO deputies. Chief Deputy Martin is a Minnesota citizen, sued in her individual and official capacity for her misconduct under color of law.

10.    Collectively, Hennepin County, Sheriff Hutchinson, and Chief Deputy Martin are referred to as "County Defendants" in this Complaint.

11.    Collectively, the City of Brooklyn Center and Hennepin County are referred to as "Municipal Defendants" in this Complaint.

12.    Defendant John Harrington is, at all times relevant to this Complaint, the Minnesota Department of Public Safety Commissioner ("Commissioner Harrington") with supervisory responsibility over the Department of Public Safety ("DPS"), and the Minnesota State Patrol ("MSP"). Commissioner Harrington is a Minnesota citizen, sued in his individual capacity for his misconduct under color of law.

13.    Defendant Booker Hodges is, at all times relevant to this Complaint, the Minnesota Department of Public Safety Assistant Commissioner ("Assistant Commissioner Hodges") and shares supervisory responsibility with Commissioner

6

Harrington over DPS and MSP. Assistant Commissioner Hodges is a Minnesota citizen, sued in his individual capacity for his misconduct under color of law.

14.     Defendant Matthew Langer is, at all times relevant to this Complaint, Chief in command of the Minnesota State Patrol with supervisory responsibility ("Colonel Langer"). Colonel Langer is a Minnesota citizen, sued in his individual capacity for his misconduct under color of law.

15.     Defendant Joseph Dwyer is, at all times relevant to this Complaint, a senior officer at the Minnesota State Patrol ("Major Dwyer"), and commands the MSP Mobile Response Team ("MRT"), which has primary responsibility at the agency for responding to protests and episodes of civil unrest. Major Dwyer is a Minnesota citizen, sued in his individual capacity for his misconduct under color of law.

16.     Collectively, Commissioner Harrington, Assistant Commissioner Hodges, Colonel Langer, and Major Dwyer are referred to as "State Defendants" in this Complaint.

17.     Defendant Stephanie Revering is, at all times relevant to this Complaint, Crystal Police Department's Chief of Police ("Chief Revering"), and President of the Hennepin County Chiefs of Police Association ("HCCPA") with final policymaking authority over HCCPA's West Metro Command ("WMC"). Chief Revering is a Minnesota citizen, sued in her individual and official capacity for her misconduct under color of law.

18.     Collectively, Commissioner Harrington, Assistant Commissioner Hodges, Colonel Langer, Major Dwyer, Sheriff Hutchinson, Chief Deputy Martin, Mayor Elliot, Interim Chief Gruenig, and Chief Revering, are referred to as "Command Defendants" in this Complaint.

7

19.     The Multi-Agency Command Center ("MACC") is, at all times relevant to this Complaint, an unincorporated organization of State, County, and Municipal law enforcement agencies acting in concert and in coordinated fashion. Operation Safety Net ("OSN") is a joint law enforcement operation that was planned, deployed, executed, and supervised by MACC. Collectively, Command Defendants combined with the Municipal Defendants named above, are referred to as "MACC Defendants" in this Complaint. MACC Defendants solely possess the discovery necessary to identify the individual John Doe Defendants (collectively, "MACC law enforcement agents") below.

20.     Defendant John Doe #1 is, at all times relevant to this Complaint, an unidentified employee of—on information and belief—the Hennepin County Sheriff's Office who committed the acts and omissions set forth below as a law enforcement agent working in active concert with MACC Defendants. John Doe #1 was acting within the course and scope of his official duties and in accordance with the customs, policies, and practices of both his agency and the MACC. On belief, he is a citizen of Minnesota, sued in his individual and official capacity for his misconduct under color of law.

21.     Defendants John Does #2-5 are, at all times relevant to this Complaint, unidentified employees of an unknown law enforcement agency who committed the acts and omissions set forth below as law enforcement agents working in active concert with MACC Defendants (collectively, "Targeting Agents"). The Targeting Agents were acting within the course and scope of their official duties and in accordance with the customs, policies, and practices of both their agency and the MACC. On belief, they are citizens of

8

Minnesota, sued in their individual and official capacity for their misconduct under color of law.

22. Defendants John Does #6-8 are, at all times relevant to this Complaint, unidentified employees of an unknown law enforcement agency who committed the acts and omissions set forth below as law enforcement agents working in active concert with MACC Defendants (collectively, "Onlooking Agents"). The Onlooking Agents were acting within the course and scope of their official duties and in accordance with the customs, policies, and practices of both their agency and the MACC. On belief, they are citizens of Minnesota, sued in their individual and official capacity for their misconduct under color of law.

23. Defendants John Does #11-13 are, at all times relevant to this Complaint, unidentified employees of an unknown law enforcement agency who committed the acts and omissions set forth below as law enforcement agents working in active concert with MACC Defendants (collectively, "Assault Agents"). The Assault Agents were acting within the course and scope of their official duties and in accordance with the customs, policies, and practices of both their agency and the MACC. On belief, they are citizens of Minnesota, sued in their individual and official capacity for their misconduct under color of law.

24. Defendant John Doe #16 is, at all times relevant to this Complaint, an unidentified employee of an unknown law enforcement agency who committed the acts and omissions set forth below as a law enforcement agent working in active concert with MACC Defendants. John Doe #16 was acting within the course and scope of his official

9

duties and in accordance with the customs, policies, and practices of both his agency and the MACC. On belief, he is a citizen of Minnesota, sued in his individual and official capacity for his misconduct under color of law.

25.     Defendants John Does #9-10 and #14-15 are, at all times relevant to this Complaint, unidentified employees of an unknown law enforcement agency with supervisory responsibility over John Does #1-8, #11-13, and #16, and who committed the acts and omissions set forth below as law enforcement agents working in active concert with MACC Defendants (collectively, "Supervisory Agents"). The Supervisory Agents were acting within the course and scope of their official duties and in accordance with the customs, policies, and practices of both their agency and the MACC. On belief, they are citizens of Minnesota, sued in their individual and official capacity for their misconduct under color of law.

26.     Defendants John Does #17-100 are, at all times relevant to this Complaint, unidentified employees of an unknown law enforcement agency, and who committed the acts and omissions set forth below as law enforcement agents working in active concert with MACC Defendants and/or worked together with Defendants to effectuate the harm complained of herein. John Does #17-100 were acting within the course and scope of their official duties and in accordance with the customs, policies, and practices of both their agency and the MACC. On belief, they are citizens of Minnesota, sued in their individual and official capacity for their misconduct under color of law.

## III. JURISDICTION *and* VENUE

27. The Plaintiff brings these claims before the Court pursuant to 42 U.S.C. § 1983, the First, Fourth, and Fourteenth Amendments to the United States Constitution.

28. Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 because the Plaintiff's actions arise under the Constitution of the United States and federal law, and § 1343(a)(3) providing redress for the deprivation of rights secured by the Constitution of the United States.

29. Venue is proper in the United States District Court, District of Minnesota, pursuant to 28 U.S.C. § 1391(b)(2) because all of the events giving rise to the claims occurred in Hennepin County and the municipality of Brooklyn Center, Minnesota.

30. This Court has supplemental jurisdiction over the included Minnesota state law claims pursuant to 28 U.S.C. § 1367.

## IV. FACTUAL BACKGROUND

### A. POLICE OFFICER MURDERS GEORGE FLOYD AND THE PUBLIC RESPONSE

31. On May 25, 2020, George Floyd, a 46-year-old black man, was arrested and subsequently murdered in Minneapolis, Minnesota after Minneapolis Police Officer Derek Chauvin pressed his knee on Mr. Floyd's neck for eight minutes and forty-six seconds.[1]

---

[1] *8 Minutes and 46 Seconds: How George Floyd Was Killed in Police Custody*, NY TIMES (June 8, 2020), https://nytimes.com/2020/05/31/us/george-floyd-investigation.html

32.    The events of Mr. Floyd's arrest and murder was captured on video by multiple bystanders, as well as individual officers' body cameras, and these videos were rapidly disseminated around the world via social media and news media platforms. George Floyd's murder became international breaking news.

33.    Protests against police brutality ignited across the United States,[2] including Minnesota. This public unrest also became international breaking news, which in turn, led to more on-the-ground journalists documenting and reporting on the civil unrest itself, and law enforcement's response to this civil unrest.

34.    Law enforcement leaders—including but not limited to Commissioner Harrington, Colonel Langer, and Sheriff Hutchinson—joined together and created a "Multi-Agency Command Center" ("MACC") to coordinate all of law enforcement's response to the civil unrest following the death of George Floyd.

35.    In addition to MACC confronting civilian demonstrators, some of the MACC Defendants also aggressively confronted members of the press providing on-the-scene coverage. Numerous journalists reported injuries sustained as a result of MACC's use of riot control tactics and use of force against clearly identifiable members of the press,[3] and triggered numerous lawsuits to be filed in District Court.[4]

---

[2] *Map: Protests and rallies for George Floyd spread across the country*, NBC NEWS (June 12, 2020), https://nbcnews.com/news/us-news/map-protests-rallies-george-floyd-spread-across-country-n1220976

[3] https://pressfreedomtracker.us

[4] *Goyette*, Case No. 20-CV-1302; *Tirado*, Case No. 20-CV-1338; *Cole*, Case No. 21-CV-1282; *Cooper*, Case No. 21-CV-1294

12

36.     These lawsuits and reports document a continuing, widespread, and persistent pattern of unconstitutional misconduct against members of the press during the George Floyd protests—by MACC's law enforcement agents—pursuant to a *de facto* policy, practice, and/or custom of targeting and retaliating against the press established by MACC policymakers and supervisors. These retaliatory actions against members of the press include, but are not limited to:

  i. shooting them with less-lethal munitions or other ballistic projectiles;

  ii. hitting them with a baton;

  iii. spraying them with chemical irritants;

  iv. grabbing, pushing, shoving, and/or tackling them;

  v. detaining and/or arresting them;

  vi. threatening use of force against them and/or threatening them with arrest; and

  vii. disparaging comments about their press passes and/or their exemption from curfew.

Every law enforcement agent who committed these acts of unconstitutional conduct did so under color of law, in concert and coordinated fashion, with MACC and MACC's law enforcement agents.

37. In one high-profile incident, a CNN correspondent was arrested on national television[5] and was only released after Minnesota Governor Tim Walz ("Governor Walz") intervened.[6]

38. Governor Walz acknowledged that law enforcement has "got to ensure that there is a safe spot for journalism to tell this story."[7] Despite Governor Walz's assurances that the role of the press would be fostered and respected, law enforcement continued to target and intimidate members of the press in a concerted effort to chill protected First Amendment activity through not only the rest of the George Floyd protests, but also during the Daunte Wright protests that occurred less than a year later.

## B.   MINNESOTA GOVERNOR ESTABLISHES CURFEWS BY EXECUTIVE ORDER EXEMPTING THE PRESS

39. In response to the tensions building in the Twin Cities during the George Floyd protests, Governor Walz activated the Minnesota National Guard on May 28, 2020 and by 11:30 p.m. that same day, the Minnesota State Patrol announced that its troopers were actively supporting efforts in Minneapolis and St. Paul.

40. Governor Walz also signed Executive Order 20-64, and declared a peacetime state of emergency which activated the Minnesota National Guard ("MNG").[8] The MNG

---

[5] https://apnews.com/cadfe65c7ce593d04c0aef7eb0276e22

[6] https://startribune.com/cnn-reporter-arrested-on-live-tv-let-go-after-gov-tim-walz-intervened/570860202/

[7] https://cnn.com/2020/05/29/politics/tim-walz-minnesota-cnn-arrest/index.html

[8] *Emergency Executive Order 20-64, Activating the Minnesota National Guard and Declaring a Peacetime Emergency to Provide Safety and Protection to the People of*

14

confirmed that more than 500 soldiers would respond to Minneapolis, St. Paul, and the surrounding communities.[9]

41. Over the next few days, the Governor issued a series of executive orders on May 29,[10] May 31,[11] June 1,[12] and June 3,[13] all implementing curfews for the cities of Minneapolis and St. Paul (the "Executive Orders").

42. Notably, "[a]ll ... members of the news media ... are exempt from the curfew" that prohibited persons from travel on any public street or place.

43. The City of Minneapolis implemented a nearly identical curfew order that also exempted members of the press.

44. Throughout the duration of the protests, both before and after the Governor and the City of Minneapolis activated their curfew orders, State and County Defendants

*Minneapolis, St. Paul, and Surrounding Communities* (May 28, 2020),
https://mn.gov/governor/assets/EO%2020-64%20Final_tcml055-433855.pdf

[9] *Over 500 National Guard soldiers activated to amid protests regarding George Floyd's death; Frey declares a state of emergency in Minneapolis*, KSTP EYEWITNESS NEWS (May 28, 2020), https://kstp.com/news/minnesota-national-guard-activated-to-control-protests-following-george-floyds-death/5743967/

[10] *Emergency Executive Order 20-65, Implementing a Temporary Nighttime Curfew in the Cities of Minneapolis and Saint Paul* (May 29, 2020),
https://mn.gov/governor/assets/EO%2020-65%20Final_tcml055-434635.pdf

[11] *Emergency Executive Order 20-68, Extending the Temporary Nighttime Curfew in the Cities of Minneapolis and Saint Paul* (May 31, 2020),
https://mn.gov/governor/assets/EO%2020-68%20Final_tcml055-434305.pdf

[12] *Emergency Executive Order 20-69, Extending the Temporary Nighttime Curfew in the Cities of Minneapolis and Saint Paul* (June 1, 2020),
https://mn.gov/governor/assets/EO%2020-69%20Final_tcml055-434605.pdf

[13] *Emergency Executive Order 20-71, Extending the Temporary Nighttime Curfew in the Cities of Minneapolis and Saint Paul* (June 3, 2020),
https://mn.gov/governor/assets/EO%2020-68%20Final_tcml055-434632.pdf

communicated and acted in concert with one another in responding to the George Floyd protests and in committing multiple constitutional violations against members of the press.

45.     The command staffs of State and County Defendants acted in concert during the George Floyd protests, maintaining regular communication and coordinating operations regarding crowd control technologies, tactical deployment of troopers and deputies, in addition to the protest responses that resulted in the violation of constitutional rights of members of the press and—in some cases—their unconstitutional arrest, transport, and/or detainment.

46.     State and County Defendants coordinated law enforcement activities during the protests, in part, through the Multi-Agency Command Center set up to respond to the George Floyd protests. Per the Department of Public Safety:

> The MACC serves as a unified command of federal, state and local law enforcement and public safety agencies supporting the state's response to any unrest that develops following the death of George Floyd. Agencies represented in the MACC include the Minnesota Department of Public Safety (State Patrol, Bureau of Criminal Apprehension, Alcohol and Gambling Enforcement, Division of Homeland Security and Emergency Management, State Fire Marshal division, Minnesota State Patrol); National Guard; Minneapolis Police Department; Saint Paul Police Department; Metro Transit Police; Bloomington Police; University of Minnesota Police; Sheriff departments from Ramsey County, Hennepin County, Anoka County, Dakota County, Washington County; and the FBI.[14]

47.     According to legislative testimony on July 9, 2020 from Commissioner Harrington, functional control of all law enforcement agencies responding to the protests devolved to the Department of Public Safety and ultimately to Commissioner Harrington,

---

[14] https://dps.mn.gov/divisions/ooc/news-releases/Pages/multi-agency-command-center-report-on-civil-unrest.aspx

16

with the sole exception of the Minneapolis Police Department ("MPD").[15] Per Commissioner Harrington, the State Patrol and other agencies under command of the Department of Public Safety acted "in concert" with the MPD. Senior officials from MPD were always present at the MACC to facilitate coordination with the Minnesota State Patrol and the other state agencies minute-by-minute as the protests unfolded.

48.    Like their command staffs, law enforcement agents in the field—MPD officers, MSP troopers, HCSO deputies, MNG soldiers, and others—worked literally side-by-side and/or in concert with one another on the ground while responding to the George Floyd protests.[16]

49.    In another instance of the coordinated law enforcement response to the Floyd protests by multiple law enforcement agencies, according to Anoka County Sheriff's Lieutenant Andy Knotz ("Lt. Knotz"), when deputies from Anoka County arrived on scene, they followed state orders, joined the patrol, and cut the tires on vehicles on Washington Avenue.[17]

---

[15] http://mnsenate.granicus.com/player/clip/5416?view_id=1

[16] E.g.
https://media.vanityfair.com/photos/5ed72084d991ee5f708bd991/master/w_1600%2Cc_l imit/george-floyd-protests-minneapolis-montgomery-18.jpg.
https://reason.com/2020/06/08/video-shows-cops-slashing-tires-across-minneapolis-during-george-floyd-protests/

[17] Paul Walsh, *Officers slashed tires on vehicles parked amid Minneapolis protests, unrest*, Star Tribune (June 11, 2020, 8:26 a.m.), https://startribune.com/officers-slashed-tires-on-vehicles-parked-during-mpls-protests-unrest/571105692/

50. Lt. Knotz said their deputies got their directions from the MACC and also confirmed that the MACC was coordinating law enforcement during the protests connected to George Floyd's death.[18]

51. The Minneapolis Police Department maintains an intelligence arm, named the Strategic Information Center, which continually monitors social media activity, live streams, and other digital sources of information. This Strategic Information Center played an integral part in MACC and MACC's law enforcement response.

52. The Hennepin County Sheriff's Office played a key role in effectuating the unlawful and unconstitutional arrests of journalists during the George Floyd protests. HCSO took custody of and transported unlawfully arrested—or otherwise detained— members of the press to jail. The HCSO operates and administers the Hennepin County Adult Detention Center ("Jail"), at which a number of unlawfully arrested journalists were processed, detained, and/or issued citations.[19]

## C. STATE AND COUNTY DEFENDANTS' UNCONSTITUTIONAL ACTIONS AGAINST THE PRESS COVERING THE GEORGE FLOYD PROTESTS

53. Even though Executive Orders expressly exempted members of the news media from the curfew, State and County Defendants ignored the exemption.

---

[18] *supra,* n.17

[19] *Goyette,* Case No. 20-CV-1302, ECF No. 333, "Answer No. 2"; *see also Goyette*, ECF No. 219-2, "Exhibit B"

18

54. Even when members of the press clearly identified themselves, State and County Defendants continued to target and intimidate the press by threatening them, spraying them with chemical irritants, and firing less-lethal ballistics designed for riot control directly at them. State and County Defendants further interfered with the news media's right to cover public events by arresting journalists despite the lack of any probable cause to do so, refusing access to areas where events unfolding, and creating obstacles to reporters' movement about the city. These incidents constitute flagrant infringements on the constitutional rights of individual reporters as well as the public's interest in the dissemination of accurate information and accountability of government for its actions.

55. The State and County Defendants unconstitutional arrest and detention of journalists was widespread and involved numerous different individual troopers, deputies, commanders, and supervisors throughout the Minnesota State Patrol, Hennepin County Sheriff's Office, and other law enforcement agencies involved with MACC. The number and scope of the violations reflects DPS, MSP, HCSO, and MACC's ongoing failure to train and supervise their troopers, deputies, employees, and/or agents.

56. The violence, intimidation, detention, and arrest of journalists—separately and collectively—had, and is continuing to have, a chilling effect on the First Amendment rights of members of the press, as well as other individuals seeking to lawfully exercise their First Amendment rights in the State of Minnesota.

57. The unlawful actions by MACC and their law enforcement agents during the George Floyd protests in 2020 include, but are not limited to, the following incidents:

19

## *MAY 26, 2020*

58.     On May 26, Star Tribune reporter Andrew Mannix was shot in the thigh with a less-lethal projectile by law enforcement while documenting the protests.[20]

## *MAY 27, 2020*

59.     On May 27, Max Nesterak—a reporter for the Minnesota Reformer—was shot in the chest with a less-lethal projectile by law enforcement while filming the protests, even though no protesters were near him when he was shot.[21]

60.     On May 27, freelance journalist Jared Goyette was observing and documenting near MPD's Third Precinct, where MPD officers were firing less-lethal ballistic ammunition, marker rounds, and tear gas intermittently and without warning or orders for dispersal. Even though Goyette was clearly identifiable as a member of the press, MPD officers shot him in the face with a less-lethal projectile. Goyette was standing alone with no one else within several feet, and was provided no warning for this use of force.[22]

61.     These early law enforcement attacks on journalists were widely documented on social media and covered by the press, including Time Magazine, and put Defendants on notice that law enforcement was targeting journalists with less-lethal projectiles and violating journalists' constitutional rights.[23]

---

[20] https://twitter.com/AndrewMannix/status/1265447846079315973

[21] https://twitter.com/maxnesterak/status/1265863514754813952

[22] *Goyette*, ECF No. 228 at 187-192; *see also* "Declaration of Jared Goyette"

[23] *E.g.*, https://time.com/5843070/george-floyd-minneapolis-protest-police-death/ ("A Minneapolis Star Tribune reporter said he was shot in the thigh with what appeared to be a foam bullet.")

20

## *MAY 28, 2020*

62.    On May 28, freelance journalist, photographer and filmmaker Katie Nelson and videographer Michael Shum—both on assignment for the New York Times—were covering the Floyd protests when law enforcement began lobbing tear gas and flash-bang grenades into the crowd they were filming. Despite being clearly identifiable as members of the press and with no protesters near them, law enforcement intentionally targeted Nelson and Shum several times with tear gas canisters and flash-bang grenades. At the time, Shum was filming the protests with large commercial camera gear and Nelson was standing with her arms up while holding a large professional long-lens camera, yelling "we're press" at law enforcement. Some of those munitions exploded right in front of Shum's large shoulder-mounted camera. Nelson submitted, under penalty of perjury, a declaration of these events in *Goyette*.[24]

63.    Shum, at some time later and still at a distance from any protesters, was now with a group of other journalists gathered nearby—including a Star Tribune photographer—when law enforcement gave no warning or an order to disperse before opening fire on Shum. One projectile ricocheted off a wall or the ground and hit Shum in the side, and a second projectile hit him directly in the foot, injuring him.[25]

64.    On May 28, Star Tribune columnist Jennifer Brooks was standing at a light rail station documenting the protests, and was in a group with other members of the press.

---

[24] *Goyette*, "Declaration of Katie G. Nelson"

[25] *Goyette*, "Declaration of Michael Shum"

21

Several Minneapolis Police Department squad cars drove by unimpeded. Then MPD Squad Car 181 passed the journalists, and the driver rolled the window down before indiscriminately pepper-spraying Brooks and other members of the press.[26]

## *MAY 29, 2020*

65.     On May 29, freelance photographer Philip Montgomery was covering the protests at the Third Precinct and was standing away from protesters with a group of other news photographers from news organizations such as Getty Images, New York Times, Associated Press, and Reuters.[27] All of the photographers had their press badges out and visible, and all were documenting the protests with their professional photography gear. Collectively, the group was clearly identifiable as journalists and was not standing amidst or near the protesters, nor were they obstructing any crowd control activity being undertaken by law enforcement. At that same time, without warning, a group of law enforcement agents—including MSP troopers—moved in front of the small cluster of photographers and began to advance. As they closed in on the photographers, they fired tear gas canisters and rubber bullets directly into the group. One agent advanced until he was roughly 15 feet away, raised and pointed his riot control gun at Montgomery, and fired a less-lethal projectile into his chest. The agent aimed directly at Montgomery even though he was clearly identifiable as a member of the press. The force of the blow shocked

---

[26] https://twitter.com/stribrooks/status/1266186985041022976

[27] *Goyette*, "Declaration of Phillip Montgomery"

Montgomery, and created a large, long-lasting bruise where he was hit directly over his heart. The injury affected his ability to continue documenting and reporting on the protests.

66. The other photographers in the group were also hit, and it was clear law enforcement targeted the group even though they were obviously journalists, not provoking or obstructing law enforcement, merely standing peaceably to the side exercising their First Amendment rights. One of these photographers, John Minchillo from the Associated Press, was wearing a vest with "PRESS" written on the front in large letters. Stated in a social media post, "No distinctions were made ... when I and my colleagues were hit by officers. Last night was full force in a wide spread. This is a protocol that I have not seen elsewhere."[28]

67. On May 29, USA Today reporter Tyler Davis was covering the protests in downtown Minneapolis, when several squad cars pulled up at his location. Law enforcement agents got out and began indiscriminately spraying pepper-spray in every direction and telling people to move north. Davis was filming two young women being pepper-sprayed to his left, when the agent doing the spraying turned to him. Davis identified himself as a member of the press, and the agent "laid on the trigger for a few seconds" spraying Davis directly in the face.[29]

---

[28] https://twitter.com/johnminchillo/status/1267116569223725059

[29] https://usatoday.com/story/opinion/2020/05/29/george-floyd-protests-leave-usa-today-reporter-hit-chemical-spray/5282374002

23

68.     On May 29, a Minnesota State Patrol trooper handcuffed and arrested CNN
reporter Omar Jimenez and his news crew during a live broadcast.[30] It was daytime, there
were no protesters around, and the reporter asked MSP where they should position
themselves prior to being arrested. When the reporter asked the trooper making the arrest
why he was being arrested, the trooper stated, "Look, I don't know man, I'm just following
orders." The crew was readily identifiable as a CNN news crew and identified themselves
as such repeatedly before being handcuffed and arrested.[31] Later that day, in response to
this arrest, Governor Walz issued a statement saying "the protection and security and safety
of the journalists covering [the protests] is a top priority[.]"[32] Governor Walz's apology
and plea to law enforcement to treat members of the press with respect and allow them to
document the protests clearly fell on deaf ears, as the unconstitutional arrests and unlawful
violence against members of the press escalated significantly.

## *MAY 30, 2020*

69.     By this time, the agencies participating in MACC's response to the Floyd
protests had notice of this widespread and persistent pattern of unconstitutional misconduct
against members of the press. This notice came from multiple sources, including traditional
media attention and news coverage, direct outreach from journalists, social media and
monitoring by MPD's Strategic Information Center. On at least two occasions, reporters

---

[30] https://youtube.com/watch?v=ftLzQefpBvM

[31] https://nytimes.com/2020/05/29/business/media/cnn-reporter-arrested-omar-jimenez.html

[32] https://washingtonpost.com/opinions/2020/05/29/minnesota-governor-issues-spectacular-apology-arrest-cnn-crew/

working for the Freedom of the Press Foundation's "U.S. Press Freedom Tracker" contacted the Minneapolis Police Department seeking comment on four of the specific instances of violence against journalists detailed above. A request for comment on the Mannix, Georgiades, and unidentified journalist incidents sent to MPD's Public Information Officer John Elder was not answered.[33]

70.     On May 30, freelance journalist Linda Tirado was photographing the protests when law enforcement shot her in the face with a less-lethal projectile and is now permanently blind in her left eye.[34] She stated in an interview with the New York Times, "I would say there is no way that anyone had looked at me and not known that I am a working journalist" and that "police have been pretty clear that they don't care if you are a working journalist."[35] On June 10, 2020, Tirado filed a federal lawsuit regarding her assault.[36]

71.     On May 30, law enforcement fired less-lethal projectiles at CBS reporter Michael George and his news crew, hitting sound engineer John Marschitz and severely

---

[33] U.S. Press Freedom Tracker, *Journalists struck by projectiles while covering Minneapolis protest* (May 26, 2020), https://pressfreedomtracker.us/all-incidents/journalists-struck-projectiles-while-covering-minneapolis-protest/; U.S. Press Freedom Tracker, *Journalists hit with 'less lethal' rounds during second day of Minnesota protests,* (May 27, 2020), https://pressfreedomtracker.us/all-incidents/journalists-hit-less-lethal-rounds-during-second-day-minnesota-protests/

[34] https://nbcnews.com/think/opinion/i-came-cover-aggression-minneapolis-then-i-became-victim-it-ncna1221241

[35] https://nytimes.com/2020/05/30/us/minneapolis-protests-press.html

[36] *Tirado v. City of Minneapolis*, Case No. 20-CV-1338

25

bruising his arm.[37] The crew was not standing within 500 feet of any protesters at the time, had their press credentials displayed, and their professional cameras out.[38] In a video of the incident, one of the crew members can be heard saying "they're sighting us in" as the less-lethal projectiles came closer and closer.[39]

72.     On May 30, law enforcement agents fired less-lethal projectiles at MSNBC reporter Ali Velshi and his news crew, hitting Velshi in the leg.[40] After this incident, agents confronted Velshi and another TV crew in a nearly deserted parking lot. The group informed law enforcement that they were news media. The agents responded, "we don't care," and began firing on the group with less-lethal projectiles.

73.     On May 30, a Fox 9 TV news crew was driving in their news van, with a placard placed on their windshield clearly indicating that the van belonged to Fox 9 News, when law enforcement fired less-lethal projectiles into the windshield, shattering it.

74.     On May 30, Reuters TV cameraman Julio-Cesar Chavez was filming law enforcement when one law enforcement agent aimed a less-lethal projectile gun directly at

---

[37] https://twitter.com/MikeGeorgeCBS/status/1266919447970942986

[38] https://twitter.com/MikeGeorgeCBS/status/1266916104951214080

[39] https://washingtonpost.com/politics/police-turn-more-aggressive-against-protesters-and-bystanders-alike-adding-to-violence-and-chaos/2020/05/31/588ad218-a32f-11ea-b619-3f9133bbb482_story.html

[40] https://washingtonpost.com/lifestyle/media/journalists-at-several-protests-were-injured-arrested-by-police-while-trying-to-cover-the-story/2020/05/31/bfbc322a-a342-11ea-b619-3f9133bbb482_story.html;
https://twitter.com/zacbears/status/1266929072560582658;
https://hollywoodreporter.com/news/msnbcs-ali-velshi-covering-protests-press-attacks-we-exist-to-hold-power-account-1296797

26

Chavez. Later that evening, in a separate incident, law enforcement fired directly at Chavez and his crew with less-lethal projectiles. Chavez was struck in the arm and neck by less-lethal projectiles fired by one or more MPD officers as he took cover at a gas station in southwest Minneapolis.[41] At the time, they were clearly identifiable as members of the press.[42]

75.     On May 30, law enforcement pepper-sprayed photojournalist Lucas Jackson in the face and also shot him in the back with a less-lethal projectile.[43] Jackson stated in a social media post, "It's not that we were being shot because we were between cops and protesters. It's that we were shot at if we were anywhere in line of sight. I've been hit because I was in the wrong place before. I've never been aimed at so deliberately so many times when I was avoiding it."[44]

76.     On May 30, law enforcement hit Canadian Broadcasting Corporation senior news correspondent Susan Ormiston in the shoulder with a less-lethal projectile and in the back with a tear gas canister. At the time they shot her, she was in a parking lot that had been cleared of protesters, and she and her crew were clearly identifiable as media with their television camera clearly visible.[45]

---

[41] https://reuters.com/article/us-minneapolis-police-protest-update/reuters-camera-crew-hit-by-rubber-bullets-as-more-journalists-attacked-at-us-protests-idUSKBN237050

[42] https://washingtonpost.com/lifestyle/media/journalists-at-several-protests-were-injured-arrested-by-police-while-trying-to-cover-the-story/2020/05/31/bfbc322a-a342-11ea-b619-3f9133bbb482-story.html

[43] https://twitter.com/Lucas_Jackson_/status/1266666583012892672

[44] https://twitter.com/Lucas_Jackson_/status/1267114291532046338

[45] https://twitter.com/mcquillanator/status/1266915485741993996

27

77.     On May 30, an MPD officer fired a flash-bang grenade directly into an MSNBC news crew led by reporter Morgan Chesky, despite the fact that Chesky was live on television and he and his news crew were clearly identifiable as news media.[46]

78.     On May 30, law enforcement shot a Univision cameraman who was clearly identifiable as a member of the press with a less-lethal projectile. The projectile hit the battery used to power his large commercial video camera, and the battery exploded, burning the cameraman.

79.     On May 30, Katie Nelson and Michael Shum were once again covering the protests for the New York Times. Michael Shum was again filming with a large shoulder-mounted camera and clearly acting as a member of the press. After MSP troopers pushed down the block, firing tear gas and projectiles, he and other journalists—including NBC photojournalist Edward Ou—took shelter in a triangle-shaped alcove off the sidewalk. As the troopers approached, Nelson realized there was no exit from the alcove, and fled back out onto the street as law enforcement agents fired rubber bullets at her. Shum remained in the alcove, continuing to film as the troopers approached. After troopers started to pursue the journalists, it was clear to Shum that law enforcement was attacking journalists with impunity, and eventually Shum turned to try and escape the area. Shum climbed onto a half wall hoping that, if he got to the other side, he would be protected from attack by law enforcement. As he climbed onto the wall, two State Patrol troopers—knowing he was a journalist—shoved him off the wall, with one of the troopers saying "get the fuck off of

---

[46] https://twitter.com/AndyRowell/status/1266946038373347328

28

there." Shum fell to the ground on the opposite side of the wall, suffering several scratches, bruises, and cuts. Ou filmed the MSP trooper shoving Shum over the wall.[47] Other members of the press stuck in the alcove were beaten.[48]

80.     On May 30, NBC photojournalist Edward Ou was standing with a group of other journalists—including videographer Michael Shum—documenting the George Floyd protests from an alcove off to the side and out of the way, with the closest protesters approximately 12-15 feet away.[49] Ou and many of the journalists in his group were using camera equipment and were displaying press badges with logos on them. Suddenly and with no warning, something—on belief, a concussion grenade—exploded in Ou's face. Then MSP troopers approached Ou and the other journalists, and Ou saw one of the troopers shaking a canister of pepper-spray. As the trooper walked up to Ou—now close enough to clearly see Ou's camera and lanyard around his neck with the colorful NBC peacock logo and the words NBC NEWS—the trooper deliberately sprayed Ou in the face. After getting doused with pepper-spray, he was hit by some hard object—on belief, a State Trooper's baton—then hit again, and was then slammed into a wall. Ou was bleeding and disoriented when MSP troopers attacked the group of journalists again, throwing more concussion grenades into the group. As journalists climbed over a nearby wall, Ou filmed a State Trooper shoving Shum over the wall. After being grabbed by a law enforcement agent, who was debating with another agent about what to do with Ou, he told the agents

---

[47] *Goyette*, ECF No. 219-1, "Exhibit A" at 42:15—43:22

[48] *Goyette*, "Declaration of Katie G. Nelson" and "Declaration of Michael Shum"

[49] https://twitter.com/edouphoto/status/1267981849537609728

he was a journalist and pleaded for help because he was having trouble seeing and breathing. The law enforcement agents did nothing. All of these events were recorded on his video camera, which kept running.[50] Ou's injuries required medical attention, and after spending several hours at the Hennepin County Medical Center for treatment, Ou left the hospital around 1:00 a.m. with four stitches in his forehead. Edward Ou testified under oath in open court regarding these incidents.[51]

81.     On May 30, Los Angeles Times reporter Molly Hennessy-Fiske and photographer Carolyn Cole were reporting on the protests outside of MPD's Fifth Precinct building, wearing their press credentials and with other journalists nearby. MSP troopers, after proceeding up the street, turned toward the journalists and started firing less-lethal projectiles into the group,[52] even though no protesters were nearby.[53]

82.     After ignoring Hennessy-Fiske's verbal identification as a member of the press, MSP troopers again fired into the group of journalists, hitting Hennessy-Fisk at least five times in the leg with less-lethal projectiles, causing her leg to bleed.[54] In an attempt to flee from the assault by law enforcement, troopers chased the journalists and fired more less-lethal projectiles.[55] Hennessy-Fiske has covered protests involving police in Ferguson,

---

[50] https://drive.google.com/file/d/1Wm5B7XOAUrJcGsex3gVk_zEFz1cfpiq/view?usp=sharing

[51] *Goyette*, ECF No. 219-1, "Exhibit A" at 20:21—53:22, 64:19—68:8

[52] https://twitter.com/mollyhf/status/1266979120686260224

[53] https://latimes.com/world-nation/story/2020-05-30/la-reporter-tear-gas-police

[54] https://twitter.com/mollyhf/status/1269008792194297866

[55] *Goyette*, ECF No. 31-3

Baton Rouge, Dallas, and Los Angeles along with covering the United States military in war zones—including Iraq and Afghanistan—and stated that she has never been fired at by law enforcement until her reporting in Minnesota. On May 25, 2021, Hennessy-Fiske filed a federal lawsuit regarding her assault.[56]

83. Carolyn Cole, wearing a flak-jacket labeled "TV" on it, was shot in the face with pepper spray at so close a distance that she suffered damage to her left cornea.[57] After escaping and getting a ride from local residents to the emergency room, law enforcement fired a paintball gun at the car marking it with red paint. Cole had to stop covering the protests, and spent more than a month recovering from the injuries suffered at the hands of the State Patrol.[58] Cole has covered conflicts both nationally and internationally for many years, and is familiar with the dangers involved in such situations. In 25 years of reporting for the Los Angeles Times, this was the first time she has been injured covering a protest or other event. On May 25, 2021, Cole filed a federal lawsuit regarding her assault.[59]

84. On May 30, VICE magazine journalist Michael Adams—and other journalists clustered near him—were holding up their press passes shortly before an MPD officer approached with a weapon pointed directly at Adams and threw him to the ground. Displaying his press pass and shouting "press," the officer responded, "I don't care."

---

[56] *Cole*, Case No. 21-CV-1282

[57] https://latimes.com/world-nation/story/2020-06-01/they-came-toward-us-firing-pepper-spray-and-rubber-bullets

[58] *Goyette*, ECF No. 31-2

[59] *Cole*, Case No. 21-CV-1282

Adams was on his knees, alone, clearly not a threat, and was surrounded by more than a dozen officers.[60] As another officer slowly walked by, Adams again said "I'm press" and held up his credential, and the officer responded by casually pepper-spraying Adams directly in the face from several inches away before continuing his stroll while Adams writhed on the ground in agony.[61]

85.　On May 30, a roving band of SWAT team members rolled through the streets of Minneapolis in an unmarked van, periodically opening fire with less-lethal weapons on citizens.[62] One leader of this unit, MPD Sgt. Andrew Bittell, told his officers as the unmarked van drove down Lake Street, "The first fuckers we see, we're just hammering them with 40s[.]" Bittell was referring of course to the 40mm "less-lethal" weapons used to attack and blind journalists during the protests. When MPD commander Bruce Folkens was told of the thuggish behavior regarding Bittell and his unit, Folkens stated it was "nice to hear" officers were "hunting people" instead of "chasing people around." Bittell stated he and his officers "enjoyed" shooting at individuals with 40mm rounds, explaining that the "enjoyment and laughter" at hitting civilians with 40mm rounds was a "coping mechanism" for the stress he and his unit felt during the protests.

86.　On May 30, KSTP investigative reporter Ryan Raiche—along with his photographer, and his producer—gathered with a group of other members of the press

---

[60] https://twitter.com/MichaelAdams317/status/1267203751913422849

[61] https://twitter.com/MichaelAdams317/status/1266945268567678976

[62] https://minnesotareformer.com/2021/09/01/jaleel-stallings-shot-at-the-mpd-a-jury-acquitted-him-of-wrongdoing/

32

outside of the Fifth Precinct. Most had large cameras, boom microphones, or visible press credentials making the group clearly identifiable as press, nor were they spread out among the protesters.[63] Eventually pinned against a wall by a line of State Troopers, commanded by Major Dwyer, the troopers indiscriminately pepper sprayed the entire group of journalists.[64]

87.     On May 30, Star Tribune photographer Anthony Souffle was tear gassed by MACC law enforcement officers (either MPD officers or MSP troopers).[65]

88.     On May 30, three members of the press were arrested and charged with curfew violations despite having identified themselves as members of the press.[66]

89.     On May 30, an MSP trooper forced WCCO videographer Tom Aviles to the ground and arrested him even though he had identified himself as a member of the press and was carrying a large video camera.[67] Video footage shows there were no protesters within 50 yards of the videographer and he was not obstructing law enforcement.[68] Aviles's producer Joan Gilbertson was with him at the time, and also identified herself as a journalist. An MSP trooper told her, "You've been warned, or the same thing will happen to you. Or you're next." Aviles spent two hours in custody. Earlier, law enforcement had

---

[63] https://facebook.com/RyanRaiche/videos/2882143978738897/

[64] https://twitter.com/ryanraiche/status/1267021649959845888

[65] https://twitter.com/AnthonySouffle/status/1267122936105893892

[66] https://twitter.com/MJKauz/status/1267273646621499392

[67] https://startribune.com/wcco-cameraman-arrested-on-video-while-covering-unrest-in-minnesota/570902742/

[68] https://minnesota.cbslocal.com/2020/05/30/wcco-photojournalist-tom-aviles-arrested-in-south-minneapolis/

33

shot Aviles with a less-lethal projectile even though he was filming them with a large video camera at the time and was clearly identifiable as a member of the press.[69]

90.     On May 30, Star Tribune reporter Chris Serres was twice ordered at gunpoint by MPD officers to "hit the ground" and warned that "if [he] moved an inch [he'd] be shot" despite prominently displaying his Star Tribune press badge for the police.[70] Serres had already been tear gassed and shot in the groin with a less-lethal projectile by law enforcement earlier that day.

91.     On May 30, Maggie Koerth, a reporter for the website FiveThirtyEight, was covering the protests and standing on a sidewalk next to Jared Goyette when they were approached by a law enforcement agent who drew his weapon on them. Both Koerth and Goyette verbally identified themselves by saying "press, press" and held up their press badges. Continuing to point his gun at Koerth, the agent said "shut up."[71]

92.     On May 30, Minnesota Public Radio reporter Madeleine Baran was covering the protests with American Public media journalist Samara Freemark. An MPD officer pointed a weapon at their heads. When they identified themselves as press, the officer did not lower his weapon, so they ran for cover and ended their reporting for the night.[72]

93.     On May 30, VICE Media reporter Alzo Slade, and three colleagues, were covering the protests when they encountered a long line of law enforcement agents in riot

---

[69] https://twitter.com/WCCO/status/1266920992946954241

[70] https://twitter.com/ChrisSerres/status/1267098060938776581

[71] https://nytimes.com/2020/06/01/business/media/reporters-protests-george-floyd.html

[72] https://twitter.com/madeleinebaran/status/1266610933071138816

gear blocking the street. The agents began firing tear-gas and spraying pepper-spray into crowd. Slade and his colleagues ducked into an alleyway, but were followed by agents in riot gear. Slade and the others immediately announced that they were members of the press, but the agents told them to get on the ground. They complied. As MSP troopers approached, Slade held up his credentials and said, "I'm press, I'm press." The troopers ignored them and zip-tied their hands behind their backs. The troopers loaded Slade and his colleagues into a wagon in the middle of the street. Hennepin County Sheriff's Deputies brought Slade and his colleagues to the Hennepin County Jail, fingerprinted, processed, and cited them for failure to comply with a lawful order. The Hennepin County Sheriff's deputies consummated the arrest and booking of these journalists despite knowing that they were in fact members of the press. The State ultimately dismissed the charges against these journalists, apparently upon the request of Minnesota Commissioner of Corrections Paul Schnell ("Commissioner Schnell"), after lawyers for VICE Media filed a complaint with the State.[73]

94.     On May 30, freelance photographer Craig Lassig and EPA photographer Tannen Maury were documenting the George Floyd protests occurring near the MPD's Fifth Precinct. After witnessing law enforcement shooting fleeing protesters in the back with tear-gas and less-lethal projectiles, Lassig and Maury left the scene. On the way, freelance photographer Stephen Maturen joined them, and the three photographers arrived in a parking lot with no protesters or law enforcement in sight. As they stood in the parking

---

[73] https://pressfreedomtracker.us/all-incidents/vice-media-reporter-arrested-while-covering-minneapolis-protests/

35

lot discussing where they should go next, a law enforcement vehicle stopped. As law enforcement agents exited the vehicle, the photographers—with all three displaying press badges and carrying professional camera gear—verbally identified themselves as members of the press to the agents. One agent said, "we don't fucking care," and ordered the group onto the ground. After they complied, law enforcement agents handcuffed Lassig, Maury, and Maturen, searched all their belongings, and seized their photography equipment. Afterwards, the three photographers were placed into a law enforcement van and brought downtown, where they sat in the van for about an hour before being booked, fingerprinted, and cited for violating the curfew, despite again identifying themselves as members of the press. After roughly two hours in custody, they were released.[74]

95.     On May 30, Star Tribune reporters Ryan Faircloth and Chao Xiong were trying to leave the protests in Faircloth's car. They mistakenly turned down a street that was blocked off at the end, and before they could turn around, MSP troopers fired less-lethal projectiles at the car without warning. Later, when Faircloth was driving alone out of the area, law enforcement again fired less-lethal rounds at Faircloth's vehicle, injuring Faircloth and blowing out the windows of his car.[75]

96.     Later that night, around midnight, Katie Nelson was driving away from the protests when she turned onto a street that was blocked off at one end by National Guard vehicles and law enforcement agents with riot gear. With her car windows open, she

---

[74] *Goyette*, ECF No. 228 at 200-206; *see also* "Declaration of Craig Lassig", attached as Exhibit 5 to the First Amended Complaint

[75] https://twitter.com/RyanFaircloth/status/1266954131324928003

36

shouted "we're press, we're press" at the agents at the end of the street. The law enforcement agents shouted back, "we don't are," and began to shoot pepper bullets or some other less-lethal projectiles at Nelson, which she heard pinging off the roof of her car.[76]

### *MAY 31, 2020*

97.     On May 31, in the early morning, law enforcement detained and searched an Australian television news team led by Tim Arvier after they identified themselves as members of the press. During this detention the law enforcement agents handcuffed the news team's cameraman, despite the fact that he was clearly a member of the press and no threat to anyone.[77]

98.     On May 31, law enforcement arrested an NBC reporter Simon Moya-Smith at approximately 2:00 a.m., despite identifying himself multiple times as a reporter and displaying his press badge for the arresting MPD officer.[78] Another law enforcement agent pepper sprayed the reporter during the arrest, and after stating his name in addition to "I am a reporter with NBC News. My press badge is on my chest" a third agent approached him saying, "Roll on your side, Mr. Journalist. You're going to be charged with, I don't know, breaking curfew." A fourth agent approached, pulled him up by his right bicep, and walked him to a nearby police cruiser as the reporter said "I am a journalist with NBC News." This officer eyed the press badge that was suspended from the reporter's neck,

---

[76] *Goyette,* "Declaration of Katie G. Nelson"

[77] https://twitter.com/TimArvier9/status/1266969637817909250

[78] https://twitter.com/SimonMoyaSmith/status/1267054164774916096

shrugged, and loaded him into the police cruiser which transported him to the Fifth Precinct. After identifying himself as a member of the press again to the MPD officer that had started to book him, he was released.

99.     On May 31, after Star Tribune reporter Liz Sawyer identified herself as a journalist to law enforcement agents, the agents told her "we don't care, we'll arrest you."[79] Earlier that evening, she was standing with a fellow Star Tribune reporter, two Kurdish journalists, and one Japanese journalist when some law enforcement agents told them to go home. When the group identified themselves as members of the press and showed their credentials, an agent said, "Your cards are bullshit."[80]

100.    On May 31, a German television news crew from the Deutsche Welle network was threatened with arrest by the State Patrol, despite having clearly identified themselves as a member of the press.[81] Earlier that evening, law enforcement had shot at the DW crew with less-lethal projectiles despite—or because of—the crew being obviously identifiable as a news crew doing a live report and shouting "we're press" at the law enforcement agents.[82]

101.    On May 31, MPD officers in a truck pulled up to a group of reporters, including Star Tribune reporter Andrew Mannix, and pointed a "large gun" at the group

---

[79] https://twitter.com/ByLizSawyer/status/1266984068765409280

[80] https://twitter.com/ChaoStrib/status/1266959110265856000

[81] https://twitter.com/N_Waters89/status/1267090303867125766

[82] https://twitter.com/rafaelshimunov/status/1267824036878278659

while shouting "do you know what curfew is?" After the reporters notified the officers that they were journalists, the officers ordered them to leave the area.[83]

102.    On more than one occasion, the agency affiliations of law enforcement individuals committing or otherwise participating in misconduct, abuse, and unconstitutional behavior during the George Floyd protests was not immediately apparent to the victims.[84]

103.    MACC participants—including State and County Defendants—became aware of these widespread and persistent incidents of unconstitutional conduct through broad reporting by news outlets, their own social media monitoring efforts, direct outreach by media, public statements made by Governor Walz, and/or direct conversations with Governor Walz. However, State and County Defendants remained deliberately indifferent, as evidenced by their capacity to change law enforcement tactics over the course of the George Floyd protests and could have, but did not, take any action to curtail violations of journalists' rights. In other words, the State and County Defendants knew about, but ignored, repeated unconstitutional conduct against members of the press.

## D.    DEFENDANTS' INADEQUATE RESPONSE TO LAW ENFORCEMENT MISCONDUCT DURING THE GEORGE FLOYD PROTESTS

104.    MACC's unconstitutional conduct and abuse against members of the press during George Floyd protests was met with widespread, international condemnation.

---

[83] https://twitter.com/AndrewMannix/status/1266968276481052672

[84] *Goyette*, ECF No. 7 at 5-18

105. Governor Walz stressed the importance that press coverage of law enforcement's crowd control actions has to ensure public trust of their government and stated "the protection, security, and safety of the journalists covering [protests] is a top priority."[85]

106. Not only was Commissioner Harrington aware of Governor Walz's public statements, but Governor Walz had direct conversations with Commissioner Harrington regarding the unconstitutional treatment of journalists.[86]

107. Governor Walz's apology and plea to law enforcement to treat journalists with respect and allow them to document the protests clearly fell on deaf ears, as the unconstitutional arrests of journalists and unlawful violence against members of the press escalated significantly in the days after, as evidenced above.

108. In fact, despite these statements by Governor Walz, according to testimony from Commissioner Harrington and Major Dwyer on July 28, 2021, not a single MSP trooper was disciplined for the misconduct that occurred during the George Floyd protests in the 14 months after the misconduct occurred.[87]

109. In a June 5, 2020 statement, the Minnesota State Patrol stated: "When conducting law enforcement operations to restore order and keep people safe, it can be difficult for officers to distinguish journalists from those who are violating a curfew order

---

[85] https://cnn.com/videos/us/2020/05/29/minnesota-governor-tim-walz-omar-jimenez-arrest-vpx.cnn

[86] *Goyette*, ECF No. 219-1, "Exhibit A" at 188:16—188:19

[87] *Goyette*, ECF No. 219-1, "Exhibit A" at 185:19—186:5, 304:24—305:1

or not complying with commands to leave an area. ... we are reviewing the incidents involving our troopers in an effort to prevent similar incidents in the future."[88] However, as noted above, the Minnesota State Patrol did not reprimand, discipline, suspend, cite, or arrest any trooper or law enforcement agent involved in any of the unlawful conduct described during the Floyd protests to "prevent similar incidents in the future."

110.   On information and belief, not a single law enforcement individual—from any agency associated with MACC—has been disciplined, reprimanded, suspended, cited, or arrested for any unlawful conduct against members of the press during the George Floyd protests prior to July 28, 2021.

111.   Policymakers and command staff involved with MACC's planning, coordination, and execution was aware "not every [law enforcement agency] possesses the same level of knowledge in ... the care and handling of [members of the press] to ensure that their best interests are upheld."[89] Despite this, not a single safeguard was put in place to remedy this obvious need to protect constitutional rights prior to—or during—the deployment of MACC, including but not limited to:

- **i.** Coordinated and/or standardized training prior to and/or during participation in MACC or MACC-related law enforcement activities.

- **ii.** Vetting and/or screening of individuals and/or agencies prior to participation in MACC or MACC-related law enforcement activities.

---

[88] https://startribune.com/minnesota-aclu-sues-to-halt-alleged-misconduct-by-enforcement-agencies-against-media/570991902/

[89] *Goyette*, ECF No. 219-1, "Exhibit A" at 258:16—258:18

41

iii. Mandatory policies defined and published by MACC demanding consistent supervision, report writing, and/or documentation regarding any and all actions by a law enforcement agent participating in MACC or MACC-related law enforcement activities.

112. Additionally, the absence of any consequence or corrective action by MACC's policymakers—towards law enforcement agents who committed unconstitutional conduct during the Floyd protests—sent a clear message to *all* law enforcement agents throughout the State of Minnesota: targeting members of the press for unlawful reprisals during civil unrest is both acceptable and encouraged.

113. Not surprisingly, given this ratification and/or tacit authorization by MACC's policymakers and command staff, MACC's law enforcement agents engaged in the exact same (and in some instances, worse) unconstitutional conduct against members of the press during the Daunte Wright protests that occurred in April 2021. In other words, when protests erupted again after Wright was killed, MACC's law enforcement agents— under the direction and supervision of MACC—reverted to the same lawless behavior it displayed in 2020.

114. MACC law enforcement agents targeted members of the press covering the Wright protests, shot them with less lethal weapons, pepper-sprayed them directly in the face at close range, harassed, assaulted, and arrested them. Additionally, law enforcement unveiled some new unconstitutional methods of intimidation and control in violation of the First Amendment: 1) broadcasting orders for all members of the press to disperse or face arrest, and 2) the detention, photographing journalists' faces, and cataloging of journalists.

Even Governor Walz conceded law enforcement's actions during the Wright protests "created [an] Orwellian picture" of Minnesota law enforcement and was an unconstitutional embarrassment to the State.[90]

115.    On June 2, 2020, the Committee for Freedom of the Press sent a letter to Commissioner Schnell and Governor Walz's General Counsel Karl Procaccini regarding the unconstitutional conduct of law enforcement.[91] The letter sets for in detail the legal basis for journalists' ability to exercise their First Amendment rights during protests, as well as the restrictions on law enforcement's ability to interfere with members of the press lawfully doing their job. It was co-signed by 155 media companies and news organizations. Because Defendants Colonel Langer and Commissioner Harrington had influence and control over MACC's law enforcement response, the letter was copied to each of them.

116.    On September 29, 2020, Molly Hennessy-Fiske tweeted that while she had submitted a complaint to the Minnesota State Patrol—including photo and video of the State Patrol's assault on her, her injuries, and a list of witnesses—nothing had been done. Hennessy-Fiske stated she then filed a second complaint about the inadequate process.[92]

117.    On November 6, 2020, Hennessy-Fiske tweeted that six months had passed since her complaint, with no response from the State Patrol.[93]

---

[90] https://startribune.com/gov-tim-walz-calls-assault-detention-of-journalists-covering-protests-unacceptable/600047293/

[91] https://www.rcfp.org/wp-content/uploads/2020/06/6-2-20_Letter_to_MN_Officials.pdf

[92] https://twitter.com/mollyhf/status/1311084827702177792

[93] https://twitter.com/mollyhf/status/1324807550123036672

118. On November 24, 2020, Hennessy-Fiske tweeted: "Update: @MnDPS_MSP illegally attacked me and other journalists six months ago and has yet to apologize/take corrective action. #Minnesota is still investigating my complaint and has refused to supply public records showing who attacked us and what they've done to investigate."[94]

119. On April 17, 2021, Hennessy-Fiske tweeted in response to footage of MSP troopers photographing and cataloging the media at the Daunte Wright protests: "It's been nearly a year since @MnDPS_MSP assaulted us and they have yet to release records we've requested—including the names of the officers who assaulted us—so this does not surprise me at all."

120. On May 25, 2021, Hennessy-Fiske and Carolyn Cole filed a separate Section 1983 lawsuit against the State Patrol, alleging among other things, that the State Patrol's assault on them while they were covering the George Floyd protests, and the State Patrol's flagrant disregard for this Court's Temporary Restraining Order issued in the wake of the State Patrol's attacks on journalists at the Daunte Wright protests, "amply demonstrates that the State Patrol does not care about the First and Fourth Amendment rights of the media and the general public."[95]

---

[94] https://twitter.com/mollyhf/status/1331340407234588677

[95] *Cole*, Case No. 21-CV-1282

44

## E.   MINNESOTA LAW ENFORCEMENT AGENCIES ONCE AGAIN JOIN FORCES IN MACC AND EXECUTE MACC'S "OPERATION SAFETY NET"

121.   To address the ongoing civil unrest in Minnesota following George Floyd's murder, and in anticipation of widespread protests during the trial of his killer (former police officer Derek Chauvin), MACC's policymakers created Operation Safety Net ("OSN") by joining the "Minneapolis Police, Metro Transit Police, Hennepin County Sheriff's Office, Ramsey County Sheriff's Office, the Minnesota State Patrol, the Minnesota National Guard, and other entities."[96]

122.   Operation Safety Net was grown from the roots of MACC's law enforcement response applied during the Floyd protests.

123.   Operation Safety Net became synonymous for MACC.

124.   Commissioner Harrington stated OSN was MACC's "plan for how the City of Minneapolis and the County of Hennepin and, by extension, the State of Minnesota would be prepared for potential protests in the wake of the Derek Chauvin trial."[97] MACC began OSN planning in July of 2020.[98]

125.   MACC continued gathering intelligence and maintained continuous monitoring of social media activity, live streams, and other digital sources of information.

---

[96] *FAQs about Operation Safety Net,* Operation Safety Net, https://safetynet.mn.gov/Pages/frequently-asked-questions.aspx (last visited May 3, 2021)

[97] *Goyette*, ECF No. 219-1, "Exhibit A" at 170:11—170:16

[98] *Goyette*, ECF No. 219-1, "Exhibit A" at 170:23—171:2

126. In January of 2021, the State reviewed the plan—which determined it was under-resourced—and it was at that time the Minnesota State Patrol, Minnesota National Guard, Department of Natural Resources, and others joined with the City of Minneapolis and Hennepin County into MACC's unified command to work together in concert.[99]

127. MSP Lieutenant Colonel Rochelle Schrofer defined MACC's OSN as "an organized group of unified command" and MACC's law enforcement agents—regardless of their agency affiliation—as "OSN officers[.]"[100]

128. Commissioner Harrington defined this "unified command" as a recognition that certain events occur which are too big for any one department to be able to handle on its own, and unified command creates a format for how multiple jurisdictions and multiple departments joining into the effort work together. Unified command brings the senior staffs of these multiple departments together so they can work in concert and in a coordinated fashion.[101]

129. The unified command of MACC placed state, county, and municipal law enforcement agents side-by-side on the streets, working together as one to respond to the protests by carrying out the command's "operational decisions."[102] MACC involved—formally or informally—parallel organizations to "ensure a unified response."[103]

---

[99] *Goyette*, ECF No. 219-1, "Exhibit A" at 171:3—171:11

[100] *Goyette*, ECF No. 104 at 3—6

[101] *Goyette*, ECF No. 219-1, "Exhibit A" at 171:22—172:13

[102] *FAQs about Operation Safety Net*, *supra* n.96

[103] *FAQs about Operation Safety Net*, *supra* n.96

130.    The Hennepin County Chiefs of Police Association was one of these parallel
organizations, which combined at least 28 police departments including the Brooklyn
Center Police Department. HCCPA made the decision to create a mobile field force, named
the West Metro Command, which would work in active concert and coordinated fashion
with MACC, but would not move into Minneapolis as a part of OSN.[104]

## F.    DAUNTE WRIGHT'S KILLING

131.    In the midst of growing tensions—as the citizens of Minnesota watched the
Derek Chauvin trial and awaited the upcoming verdict—the Brooklyn Center Police
Department initiated a traffic stop in Brooklyn Center, Minnesota because of expired
automobile tabs on Sunday, April 11, 2021.

132.    The driver, Daunte Wright, a 20-year-old biracial Black man, was pulled
over, which ultimately led BCPD Officer Kimberly Potter to make an attempted arrest of
Wright for an outstanding arrest warrant. After a brief struggle, Wright was fatally shot at
close range by Potter.

## G.    THE ENSUING CIVIL UNREST AND RESPONSE BY THE CITY

133.    Still reeling from the killing of George Floyd less than a year prior, there was
an immediate response on April 11, 2021 by the citizens of Minnesota and civil unrest grew
that very evening. This marked the beginning of the Daunte Wright protests.

---

[104] *Goyette*, ECF No. 219-1, "Exhibit A" at 174:4—174:10

47

134.    In response to the civil unrest, on that same evening, the City of Brooklyn Center declared an emergency, enacted a curfew, and requested assistance and mutual aid from the State and local agencies to respond to this civil unrest and to protect the community.

135.    The Hennepin County Sheriff's Office—with other state and local agencies—responded immediately to the City's request for assistance, participating in the joint law enforcement response in Brooklyn Center.[105]

136.    This joint law enforcement response included the HCCPA's West Metro Command mobile field force—which operates under a mutual aid pact administered by the HCSO—as well as other law enforcement agencies already participating in MACC's OSN.

137.    On information and belief, the WMC was organized, directed, and/or supervised by Crystal Police Chief Stephanie Revering. Chief Revering serves as the President of the HCCPA.

138.    Following the events on Sunday, April 11, MACC placed Operation Safety Net into "Phase 3" of the plan, which included rapid escalation of law enforcement resources. By operating the Multi-Agency Command Center under a unified command structure, MACC's Operation Safety Net plan directed law enforcement in Brooklyn Center.

139.    Each and every law enforcement agent deployed around the Brooklyn Center Police Department during the Wright protests was an active and willing participant in OSN,

---

[105] *Goyette*, ECF No. 219-1, "Exhibit A" at 174:11—174:13, 174:18—174:24

and acted under color of law, and worked in concert and coordinated fashion with MACC Defendants.

140.    Liz Kramer, Solicitor General at the Attorney General's Office ("Solicitor General Kramer"), identified OSN in an email as "the collaboration conducting security in Brooklyn Center[.]"[106]

141.    Commissioner Harrington stated in open court that "while it's a unified command and everybody is at the table together, ultimately the decision of what you do in a particular case, in a particular jurisdiction, resides with the local jurisdiction."[107]

142.    Under unified command, the City of Brooklyn Center was the local jurisdiction and decisionmaker responsible for setting MACC's mission goals. At all times, the City retained the ability to change law enforcement tactics.

143.    When video of Mr. Wright's killing was later released, it sparked additional outrage, and multiple protests ensued for many days as a call to change systemic racism in our nation's police departments and law enforcement violence towards people of color.

144.    Thousands of Minnesota residents took to public streets and spaces, primarily outside the Brooklyn Center City Hall where the Brooklyn Center Police Department is headquartered.

145.    The vast majority of these protesters exercised their First Amendment rights in a forthright, peaceful, and lawful manner.

---

[106] *Goyette*, ECF No. 121, "Exhibit 6"

[107] *Goyette*, ECF No. 219-1, "Exhibit A" at 172:14—172:21

146.    On Monday, April 12, Governor Walz signed Emergency Executive Order 21-17 declaring a peacetime emergency in the wake of the killing of Daunte Wright and ordering "state agencies, in cooperation with appropriate federal agencies, to assist local units of government as they respond to and recover from this emergency."[108]

147.    Afterwards, on April 12, Governor Walz signed Emergency Executive Order 21-18. It imposed a curfew on all public areas within Anoka, Dakota, Hennepin, and Ramsey counties from 7:00 p.m. on April 12 until 6:00 a.m. on April 13. The curfew specifically exempted members of the news media.[109]

148.    Nightly curfews within the City of Brooklyn Center continued for the remainder of the Daunte Wright protests, activated by Governor Walz and/or Mayor Elliot ("Curfew Orders"). Each and every curfew order issued during the Wright protests specifically exempted members of the news media, including journalists and other members of the press. The Curfew Orders did not create a hierarchy, and gave members of the press the same rights to be out as other critical groups.

149.    These Curfew Orders and, particularly, the portions pertaining to the lawful enforcement of the curfew, were well-known by, and became part of the rules of engagement for, MACC and each responding law enforcement agency, including each of the Defendants herein.

---

[108] https://www.lrl.mn.gov/archive/execorders/21-17.pdf

[109] https://www.lrl.mn.gov/archive/execorders/21-18.pdf

150. Also on April 12, Mayor Elliot exercised his authority to issue Mayoral Declaration No. 2021-01 declaring a local emergency in the City of Brooklyn Center as a result of the civil unrest.

151. The City Council adopted, also on April 12, Resolution No. 2021-58 ("Resolution") that recognized "localities can limit police tactics and brutality in response to protests" and thereby "bans … violent crowd control and dispersion techniques such as the use of rubber bullets[.]"[110]

152. Additionally, the City Council "adopted a resolution to extend the emergency declaration and expressly consented to [Mayor Elliot] taking command of the policy as provided in the City Charter to respond to the Emergency[.]"[111]

153. This express consent by the City Council provided Mayor Elliot the authority—under § 2.06 of the City Charter—to "take command of the police, maintain order, and enforce the law."[112] In other words, the City assigned Mayor Elliot absolute final policymaking authority over the City of Brooklyn Center's law enforcement and its response to the local emergency as a result of the civil unrest.

154. The next day, on April 13, Mayor Elliot made a deliberate choice to override the City Council's Resolution banning the use of tear gas, chemicals, violent crowd control and dispersion techniques, rubber bullets, and kettling by using his policymaking authority

---

[110] *City Council Resolution No. 2021-58,*
https://pbs.twimg.com/media/Ey0QT9KVIAIlDd7?format=jpg&name=medium

[111] *See* "Mayoral Proclamation No. 2021-02"

[112] https://www.ci.brooklyn-center.mn.us/home/showpublisheddocument/286/637535212058930000

51

to issue Mayoral Emergency Proclamation No. 2021-02. Mayor Elliot's policy—addressed to both "those responding from other agencies" and "Brooklyn Center Police officers" (collectively, the "City's agents" or "MACC law enforcement agents")—declared the City Council's "Resolution does not apply to joint law enforcement operations occurring within the City[.]"[113]

155.    In less than 48 hours after the killing of Daunte Wright, Mayor Elliot amassed—with MACC's assistance—numerous militaristic armored vehicles and law enforcement agents from multiple agencies within City limits, wearing tactical dress, including helmets and gas masks, to protect the City and maintain order by enforcing the law. The City's agents were also equipped with wooden batons, full-body riot shields, flash bang and/or other concussion-style grenades, pepper-spray, chemicals (such as tear gas, skunk, inert smoke, pepper gas, pepper pellets, xylyl bromide, and/or similar substances—collectively, "chemical agents"), and weapons capable of firing projectiles (such as .68 caliber marker rounds, pepper balls, 40-millimeter rubber bullets, foam batons, and/or similar projectiles—collectively, "less-lethal projectiles").

156.    Also on April 13, Mayor Elliot used his policymaking authority to request—through the HCCPA—that Sheriff Hutchinson take a lead role in incident command.

157.    Sheriff Hutchinson—who shared jurisdiction with the City, and was a MACC policymaker and member of MACC's command staff—accepted the lead role in incident command for the Daunte Wright protests.

---

[113] *See* "Mayoral Proclamation No. 2021-02"

158.    Mayor Elliot did not relinquish his policymaking authority, ability to change law enforcement tactics and response to the civil unrest, ability to request another agent take a lead role in incident command, and/or ability to dismiss agents from participating in the City's mission of maintaining order and enforcing the law.

159.    Instead, Mayor Elliot worked in concert and coordinated fashion with MACC and other MACC Defendants, consumed information and intelligence gathered by MACC, and maintained communication with MACC's policymakers and command staff.

160.    The joint law enforcement response continued under a unified command structure with the leadership of the Hennepin County Sheriff's Office, Department of Public Safety, Brooklyn Center Police Department, and many other agencies, including the Minnesota State Patrol, Minnesota Department of Natural Resources, Minnesota National Guard, Minneapolis Police Department, and numerous other law enforcement agencies from around the State.

161.    However, it remains unclear how many and which law enforcement agencies were acting in active concert and participation with MACC and OSN. In an interrogatory served to State Defendants in the *Goyette* case, they were asked to identify "every agency participating in Operation Safety Net"[114] and the State Defendant's response did not include, for example, the Brooklyn Center Police Department,[115] Nebraska State Patrol and

---

[114] *Goyette*, ECF No. 121, Exhibit 2, "Interrogatory No. 2"

[115] MN Operation Safety Net, *News Conference: April 17, 2021 – Briefing Update #1* (12:20 a.m., April 17, 2021), https://www.youtube.com/watch?v=cQSN9kAUwb4 (streaming live OSN press briefing, including comments from the interim chief of the Brooklyn Center Police Department)

Ohio State Patrol, despite OSN having made public statements suggesting that these agencies were, in fact, involved.[116]

162.    State Defendants have asserted that OSN "is a coordinated effort[.]"[117] In addition to the law enforcement agencies named officially through OSN, the State Defendants have also made it clear that other law enforcement agencies can be called upon to provide mutual aid during times of mass unrest. This coordination created a shared purpose, and when entities participated in MACC deployments—such as OSN—their interests closely aligned with MACC Defendants.

163.    Because Mayor Elliot maintained his policymaking authority over the law enforcement response to the Daunte Wright protests, on April 14, both the HCSO and HCCPA requested written confirmation from Mayor Elliot regarding the City's ongoing request for mutual aid from MACC.

164.    These requests from HCSO and HCCPA provided Mayor Elliot an additional opportunity to change law enforcement tactics and response to the civil unrest, to request another agent take a lead role in incident command, and/or to dismiss some or all law enforcement agents from participating in the City's mission of maintaining order and enforcing the law. Instead, even after notice of repeated unconstitutional conduct, the City

---

[116] Minnesota OSN (@MinnesotaOSN), TWITTER (April 19, 2021, 8:52 p.m.), https://twitter.com/MinnesotaOSN/status/1384324142338646021 (indicating that the Ohio and Nebraska state patrol will be sending additional officers to assist and that those officers "will report" to the Minnesota State Patrol)

[117] *Goyette*, ECF No. 143 at 5

allowed law enforcement agents to continue their targeted unconstitutional conduct against members of the press for the duration of the Daunte Wright protests.

## H.   MACC   DEFENDANTS'   WIDESPREAD   PATTERN   OF UNCONSTITUTIONAL CONDUCT AGAINST THE PRESS COVERING THE DAUNTE WRIGHT PROTESTS

165.   In response to the Daunte Wright protests in Brooklyn Center, the City adopted MACC's continued tradition of heavy-handed tactics, harassment, and abuse towards journalists that characterized the law enforcement response to the George Floyd protests in May of 2020.

166.   Similar to the Floyd protests, Curfew Orders in Brooklyn Center issued by Governor Walz included explicit exemptions allowing members of the press to remain on-site and continue reporting. Instead, MACC Defendants ignored the exemption and repeatedly singled out members of the press in dispersal orders broadcast to the crowd, which expressly commanded members of the press to leave.

167.   Also, eerily similar to the Floyd protests, the harassment of journalists in Brooklyn Center was not limited to dispersal orders; MACC Defendants and their law enforcement agents worked in coordinated fashion with each other to engage in alarming, aggressive tactics to intimidate and/or harm members of the press providing on-the-scene coverage. Members of the press were threatened, physically grabbed, targeted with chemical irritants, shot with less-lethal projectiles and concussion grenades, arrested, and beaten.

55

168.    Even when members of the press clearly identified themselves, MACC
Defendants and their agents were not deterred from engaging in the policy, practice, and/or
custom that allowed unconstitutional conduct towards members of the press.

169.    MACC Defendants further interfered with members of the press and their
right to cover public events by arresting members of the press despite the lack of any
probable cause to do so, refusing access to public areas where events were unfolding, and
creating obstacles to reporters' movement about the city. These incidents constitute
flagrant infringements on the constitutional rights of individual reporters as well as the
public's interest in the dissemination of accurate information and accountability of
government for its actions.

170.    Throughout the entire duration of the Wright protests, MACC Defendants
and their law enforcement agents—working in active concert and in coordinated fashion
with one another—engaged in a continuing, widespread, persistent pattern of
unconstitutional conduct that intentionally targeted members of the press with unjustified
arrests, excessive force, unlawful dispersal orders, and other retaliatory actions.

171.    The events documented below demonstrate that targeting members of the
press was neither isolated nor a byproduct of their proximity to unruly protesters, but an
intentional and coordinated strategy designed by MACC Defendants to suppress reporting
activity and prevent the public from holding law enforcement accountable for their actions.

### *APRIL 11, 2021*

172.    On Sunday night, April 11, freelance journalist Tim Speier was hit with a
grenade striking him directly in the chest, then detonated at his feet. This incident was

56

observed by a reporter for the non-profit media organization Unicorn Riot who posted about the incident on Twitter at 10:22 p.m.[118] Speier's shoulder, protected from the worst of the impact by a protective vest, was a bit sore following the incident. Speier's vest was clearly labeled "PRESS" and he was also wearing press credentials around his neck. Additionally, Speier was standing among other clearly identifiable journalists, and there were no protesters near him. Law enforcement fired several flash-bang grenades into the clutch of reporters. Another media outlet near Speier—Mercado Media—captured footage of the incident, which confirms there were no protesters anywhere near Speier when he was hit.[119] Additional video taken by the nonprofit media outlet Unicorn Riot shows that the law enforcement agents who fired these grenades appeared to be Hennepin County Sheriff's deputies.[120] The U.S. Press Freedom Tracker ("Tracker")—co-founded by the Committee to Protect Journalists and catalogues press freedom violations in the United States—reached out to the Brooklyn Center Police Department for comment regarding this incident, but the BCPD did not respond.[121]

173.   On April 11, while broadcasting a live video feed of the Wright protests, Unicorn Riot posted on Twitter at 11:27 p.m. that a "police officer sounding aggravated over the loudspeaker at the Brooklyn Center [protest] just said the unlawful assembly

---

[118] https://twitter.com/UR_Ninja/status/1381447532262404096

[119] https://twitter.com/timmy2thyme/status/1381675958126714886

[120] https://twitter.com/i/broadcasts/1YqKDeQRPvwGV (at timestamp 49:25)

[121] https://pressfreedomtracker.us/all-incidents/freelance-journalist-struck-in-chest-with-flash-bang-grenade-during-brooklyn-center-protest/

57

means everyone must leave or face arrest. He made sure to say 'this includes the media.'"[122] A series of tweets followed, reporting real-time updates regarding law enforcement such as, "[law enforcement] making sure to repeat 'this includes the media' when issuing threats to the crowd[,]"[123] "Dispersal warning w threat of arrest ('this includes the media') repeated again[,]"[124] "...you will be arrested...you have no time remaining...you must leave now...this includes the media[,]'"[125] and "Several people have been injured due to heavy use of OC gas/other police munitions being fired directly at protesters & reporters."[126]

174. On April 11, at 11:30 p.m., Star Tribune reporter Andrew Mannix posted a video to Twitter captioned, "Police declaring unlawful assembly[,] Saying that includes media."[127]

175. On April 11, at 11:49 p.m., MPR News photojournalist Evan Frost posted a video captioned, "Police are issuing more dispersal orders, stun grenades, and tear gas. Say they will arrest anyone who does not disperse in 10 minutes including journalists."[128]

---

[122] https://twitter.com/UR_Ninja/status/1381447532262404096

[123] https://twitter.com/UR_Ninja/status/1381464075209691141

[124] https://twitter.com/UR_Ninja/status/1381465802495381505

[125] https://twitter.com/UR_Ninja/status/1381466720678858755

[126] https://twitter.com/UR_Ninja/status/1381467312419602434

[127] https://twitter.com/AndrewMannix/status/1381464797565304836

[128] https://twitter.com/efrostee/status/1381469408506347522

## *APRIL 12, 2021*

176.     In the early morning hours of Monday, April 12 at 12:56 a.m., Minneapolis photojournalist Chad Davis posted a video with the caption, "VIDEO: Brooklyn Center Police begin shooting at protesters (and media). From earlier this evening [on April 11]."[129]

177.     On April 12, also in the early morning hours, freelance photojournalist Joshua McFadden was standing with other journalists near the police station when a projectile hit him in his left thigh, burning a hole about four inches wide in his pants and leaving a powdery substance and brown singe marks on the fabric. McFadden's leg was badly bruised where the object hit him. It "may have been a flash-bang grenade or a tear-gas canister, because either can be hot" McFadden said, while adding that it "wasn't just a rubber bullet" that hit him. McFadden was standing with a group of journalists who were clearly identifiable as members of the press at the time he was hit, and both he and the other journalists were carrying large cameras. Additionally, the journalists in the group sometimes shouted out to identify themselves to law enforcement as press. McFadden believed that he was targeted as a journalist, because he was near others who were obviously members of the press. When contacted about this incident, neither the Hennepin County Sheriff's Office nor the Brooklyn Center Police Department responded to requests for comment.[130]

---

[129] https://twitter.com/daviss/status/1381486341335048196

[130] https://pressfreedomtracker.us/all-incidents/photojournalist-on-assignment-for-new-york-times-hit-with-projectiles-while-covering-brooklyn-center-protest/

59

178.    On April 12, a photojournalist working for the New York Times was covering the protests. A Minnesota State Patrol Captain recognized the journalist, rushed out from a line of MSP troopers, and grabbed him. The trooper then pulled the journalist behind the line as another trooper held the journalist's hands behind his back and took his phone. The journalist asked the trooper why he was being held and his phone seized, and the trooper responded: "Because that's our strategy now."[131]

179.    In response to the events that took place on Sunday, April 11—and into the early morning hours of Monday, April 12—MACC live-streamed a press conference at 1:15 a.m. on a YouTube channel dedicated to OSN, which took place at a podium adorned with an Operation Safety Net logo sign ("OSN podium").[132]

> i.  Commissioner Harrington stated that, "a collection of police agencies from Hennepin County" known as "West Metro Command" was assembled to respond to growing civil unrest immediately after the killing of Mr. Wright.[133] Commissioner Harrington went on to say that—after conversations with Hennepin County, BCPD Chief of Police, and others— MACC was opened as "we had planned to do" for Operation Safety Net, and that HCSO, BCPD, WMC, MSP, DNR, MNG, and MPD "assembled to

---

[131] https://www.rcfp.org/wp-content/uploads/2021/04/Ballard-Spahr-Minnesota-Walz-Protest-Journalist-Letter-April-17-2021.pdf

[132] MN Operation Safety Net, *News Conference: April 12, 2021 – Briefing Update #1* (1:15 a.m., April 12, 2021), https://youtube.com/c/MinnesotaOSN/videos

[133] *supra*, n.132 at 3:30—3:46

coordinate a response" to civil unrest.[134] The series of events that occurred on April 11 triggered "full activation" of MACC's OSN "Phase 3" deployment, and would include a "robust assortment" of "State and local police departments working together" over the coming days.[135]

    ii. Chief Deputy Martin added that the HCSO was "assisting in coordination with OSN group [and] Brooklyn Center[.]"[136]

    iii. Colonel Langer explained that the law enforcement response in Brooklyn Center was a "highly coordinated effort at the MACC with the agencies [Commissioner Harrington] listed[.]"[137]

    iv. Commissioner Harrington returned to wrap up the OSN press conference and answer questions by news media in the room, where he reiterated that OSN was "a coordinated effort" and that everyone at MACC was "in the same room" with radios and there was a wide array "paying close attention" to the events unfolding.[138]

    180.    Later that day, at 2:00 p.m., another MACC press conference was live-streamed at the OSN podium and included Minnesota Governor Tim Walz, Minneapolis Mayor Jacob Frey, Saint Paul Mayor Melvin Carter, DPS Commissioner Harrington, MPD

---

[134] *supra*, n.132 at 3:46—4:32

[135] *supra*, n.132 at 6:10—6:43

[136] *supra*, n.132 at 7:15—7:29

[137] *supra*, n.132 at 8:57—9:10

[138] *supra*, n.132 at 12:00—12:18

Chief Arradondo, HCSO Sheriff Hutchinson, MNG Major General Shawn Manke, MSP Colonel Langer, and BCPD Chief Gannon.[139]

    i. Governor Walz stated that MACC's Operation Safety Net planning "has been many months in the making" and "there is a level of coordination amongst law enforcement agencies … never before seen in Minnesota[.]"[140] Regarding the civil unrest in Brooklyn Center, Governor Walz said "the largest police presence in Minnesota history and coordination will be prepared."[141]

    ii. Commissioner Harrington noted MACC was able to mobilize quickly after the killing of Daunte Wright because of "the coordinated efforts that we had already setup[.]"[142] He further explained the MACC policymakers was taking responsibility for the operation, stating "we have already spoken to many of the officers, and will continue to train and drill down with the officers[.]"[143]

    iii. Chief Arradondo clarified that "Phase 3" of Operation Safety Net was originally planned to start during closing arguments at the Chauvin trial.[144]

---

[139] MN Operation Safety Net, *News Conference: April 12, 2021 – Briefing Update #2* (2:30 p.m., April 12, 2021), https://youtube.com/c/MinnesotaOSN/videos

[140] *supra*, n.139 at 17:52—18:01

[141] *supra*, n.139 at 37:04—37:10

[142] *supra*, n.139 at 46:28—46:32

[143] *supra*, n.139 at 49:14—49:20

[144] *supra*, n.139 at 51:15—51:32

iv. Colonel Langer added MSP troopers would "assist the local law enforcement agencies that planned to have a need for resources beyond which they can meet with their own jurisdictions."[145]

v. Major General Manke explained that "late last night" the MNG was asked to support Brooklyn Center, which they did with 100 MNG guardsmen, and helped secure BCPD and support in their effort.[146] Additionally, he noted that MNG "continues to be an active participant in all aspects of OSN and is working in conjunction with all the partners[.]"[147]

vi. Commissioner Harrington wrapped up the OSN press conference by answering questions. In one of his responses, he stated—based on his previous experience as a Training Director—law enforcement "training is very much necessary" to "change behaviors" and that it "takes lots of repetitions to train officers."[148]

181. Later that evening, on April 12, photojournalist Mark Vancleave was holding his camera in front of him when a rubber bullet struck the hand he was holding the camera with, resulting in some lacerations on his middle finger and two broken bones in his ring finger. Vancleave was identifiable as press by his ID and a large yellow "PRESS" card.

---

[145] *supra*, n.139 at 55:34—55:47

[146] *supra*, n.139 at 58:18—58:33

[147] *supra*, n.139 at 59:26—59:35

[148] *supra*, n.139 at 1:04:37—1:04:53

Video taken of the incident indicates that Vancleave was shot by an MSP trooper.[149] A few days after Vancleave was injured, he tweeted "I remain deeply concerned for my fellow journalists to fairly and accurately report on the crisis unfolding in our communities— particularly as Minnesota law enforcement continues to target journalists with force and disregard [their] constitutionally protected role. Our leaders must do better."[150] The Brooklyn Center Police Department did not respond to a voicemail by the Tracker requesting comment regarding this incident.[151]

182.    On April 12, photojournalist Carlos Gonzalez noticed an agitated woman confronting law enforcement while being held back by others at the demonstration. In a video posted to Twitter shortly after the incident, the woman can be seen confronting a line of law enforcement agents in front of the Brooklyn Center police department.[152] Moments later, an agent can be seen shooting a burst of pepper spray at an individual out of frame, then turning to Gonzalez and spraying him. While Gonzalez said that he didn't even see it coming, or want to speculate on what the agent—on belief, an MSP trooper—was thinking, he noted that he was clearly identifiable as a member of the press. Not only was Gonzalez carrying his professional camera but had both his standard press pass and a large yellow "PRESS" card around his neck in plain view. Gonzalez said that "myself, my colleagues,

---

[149] https://twitter.com/MDVancleave/status/1383516520857276416

[150] https://twitter.com/MDVancleave/status/1383520588153585675

[151] https://pressfreedomtracker.us/all-incidents/photojournalist-struck-with-crowd-control-munition-during-brooklyn-center-protest/

[152] https://twitter.com/CarlosGphoto/status/1381794769182023682

64

all the other press out there—we're out there working, being professionals. We're not chanting and yelling and getting in cops' faces, or anything like that. I think it's pretty obvious to distinguish who we are." The Tracker, who documented the incident in a press report, reached out to the Brooklyn Center Police Department and stated they did not respond to a voicemail requesting comment as of press time.[153]

183.     On April 12, independent photojournalist Timothy Evans was photographing demonstrators as he stood with his back to the police station, about 20 feet from the fence surrounding it. Evans was holding his camera to his face with his right hand to take photography when a marker round fired by law enforcement hit the back of that hand. The painful impact made Evans let go of his camera, which hung from a strap around his neck. While Evans did not know if he was targeted, he did have a "PRESS" label attached to his backpack. Evans suffered a bruise on his hand for more than a week after he was hit.[154]

184.     On April 12, freelance photojournalist Aaron Nesheim observed law enforcement trying to get people to move back when one law enforcement agent reached forward and started pepper-spraying people. Moments before the agent stopped spraying, he saw Nesheim with the camera and lunged forward and pepper-sprayed Nesheim right in the face. Nesheim was wearing both a helmet and body armor vest, which were labeled with "PRESS" on multiple sides, as well as press credentials. In a post to Instagram[155]

---

[153] https://pressfreedomtracker.us/all-incidents/minneapolis-star-tribune-photojournalist-pepper-sprayed-while-documenting-protests-in-brooklyn-center/

[154] https://pressfreedomtracker.us/all-incidents/photojournalist-hit-in-hand-with-law-enforcement-projectile-at-brooklyn-center-protest/

[155] https://instagram.com/p/CNmu3U7Hzvt/

Nesheim wrote: "Tonight I was pepper sprayed[156] and tear gassed worse than I've ever experienced" and "I would love to say I am surprised by this violation of my rights, but sadly I find it to be par for the course."[157]

185. On April 12, at 9:57 p.m., Unicorn Riot reported via Twitter that "Journalist Louie Tran [was] just arrested."[158]

## *APRIL 13, 2021*

186. On April 13, at 12:30 a.m. Tuesday morning, MACC live-streamed another OSN press conference from the OSN podium to provide information about the events of Monday night, April 12. Participating were DPS Assistant Commissioner Booker Hodges, MSP Colonel Langer, and HCSO Sheriff Hutchinson.[159]

- **i.** Assistant Commissioner Hodges stated "plans that [MACC] had put in place over the last few months were executed."[160]
- **ii.** Sheriff Hutchinson stated that "the deputies, troopers, DNR officers, and cops from all over the region came out" to "the operation tonight[.]"[161]
- **iii.** Colonel Langer explained that MACC was "monitoring particularly what was going on in the City of Brooklyn Center around the Brooklyn Center

---

[156] https://instagram.com/p/CNljjMaHNjm/

[157] https://pressfreedomtracker.us/all-incidents/photojournalist-for-new-york-times-targeted-with-pepper-spray-at-brooklyn-center-protest/

[158] https://twitter.com/UR_Ninja/status/1381803582522023937

[159] MN Operation Safety Net, *News Conference: April 13, 2021 – Briefing Update #1* (12:30 a.m., April 13, 2021), https://youtube.com/c/MinnesotaOSN/videos

[160] *supra*, n.159 at 4:53—5:00

[161] *supra*, n.159 at 5:21—5:39

Police Department and had been requested to assist."[162] He confirmed MACC "had Minnesota State Patrol, Department of Natural Resources conservation officers, [West Metro Command] made up of the suburban agencies in Hennepin County, and others" involved in MACC.[163] Additionally, it was noted that all agencies in MACC participated in "decisions needed to be made[.]"[164]

187.    On April 13, at 9:02 p.m., Nicholas Bogel-Burroughs, a reporter for the New York Times, posted an image of thick white smoke, captioned "[Minnesota State Patrol are] specifically ordering news media to leave."[165] Forty minutes later, Bogel-Burroughs posted a video with the caption, "Minnesota State Patrol officers just rushed in and appeared to arrest several people in Brooklyn Center on Day 3 of the #DaunteWright protests. That came immediately after police fired flashbangs and after about 45 mins of repeatedly ordering the news media, in particular, to leave."[166]

188.    On April 13, shortly after 9:00 p.m., Unicorn Riot journalist Niko Georgiades was reporting on the protests,[167] while standing with a group of other clearly identifiable

---

[162] *supra*, n.159 at 6:28—6:38

[163] *supra*, n.159 at 6:38—6:51

[164] *supra*, n.159 at 8:17—8:38

[165] https://twitter.com/NickAtNews/status/1382152255714045952

[166] https://twitter.com/NickAtNews/status/1382162348962680832

[167] https://youtu.be/BIQP0qEmOW8

journalists away from the protesters.[168] Minnesota State Patrol made the announcement that "Media and press you must leave the area. Media and press you must leave the area now[.]"[169] About twenty minutes later, the State Patrol once again singled out members of the press with orders to leave.[170] While broadcasting a live video feed of the Wright protests, Georgiades was shot "in the leg with some kind of impact round" and "it appeared to be deliberate and not accidental."[171] After this incident, at 9:41 p.m., Unicorn Riot tweeted "…state patrol is still repeatedly ordering the press specifically to leave"[172] and a few minutes later at 9:43 p.m. "'Media leave the area…media and press leave the area now' – state patrol for like the 100th time in the last half hour."[173] These events were recorded on video, which confirms that there was no one around Georgiades at the time he was hit, other than a few members of the press.[174] Unicorn Riot posted an update and images a few hours later about Georgiades' injury, one of which depicted a bloodied body part and was captioned "Content Advisory: Blood[.] Our field reporter Niko had skin broken and blood drawn by an impact round fired at him by Minnesota police while he was documenting

---

[168] https://pressfreedomtracker.us/all-incidents/unicorn-riot-journalist-shot-with-projectile-in-brooklyn-center/

[169] https://twitter.com/UR_Ninja/status/1382153689977225218

[170] https://twitter.com/UR_Ninja/status/1382158417863786506

[171] https://twitter.com/UR_Ninja/status/1382160507088506892

[172] https://twitter.com/UR_Ninja/status/1382161958011490308

[173] https://twitter.com/UR_Ninja/status/1382162658552594432

[174] https://twitter.com/i/broadcasts/1lDGLpXXvAqGm (at timestamps 32:00-35:00)

#DaunteWright protests on our stream tonight."[175] A photograph of the injury to Georgiades' leg was posted to Twitter.[176]

189.    On April 13, Minneapolis Star Tribune reporter Kim Hyatt posted to Twitter at 8:59 p.m. that law enforcement were "telling the media to leave."[177] Approximately twenty minutes later, Hyatt posted two images, both captioned that law enforcement "keep announcing 'media and press leave the area.'"[178] At 9:38 p.m., Hyatt posted a video—the thumbnail showing her large, yellow "PRESS" credentials—with the caption that law enforcement are "making arrests and physically grabbing press and telling us to leave."[179] Shortly after, Hyatt posted to twitter that law enforcement had come from around the backside of an apartment building located across the street from the police department,[180] and "ambushed everyone" who had gathered there.[181] She said in the video "I was holding up my [press] badge and they still grabbed me and told me to get out of here." At 9:48 p.m., Hyatt posted on Twitter "…they announced this was an unlawful assembly and told the media to leave around a dozen times."[182] The Tracker called the Brooklyn Center Police Department regarding this incident, and they did not immediately respond to a voicemail

---

[175] https://twitter.com/UR_Ninja/status/1382216568332029953

[176] https://twitter.com/UR_Ninja/status/1382216568332029953/photo/2

[177] https://twitter.com/kimvhyatt/status/1382151581521616896

[178] https://twitter.com/kimvhyatt/status/1382156770496352258

[179] https://twitter.com/kimvhyatt/status/1382161297157062661

[180] https://twitter.com/kimvhyatt/status/1382163062048841729

[181] https://twitter.com/kimvhyatt/status/1382159398596923402

[182] https://twitter.com/kimvhyatt/status/1382163875215327233

requesting comment.[183] At a press conference the following day, according to her tweets, the reporter asked Mayor Elliot what he thought about law enforcement's unconstitutional conduct.

190.    On April 13, at 9:33 p.m., Andrew Mannix tweeted "Toward the end, patrol was firing a lot of projectiles. One bounced off the bottom of my boot as I was walking away."[184]

191.    Veteran CNN reporter Sara Sidner stated, "I have NEVER heard police in America actually say 'journalists will be arrested during a protest.' But that happened in #BrooklynCenter last night."[185]

192.    At 11:55 p.m. on April 13, Jared Goyette tweeted that he was "frustrated by @MinnesotaOSN's inability to respect or understand that the [F]irst [A]mendment protects journalists' right to cover events of public interest, even when there is curfew, and even when there is a dispersal order."[186] In this tweet, Goyette tagged the official Twitter account for MACC's Operation Safety Net, putting them on notice that members of the press were being targeted for unlawful reprisals and suffering unconstitutional violations.

193.    On April 13, MSP troopers grabbed CNN producer Carolyn Sung by her backpack, threw her to the ground, and zip-tied her hands behind her back. Sung repeatedly

---

[183] https://pressfreedomtracker.us/all-incidents/minneapolis-star-tribune-reporter-grabbed-ordered-to-disperse-during-brooklyn-center-protest/

[184] https://twitter.com/AndrewMannix/status/1382159998457896960

[185] https://twitter.com/sarasidnerCNN/status/1382338180993716230

[186] https://twitter.com/JaredGoyette/status/1382195855495630848

identified herself as a journalist working for CNN and showed her credentials. Despite repeatedly hearing Sung identify herself as a member of the press, and that the zip ties were too tight on her wrists, one trooper yelled at her "Do you speak English?" Sung is Asian-American, whose primary language is English.[187] A letter was sent by Sung's attorney to Minnesota Governor Tim Walz in an effort to impress upon him the gravity of the misconduct by law enforcement towards the press, and to memorialize an earlier phone conversation related this and other similar incidents.[188]

194.    After arresting Sung, Minnesota State Trooper Sgt. Andrew Derungs prepared a knowingly false "Statement of Probable Cause to Detain" to justify MSP's arrest, detention, and transport of Sung to the Hennepin County Jail for processing. This false report prepared by the State Patrol stated that Sung had "defied several dispersal orders," was "actively defiant" to State Troopers, "refused to leave the area," and "participated in vandalizing and rioting activity"—all of which Derungs knew was untrue. State Troopers concocted these lies about Ms. Sung to justify her unlawful detention and cover up their own misconduct. Sung, through her counsel, asked the State Patrol to correct this blatantly false report and they refused to do so.[189]

195.    Sung was transported to Hennepin County Jail, where HCSO deputies patted her down, fingerprinted her, and ordered her to strip and don an orange jumpsuit, despite

---

[187] https://pressfreedomtracker.us/all-incidents/cnn-producer-thrown-to-the-ground-arrested-while-covering-protests-in-brooklyn-center/

[188] https://cpj.org/wp-content/uploads/2021/04/Letter-to-Minnesota-governor.pdf

[189] *Goyette*, ECF No. 219-2, "Exhibit B"

71

Sung identifying herself as a member of the press. The HCSO held Sung in custody until attorneys for CNN secured her release.[190] As with photographers Maury, Maturen, and Lassig, Sung's unlawful arrest was followed by continued unlawful and unconstitutional detention, and treatment, at the hands of the HCSO.

196. The HCSO Criminal Intelligence Division added information regarding Sung to a Dossier of photographs of individuals that HCSO purports were involved in "planned events, protests, and rallies." This Dossier was maintained by the HCSO and reviewed internally, and contains photographs and information of other clearly identifiable journalists which will be used to profile, monitor, and target individuals at future protests.

197. Sheriff Hutchinson and the HCSO were well-aware of their obligation to safeguard the First Amendment rights of Sung and other members of the press, and intentionally violated press's First Amendment rights despite this knowledge.

198. On April 13, independent journalist Naasir Akailvi was arrested and cited while reporting on the Wright protests. Law enforcement were smashing a car's windows for some reason, and Akailvi was filming the incident. A law enforcement agent grabbed Akailvi from behind, pulled him to the ground and zip-tied Akailvi's hands behind his back. Akailvi told the officer, "I'm press, I'm press." He had press credentials on his person and tried to present them to the agent. The agent took Akailvi's camera, microphone, and tripod, and told Akailvi he would be charged. Akailvi was cited for "failure to obey a lawful

---

[190] https://www.cnn.com/2021/04/19/media/minnesota-protests-coverage-reliable-sources/index.html

order" for failing to disperse when law enforcement ordered members of the press to leave the area.[191]

199. Other journalists commented on Defendants' aggressive behavior. CNN journalist Miguel Marquez stated, "I've only seen [behavior like that] in Afghanistan when U.S. forces were trying to control a local population."[192]

200. On April 13, Adam Gray, the Chief photojournalist for a UK-based news service, was walking backward away from law enforcement so he could keep them in view and take photographs. Gray was very clearly a member of the press, noting that he also had two large cameras around his neck in addition to press credentials issued by the New York Police Department. A video posted to Gray's Instagram account shows MSP troopers in full riot gear charging at him and shoving him into a patch of grass and he can be heard saying that he is a member of the press. Gray then had his hands zip-tied and was waiting for a citation to be written when he heard a voice on the police radio that said members of the press should be charged with failure to disperse.[193]

201. On April 13, as the protest continued into the night, freelance photojournalist Joshua McFadden heard law enforcement order members of the press to leave the area,

---

[191] https://pressfreedomtracker.us/all-incidents/journalist-cited-while-reporting-on-brooklyn-center-protest/

[192] https://www.cnn.com/2021/04/19/media/minnesota-protests-coverage-reliable-sources/index.html

[193] https://pressfreedomtracker.us/all-incidents/photographer-arrested-cited-while-covering-brooklyn-center-protests/

which can be heard in a video posted to Twitter.[194] Having been hit with projectiles the previous night, McFadden decided to leave. Unable to go directly to his car because the street was blocked, McFadden met up with photojournalist Chris Tuite at a nearby gas station. The two of them saw Jack Flom in a car heading their direction and Flom offered to give them a ride to where the McFadden's car was parked. Right after McFadden and Tuite got in the car, law enforcement agents surrounded the car and beat on the windows with batons to the point where, according to McFadden, it almost seemed like the windows were going to break. Then, agents pointed their weapons—which looked like guns—at the occupants in the car and were shouting at them to get out of the car, which was not possible because the vehicle was surrounded. Agents then dragged Flom of the car out along with Tuite, before two officers got into the vehicle—one into the driver's seat, and the other in the back seat next to McFadden. The agents started hitting McFadden with their clubs, striking him on his legs and hitting his camera, like they were trying to break it. Even when McFadden identified himself as a member of the press multiple times, the agents did not stop. Tuite, outside the car at this point, saw the agents in the car hitting McFadden and told another agent that McFadden was a member of the press and a photographer for the New York Times. McFadden noted that from the time agents began beating on the car windows until when he was let go was about 45 minutes, and said that it seemed there was a certain amount of disdain for the journalists at the protests.[195]

---

[194] https://twitter.com/UR_Ninja/status/1381463907630411778/

[195] https://pressfreedomtracker.us/all-incidents/photojournalist-hit-by-officers-with-batons-during-brooklyn-center-protest/

74

202. On April 13, at that same time, freelance photojournalist Chris Tuite was in Flom's car with Flom and McFadden trying to leave the area when law enforcement agents surrounded the car and with their AR-15s, pointed them at the occupants and tried to knock the windows in using the butt of their guns. In response, Tuite screamed "Media!" more than a dozen times, and held his media pass up to the window before agents physically pulled Tuite from the vehicle.[196] Tuite submitted a declaration under penalty of perjury,[197] and provided testimony in open court of these events in *Goyette*.[198]

## *APRIL 14, 2021*

203. At 12:00 a.m. on Wednesday morning, April 14, MACC once again live-streamed an OSN press conference from the OSN podium to discuss the events of Tuesday night, April 13. Participating—similar to the night before—was DPS Assistant Commissioner Hodges, MPD Deputy Chief Amelia Huffman, MSP Colonel Langer, and HCSO Sheriff Hutchinson.[199]

i. Assistant Commissioner Hodges reported that the results achieved by law enforcement was due to "our unified command and this plan that we've been

---

[196] https://pressfreedomtracker.us/all-incidents/officers-point-weapons-at-photojournalist-pull-him-out-of-car-at-brooklyn-center-protest/

[197] *Goyette*, ECF No. 172, "Second Declaration of Chris Tuite"; see also *Kaplan v. Harrington*, Case No. 22-CV-0640, "Complaint" at 102—104

[198] *Goyette*, ECF No. 219-1, "Exhibit A" at 97:8—108:20

[199] MN Operation Safety Net, *News Conference: April 14, 2021 – Briefing Update #1* (12:00 a.m., April 14, 2021), https://youtube.com/c/MinnesotaOSN/videos

75

putting together for the last 3 months" and that MACC intends to "continue to execute our plan."[200]

ii. HCSO Sheriff Hutchinson reported that he "was the incident commander, but we are under a unified command—which is everybody under Operation Safety Net[.]"[201] He later added that "because of unified command, we all are working together, we're in the same room, we're making decisions together."[202]

iii. MSP Colonel Langer said his role in this news conference, similar to previous nights, was to "walk through a little bit of the events tonight, in representing of the unified command, and the law enforcement leaders that have been involved."[203] Colonel Langer once again underscored the fact that "our teams were actively working together under unified command, and had developed plans" to execute in Brooklyn Center.[204] After "decisions were made to provide dispersal orders," he confirmed that "our teams worked together in coordinated fashion to enforce dispersal orders that were given."[205]

---

[200] *supra*, n.199 at 1:27—1:39

[201] *supra*, n.199 at 2:09—2:17

[202] *supra*, n.199 at 7:37—7:45

[203] *supra*, n.199 at 2:50—3:05

[204] *supra*, n.199 at 3:26—3:32

[205] *supra*, n.199 at 4:20—4:45

204.     On April 14, 2021, at 12:22 a.m., OSN tweeted a quote from MSP Colonel Langer: "'We are prepared and we will be back tomorrow.'"[206]

205.     On April 14, at 2:30 p.m., DPS Director of Communications, Bruce Gordon, and Defendant Colonel Langer met with the General Counsel and Managing Editor for the Star Tribune to discuss "developing media issues in Brooklyn Center."[207]

206.     On Wednesday night, April 14, Niko Georgiades, a journalist with a non-profit media outlet Unicorn Riot and was hit with a less-lethal projectile the night before, observed people shouting at National Guard vehicles that were loading up and leaving, which appeared to prompt the Minnesota State Patrol to decide to make arrests. In a video posted to the media outlet's website,[208] Georgiades can be heard identifying himself as a member of the press as a law enforcement officers comes up to him and tells him he's under arrest. Georgiades replied, "[f]or what? I'm press" and "I'm not doing anything, I'm press." An agent shouts "stop resisting" when Georgiades had his camera in one hand, and the agent was straightening out Georgiades' other arm behind him. Georgiades responded "I'm not resisting, I'm press." While law enforcement was detaining him, one agent pulled a wireless microphone out from Georgiades' pocket, threw it on the ground, and kicked it.[209] Georgiades' wrists were restrained in cuffs and he was brought over to where two other journalists were also being held. Law enforcement photographed the three

---

[206] https://twitter.com/MinnesotaOSN/status/1382202665950715904

[207] *Goyette*, ECF No. 121, "Exhibit 2" at Interrogatory Answer No. 6

[208] https://unicornriot.ninja/2021/police-break-equipment-shoot-beat-and-detain-press/

[209] https://twitter.com/UR_Ninja/status/1382567290663809024

journalists' faces and press credentials. When Georgiades went back to retrieve his microphone, an agent yelled at him when he had asked why the equipment had been thrown. The microphone was found under some bushes and had some missing and damaged parts.[210]

207.    On April 14, Lauren Blanchard—national media correspondent for Fox News—posted on Twitter at 10:21 p.m. "My crew and I were ordered out of cars and to the ground by police" and "They took photos of all our credentials. After about 5 mins they let us back into our cars and let us leave. . . . We were not the only media crew stopped[.]"[211] A few minutes later, Blanchard posted a video capturing part of the encounter with a caption "Partial video of my crew and I as we tried to leave the area. Police had blocked everyone in. We were ordered on our knees – hands up. They took pics of all our IDs."[212] She later went on to say, at 10:52 p.m., that "the curfew put in place by the Mayor of Brooklyn Center had media exempt. We were scolded by the law enforcement checking our IDs that we were not supposed to be there."[213]

208.    On April 14, State Troopers assaulted and arrested independent journalists Naasir Akailvi and Tracy Gunapalan of the online Neighborhood Reporter. Akailvi and Gunapalan were returning to their car as the protests dwindled. As they were departing,

---

[210] https://pressfreedomtracker.us/all-incidents/unicorn-riot-journalist-detained-microphone-damaged-while-covering-brooklyn-center-protest/

[211] https://twitter.com/LaurenBlanch12/status/1382534601462185984

[212] https://twitter.com/LaurenBlanch12/status/1382537312953860100

[213] https://twitter.com/LaurenBlanch12/status/1382542234462093312

78

they stopped to film an interaction between law enforcement and protesters. At this point, a line of State Troopers in riot gear began running up the street at Akailvi and Gunapalan. The two journalists waved their camera and microphone and shouted they were press, but the troopers yelled at them to move, so the pair started running. As they were running, one MSP trooper shoved Akailvi to the ground,[214] and another trooper shoved Gunapalan to the ground.[215] A trooper pulled the microphone out of Akailvi's hand, and as he was falling, the battery pack for his camera fell from his backpack. The trooper sat on Akailvi's back and handcuffed him. A different trooper handcuffed Gunapalan. According to Gunapalan: "The whole time I kept yelling, 'I'm press, I'm press' and they didn't seem to care." Akailvi told the troopers he was press and had a press pass around his neck. Another trooper said, "That doesn't always work, does it?" Akailvi continued to state he was press and asked to speak to a supervisor. The trooper responded, "you can get the fuck out of here." Troopers then brought Akailvi and Gunapalan to an area where another independent journalist was being detained. Troopers photographed their faces, credentials, and press passes before releasing them. After being processed and released, Akailvi returned to the area where he had been stopped to try and find his microphone and battery pack. He found the microphone

---

[214] https://pressfreedomtracker.us/all-incidents/social-media-journalists-detained-while-covering-brooklyn-center-protest

[215] https://pressfreedomtracker.us/all-incidents/local-social-media-journalists-detained-while-covering-brooklyn-center-protest/

79

more than 15 feet from where he had been pulled to the ground. It was broken into multiple pieces and destroyed.[216] He never located his battery pack.

209.    In response to the recent targeting of journalists by law enforcement, and based on particularized evidence that the State Troopers bore direct responsibility for a part of it, members of the press in *Goyette* sought a Temporary Restraining Order[217] ("TRO") against State Defendants, and their agents, servants, employees, and representatives.

## *APRIL 15, 2021*

210.    Similar to previous nights, MACC live-streamed an OSN press conference at 12:00 a.m. on Thursday morning from the OSN podium to discuss the events of Wednesday night, April 14. Participants in this news conference included Defendants Commissioner Harrington, Colonel Langer, and Sheriff Hutchinson.[218]

  i.  Commissioner Harrington reminded everyone "the Operation Safety Net operation that was begun 9 months or so ago" was so MACC could "be prepared for the Chauvin trial" and "our unified command" was composed "of State police assets, Minnesota National Guard, local police assets such as Minneapolis, County assets like Hennepin County[.]"[219] Commissioner Harrington also stated MACC "assembled this group very deliberately and

---

[216] https://twitter.com/UR_Ninja/status/1382567872547987461; *see also* https://twitter.com/UR_Ninja/status/1382576839151996928

[217] *Goyette,* ECF No. 94

[218] MN Operation Safety Net, *News Conference: April 15, 2021 – Briefing Update #1* (12:00 a.m., April 15, 2021), https://youtube.com/c/MinnesotaOSN/videos

[219] *supra*, n.218 at 8:50—9:25

have been planning very deliberately on how we would work this" and "our plans shifted when Mr. Wright was killed in Brooklyn Center and protests broke out[.]"[220] He went on to say "this is an ongoing process, this is a process where we are learning every day, we are continuing to communicate every day with … our law enforcement partners and with the elected officials—who we are working with steadily to try and make sure that they are kept informed of what's going on and that we can work with them through advice and counsel[.]"[221]

ii. Sheriff Hutchinson added that the "Hennepin County Sheriff's Office and our partner law enforcement agencies will continue to provide public safety services to the City of Brooklyn Center"[222] and that "we're under a unified command."[223] Additionally, Sheriff Hutchinson confirmed that he sent a letter to Brooklyn Center Mayor Mike Elliot discussing the command and control going on between the City and the Sheriff's Office.[224]

iii. Colonel Langer was happy to report that MACC was "prepared around the Brooklyn Center police department tonight[.]"[225] After he explained that

---

[220] *supra*, n.218 at 9:41—9:59

[221] *supra*, n.218 at 11:56—12:25

[222] *supra*, n.218 at 12:42—12:53

[223] *supra*, n.218 at 13:14—13:27

[224] https://bringmethenews.com/minnesota-news/in-letter-hennepin-sheriff-asks-brooklyn-center-do-you-still-want-our-help

[225] *supra*, n.218 at 14:05—14:14

MACC was "watching" and "tracking" activity, MACC "exercised patience as a unified command, and at some point around the time of the curfew, we decided to move in after dispersal orders."[226]

## *APRIL 16, 2021*

211.    By this day, April 16, MACC Defendants were on notice of the unconstitutional behavior by their law enforcement agents, but did nothing to address the problem.

212.    Despite numerous public announcements decrying the targeting of journalists—including statements from the Governor himself—the attacks on journalists continued.

213.    These repeated attacks on members of the press demonstrated MACC Defendants' failure to take this matter seriously, to adequately hold themselves accountable for the misconduct, and to sufficiently investigate and discipline the law enforcement agents responsible for it.

214.    On April 16, earlier in the day and prior to the assault on the Plaintiff, a United States District Judge granted *Goyette*'s Temporary Restraining Order to stop law enforcement from attacking, harassing, and retaliating against reporters covering the protests in the City of Brooklyn Center.[227]

---

[226] *supra*, n.218 at 14:24—15:10

[227] *Goyette*, ECF No. 105

215.    MACC Defendants acted with deliberate indifference to the constitutional

rights of the members of the press as evidenced by the recurring use of excessive force

against them. These recurring incidents, some of which are referenced above in this

Complaint, are also highlighted throughout the Judge's Order granting the TRO:

"Declarations … detail treatment that members of the press … have experienced
while photographing, filming, or otherwise documenting government activity at
protest scenes."[228]

"…members of the press have sustained severe injuries at the hands of law
enforcement in recent days. These severe injuries include bruising and at least one
injury requiring surgery."[229]

"…actions toward the press, including dispersal orders, harassment, use of chemical
agents, and less-lethal weapons, threats, detention, and arrests…."[230]

"…declarations detail the treatment that members of the press experienced while
covering protests on April 11-14, 2021. The declarations reflect that these individuals
were directed by law enforcement to vacate the protest area, physically grabbed,
struck by less-lethal projectiles and rubber bullets, and pepper sprayed."[231]

"…at least one member of the press is likely physically unable to continue reporting
for up to six weeks because of injuries he sustained as a result of being struck by a
less-lethal projectile."[232]

"…although … members of the press were clearly identifiable as reporters and press
photographers, [law enforcement] singled them out in a variety of ways. [Law
enforcement] advised the press that they needed to vacate the protest areas, pepper
sprayed them, and hit them with less-lethal projectiles."[233]

---

[228] *supra,* n.227, p. 6

[229] *supra,* n.227, p. 9

[230] *supra,* n.227, p. 9-10

[231] *supra,* n.227, p. 10

[232] *supra,* n.227, p. 11

[233] *supra,* n.227, p. 11

"Law enforcement officers targeted the press, threatening to 'arrest anyone who does not disperse in 10 minutes including journalists' and repeatedly ordering the press to leave, shouting messages such as: 'Media you need to disperse. Leave the area.'"[234]

"...a Star Tribune photojournalist, who had a camera and press credentials in clear view, was pepper sprayed in the eye while photographing a scene. According to another journalist, '[o]ne officer just shot our ground reporter in the leg with some kind of impact round – it appeared to be deliberate and not accidental.'"[235]

216.    Sadly, the Judge's Order had little effect on the conduct of law enforcement agents involved with MACC and Operation Safety Net. The Minnesota State Patrol's failure to comply is not surprising, as the Judge's Order was not communicated to MSP supervisory troopers (Captains and above) until the morning of April 17, 2021.

217.    However, as Solicitor General Kramer stated, "[t]his TRO, while issued against DPS/MSP, is a declaration of what the law is in Minnesota more broadly, and therefore all OSN and law-enforcement partners must comply with it."[236]

218.    The polices, practices, and/or customs of MACC and MACC Defendants was so permanent and well settled that, despite this declaration of Minnesota law, MACC and MACC Defendants continued with their heavy-handed tactics on the sixth day of the Wright protests. In other words, on the day of the Plaintiff's assault, and after the Judge's Order granting the TRO was issued, recurring incidents of unconstitutional conduct by law enforcement continued:

---

[234] *supra,* n.227, p. 11
[235] *supra,* n.227, p. 11-12
[236] *Goyette,* Doc 121-1, "Exhibit 7"

84

219.    On April 16, independent photojournalist Jon Farina had a law enforcement

agent move suddenly close to his camera before the agent, holding a baton with a hand at

each end, used it to shove Farina in the shoulder.[237] Immediately afterwards, a second agent

came up behind Farina, grabbed his backpack, and used it to pull Farina back. The agent

shouted "get out of here" before following Farina and shining a flashlight at him. Farina

said he decided to leave the area because he felt he might be arrested if he stayed, and that

he believed he was targeted for being a journalist. Farina also believed the agents tried to

intimidate journalists, and that it was "very clear and obvious all journalists were targeted

that day."[238]

220.    On April 16, freelance photojournalist Chris Tuite was taking a photo of a

law enforcement agent kneeling on another photojournalist's back when he was grabbed

from behind by another agent—hard enough to rip the neck of his shirt—and told him he

was under arrest. Tuite was ultimately directed to leave the area, and after rounding the

corner of a nearby building, Tuite was jumped by five more law enforcement agents. One

of these agents put a can of pepper spray in his face and screamed, "what the fuck do you

not understand? Go fucking north. This was your one free pass. Are you fucking stupid?

Go now or I'll arrest you!" With a press pass around his neck and carrying several cameras,

Tuite was certain the agents were aware he was a journalist as they specifically said to him,

---

[237] https://twitter.com/StatusCoup/status/1383265430672863237/

[238] https://pressfreedomtracker.us/all-incidents/photojournalist-for-status-coup-shoved-pulled-by-law-enforcement-officers/

"Media: get out of here!"[239] Tuite submitted a declaration under penalty of perjury,[240] and provided testimony in open court of these events in *Goyette*.[241]

221.    On April 16, while covering the protests, freelance photojournalist Timothy Evans had a law enforcement agent run directly at him and at about 5 feet away, sprayed him in the face with a chemical agent.[242] Evans dropped to his knees and held up his press credential in one hand and one of his cameras in the other. While Evans was still kneeling, he took a photograph of another photojournalist being confronted by a law enforcement agent. Immediately afterwards, Evans heard someone shout "get on the ground" and saw an agent charging at him. When Evans held out his press credential and shouted to identify himself as press, the agent proceeded to tackle him onto his back and punch Evans in the face. The agent then ordered Evans to roll over onto his stomach and told him he was under arrest. Evans complied, continuing to tell the agent he was a journalist. The agent told Evans to "shut up" and that he doesn't care if Evans was media and that he should have left when he had the chance. After Evans showed the agent his press credential—attached to a lanyard around his neck—the agent ripped the lanyard off his neck, and threw it in the dirt. Evans told the agent that press was exempt from the curfew, and the agent responded, "you're a liar. Shut the fuck up." The agent kneeled on Evans' back and used a shield to

---

[239] https://pressfreedomtracker.us/all-incidents/photojournalist-threatened-assaulted-by-minnesota-state-patrol-while-covering-brooklyn-center-protest/

[240] *Goyette*, ECF No. 127, "Declaration of Chris Tuite"

[241] *Goyette*, ECF No. 219-1, "Exhibit A" at 108:21—127:21

[242] https://pressfreedomtracker.us/all-incidents/photojournalist-assaulted-detained-while-covering-brooklyn-center-protest/

push down on him.[243] Another agent—either a HCSO deputy or MSP trooper—soon came up to them and Evans tried to tell the new agent he was press, to which the agent replied "shut the fuck up" and smashed the back of the Evans' helmet, thrusting his face into the dirt. Eventually, law enforcement said they would let Evans go as long as he agreed to leave the area and not continue to cover the protests. Evans submitted, under penalty of perjury, an amended declaration of these events in *Goyette*.[244]

222.    On April 16, freelance photojournalist Joshua McFadden, on assignment for the New York Times, was with other journalists—sticking together as a group, huddled together in one area—when law enforcement rushed in and detained them. The group included other photographers, TV news staff, and reporters, and were repeating "we're press, we're press!" Law enforcement agents told the journalists "we don't care" and ordered them to lie on the ground. While on the ground, one agent ordered McFadden to get up and then another agent told him to get back down. At that point McFadden was on his knees, identified himself as a member of the press, and asked the agents "what do you want me to do?" Another group of agents rushed and trampled over McFadden, knocking him to the ground like a football tackle. The agents started hitting him and hitting his camera. McFadden said he previously had similar experiences three days earlier in

---

[243] Initially, Evans believed that it was an MSP trooper who originally assaulted him. Later, Evans received a photograph from photojournalist Chris Tuite, suggesting it was in fact a Hennepin County Sheriff's Deputy who assaulted him.

[244] *Goyette*, ECF No. 126

Brooklyn Center, and believed he was targeted by law enforcement because he was a journalist.[245]

223. On April 16, as law enforcement advanced on protesters, Agence France-Presse ("AFP") photojournalist Chandan Khanna—along with a fellow AFP reporter[246] and an AFP video[247] correspondent—moved to a well-lit spot in effort to make clear to law enforcement that they weren't protesters. Law enforcement then rushed toward the AFP journalists, even as the journalists shouted to identify they were not protesters. After one law enforcement agent sprayed a nearby photographer, the agent then turned to the AFP journalists and began spraying each of the three of them with the chemical irritant causing the group to continue shouting to identify themselves as journalists.[248] Khanna said "I can say with all confidence, that [the agent] knew we were press, and [the agent] made sure that he sprayed all of us."[249] As the agent was spraying the AFP journalists, the dispenser clogged, so the agent shook it and then resumed spraying them as documented in a photo

---

[245] https://pressfreedomtracker.us/all-incidents/photojournalist-detained-tackled-by-law-enforcement-in-brooklyn-center/

[246] https://pressfreedomtracker.us/all-incidents/afp-reporter-news-crew-pepper-sprayed-while-covering-brooklyn-center-protest/

[247] https://pressfreedomtracker.us/all-incidents/afp-correspondent-news-crew-pepper-sprayed-while-covering-brooklyn-center-protest/

[248] https://twitter.com/Chandanphoto/status/1383433470869872645/photo/2

[249] https://twitter.com/Chandanphoto/status/1383667472604168195

taken by Alex Kent and posted to Twitter:[250]



In an April 27, 2021 letter to Sheriff Hutchinson, Commissioner Schnell identified the law enforcement agent in the photo as a HCSO deputy. In the letter, Commissioner Schnell noted, "it is difficult to imagine circumstances that would warrant the use of chemical irritant against those plainly obvious journalists."[251] After the agent stopped spraying, he shouted at them to "get the fuck out!" When another agent grabbed Khanna by the right arm and dragged him away from the area, he saw a number of journalists who had been detained and were lying on the ground. Khanna tried to take photographs, but law

---

[250] https://twitter.com/AlexKentTN/status/1383290508181590018

[251] https://twitter.com/webster/status/1387542610554744837

enforcement formed a human shield around him to block his view. The agent who grabbed Khanna's arm told him multiple times, "if you point your camera anywhere I'm going to arrest you."[252]

224.    Freelance photojournalist Aaron Nesheim on assignment for The New York Times, was wearing a protective vest labeled with "PRESS" on the front and back. While Nesheim was photographing as law enforcement advanced on the crowd and ordered everyone to lie down on their stomachs, one law enforcement agent pepper-sprayed Nesheim, grabbed him by the front of the vest, and used his vest to throw him on the ground. Nesheim said the agent definitely understood he was a member of the press. The force of his fall damaged the lens on one of his cameras.[253]

225.    Journalist Brad Svenson—who runs a citizen watchdog news platform and live-streams protests—was standing in a gap in the crowd when a flashbang came in his direction from behind a fence that surrounded the police station. The grenade hit Svenson on his right shin and detonated. Svenson said "it was a big enough explosion to rattle me pretty good." Svenson had a patch of skin that looked like a sunburn and he felt a burning sensation on his leg for about a week and a half. Svenson said he feels that he was targeted

---

[252] https://pressfreedomtracker.us/all-incidents/afp-photojournalist-news-crew-pepper-sprayed-at-brooklyn-center-protest/

[253] https://pressfreedomtracker.us/all-incidents/photojournalist-for-new-york-times-thrown-to-ground-detained-while-covering-brooklyn-center-protest/

by law enforcement because he was a journalist, and had the word press marked on his vest and helmet.[254]

226. NBC photojournalist Edward Ou was documenting the Daunte Wright protests from the perspective of a woman who lived in Brooklyn Center across the street from the Brooklyn Center Police Department. Ou was interviewing her in her own home, and was not close to protesters or law enforcement agents. Ou was surprised to hear law enforcement broadcasting a message ordering everyone to disperse, including members of the press; even though he was on private property, he knew the media were exempt from the curfew in Brooklyn Center that night. Incredibly, a law enforcement agent saw Ou filming the woman and her children through an open window in her home. The agent approached the window and pointed a weapon at Ou, threatening Ou to back off—even though he was on private property and inside a private residence—with a purpose to intimidate Ou into ceasing his First Amendment activities. The agent's conduct demonstrated a total ignorance of the constitutional rights of the woman being interviewed, as well as Ou's First Amendment rights, and is indicative of Defendants' complete failure to correct the misbehavior that led to the countless First Amendment violations that occurred during the Floyd and Wright protests. Ou, not wanting to do anything that would cause the woman he was interviewing or her home to be attacked, put his camera down and stayed out of sight. Ou was scared that law enforcement would attack him, his interviewee,

---

[254] https://pressfreedomtracker.us/all-incidents/journalist-hit-with-flash-bang-grenade-while-covering-brooklyn-center-protest/

and her children—even though the group was inside a private residence—similar to the attacks he both witnessed and suffered during the Floyd protests.[255]

227.    On April 16, freelance journalist J.D. Duggan was with a group of journalists whom MSP troopers surrounded and forced to the ground. When Duggan got down to his knees, a law enforcement agent pushed him onto his stomach before photographing his credentials.[256]

---

[255] *Goyette*, ECF No. 219-1, "Exhibit A" at 53:23—62:6

[256] https://twitter.com/JDugganMN/status/1383260154758533129

228.     The troopers claimed these unconstitutional actions against members of the

press was for "easier processing" and was captured in photographs posted to Twitter.[257]



In this photo, MSP troopers detain a journalist with PRESS markings and a large camera.

229.     Similarly, USA Today photojournalist Jasper Colt reported that MSP

troopers rounded up protesters and members of the press in one group and told everyone

to lie down on their stomachs.[258] Law enforcement agents identified people who were

[257] https://twitter.com/jaspercolt/status/1383285891104342023/photo/2

[258] https://usatoday.com/story/news/nation/2021/04/17/brooklyn-center-protests-police-round-upjournalists/7268057002

93

members of the press and brought them to another area where they photographed journalists' credentials, IDs, and their faces.[259]

230. Reuters photojournalist Leah Mills,[260] WCCO reporter Reg Chapman,[261] Star Tribune journalists Liz Sawyer and Susan Du were just a few among the multitude of journalists detained and photographed, as video shows.[262]

231. In addition to the unconstitutional conduct targeting members of the press, Defendants repeatedly forced journalists to locations from which they could not witness, document, or report on the law enforcement response to the protesters.[263]

232. MACC Defendants acted with deliberate indifference to the constitutional rights of the members of the press—as evidenced by the recurring use of force against them night after night—even after notice of misconduct by law enforcement agents deployed in Brooklyn Center.

233. On most nights of the Wright protests, and specifically on April 16, law enforcement encircled the protest area, surrounding protesters, bystanders, observers, and members of the press, cutting off all routes of egress—including sidewalks—which

---

[259] https://pressfreedomtracker.us/all-incidents/usa-today-photojournalist-detained-during-brooklyn-center-protest/

[260] https://pressfreedomtracker.us/all-incidents/reuters-photojournalist-detained-at-brooklyn-center-protest/

[261] https://youtube.com/watch?v=YxH-2u7i-6w

[262] https://twitter.com/MDVancleave/status/1383265657601413125

[263] https://twitter.com/JDugganMN/status/1382541484524777475

94

prohibited individuals trapped inside from leaving. This is a law enforcement tactic referred to as "kettling."

234. It was clear—by the coordination of actions by law enforcement agents who surrounded the area into a group (the "kettle") and the systematic disbursement of chemicals, flash-bang grenades, concussion grenades, and less-lethal projectiles—this kettling tactic was planned. MACC Defendants—and command staff of the agencies participating in OSN—had notice of, and sanctioned the conduct of, the Defendants as described herein.

235. MACC Defendants were directing such actions and conduct.

236. Additionally, MACC Defendants did not prevent law enforcement agents from engaging in such conduct. Instead, MACC Defendants tacitly accepted, encouraged, and promoted such misconduct by not disciplining and/or removing law enforcement agents from MACC or OSN involvement when they did engage in such misconduct.

## *APRIL 17, 2021*

237. At 12:20 a.m. Saturday morning, April 17, another MACC press conference was live-streamed from the OSN podium to provide information about the events of Friday night, April 16. Participating in this news conference was Defendants Commissioner Harrington, Sheriff Hutchinson, Colonel Langer, and Interim Chief Gruenig.[264]

    i. Commissioner Harrington revealed that MACC had exceptional visibility all throughout the protest area—and beyond—as they were able to see riotous

---

[264] MN Operation Safety Net, *News Conference: April 17, 2021 – Briefing Update #1* (12:20 a.m., April 17, 2021), https://youtube.com/c/MinnesotaOSN/videos

materials being "carried in and staged *behind* the apartment buildings in that area."[265] Commissioner Harrington noted the "mobile field force team standing there" behind the fence, after a third dispersal order was given, moved out,[266] and after an "inner perimeter had been re-secured[,]" MACC "continued to make arrests with mobile field force teams that were out there."[267] Commissioner Harrington also referenced MACC's online capabilities, and their ability to track social media posts, noting that when a protest-related "social meme was going through social media," MACC was "aware[.]"[268]

ii. Sheriff Hutchinson clarified that it was "police officers and deputies inside the fence."[269]

iii. Colonel Langer stated that MSP had "State Troopers in the metro for this operation to help the City of Brooklyn Center[.]"[270]

iv. Interim Chief Gruenig said "we appreciate all of our partners helping us with this situation."[271]

---

[265] *supra*, n.264 at 3:29—3:38 (emphasis added)

[266] *supra*, n.264 at 5:38—5:43

[267] *supra*, n.264 at 6:55—7:06

[268] *supra*, n.264 at 15:01—15:09

[269] *supra*, n.264 at 8:37—8:43

[270] *supra*, n.264 at 10:50—10:56

[271] *supra*, n.264 at 13:38—13:43

238.   Governor Walz went on to publicly acknowledge that the assaults on the media were "chilling" stating, "Apologies are not enough; it just cannot happen."[272]

239.   Governor Walz conceded that "we all need to recognize the assault on media ... in our country over the last few years is chilling."[273] Notably, Governor Walz's statement about "chilling" freedom of the press did not include any reference to the chilling effect of media assaults by the policymakers and law enforcement leaders directly under his command, which reflects the State Defendants' ongoing failure to accept responsibility for the unconstitutional conduct of the Minnesota State Patrol and other law enforcement agents working in concert and coordination fashion with MACC.

## V. ALLEGATIONS

### A.   NAMED-PLAINTIFF BJORN IVERSON

240.   Plaintiff Bjorn Iverson is, at all times relevant to this Complaint, a member of the press and working as an independent freelance photojournalist.

241.   On April 13, 2021, Plaintiff—like many other members of the press—went to the City of Brooklyn Center to cover the civil uprisings. He went to the Wright protest scene outside of the Brooklyn Center Police Department to take photographs. While documenting the protest demonstrations and the response by law enforcement, the Plaintiff

---

[272] Kellen Browning, *Minnesota Governor Calls Alleged Assaults on Journalists 'Chilling'*, N.Y. TIMES (April 18, 2021),
https://nytimes.com/2021/04/18/business/minnesota-journalists-assault-protests.html

[273] https://www.nytimes.com/2021/04/18/business/minnesota-journalists-assault-protests.html

wore distinctive clothing indicating he was a member of the press, and used large professional camera equipment.

242.    Later that night, on April 13, a massive show of authority and threats of arrest by MACC Defendants occurred. MACC Defendants' law enforcement agents— specifically MSP troopers—moved in and demanded that members of the press were to leave the area.

243.    Major Dwyer testified that—similar to the Floyd protests—the area surrounding the Brooklyn Center Police Department "needed to be cleared" pursuant to MACC's Operation Safety Net, which included instructions to "clear the streets[.]"[274]

244.    MACC Defendants and their agents used loudspeakers to announce "Media and press you must leave the area now!" Same or similar messages were repeated multiple times that night.

245.    As a member of the press, Plaintiff felt targeted by MACC Defendants and their agents, and no longer believed he was free to remain in or around the area, nor did Plaintiff feel free to continue documenting or participate in news-gathering activities regarding law enforcement's response to the protests and civil unrest.

246.    Fearing physical harm and/or arrest as a result of being targeting by MACC Defendants and their agents, Plaintiff ceased his reporting activities and left the City of Brooklyn Center. In other words, the Plaintiff wanted to and intended to continue covering the events surrounding the Brooklyn Center Police Department, but feared for his safety.

---

[274] *Goyette*, ECF No. 219-1, "Exhibit A" at 242:15—17, 244:21—24, and 296:13—17

247. On the afternoon of April 14, 2021, Plaintiff—like many other members of the press—returned to the area, choosing to head to the scene outside of the Brooklyn Center Police Department to take photographs. While documenting the protest demonstrations and the response by law enforcement, the Plaintiff wore distinctive clothing indicating he was a member of the press, and used large professional camera equipment.

248. Later that evening, on April 14, the Plaintiff witnessed law enforcement agents—deployed inside a fence surrounding the BCPD—spraying chemicals and sticking guns through the fence, while firing less-lethal munitions at nearby protesters as documented in this photograph taken by the Plaintiff:



Plaintiff—who was positioned off to the side, out of the way, standing between the fence and a large tree, and surrounded by other members of the press—documented this engagement between protesters and law enforcement agents, which was later posted to Twitter.[275] On information and belief, 40mm and .68 caliber guns with precision sights are being used, and the law enforcement agents using them are equipped with radio communication.

249.    Major Dwyer testified the fence shown in the photograph above—erected around the Brooklyn Center Police Department by MACC—had the purpose of "de-escalation."[276] The Plaintiff observed behavior by MACC law enforcement agents that contradicts Major Dwyer's statement.

250.    While multiple law enforcement agents from different agencies were involved in the documented engagement, the agencies of each agent were not immediately or easily apparent; however, each and every agent acted in concert and coordinated fashion with one another. On information and belief, there were at least four separate law enforcement agencies participating in this particular engagement.

251.    Unidentified law enforcement agent John Doe #1—wearing what appeared to be an HCSO deputy uniform and acting in concert with the other MACC law enforcement agents—was indiscriminately spraying a large can of pepper-spray onto nearby protesters. However, John Doe #1—upon identifying the Plaintiff as a member of

---

[275] https://twitter.com/pjdocs

[276] *Goyette*, ECF No. 219-1, "Exhibit A" at 240:9—241:1

the press who was taking photographs of the engagement between law enforcement agents behind the fence and protesters near the fence—maliciously shined a high-powered LED flashlight into the lens of Plaintiff's camera as documented in these photographs:







This intentional, willful, malicious, and retaliatory act by John Doe #1 suppressed Plaintiff's ability to document and report on the engagement between law enforcement and protesters.

252.    Regardless of the different position or angle Plaintiff would take in an effort to continue his news-gathering activities, Defendant Doe #1 would reposition himself and his flashlight to maintain his effect of blinding the Plaintiff's camera and prevent photographs from being taken. In addition to rendering Plaintiff unable to exercise his First Amendment right, John Doe #1 held—in a threatening manner—a large canister of pepper-spray in his hand.

103

253.    Plaintiff felt targeted as a member of the press during this encounter with

John Doe #1, fearing that—if he continued to document and/or remained in the area—he

would suffer further retaliation, such as being pepper-sprayed by John Doe #1, being shot

intentionally by the numerous MACC law enforcement agents nearby working in concert

with John Doe #1, and/or arrested. This reasonable fear caused Plaintiff to cease his news-

gathering activities and flee the immediate vicinity.

254.    This encounter with a MACC law enforcement agent—targeting a member

of the press in a threatening manner and suppressing their ability to report on government

activity—was posted to Twitter and identified John Doe #1's face:



This Twitter post—which tagged the Hennepin County Sheriff's Office, and used hashtags monitored by MACC—put the HCSO and other MACC Defendants on notice that MACC law enforcement agents was targeting members of the press for unlawful reprisals while executing MACC's carefully planned operation.[277] HCSO did not respond, follow-up, or take any other action.

255.    Later that night, and similar to the previous night, a massive show of authority by MACC Defendants occurred as their law enforcement agents—in concert and coordinated fashion—rapidly approached and demanded that members of the press were to leave the area under threat of arrest. As a member of the press, Plaintiff felt targeted by MACC Defendants and their agents, and no longer believed he was free to remain in or around the public spaces surrounding the Brooklyn Center Police Department, nor did Plaintiff feel free to continue documenting or participate in news-gathering activities regarding law enforcement's response to the protests and civil unrest.

256.    Fearing physical harm and/or arrest as a result of this targeting by MACC Defendants, Plaintiff ceased his reporting activities and left the City of Brooklyn Center. In other words, the Plaintiff wanted to and intended to continue covering the events surrounding the Brooklyn Center Police Department, but feared for his safety.

257.    The impact of threats, harassment, detentions, arrests, beatings, property damage, attacks with chemical agents, concussion grenades and less-lethal projectiles, and other abuses hurled at members of the press by MACC Defendants and their law

---

[277] https://twitter.com/pjdocs

enforcement agents was real, significant, and enduring. Despite this abuse happening against other members of the press, and the harassment and threats of arrest Plaintiff personally experienced, Plaintiff remained dedicated to his reporting and documenting of the civil unrest. As described below, the Plaintiff's perseverance in exercising his First Amendment rights will come with a real and significant cost.

258.    On the evening of April 16, similar to the days prior, Plaintiff once again arrived at the scene outside of the Brooklyn Center Police Department to take photographs and document the protest demonstrations, law enforcement, and MACC Defendant's response to the civil unrest. He did not anticipate being shot, grabbed, pushed, and directly threatened with arrest instead.

259.    While on scene, prior to 9:00 p.m. that night, the Plaintiff—along with many other members of the press—became aware, almost in real time, of a Temporary Restraining Order ("TRO") that was granted by United States District Judge Wilhelmina M. Wright ("Judge's Order") which ordered law enforcement to stop attacking, harassing, and retaliating against members of the press covering the Daunte Wright protests in Brooklyn Center.[278]

260.    Plaintiff, still on scene, read the Judge's Order to make sure that, as a member of the press, he too was compliant. Afterall, Plaintiff did not wish to become one of the many victims of the MACC Defendants' pattern and practice of excessive force without fear of repercussion.

---

[278] https://twitter.com/webster/status/1383236359066853376

261. Yet, after everything Plaintiff had witnessed and/or learned in the previous days of his reporting duties, Plaintiff's fear was persistent and significant, uncertain that the Judge's Order would be followed by MACC Defendants and their law enforcement agents.

262. Afterall, up to this point in time, MACC Defendants had been ignoring exemptions in curfew orders issued by Governor Walz and Mayor Elliot, public directions for law enforcement to stop attacking the press by Governor Walz, pleas from journalists, and the clearly established constitutional rights and Minnesota law protecting members of the press from such unconstitutional conduct.

263. At approximately 9:56 p.m., the Plaintiff took a photograph of two MACC law enforcement agents:



The agency these individuals belong to was not easily identifiable or apparent. The agents are equipped with radio communications, weapons capable of firing less-lethal munitions,

107

gun-mounted spotlight, and other weapons. On information and belief, the agent on the right is John Doe #3 (one of the Targeting Agents).

264. At approximately 9:57 p.m., the Plaintiff witnessed a line of busses and military vehicles approaching from the south:



Similar to the Floyd protests, these vehicles were carrying MACC law enforcement agents, arriving on scene to deploy and execute a previously communicated plan.

265. Plaintiff remained at all times clearly identifiable as a member of the press by wearing five high contrast patches indicating he was a member of the press.[279]

---

[279] *Iverson v. City of Brooklyn Center*, Case No. 23-CV-0917, ECF No. 1, Exhibit A ("id-badges.jpg")

108

266.     These distinctive markings on Plaintiff's clothing were considered indicia of being a journalist, and satisfied the Judge's Order to facilitate law enforcement's identification of the Plaintiff as a member of the press.[280]

267.     Additionally, the Plaintiff was also carrying and using his professional-grade camera and lens, generally kept himself physically separate from protesters to emphasize his status as a member of the press, and in no way participated in the protest demonstrations.

268.     The distinctive markings on the Plaintiff, professional camera equipment carried by the Plaintiff, and the Plaintiff's actions would have been visible to Defendants, law enforcement agents stationed on top of and outside of the Brooklyn Center Police Department, video monitoring equipment, and/or any law enforcement agent in the area.

269.     At approximately 9:58 p.m., a previously communicated plan to deprive members of the press of their constitutional rights was acted on—by John Does #2 and #3 when they worked in concert with each other—by targeting Plaintiff with bright high-powered spotlights, from separate locations, some distance apart. Defendant Does engaged in these overt acts in furtherance of a conspiracy, and worked in concert and coordinated fashion with MACC Defendants, MACC policymakers, members of MACC's command staff, and MACC law enforcement agents including each of the Assault Agents, Supervisory Agents.

---

[280] *Goyette*, ECF No. 105 at p. 21 ("...indicia of being a Journalist: visual identification as a member of the press, such as ... wearing ... distinctive clothing that identifies the wearer as a member of the press.")

270. Defendant Doe #2 was operating a moveable spotlight mounted on a large armored vehicle parked in front of the Brooklyn Center Police Department. The dark-colored vehicle had the markings "S.W.A.T." and "SHERIFF" visible on it, as documented by this photograph taken by the Plaintiff:



The agency that owns this armored vehicle was not easily identifiable or apparent to the Plaintiff.

271. Defendant Doe #3—who can be seen in the above photo (¶ 270), holding a gun and standing some distance to the right of the armored vehicle—was operating a gun-

mounted spotlight as documented by this photograph taken by the Plaintiff:



272. With bright, high-powered spotlights shining on him from separate locations some distance apart, the Plaintiff immediately felt targeted by John Doe #2, John Doe #3, and MACC Defendants, and Plaintiff had an instant fear of imminent bodily harm.

273. Plaintiff, using his knowledge of best practices as a photojournalist, knew putting his hands in the air and verbally re-asserting his status as a member of the press would be the appropriate response to ensure there was no doubt the Plaintiff was, in fact, a photojournalist and that he posed no threat to anyone.

274. Plaintiff raised both hands into the air—one of which was empty, and the other holding his professional camera—to allow an unobstructed view of the large "PRESS" marking on his chest. Additionally, at that same time, Plaintiff yelled "PRESS" several times in a loud and clear voice.

275.    At approximately 9:58 p.m.—after Defendants clearly identified Plaintiff as a member of the press—the Defendants observed Plaintiff taking part in a First Amendment-protected news-gathering activity such as photographing law enforcement agents closing in and rushing towards other members of the press some distance away:



276.    In the photograph taken by the Plaintiff above (¶ 275), clearly identifiable members of the press—tucked away in a corner, in a public space, with their hands up, and approximately 200 feet away from protest demonstrations—are rushed at by MACC law enforcement agents. These law enforcement agents—specifically MSP troopers—yelled at, harassed, and otherwise prevented these members of the press from observing, documenting, and reporting what was about to occur.

277. At approximately 9:59p.m., the Plaintiff witnessed additional troopers

running up the street:



278. At approximately 9:59 p.m., John Doe #4—located in a line of MSP troopers previously photographed by Plaintiff—joined in with Defendant Does #2 and #3 and targeted Plaintiff with a handheld or gun-mounted spotlight, as documented by this video screenshot recorded by the Plaintiff:



279. With spotlights targeting the Plaintiff from multiple and separate locations—even after clearly identifying himself, both visually and verbally, as a member of the press—Onlooking Agents, Supervisory Agents, MACC Defendants, nor any other John Doe law enforcement agent or supervisor intervened to stop and/or prevent the eminent assault that was about to take place on the Plaintiff.

280. By this time, each Defendant observed or had reason to know that excessive force would be used and had both an opportunity and means to prevent the harm that was about to occur.

281. Plaintiff had not committed any crime.

282. Plaintiff had not displayed any aggression.

283. Plaintiff was unarmed.

284. Plaintiff posed no threat to the safety of any law enforcement agent or others.

285. Plaintiff was standing alone and positioned in an open public space that was some distance away from both protesters and law enforcement.

286. MACC Defendants and their law enforcement agents provided no notice or warning to the Plaintiff, did not provide instruction a reasonable person could comply with, and no opportunity was given to disperse or move to a different location.

287. Instead, Assault Agents executed on a previously communicated conspiracy ("conspiracy" or "plan"). The conspiracy plan operated under the guise of Curfew enforcement and/or Unlawful Assembly—both of which exempted members of the press—and MACC law enforcement agents started to "clear the streets" with willful disregard to the constitutional rights of the Plaintiff and other members of the press.

288.     As a part of the conspiracy plan, Assault Agents retaliated against Plaintiff

as a member of the press and deprived him of his constitutional rights by shooting Plaintiff

several times with less-lethal projectiles. Additionally, and/or in the alternative, Assault

Agents acted pursuant to MACC Defendants' policy, practice, and/or custom of targeting

members of the press for unlawful reprisals during the Daunte Wright protests.

289.     At approximately 9:59 p.m. and after three Targeting Agents had targeted the

Plaintiff, he was struck two times—in his calf and buttocks—with less lethal projectiles

fired by Assault Agents (John Does #11 and #12) resulting in serious injuries.[281]

290.     On information and belief, the less-lethal projectiles shot at the Plaintiff were

.68 caliber pepper-ball rounds or other similar munition with a white powdery substance.

291.     By this time, with the Plaintiff now "marked" for additional retaliation, each

Defendant observed or had reason to know that additional excessive force would be used

and had both an opportunity and means to prevent the additional harm that was about to

occur.

292.     Instead, John Doe #5 located in the MSP trooper line, aimed a fourth

spotlight targeting the Plaintiff. In doing so, Defendant Doe #5 joined in concert with

Defendant Does #2-4—already targeting the Plaintiff from multiple and separate

---

[281] *Iverson*, Complaint, ECF No. 1, Exhibit C ("left-calf.jpg"), and Exhibit D ("left-buttocks.jpg")

locations—as documented by this video screenshot recorded by the Plaintiff:



The spotlight on the right is mounted on the armored truck (*see* ¶ 270) and the two spotlights on the left are MSP troopers in the line (*see* ¶¶ 275, 277). These spotlights intentionally moved and followed the Plaintiff, maintaining the center of their beam on the Plaintiff, and were not accidental.

293.    At approximately 9:59 p.m., the Plaintiff went to take a photograph of MACC law enforcement agents. However, he was interrupted when he was hit with a 40mm less-lethal projectile directly in the knee by Assault Agents (John Doe #13), resulting in serious injuries.[282]

294.    The force was so great, even at the distance between Plaintiff and the shooters, the projectiles ripped his pants, tearing a hole in them.[283]

---

[282] *Iverson*, ECF No. 1, Exhibit B ("left-knee.jpg")

[283] *Iverson*, ECF No. 1, Exhibit E ("tear.jpg")

295.     When firing their weapons, Defendant Assault Agents were positioned somewhere within the fenced area surrounding the Brooklyn Park Police Department and/or the line of MSP troopers on the street.

296.     The assault on the Plaintiff by law enforcement ended his liberty and freedom of movement.

297.     With spotlights continuing to target Plaintiff, he feared more assaults by MACC law enforcement agents, and the Plaintiff felt forced to retreat temporarily. The Plaintiff—in shock that he was being targeted as a member of the press by MACC Defendants and their law enforcement agents—took a few moments to process what was happening.

298.     At approximately 10:00 p.m., after reassessing the situation, the Plaintiff returned to the exact location where he was shot, and immediately located the 40mm projectile that hit him.

299.     Fearful to pick up the 40mm ballistic projectile to keep as physical evidence of his assault—afraid MACC Defendants and their law enforcement agents would shoot him again—the Plaintiff instead took a photograph of a less-lethal projectile that struck

him moments earlier:



300.    In order to shoot the Plaintiff with less-lethal projectiles, Assault Agents had to execute a series of volitional acts.

301.    Making matters worse, no law enforcement agent rendered aid to the Plaintiff after he was shot.

302.    The events surrounding the shooting became particularly suspicious when all of the law enforcement agents at the scene failed to render aid to the Plaintiff, a seriously injured person.

118

303.    Instead,    MACC    law    enforcement    agents    just    stood    there:



304.    Shortly afterwards, the Plaintiff witnessed another MACC law enforcement

agent—working in concert and coordinated fashion with MACC Defendants—who was

using    a    weapon    capable    of    firing    less-lethal    projectiles:



119

305. Plaintiff did, in fact, become one of the many victims of the MACC and MACC Defendants' pattern and practice of targeting members of the press with unlawful reprisals during the Wright protests.

306. MACC Defendants, Targeting Agents, Assault Agents, Onlooking Agents, Supervisory Agents, any other involved John Doe law enforcement agents, and any John Doe law enforcement agents who failed to intervene did not care about the Plaintiff's constitutional rights, and showed they had no concern about him as a human being who was injured.

307. Instead, at approximately 10:04 p.m., after MACC had established a kettle, MACC law enforcement agents—including HCSO deputies—began rushing into the area from behind the fence and started to effect mass arrest, as documented by this photograph taken by the Plaintiff:



308. Plaintiff did not interfere or impede law enforcement. Instead, he remained in a public space, out of the way, and used a 100mm lens to document from a distance. While continuing to verbally identify his status as a member of the press, after being shot three times, the Plaintiff photographed law enforcement making arrests:



309. Plaintiff also observed John Doe #14 and #15 standing in front of the BCPD entrance, supervising law enforcement agents and their activities in the area, as

documented    by    this    photograph    taken    by    the    Plaintiff:



310.    Multiple law enforcement agents from different agencies—including HCSO

deputies and MSP troopers—continued to work in concert and coordinated fashion with

one another as documented in a photograph taken by Plaintiff:



This photograph shows both an MSP trooper (left) and a HCSO deputy (right), each making a separate arrest, while other MSP troopers, HCSO deputies, and MACC law enforcement officers stand by.

311.    At approximately 10:06 p.m., John Doe #16 witnessed Plaintiff in a public place; Plaintiff was lawfully exercising his First Amendment rights and engaged in news-gathering activity by taking photographs and documenting the scene. Defendant Doe #16 approached the Plaintiff, physically grabbed him by the upper arm, yelled at him to leave the area under threat of arrest, forcefully pushed him towards a nearby residential parking lot, and directed the Plaintiff to "go that way!" When the Plaintiff verbally identified himself as a member of the press, the law enforcement agent said "I don't care!"

312.    John Doe #16's actions was yet another instance of law enforcement repeatedly forcing journalists to locations from which they could not witness, document, and/or report on the law enforcement response to the protests.

313.    Plaintiff searched for a way out of the area that John Doe #16 pushed him towards, and due to a tall fence surrounding the area, Plaintiff could find no route of egress.

314.    Plaintiff was faced with two options: either discard some equipment in order to climb over an approximately seven-foot-tall fence to escape the area as instructed by law enforcement, or, return to the area where Plaintiff had been previously targeted, shot, grabbed, pushed, and threatened to be arrested by law enforcement agents.

315.    Plaintiff felt that the only way to escape—not just being unlawfully arrested, but the physical violence he feared he would continue suffering at the hands of law enforcement if he stayed—was to make the difficult decision to discard some equipment

and climb over the fence in order to leave the area as directed. Upon landing on the other side of the fence, the force of the drop caused significant pain to the Plaintiff's ankles.[284]

316.    Shortly after climbing over the fence, Plaintiff made his way north, eventually finding himself in an unknown area alongside others—strangers who appeared seemingly out of nowhere—also fleeing from law enforcement's aggressive and unpredictable behavior. At approximately 10:11 p.m., Plaintiff captured this photo of protesters jumping another fence, a fence he too needed to climb over in order to return to his vehicle and leave the area:



317.    In an effort to reach his vehicle—parked in a church parking lot many blocks north of the original protest area, which had been designated by law enforcement in the

---

[284] Plaintiff suffered an unrelated injury to his ankles in 2012 that persists today. Certain activity can trigger additional and significant short-term pain.

nights prior as the designated exit route—Plaintiff was unable to after finding himself blocked by law enforcement agents and military vehicles, such as this Humvee:



318. Plaintiff was in pain and asked an MNG guardsman at this roadblock— located many blocks north of where the protest demonstrations occurred—if he could return to his vehicle and was denied access. According to the MNG guardsman, "nobody is allowed in or out" of the area, which included public streets and sidewalks leading to the church.

319. Plaintiff feared if he stayed in the area or continued his reporting activities he would be identified as a member of the press and unlawfully detained by MACC Defendants, MSP, HCSO, and/or other MACC law enforcement agents. Plaintiff ceased his reporting activities and left the area on foot.

320. On the morning of April 17, 2021, Plaintiff sought professional medical attention at a hospital in Maple Grove.

321. The Plaintiff wanted to and intended to continue covering the events surrounding the Brooklyn Center Police Department, but feared for his safety. Additionally, the Plaintiff was rendered physically unable to continue reporting because of the physical injuries sustained as a result of the tactics executed by MACC Defendants and their law enforcement agents.

322. The failure to report, or to accurately report, the use of force by MACC Defendants and their law enforcement agents occurred repeatedly in the days following Mr. Wright's death.

323. This failure to report, accurately or otherwise, was one of the many MACC policies, practices, and/or customs adopted by MACC Defendants and law enforcement agents participating in MACC and OSN.

324. In an effort to prevent accountability, there has been no transparency with regard to Plaintiff's incident.

325. Additionally, consistent with MACC policies, practices, and/or customs—as evidenced by the lack of documentation involving the constitutional abuses against other members of the press described in this complaint—Assault Agents failed to follow their agency policies with regard to report writing and supervisor notification.

326. The Supervisory Agents, MACC Defendants, MACC policymakers, and MACC command staff had actual knowledge of the constitutionally infirm reporting and lack of adherence to policies among law enforcement agents or were deliberately indifferent to the need for proper reporting by turning a blind eye.

126

327. MACC and each of the MACC Defendants, MACC policymakers, MACC command staff, and Supervisory Agents have acquiesced in further frustration of Plaintiff's civil rights by failing to require adherence to policies regarding report writing, supervisor notification and policy-violation notifications.

328. The Supervisory Agents—working in concert with MACC and each of the MACC Defendants, MACC policymakers, and MACC command staff—were causally and directly involved in the violation of Plaintiff's constitutional rights.

329. Further, multiple law enforcement agents in the area of Plaintiff's shooting were equipped with body-worn cameras ("BWC").

330. To date, Plaintiff has been unable to obtain and BWC footage of the incident from the City—either none exists or the City is withholding it.

331. As a result of the widespread lack-of-reporting and cover-up methods, Plaintiff has been unable to identify the shooters—Assault Agents—by name.

332. Despite the Judge's Order issued earlier that day and prior to the shooting of Plaintiff, each of the Defendants continued with their heavy-handed and unlawful tactics, including shooting Plaintiff, a clearly identified member of the press. Even a federal court order did not halt the Defendants' unlawful, unconstitutional practices.

333. As noted above, Curfew Orders imposed in Brooklyn Center and Hennepin County specifically exempted members of the press.

334. Each of the Defendants knew the Plaintiff and other members of the press were not in violation of the curfew, and had well-established constitutional rights to be present to cover the Daunte Wright protests.

335.    Each of the Defendants had no interest in ensuring the Plaintiff and other members of the press were protected from dangerous munitions or other unlawful reprisals.

336.    Defendants treated readily identifiable members of the press lawfully covering the Wright protests—including Plaintiff—the same way they treated an unlawful assembly: by assaulting them.

337.    The actions by each of the Defendants would chill any person of ordinary firmness from continuing to engage in the protected activities of the press and did in fact chill Plaintiff's exercise of his First Amendment rights.

338.    Photojournalism plays a vital role in the freedom of the press, particularly in such a tumultuous time in our nation's history with regard to law enforcement's excessive use of force.

339.    Each of the Defendants acted with deliberate indifference to the constitutional rights of Plaintiff and members of the press as evidenced by the recurring use of excessive force and other unlawful reprisals against them, chilling the press' ability to cover matters of public concern, including law enforcement's tactics during the protests.

340.    As a direct and proximate result of the Defendants' actions, the Plaintiff has been damaged by suffering loss of freedom and liberty, physical injury and discomfort, pain and suffering, medical bills, emotional damages, and pain of the mind including but not limited to mental anguish, inconvenience, humiliation, embarrassment, loss of enjoyment of life, and stress.

341.    Plaintiff continues to suffer trigger-based fear, panic attacks, nightmares, sleepless nights, and post-traumatic stress disorder symptoms as a result from the attack.

342.    The harm caused by the Defendants' unlawful conduct against the Plaintiff is not limited to the physical and mental injuries sustained during the Wright protests. Rather, every instance in which Plaintiff—a member of the press—was sent home, avoided public spaces, or was otherwise deterred from observing, recording, and reporting on the protests because of the chilling impact of Defendants' behavior reflects an injury to Plaintiff's constitutional rights. Additionally, or in the alternative, the Plaintiff suffered irreparable harm each and every time the Plaintiff was unable to exercise his constitutionally protected rights under the First Amendment.

343.    Defendants are jointly and severally liable to the Plaintiff.

## B.    NAMED-DEFENDANT CITY OF BROOKLYN CENTER

344.    The City of Brooklyn Center ("City") committed the acts and omissions set forth below.

345.    On April 11, 2021, the City of Brooklyn Center requested assistance and mutual aid from the State and local agencies to respond to civil unrest in Brooklyn Center and to protect the community. In response, MACC was organized by MACC Defendants, unified command was established, and MACC's unified command deployed Phase 3 of Operation Safety Net.

346.    The City and the Brooklyn Center Police Department became an active and willing participant in MACC. Through MACC, the City and BCPD communicated—and worked in concert and coordinated fashion—with the County and other law enforcement agencies.

347. As the local municipality, the City had jurisdiction and was in charge of setting mission goals, which directed MACC's highly coordinated effort that included BCPD, HCSO, WMC, MSP, MNG, MPD, and other law enforcement agencies.

348. On April 12, 2021, the City of Brooklyn Center's City Council adopted Resolution No. 2021-58 that officially declared the civil unrest and protests within the City—after the killing of Daunte Wright—an "emergency."

349. The City Council's Resolution specifically recognized that "localities can limit police tactics and brutality in response to protests[.]" In an effort to limit police tactics and brutality in response to protests, the City banned "violent crowd control and dispersion techniques such as the use of rubber bullets[.]"

350. The City Council's Resolution also extended the emergency declaration and expressly consented to Mayor Elliot—under the policy as provided in the City Charter § 2.06—to respond to the Emergency and "take command of the police[.]" In other words, the City assigned Mayor Elliot absolute final policymaking authority over the City of Brooklyn Center's law enforcement and its response to the local emergency as a result of the civil unrest. In the alternative, the City's informal custom in Brooklyn Center is for the City's mayor to control the law enforcement response to civil unrest and protests with final policymaking authority.

351. This final policymaking authority—given by the City to Mayor Elliot—made Mayor Elliot the City's principal, and provided Mayor Elliot the ability to authorize others to act on the City's behalf as agents.

352.    Throughout the duration of the Daunte Wright protests, the City received notice of multiple, repeated, persistent, and wide-spread unconstitutional conduct against members of the press by law enforcement agents. These law enforcement individuals were in the City of Brooklyn Center, at the direct request of the City, and acting as the City's law enforcement agents.

353.    The coordinated effort of law enforcement agents deployed around the Brooklyn Center Police Department acting in concert and coordinated fashion with one another—displayed by the tactical lines, synchronized movements, kettle tactics, and systemic deployment of chemical spray, flash-bang grenades, concussion grenades, and/or less-lethal projectiles—demonstrates that the City was on notice of and sanctioned unconstitutional conduct.

354.    Notice of unconstitutional conduct against members of the press also came in the form of broad news reporting, direct outreach by reporters, public comments by Governor Walz and other community leaders, and social media posts that described the misconduct by law enforcement agents responding to the Daunte Wright protests in Brooklyn Center.

355.    Additional notice given to the City came from the multiple Department of Justice reports recommending changes in law enforcement supervision and training protocol regarding individuals' constitutional rights, after-action reports concluding an inadequate response to previous episodes of civil unrest by law enforcement, and numerous public statements from Governor Walz regarding unconstitutional misconduct by law enforcement against members of the press when responding to similar civil unrest

approximately 11 months prior—all of which were disseminated through broad news reporting and social media.

356.    The City—even after actual and/or constructive knowledge of unconstitutional violations against members of the press by law enforcement agents in Brooklyn Center at the City's request and doing the City's work—chose an impermissible way of operating by allowing the persistent pattern and practice of constitutional violations by law enforcement against members of the press to continue. In other words, the City engaged in a pattern of decisions that violated the constitutional rights of the Plaintiff and members of the press.

357.    At no time throughout the duration of the protests did the City withdraw and/or reassign Mayor Elliot's policymaking authority regarding the City's law enforcement response to the Wright protests.

358.    The City ratified and/or tacitly authorized Mayor Elliot's decisions and actions which allowed multiple, repeated, persistent, and wide-spread unconstitutional conduct against members of the press by the City's law enforcement agents to continue day after day. This ratification and/or tacit authorization by the City ultimately led to the constitutional deprivations the Plaintiff suffered.

359.    The City continued with courses of action so prevalent in the day-to-day business of the government, they had become *de facto* polices, practices, and/or customs.

360.    The City had the authority to direct law enforcement agents deployed in Brooklyn Center not to harm members of the press, and failed to prevent the harm suffered by the Plaintiff.

361. By April 16, 2021—after receiving sufficient notice—the City permitted constitutional violations against members of the press to continue.

362. By April 16, the City had a policy, practice, and/or custom of:

   i. failing to provide warnings and/or lawful orders before deploying crowd control weapons—including chemical agents and injurious less-lethal munitions—against members of the press in Brooklyn Center during the Wright protests;

   ii. authorizing the deployment of crowd control weapons and/or less-lethal munitions in an unconstitutional manner;

   iii. unlawful indiscriminate use of less-lethal projectiles;

   iv. permitting constitutional violations—including, but not limited to, excessive force—against members of the press;

   v. targeting members of the press for unlawful reprisals;

   vi. delegating law enforcement responsibility to non-employees without maintaining adequate supervision; and/or

   vii. inaction in light of notice that the City and MACC law enforcement response to the Daunte Wright protests was causing and would continue to cause constitutional violations against members of the press.

363. The City has a policy, practice, and/or custom of permitting excessive force, because even though the City knew of repeated allegations of law enforcement brutality against members of the press in Brooklyn Center, the City either positively encouraged law enforcement agents to cover up the abuse or otherwise tacitly approved these tactics. In

133

other words, the unconstitutional conduct against members of the press by law enforcement agents—in Brooklyn Center at the City's request and doing the City's work—was so pervasive, the City knew of, or recklessly disregarded, the existence of relevant policies, practices, and/or customs.

364. The City knew with moral certainty that, if the City ever deployed law enforcement in the city to respond to civil unrest, law enforcement—acting as agents for the City to maintain order and enforce the law—would come into contact with members of the press. Thus, the need to train and supervise the City's law enforcement agents in the constitutional limitations regarding Freedom of Press prior to and/or during deployment was so obvious that the failure to do so was deliberate indifference to the constitutional rights of the Plaintiff and other members of the press.

365. The City was aware of the arrests, assaults, and mistreatment of journalists. Additionally, the City had the capacity to change law enforcement tactics over the course of the Wright protests, yet the City did not take any action to curtail the repeated constitutional violations happening against members of the press. This failure to act resulted in the violation of Plaintiff's constitutional rights.

366. The City did nothing to quell the law enforcement misconduct and instead ratified and/or tacitly authorized it in an ongoing failure of supervision that resulted in the copious constitutional violations identified throughout this Complaint.

367. Further, the unchecked unconstitutional conduct of the City's law enforcement agents at the Daunte Wright protests reflects the City's failure to train and supervise the City's law enforcement agents with respect to the First Amendment rights of

journalists, resulting in a pattern and practice of targeting members of the press in retaliation for their exercise of First Amendment rights.

## C. NAMED-DEFENDANT MAYOR MIKE ELLIOT

368. The City of Brooklyn Center's Mayor Mike Elliot ("Mayor Elliot") committed the acts and omissions set forth below.

369. During the Wright protests, Mayor Elliot fully assumed and acted upon the authority formally defined in § 2.06 of the City Charter.

370. On April 12, 2021, Mayor Elliot exercised final policymaking authority—given to him by the City—to issue Mayoral Declaration No. 2021-01 ("Declaration") declaring a local emergency in the City of Brooklyn Center as a result of the civil unrest.

371. The next day, on April 13, Mayor Elliot used his final policymaking authority to issue Mayoral Emergency Proclamation No. 2021-02 ("Proclamation").

372. In his Proclamation, Mayor Elliot called the final policymaking authority given to him by the City Council "command authority[.]"

373. In his Proclamation, Mayor Elliot acknowledged the City relied on state and other law enforcement agencies in MACC "to assist" the City, and he provided clarity to "ensure the City receives the support it needs to properly protect the City." However, Mayor Elliot wanted "to overcome the hesitancy" expressed by MACC regarding the City's Resolution, and did not want the City's Resolution to be "interpreted as limiting" the MACC law enforcement agents.

135

374.    In his Proclamation, Mayor Elliot clarified two things about the City Council's Resolution. First, the restricting of certain crowd control measures by the Brooklyn Center Police Department was only for preemptive use. Second, the Resolution does not apply to joint law enforcement operations occurring within the City. In other words, Mayor Elliot made sure to allow the use of less-lethal projectiles as long as it was not preemptive—or—if deployed during a joint law enforcement operation, such as Operation Safety Net.

375.    Mayor Elliot, knowing MACC wanted to "clear the streets" and public areas surrounding the Brooklyn Center Police Department under the guise of curfew orders and/or unlawful assembly, issued his Proclamation understanding that less-lethal munitions would be used for that purpose. Additionally, knowing members of the press would be on scene documenting and reporting, Mayor Elliot agreed the public area around the Brooklyn Center Police Department "needed to be cleared" regardless of First Amendment rights and that less-lethal munitions would be used for that purpose.

376.    However, Mayor Elliot's Proclamation made clear he was in control of the law enforcement response to the civil unrest with "command authority" and each of the other MACC Defendants were "to assist[.]"

377.    In this role, Mayor Elliot had final policymaking authority and responsibility over the City's law enforcement training and supervision, as well as the City's coordinated law enforcement response during the Wright protests. If the City's law enforcement training and supervision was deficient, inadequate, or insufficient, it was Mayor Elliot's duty to improve the training and supervision. Additionally, and/or in the alternative, Mayor

136

Elliot had final policymaking authority over MACC's law enforcement training and supervision while deployed in Brooklyn Center. If MACC's law enforcement training and supervision was deficient, inadequate, or insufficient, Mayor Elliot had a duty to improve the training and supervision of MACC law enforcement agents prior to and/or during deployment in Brooklyn Center.

378. In his Proclamation, Mayor Elliot used the "command authority provided" to him to specifically address both the Brooklyn Center Police Department, and "those responding from other agencies" (collectively, "law enforcement agents" or "City's agents" or "MACC law enforcement agents"), and that the City's agents were "expressly authorized" to use force to "respond to the civil unrest" in Brooklyn Center.

379. In his Proclamation, Mayor Elliot acknowledged the City's mission objectives and the work he was to accomplish: 1) to "maintain order[.]" 2) to "enforce the law[,]" and 3) to "protect the city" (collectively, the "City's work").

380. Mayor Elliot bolstered the BCPD's police force with law enforcement agents from other agencies, and deployed them around the BCPD to quell civil unrest and clear the streets after curfew. Mayor Elliot did so without instructing or training the City's agents in the constitutional limitations on the use of force and press freedom.

381. If not for Mayor Elliot's affirmative actions, the law enforcement agents from outside agencies deployed in the City during the Wright protests would not have jurisdiction. Mayor Elliot provided MACC and MACC law enforcement agents the authority to act as a law enforcement agent of the City.

137

382.    By April 16, Mayor Elliot—in his role as the City's Mayor, in emergency command of the BCPD, a City official with final policymaking authority, a member of MACC's command staff directly contributing to MACC's law enforcement response during the Wright protests in Brooklyn Center, and/or a MACC policymaker—had notice of multiple instances of unconstitutional conduct targeting members of the press by the City's law enforcement agents responding to the civil unrest at the City's request and in Brooklyn Center to do the City's work. This notice—in the form of broad news reporting, direct outreach by reporters, and social media monitoring—described the repeated and targeted misconduct and unlawful reprisals against members of the press. In other words, Mayor Elliot knew law enforcement agents deployed in the City at his request was targeting members of the press for unlawful reprisals.

383.    Additionally, the coordinated effort of the City's law enforcement agents, and other MACC law enforcement agents, deployed around the Brooklyn Center Police Department acting in concert and coordinated fashion with one another—displayed by the tactical lines, synchronized movements, kettle tactics, and systemic deployment of chemical spray, flash-bang grenades, concussion grenades, and/or less-lethal projectiles— demonstrates that Mayor Elliot was on notice of and sanctioned unconstitutional conduct.

384.    Mayor Elliot—even after actual and/or constructive knowledge of unconstitutional violations against members of the press by law enforcement agents in Brooklyn Center at the City's request and doing the City's work—chose an impermissible way of operating by allowing the persistent pattern and practice of constitutional violations by law enforcement against members of the press to continue. In other words, Mayor Elliot

engaged in a pattern of decisions that violated the constitutional rights of the Plaintiff and members of the press.

385.    Mayor Elliot had a duty to supervise the City's law enforcement agents, including BCPD officers and MACC law enforcement agents, during their deployment in the City. It is clear, by failing to take any corrective action, Mayor Elliot tacitly authorized and condoned the actions of the City's law enforcement agents.

386.    Mayor Elliot maintained a final policymaking, supervisory, and/or command authority over the City's law enforcement response to the protests, had notice of a pattern of unconstitutional acts by the City's agents, and was deliberately indifferent to these unconstitutional acts. Additionally, Mayor Elliot shared a final policymaking, supervisory, and/or command authority over MACC's law enforcement response to the protests, had notice of a pattern of unconstitutional acts by MACC law enforcement agents, and was deliberately indifferent to the unconstitutional acts.

387.    At no time during the Wright protests did Mayor Elliot issue resolutions, proclamations, or in any way address the City's law enforcement agents—in Brooklyn Center and doing the City's work—regarding their unconstitutional conduct against members of the press. Additionally, Mayor Elliot did not withdraw the City's request for assistance and mutual aid, remove any law enforcement agents or agencies from the City's law enforcement response, or take any affirmative action to stop unconstitutional conduct by the City's law enforcement against members of the press.

388.    In his role, Mayor Elliot had the authority to improve law enforcement training and/or supervision, yet failed to improve the training and/or supervision of the

City's law enforcement agents—including BCPD officers and MACC law enforcement agents—after receiving notice of unconstitutional acts by the City's agents. Additionally, Mayor Elliot failed to improve MACC's law enforcement training or supervision after receiving notice of the unconstitutional acts by MACC law enforcement agents.

389. In his role, Mayor Elliot made a decision to take no corrective action stopping unconstitutional conduct against members of the press. Additionally, Mayor Elliot's deliberate choice to ignore the constitutional violations against members of the press by taking no corrective action was the moving force behind the Plaintiff's injuries.

390. Mayor Elliot observed or intended the use of excessive force by the City's law enforcement agents—including BCPD officers and MACC law enforcement agents—against the Plaintiff and other members of the press, and did not intervene to halt it.

391. Mayor Elliot had the authority to direct law enforcement agents deployed in Brooklyn Center not to harm members of the press, and failed to prevent the harm suffered by the Plaintiff.

392. By April 16, 2021—after receiving sufficient notice—Mayor Elliot permitted constitutional violations against members of the press to continue.

393. By April 16, Mayor Elliot had a policy, practice, and/or custom of:

   i. failing to provide warnings and/or lawful orders before deploying crowd control weapons—including chemical agents and injurious less-lethal munitions—against members of the press in Brooklyn Center during the Wright protests;

140

ii. authorizing the deployment of crowd control weapons and/or less-lethal munitions in an unconstitutional manner;

iii. unlawful indiscriminate use of less-lethal projectiles;

iv. permitting constitutional violations—including but not limited to excessive force—against members of the press;

v. targeting members of the press for unlawful reprisals;

vi. delegating law enforcement responsibility to non-employees without maintaining adequate supervision; and/or

vii. inaction in light of notice that the City and MACC law enforcement response to the Daunte Wright protests was causing and would continue to cause constitutional violations against members of the press.

394.    Mayor Elliot was personally involved in creating, applying, and/or interpreting policy related to the City's law enforcement response to the Wright protests. Additionally, and/or in the alternative, Mayor Elliot was personally involved in creating, applying, and/or interpreting policy related to MACC's law enforcement response to the Wright protests.

395.    In April of 2021, policy related to the City's law enforcement response during civil unrest in the City was established by Mayor Elliot, and with the concurrence or acquiescence of the City Council. Further, Mayor Elliot had the responsibility for overall guidance to the City's law enforcement response during the Wright protests. Additionally, procedure—which is how the City's policies, practices, and customs are implemented—is

the responsibility of Mayor Elliot to develop in concert with his subordinates, including but not limited to, Interim Chief Gruenig.

396.    Mayor Elliot issued and/or relayed orders that allowed employees, subordinates, and agents to use excessive force against the Plaintiff and members of the press.

397.    Mayor Elliot, in emergency command of the BCPD, was formally subject to the ultimate authority of the City's governing body, yet prior to April 16, the City never sought to curb or correct the way in which Mayor Elliot—aided by each of the other individual Command Defendants—was, in fact, exercising his formal authority to train and/or supervise MACC law enforcement agents as a critical aspect of his general authority to direct the full activities of the City's law enforcement response during the Wright protests.

398.    Mayor Elliot communicated with, and was in contact with, each of the other MACC Defendants through formal and informal channels during the Wright protests.

399.    Mayor Elliot worked together, in concert and coordinated fashion, with each of the other MACC Defendants during the Wright protests.

400.    In his role—as the City's Mayor, in command of the BCPD, and/or a MACC policymaker, with final policymaking, supervisory, and/or command authority over the City's law enforcement agents—Defendant Mayor Elliot exerted influential power over the culture, actions, and professional standards of the City's law enforcement agents. Additionally, and/or in the alternative, Mayor Elliot used his role to exert influential power over the culture, actions, and professional standards of MACC law enforcement agents.

401. Mayor Elliot's influence over the City's law enforcement response to the Wright protests extends to policies, practices, and customs governing the use of force and press freedom. Additionally, and/or in the alternative, Mayor Elliot's influence over MACC's law enforcement response to the Wright protests extends to policies, practices, and customs governing the use of force and press freedom.

402. Mayor Elliot used his influence to create the implicit and explicit policies, practices, and customs of MACC, and worked together with each of the MACC Defendants in their use of chemical agents and less-lethal projectiles, crowd control techniques, and the tactical deployment of law enforcement agents responding to the Wright protests that resulted in the violation of Plaintiff's constitutional rights.

403. In his role, Mayor Elliot was aware of the arrests, assaults, and mistreatment of journalists, and directly participated in the constitutional violations against members of the press.

404. Mayor Elliot had the capacity to change law enforcement tactics over the course of the Wright protests, yet Mayor Elliot did not take any action to curtail the repeated constitutional violations happening against members of the press. This failure to act resulted in the violation of Plaintiff's constitutional rights.

405. Mayor Elliot did nothing to quell the law enforcement misconduct and instead ratified and/or tacitly authorized it in an ongoing failure of supervision that resulted in the copious constitutional violations identified throughout this Complaint.

406. Further, the unchecked unconstitutional conduct of the City's law enforcement agents at the Daunte Wright protests reflects Mayor Elliot's failure to train

143

and supervise the City's law enforcement agents with respect to the First Amendment rights of journalists, resulting in a pattern and practice of targeting members of the press in retaliation for their exercise of First Amendment rights.

407.    Mayor Elliot condoned such practices which caused the unlawful practices to continue as an established custom or usage. Mayor Elliot's condonation resulted from his deliberate indifference to the constitutional rights of Plaintiff and other members of the press within the City's jurisdiction who would encounter MACC law enforcement agents engaging in such practices. In specific accord with and in furtherance of these condoned customs and usages, Plaintiff was assaulted and injured by MACC law enforcement agents.

408.    Mayor Elliot conspired with each of the other Command Defendants and reached an agreement of how they would respond to the Daunte Wright protests and the press reporting on them ("conspiracy" or "plan"). The conspiracy plan involved:

    i. suppressing reporting activity by Plaintiff and members of the press;

    ii. targeting Plaintiff and members of the press for unlawful reprisals; and/or

    iii. depriving Plaintiff and members of the press of their constitutional rights.

409.    As a co-conspirator in the conspiracy plan, Mayor Elliot engaged in the overt acts described throughout this Complaint in furtherance of the conspiracy. Additionally, and/or in the alternative, Mayor Elliot instructed employees, subordinates, and/or agents to take actions in furtherance of the conspiracy.

410.    Mayor Elliot is a City official with final policymaking, supervisory, and/or command authority, and took action that led to Plaintiff's constitutional violations and injuries.

## D. NAMED-DEFENDANT INTERIM CHIEF TONY GRUENIG

411. The Brooklyn Center Police Department's Interim Chief Tony Gruenig ("Interim Chief Gruenig") committed the acts and omissions set forth below.

412. Interim Chief Gruenig was promoted to BCPD's Interim Chief of Police on April 13, 2021. In this role, final policymaking authority and responsibility over the City's law enforcement training and supervision belonged to Interim Chief Gruenig, as did the City's coordinated law enforcement response during the Wright protests. If the City's law enforcement training and supervision was deficient, inadequate, or insufficient, it was Interim Chief Gruenig's duty to improve the training and supervision. Additionally, and/or in the alternative, Interim Chief Gruenig had final policymaking authority over MACC's law enforcement training and supervision while deployed in Brooklyn Center. If MACC's law enforcement training and supervision was deficient, inadequate, or insufficient, Interim Chief Gruenig had a duty to improve the training and supervision prior to and/or during deployment in Brooklyn Center.

413. By April 16, 2021, Interim Chief Gruenig—in his role as BCPD's Interim Chief of Police, a City law enforcement official with final policymaking authority, a member of MACC's command staff directly contributing to MACC's law enforcement response during the Wright protests in Brooklyn Center, and/or a MACC policymaker— had notice of multiple instances of unconstitutional conduct targeting members of the press by the City's law enforcement agents responding to the civil unrest at the City's request and in Brooklyn Center to do the City's work. This notice—in the form of broad news reporting, direct outreach by reporters, and social media monitoring—described the

145

repeated and targeted misconduct and unlawful reprisals against members of the press. In other words, Interim Chief Gruenig knew law enforcement agents deployed in the City at the City's request was targeting members of the press for unlawful reprisals.

414. Additionally, the coordinated effort of the City's law enforcement agents, and other MACC law enforcement agents, deployed around the Brooklyn Center Police Department acting in concert and coordinated fashion with one another—displayed by the tactical lines, synchronized movements, kettle tactics, and systemic deployment of chemical spray, flash-bang grenades, concussion grenades, and/or less-lethal projectiles—demonstrates that Interim Chief Gruenig was on notice of and sanctioned unconstitutional conduct.

415. Interim Chief Gruenig—even after actual and/or constructive knowledge of unconstitutional violations against members of the press by law enforcement agents in Brooklyn Center at the City's request and doing the City's work—chose an impermissible way of operating by allowing the persistent pattern and practice of constitutional violations by law enforcement against members of the press to continue. In other words, Interim Chief Gruenig engaged in a pattern of decisions that violated the constitutional rights of the Plaintiff and members of the press.

416. Interim Chief Gruenig had a duty to supervise the City's law enforcement agents, including BCPD officers and MACC law enforcement agents, during their deployment in the City. It is clear, by failing to take any corrective action, Interim Chief Gruenig tacitly authorized and condoned the actions of the City's law enforcement agents.

417. Interim Chief Gruenig maintained a policymaking and supervisory authority over the City's law enforcement response to the protests, had notice of a pattern of unconstitutional acts, and was deliberately indifferent to the unconstitutional acts. Additionally, Interim Chief Gruenig shared a policymaking and supervisory authority over MACC's law enforcement response to the protests, had notice of a pattern of unconstitutional acts, and was deliberately indifferent to the unconstitutional acts.

418. At no time during the Wright protests did Interim Chief Gruenig address the City's law enforcement agents—in Brooklyn Center and doing the City's work—regarding their unconstitutional conduct against members of the press. Additionally, Interim Chief Gruenig did not withdraw the City's request for assistance and mutual aid, remove any law enforcement agents or agencies from the City's law enforcement response, or take any affirmative action to stop unconstitutional conduct by the City's law enforcement against members of the press.

419. In his role, Interim Chief Gruenig had the authority to improve law enforcement training and/or supervision, yet failed to improve the law enforcement training and/or supervision of the City's law enforcement agents—including BCPD officers and MACC law enforcement agents—after receiving notice of unconstitutional acts by the City's law enforcement agents. Additionally, Interim Chief Gruenig failed to improve MACC's law enforcement training or supervision after receiving notice of the unconstitutional acts by MACC law enforcement agents

420. In his role, Interim Chief Gruenig made a decision to take no corrective action to stop unconstitutional conduct against members of the press. Additionally, Interim

147

Chief Gruenig's deliberate choice to ignore the constitutional violations against members of the press by taking no corrective action was the moving force behind the Plaintiff's injuries.

421.    Interim Chief Gruenig observed or intended the use of excessive force by the City's law enforcement agents—including BCPD officers and MACC law enforcement agents—against the Plaintiff and other members of the press, and did not intervene to halt it.

422.    Interim Chief Gruenig had the authority to direct law enforcement agents deployed in Brooklyn Center not to harm members of the press, and failed to prevent the harm suffered by the Plaintiff.

423.    By April 16, 2021—after receiving sufficient notice—Interim Chief Gruenig permitted constitutional violations against members of the press to continue.

424.    By April 16, Interim Chief Gruenig had a policy, practice, and/or custom of:

   i. failing to provide warnings and/or lawful orders before deploying crowd control weapons—including chemical agents and injurious less-lethal munitions—against members of the press in Brooklyn Center during the Wright protests;

   ii. authorizing the deployment of crowd control weapons and/or less-lethal munitions in an unconstitutional manner;

   iii. unlawful indiscriminate use of less-lethal projectiles;

   iv. permitting constitutional violations—including, but not limited to, excessive force—against members of the press;

148

v. targeting members of the press for unlawful reprisals;

vi. delegating law enforcement responsibility to non-employees without maintaining adequate supervision; and/or

vii. inaction in light of notice that the City and MACC law enforcement response to the Daunte Wright protests was causing and would continue to cause constitutional violations against members of the press.

425.    Interim Chief Gruenig was personally involved in creating, applying, and/or interpreting policy related to the City's law enforcement response to the Wright protests. Additionally, and/or in the alternative, Interim Chief Gruenig was personally involved in creating, applying, and/or interpreting policy related to MACC's law enforcement response to the Wright protests.

426.    Interim Chief Gruenig issued and/or relayed orders that allowed employees, subordinates, and agents to use excessive force against the Plaintiff and members of the press.

427.    Interim Chief Gruenig communicated with, and was in contact with, each of the other MACC Defendants through formal and informal channels during the Wright protests.

428.    Interim Chief Gruenig worked together, in concert and coordinated fashion, with each of the other MACC Defendants during the Wright protests.

429.    In his role—as BCPD's Interim Chief of Police, a MACC policymaker, and/or a member of MACC's command staff, with final policymaking, supervisory, and/or command authority over the City's law enforcement agents—Defendant Interim Chief

149

Gruenig exerted influential power over the culture, actions, and professional standards of the City's law enforcement agents. Additionally, and/or in the alternative, Interim Chief Gruenig used his role to exert influential power over the culture, actions, and professional standards of MACC law enforcement agents.

430. Interim Chief Gruenig's influence over the City's law enforcement response to the Wright protests extends to policies, practices, and customs governing the use of force and press freedom. Additionally, and/or in the alternative, Interim Chief Gruenig's influence over MACC's law enforcement response to the Wright protests extends to policies, practices, and customs governing the use of force and press freedom.

431. Interim Chief Gruenig used his influence to create the implicit and explicit policies, practices, and customs of MACC, and worked together with each of the MACC Defendants in their use of chemical agents and less-lethal projectiles, crowd control techniques, and the tactical deployment of law enforcement agents responding to the Wright protests that resulted in the violation of Plaintiff's constitutional rights.

432. In his role, Interim Chief Gruenig was aware of the arrests, assaults, and mistreatment of journalists, and directly participated in the constitutional violations against members of the press.

433. Interim Chief Gruenig had the capacity to change law enforcement tactics over the course of the Wright protests, yet Interim Chief Gruenig did not take any action to curtail the repeated constitutional violations happening against members of the press. This failure to act resulted in the violation of Plaintiff's constitutional rights.

434.    Interim Chief Gruenig did nothing to quell the law enforcement misconduct and instead ratified and/or tacitly authorized it in an ongoing failure of supervision that resulted in the copious constitutional violations identified throughout this Complaint.

435.    Further, the unchecked unconstitutional conduct of the City's law enforcement agents at the Daunte Wright protests reflects Interim Chief Gruenig's failure to train and supervise the City's law enforcement agents with respect to the First Amendment rights of journalists, resulting in a pattern and practice of targeting members of the press in retaliation for their exercise of First Amendment rights.

436.    Interim Chief Gruenig conspired with each of the other Command Defendants and reached an agreement of how they would respond to the Daunte Wright protests and the press reporting on them ("conspiracy" or "plan"). The conspiracy plan involved:

   i.  suppressing reporting activity by Plaintiff and members of the press;

   ii. targeting Plaintiff and members of the press for unlawful reprisals; and/or

   iii. depriving Plaintiff and members of the press of their constitutional rights.

437.    As a co-conspirator in the conspiracy plan, Interim Chief Gruenig engaged in the overt acts described throughout this Complaint in furtherance of the conspiracy. Additionally, and/or in the alternative, Interim Chief Gruenig instructed employees, subordinates, and/or agents to take actions in furtherance of the conspiracy.

438.    Interim Chief Gruenig is a City law enforcement official with final policymaking, supervisory, and/or command authority, and took action that led to Plaintiff's constitutional violations and injuries.

## E.  NAMED-DEFENDANT HENNEPIN COUNTY

439.  Hennepin County ("County") committed the acts and omissions set forth below.

440.  At the start of the Daunte Wright protests on April 11, 2021, the County and the Hennepin County Sheriff's Office responded to the City of Brooklyn Center's request to assist with the civil unrest occurring in Brooklyn Center and to protect the City. Brooklyn Center is a municipality within Hennepin County.

441.  The County and HCSO became an active and willing participant in MACC. Through MACC, the County and HCSO communicated—and worked in concert and coordinated fashion—with the City and other MACC law enforcement agencies.

442.  The County shared jurisdiction with the City, and was in charge of setting mission goals, which directed MACC's highly coordinated effort that included BCPD, HCSO, WMC, MSP, MNG, MPD, and other law enforcement agencies.

443.  The County provided Sheriff Hutchinson final policymaking authority related to the law enforcement response during the Wright protests. This final policymaking authority made Sheriff Hutchinson the County's principal, and provided Sheriff Hutchinson the ability to authorize others to act on the County's behalf as agents. Additionally, and/or in the alternative, the County's informal custom in Hennepin County is for the County's Sheriff to control the law enforcement response to civil unrest and protests with final policymaking authority.

444.  Throughout the duration of the Daunte Wright protests, the County had actual and/or constructive knowledge of the multiple, repeated, persistent, and wide-spread

152

unconstitutional conduct by law enforcement agents against members of the press. These law enforcement individuals were in Hennepin County, and acting as the County's law enforcement agents.

445.    The coordinated effort of law enforcement agents deployed around the Brooklyn Center Police Department acting in concert and coordinated fashion with one another—displayed by the tactical lines, synchronized movements, kettle tactics, and systemic deployment of chemical spray, flash-bang grenades, concussion grenades, and/or less-lethal projectiles—demonstrates that the County was on notice of and sanctioned unconstitutional conduct.

446.    Notice of unconstitutional conduct against members of the press also came in the form of broad news reporting, direct outreach by reporters, public comments by Governor Walz and other community leaders, and social media posts describing the misconduct by law enforcement agents responding to the Daunte Wright protests in Hennepin County.

447.    Additional notice given to the County came from the multiple Department of Justice reports recommending changes in law enforcement supervision and training protocol regarding individuals' constitutional rights, after-action reports concluding an inadequate response to previous episodes of civil unrest by law enforcement, and numerous public statements from Governor Walz regarding unconstitutional misconduct by law enforcement against members of the press when responding to similar civil unrest approximately 11 months prior—all of which were related to incidents in Hennepin County and were disseminated through broad news reporting and social media.

153

448.    The County—even after actual and/or constructive knowledge of unconstitutional violations against members of the press by law enforcement agents in Hennepin County—chose an impermissible way of operating by allowing the persistent pattern and practice of constitutional violations by law enforcement against members of the press to continue. In other words, the County engaged in a pattern of decisions that violated the constitutional rights of the Plaintiff and members of the press.

449.    At no time throughout the duration of the protests did the County withdraw and/or reassign Sheriff Hutchinson's policymaking authority regarding the County's law enforcement response to the Wright protests.

450.    The County ratified and/or tacitly authorized Sheriff Hutchinson's decisions and actions which allowed multiple, repeated, persistent, and wide-spread unconstitutional conduct against members of the press by the County's law enforcement agents to continue day after day. This ratification and/or tacit authorization by the County ultimately led to the constitutional deprivations the Plaintiff suffered.

451.    The County continued with courses of action so prevalent in the day-to-day business of the government, they had become *de facto* polices, practices, and/or customs.

452.    The County had the authority to direct law enforcement agents deployed in Hennepin County not to harm members of the press, and failed to prevent the harm suffered by the Plaintiff.

453.    By April 16, 2021—after receiving sufficient notice—the County permitted constitutional violations against members of the press to continue.

454. By April 16, the County had a policy, practice, and/or custom of:

    i. failing to provide warnings and/or lawful orders before deploying crowd control weapons—including chemical agents and injurious less-lethal munitions—against members of the press in Hennepin County during the Wright protests;

    ii. authorizing the deployment of crowd control weapons and/or less-lethal munitions in an unconstitutional manner;

    iii. unlawful indiscriminate use of less-lethal projectiles;

    iv. permitting constitutional violations—including, but not limited to, excessive force—against members of the press;

    v. targeting members of the press for unlawful reprisals;

    vi. delegating law enforcement responsibility to non-employees without maintaining adequate supervision; and/or

    vii. inaction in light of notice that the County and MACC law enforcement response to the Daunte Wright protests was causing and would continue to cause constitutional violations against members of the press.

455. The County has a policy, practice, and/or custom of permitting constitutional violations, because even though the County knew of repeated allegations of law enforcement brutality against members of the press in Hennepin County, the County either positively encouraged law enforcement agents to cover up the abuse or otherwise tacitly approved these tactics. In other words, the unconstitutional conduct against members of

155

the press by law enforcement agents—in Hennepin County—was so pervasive, the County knew of the custom or recklessly disregarded its existence.

456.    The County knew with moral certainty that, if the County ever deployed law enforcement in the county to respond to civil unrest, law enforcement—acting as agents for the County—would come into contact with members of the press. Thus, the need to train and supervise the County's law enforcement agents in the constitutional limitations regarding Freedom of Press prior to and/or during deployment was so obvious that the failure to do so was deliberate indifference to the constitutional rights of the Plaintiff and other members of the press.

457.    Hennepin County was aware of the arrests, assaults, and mistreatment of journalists. Additionally, the County had the capacity to change law enforcement tactics over the course of the Wright protests, yet the County did not take any action to curtail the repeated constitutional violations happening against members of the press. This failure to act resulted in the violation of Plaintiff's constitutional rights.

458.    The County did nothing to quell the law enforcement misconduct and instead ratified and/or tacitly authorized it in an ongoing failure of supervision that resulted in the copious constitutional violations identified throughout this Complaint.

459.    Further, the unchecked unconstitutional conduct of the County's law enforcement agents at the Daunte Wright protests reflects the County's failure to train and supervise the County's law enforcement agents with respect to the First Amendment rights of journalists, resulting in a pattern and practice of targeting members of the press in retaliation for their exercise of First Amendment rights.

## F. NAMED-DEFENDANT HENNEPIN COUNTY SHERIFF DAVID P. HUTCHINSON

460. Hennepin County's Sheriff David P. Hutchinson ("Sheriff Hutchinson") committed the acts and omissions set forth below.

461. Prior to the Floyd and Wright protests, Sheriff Hutchinson and the HCSO have a history of unconstitutional conduct towards members of the press. HCSO provided law enforcement assistance during the 2016 Standing Rock protests against construction of the Dakota Access Pipeline.[285] During those protests, HCSO deputies arrested, assaulted,[286] and pepper-sprayed members of the press, including journalists from the nonprofit independent media organization Unicorn Riot.[287]

462. On April 11, 2021, Sheriff Hutchinson and HCSO responded immediately to Brooklyn Center's request for assistance in protecting the City and maintaining order by enforcing the law. This response was part of a joint law enforcement operation under the umbrella of MACC's Operation Safety Net.

463. On April 13, The City of Brooklyn Center made a request through the Hennepin County Chiefs of Police Association for the Hennepin County Sheriff's Office to take the lead role in incident command at the protests, and that very same night Sheriff Hutchinson and the HCSO assumed operational command of the law enforcement response to the protests under a unified command structure.

---

[285] https://kitoconnell.com/2016/10/28/100-arrested-brutal-police-crackdown-standing-rock-water-protectors/

[286] https://twitter.com/UR_Ninja/status/791742742531563520

[287] https://twitter.com/UR_Ninja/status/791771220513591296

157

464. The operational command of MACC law enforcement agents at the protest scene outside of the Brooklyn Center Police Department occurred as part of Sheriff Hutchinson's MACC function. As such, Sheriff Hutchinson worked in concert with each of the other MACC Defendants.

465. In this role, final policymaking authority and responsibility over the County's law enforcement training and supervision belonged to Sheriff Hutchinson, as did the County's coordinated law enforcement response during the Wright protests. If the County's law enforcement training and supervision was deficient, inadequate, or insufficient, it was Sheriff Hutchinson's duty to improve the training and supervision. Additionally, and/or in the alternative, Sheriff Hutchinson had final policymaking authority over MACC's law enforcement training and supervision while deployed in Brooklyn Center. If MACC's law enforcement training and supervision was deficient, inadequate, or insufficient, Sheriff Hutchinson had a duty to improve the training and supervision prior to and/or during deployment in Hennepin County.

466. If not for Sheriff Hutchinson's affirmative actions, the law enforcement agents from outside agencies deployed in the County during the Wright protests would not have jurisdiction. Sheriff Hutchinson provided MACC and MACC law enforcement agents the authority to act as law enforcement agents of the County.

467. By April 16, Sheriff Hutchinson—in his role as Hennepin County Sheriff, incident commander of MACC's law enforcement response to the Wright protests in Hennepin County, a County law enforcement official with final policymaking authority, a member of MACC's command staff directly contributing to MACC's law enforcement

158

response during the Wright protests in Brooklyn Center, and/or a MACC policymaker—had notice of multiple instances of unconstitutional conduct by County and MACC law enforcement agents responding to the civil unrest in Hennepin County. This notice—in the form of broad news reporting, direct outreach by reporters, and social media monitoring—described the repeated and targeted misconduct against members of the press. In other words, Sheriff Hutchinson knew law enforcement agents deployed in the County—and acting as law enforcement agents of the County—were targeting members of the press for unlawful reprisals.

468.    Additionally, the coordinated effort of County and MACC law enforcement agents, deployed around the Brooklyn Center Police Department acting in concert and coordinated fashion with one another—displayed by the tactical lines, synchronized movements, kettle tactics, and systemic deployment of chemical spray, flash-bang grenades, concussion grenades, and/or less-lethal projectiles—demonstrates that Sheriff Hutchinson was on notice of and sanctioned unconstitutional conduct.

469.    Sheriff Hutchinson—even after actual and/or constructive knowledge of unconstitutional violations against members of the press by County and MACC law enforcement agents in Hennepin County—chose an impermissible way of operating by allowing the persistent pattern and practice of constitutional violations by law enforcement against members of the press to continue. In other words, Sheriff Hutchinson engaged in a pattern of decisions that violated the constitutional rights of the Plaintiff and members of the press.

159

470. Sheriff Hutchinson had a duty to supervise the County's law enforcement agents—including HCSO deputies and MACC law enforcement agents—deployed in Hennepin County and participating in MACC operations. It is clear, by failing to take any corrective action, Sheriff Hutchinson tacitly authorized and condoned the actions of the County's law enforcement agents.

471. Sheriff Hutchinson maintained a final policymaking, supervisory, and/or command authority over the County's law enforcement response to the protests, had notice of a pattern of unconstitutional acts, and was deliberately indifferent to the unconstitutional acts. Additionally, Sheriff Hutchinson shared a final policymaking, supervisory, and/or command authority over the MACC's law enforcement response to the protests, had notice of a pattern of unconstitutional acts, and was deliberately indifferent to the unconstitutional acts.

472. At no time during the Wright protests did Sheriff Hutchinson address County and MACC law enforcement agents regarding their unconstitutional conduct against members of the press. Additionally, Sheriff Hutchinson did not withdraw himself as MACC's incident commander, remove any law enforcement agents or agencies from the County's law enforcement response, or take any affirmative action to stop unconstitutional conduct by County and MACC law enforcement agents against members of the press.

473. Sheriff Hutchinson had the authority to improve law enforcement training and/or supervision, yet failed to improve the law enforcement training and/or supervision of the County's law enforcement agents—including HCSO deputies and MACC law enforcement agents—after receiving notice of unconstitutional acts by the County's agents.

Additionally, as MACC's incident commander, Sheriff Hutchinson failed to improve MACC's law enforcement training or supervision after receiving notice of the unconstitutional acts by MACC law enforcement agents despite having the authority to do so.

474. In his role, Sheriff Hutchinson made a decision to take no corrective action to stop unconstitutional conduct against members of the press. Additionally, Sheriff Hutchinson's deliberate choice to ignore MACC's and/or the County's constitutional violations against members of the press by taking no corrective action was the moving force behind the Plaintiff's injuries.

475. Sheriff Hutchinson observed or intended the use of excessive force by the County's law enforcement agents—including HCSO deputies and MACC law enforcement agents—against the Plaintiff and other members of the press, and did not intervene to halt it.

476. Sheriff Hutchinson had the authority to direct law enforcement agents deployed in Hennepin County not to harm members of the press, and failed to prevent the harm suffered by the Plaintiff.

477. By April 16, 2021—after receiving sufficient notice—Sheriff Hutchinson permitted constitutional violations against members of the press to continue.

478.    By April 16, Sheriff Hutchinson had a policy, practice, and/or custom of:

    **i.** failing to provide warnings and/or lawful orders before deploying crowd control weapons—including chemical agents and injurious less-lethal munitions—against members of the press in Hennepin County during the Wright protests;

    **ii.** authorizing the deployment of crowd control weapons and/or less-lethal munitions in an unconstitutional manner;

    **iii.** unlawful indiscriminate use of less-lethal projectiles;

    **iv.** permitting constitutional violations—including, but not limited to, excessive force—against members of the press;

    **v.** targeting members of the press for unlawful reprisals;

    **vi.** delegating law enforcement responsibility to non-employees without maintaining adequate supervision; and/or

    **vii.** inaction in light of notice that the County and MACC law enforcement response to the Daunte Wright protests was causing and would continue to cause constitutional violations against members of the press.

479.    Sheriff Hutchinson was personally involved in creating, applying, and/or interpreting policy related to HCSO's law enforcement response to the Wright protests. Additionally, and/or in the alternative, Sheriff Hutchinson was personally involved in creating, applying, and/or interpreting policy related to MACC's law enforcement response to the Wright protests.

480. In April of 2021, policy related to the County's law enforcement response during civil unrest in Hennepin County was established by Sheriff Hutchinson, and with the concurrence or acquiescence of Hennepin County's governing body. Further, Sheriff Hutchinson had the responsibility for overall guidance to the County's law enforcement response during the Wright protests. Additionally, procedure—which is how the County's policies, practices, and customs are implemented—is the responsibility of Sheriff Hutchinson to develop in concert with his subordinates, including but not limited to, Chief Deputy Tracey Martin.

481. Sheriff Hutchinson issued and/or relayed orders that allowed employees, subordinates, and agents to use excessive force against the Plaintiff and members of the press.

482. Sheriff Hutchinson, in command of the HCSO, was formally subject to the ultimate authority of the County's governing body, yet prior to April 16, the County never sought to curb or correct the way in which Sheriff Hutchinson—aided by each of the other individual Command Defendants—was, in fact, exercising his formal authority to train and/or supervise MACC law enforcement agents as a critical aspect of his general authority to direct the full activities of the County's law enforcement response during the Wright protests.

483. Sheriff Hutchinson communicated with, and was in contact with, each of the other MACC Defendants through formal and informal channels during the Wright protests.

484. Sheriff Hutchinson worked together, in concert and coordinated fashion, with each of the other MACC Defendants during the Wright protests.

163

485.    In his role—as Hennepin County Sheriff, MACC's incident commander during the Wright Protests, a MACC policymaker, and/or a member of MACC's command staff, with final policymaking, supervisory, and/or command authority over the County's law enforcement agents—Defendant Sheriff Hutchinson exerted influential power over the culture, actions, and professional standards of the County's law enforcement agents. Additionally, and/or in the alternative, Sheriff Hutchinson used his role to exert influential power over the culture, actions, and professional standards of MACC law enforcement agents.

486.    Sheriff Hutchinson's influence over the County's law enforcement response to the Wright protests extends to policies, practices, and customs governing the use of force and press freedom. Additionally, and/or in the alternative, Sheriff Hutchinson's influence over MACC's law enforcement response to the Wright protests extends to policies, practices, and customs governing the use of force and press freedom.

487.    Sheriff Hutchinson used his influence to create the implicit and explicit policies, practices, and customs of MACC, and worked together with each of the MACC Defendants in their use of chemical agents and less-lethal projectiles, crowd control techniques, and the tactical deployment of law enforcement agents responding to the Wright protests that resulted in the violation of Plaintiff's constitutional rights.

488.    In his role, Sheriff Hutchinson was aware of the arrests, assaults, and mistreatment of journalists, and directly participated in the constitutional violations.

489. Sheriff Hutchinson had the capacity to change law enforcement tactics over the course of the Wright protests, yet Sheriff Hutchinson did not take any action to curtail the repeated constitutional violations happening against members of the press. This failure to act resulted in the violation of Plaintiff's constitutional rights.

490. Sheriff Hutchinson did nothing to quell the law enforcement misconduct and instead ratified and/or tacitly authorized it in an ongoing failure of supervision that resulted in the copious constitutional violations identified throughout this Complaint.

491. Further, the unchecked unconstitutional conduct of County and MACC law enforcement agents at the Daunte Wright protests reflects Sheriff Hutchinson's failure to train and supervise County and MACC law enforcement agents with respect to the First Amendment rights of journalists, resulting in a pattern and practice of targeting members of the press in retaliation for their exercise of First Amendment rights.

492. Sheriff Hutchinson condoned such practices which caused the unlawful practices to continue as an established custom or usage. Sheriff Hutchinson's condonation resulted from his deliberate indifference to the constitutional rights of Plaintiff and other members of the press within the County's jurisdiction who would encounter MACC law enforcement agents engaging in such practices. In specific accord with and in furtherance of these condoned customs and usages, Plaintiff was assaulted and injured by MACC law enforcement agents.

493. Sheriff Hutchinson conspired with each of the other MACC Defendants and reached an agreement of how they would respond to the Daunte Wright protests and the press reporting on them ("conspiracy" or "plan"). The conspiracy plan involved:

165

    **i.** suppressing reporting activity by Plaintiff and members of the press;

    **ii.** targeting Plaintiff and members of the press for unlawful reprisals; and/or

    **iii.** depriving Plaintiff and members of the press of their constitutional rights.

494.    As a co-conspirator in the conspiracy plan, Sheriff Hutchinson engaged in the overt acts described throughout this Complaint in furtherance of the conspiracy. Additionally, and/or in the alternative, Sheriff Hutchinson instructed employees, subordinates, and/or agents to take actions in furtherance of the conspiracy.

495.    Sheriff Hutchinson has shown no remorse for his actions or the actions of MACC law enforcement agents—including HCSO deputies—that resulted in multiple constitutional violations against members of the press throughout the Wright protests. In a text on May 3, 2021 a command staff member asked Sheriff Hutchinson if he needed any information in preparation for a phone call with Commissioner Schnell. Sheriff Hutchinson responded, "Idk. Maybe. Fuck you-ya bald mumbling faggot[.]" Commissioner Schnell, at Governor Walz's request, had been assisting in a complaint against a Hennepin County Sheriff's deputy that pepper-sprayed a member of the press during the Wright protests.

496.    By the start of the Wright protests, Sheriff Hutchinson acted with impunity and embraced intimidation, threats, and retaliatory actions as Hennepin County's Sheriff. In April 2022, members of Sheriff Hutchinson's command staff told outside investigator, Amy Kern of KZ Workplace ("Investigator Kern"), they had endured a discriminatory and hostile work environment. In an email to Investigator Kern, one member of Sheriff Hutchinson's command staff said offensive conduct included "slurs, epithets, name-calling, threats, intimidation, ridicule, mockery, insults and put-downs, and offensive

166

pictures. All of this by Sheriff Hutchinson, directed at his subordinates." After Sheriff Hutchinson became aware his senior staff were reviewing timecards to show he was falsifying work hours for himself and three subordinates, Sheriff Hutchinson threatened to retaliate. "[Sheriff Hutchinson] stated that if he found out who from the Command Staff was looking into his time and reporting it, they would regret it," said the email to Investigator Kern. "He stated, Bring it on. Theres nothing that anyone can do to me. He further stated that the Governor tried to take him down, the County Board tried to take him down, and the MN POST Board tried to take him down, and they all failed. He then stated that we would fail, too," according to the email. Hennepin County Administrator David Hough confirmed there are two pending complaints against Hutchinson as of July 11, 2022.

497. Sheriff Hutchinson is a Hennepin County law enforcement official with final policymaking, supervisory, and/or command authority, and took action that led to Plaintiff's constitutional violations and injuries.

## G. NAMED-DEFENDANT HENNEPIN COUNTY CHIEF DEPUTY TRACEY MARTIN

498. Hennepin County Sheriff's Office Chief Deputy Tracey Martin ("Chief Deputy Martin") committed the acts and omissions set forth below.

499. On April 13. The City of Brooklyn Center made a request through the Hennepin County Chiefs of Police Association for the Hennepin County Sheriff's Office to take the lead role in incident command at the protests, and that very same night Chief Deputy Martin assisted Sheriff Hutchinson with HCSO's operational command of the MACC's law enforcement response to the protests under a unified command structure.

500. Assisting in operational command of MACC law enforcement agents at the protest scene outside of the Brooklyn Center Police Department occurred as part of Chief Deputy Martin's MACC function. Additionally. Chief Deputy Martin shared responsibility over the County's law enforcement training and supervision.

501. By April 16, Chief Deputy Martin—in her role as HCSO's second-in-command, a County law enforcement official with final policymaking authority, assistant incident commander of MACC's law enforcement response to the Wright protests in Hennepin County, a member of MACC's command staff directly contributing to MACC's law enforcement response during the Wright protests in Brooklyn Center, and/or a MACC policymaker—had notice of multiple instances of unconstitutional conduct by the MACC law enforcement agents responding to the civil unrest in Brooklyn Center and Hennepin County. This notice—in the form of broad news reporting, direct outreach by reporters, and social media monitoring—described the repeated and targeted misconduct against

168

members of the press. In other words, Chief Deputy Martin knew law enforcement agents deployed in the County—and acting as law enforcement agents of the County—were targeting members of the press for unlawful reprisals.

502. Additionally, the coordinated effort of the County's law enforcement agents, and other MACC law enforcement agents, deployed around the Brooklyn Center Police Department acting in concert and coordinated fashion with one another—displayed by the tactical lines, synchronized movements, kettle tactics, and systemic deployment of chemical spray, flash-bang grenades, concussion grenades, and/or less-lethal projectiles—demonstrates that Chief Deputy Martin was on notice of and sanctioned unconstitutional conduct.

503. Chief Deputy Martin—even after actual and/or constructive knowledge of unconstitutional violations against members of the press by law enforcement agents in Hennepin County—chose an impermissible way of operating by allowing the persistent pattern and practice of constitutional violations by law enforcement against members of the press to continue. In other words, Chief Deputy Martin engaged in a pattern of decisions that violated the constitutional rights of the Plaintiff and members of the press.

504. Chief Deputy Martin had a duty to supervise the County's law enforcement agents—including HCSO deputies and MACC law enforcement agents—deployed in Hennepin County and participating in MACC operations. It is clear, by failing to take any corrective action, Chief Deputy Martin tacitly authorized and condoned the actions of the County's law enforcement agents.

505.     Chief Deputy Martin shared a final policymaking, supervisory, and/or command authority over the County's law enforcement response to the protests, had notice of a pattern of unconstitutional acts, and was deliberately indifferent to the unconstitutional acts. Additionally, Chief Deputy Martin shared a final policymaking, supervisory, and/or command authority over the MACC's law enforcement response to the protests, had notice of a pattern of unconstitutional acts, and was deliberately indifferent to the unconstitutional acts.

506.     At no time during the Wright protests did Chief Deputy Martin address the County's law enforcement agents regarding their unconstitutional conduct against members of the press. Additionally, Chief Deputy Martin did not withdraw herself as assistant incident commander, remove any law enforcement agents or agencies from the County's law enforcement response, or take any affirmative action to stop unconstitutional conduct by the County's law enforcement against members of the press.

507.     Chief Deputy Martin had the authority to improve law enforcement training and/or supervision, yet failed to improve the law enforcement training and/or supervision of the County's law enforcement agents—including HCSO deputies and MACC law enforcement agents—after receiving notice of unconstitutional acts by the County's agents. Additionally, as a member of MACC's command staff, Chief Deputy Martin failed to improve MACC's law enforcement training or supervision after receiving notice of the unconstitutional acts by MACC law enforcement agents despite having the authority to do so.

170

508.    In her role, Chief Deputy Martin made a decision to take no corrective action to stop unconstitutional conduct against members of the press. Additionally, Chief Deputy Martin's deliberate choice to ignore MACC's and/or the County's constitutional violations against members of the press by taking no corrective action was the moving force behind the Plaintiff's injuries.

509.    Chief Deputy Martin observed or intended the use of excessive force by the County's law enforcement agents—including HCSO deputies and MACC law enforcement agents—against the Plaintiff and other members of the press, and did not intervene to halt it.

510.    Chief Deputy Martin had the authority to direct law enforcement agents deployed in Hennepin County not to harm members of the press, and failed to prevent the harm suffered by the Plaintiff.

511.    By April 16, 2021—after receiving sufficient notice—Chief Deputy Martin permitted constitutional violations against members of the press to continue.

512.    By April 16, Chief Deputy Martin had a policy, practice, and/or custom of:

   i.    failing to provide warnings and/or lawful orders before deploying crowd control weapons—including chemical agents and injurious less-lethal munitions—against members of the press in Hennepin County during the Wright protests;

   ii.   authorizing the deployment of crowd control weapons and/or less-lethal munitions in an unconstitutional manner;

   iii.  unlawful indiscriminate use of less-lethal projectiles;

171

iv. permitting constitutional violations—including, but not limited to, excessive force—against members of the press;

v. targeting members of the press for unlawful reprisals;

vi. delegating law enforcement responsibility to non-employees without maintaining adequate supervision; and/or

vii. inaction in light of notice that the County and MACC law enforcement response to the Daunte Wright protests was causing and would continue to cause constitutional violations against members of the press.

513.     Chief Deputy Martin was personally involved in creating, applying, and/or interpreting policy related to HCSO's law enforcement response to the Wright protests. Additionally, and/or in the alternative, Chief Deputy Martin was personally involved in creating, applying, and/or interpreting policy related to MACC's law enforcement response to the Wright protests.

514.     Chief Deputy Martin issued and/or relayed orders that allowed employees, subordinates, and agents to use excessive force against the Plaintiff and members of the press.

515.     Chief Deputy Martin communicated with, and was in contact with, each of the other MACC Defendants through formal and informal channels during the Wright protests.

516.     Chief Deputy Martin worked together with each of the other MACC Defendants during the Wright protests.

172

517. In her role—as HCSO's Chief Deputy, MACC's assistant incident commander during the Wright Protests, a MACC policymaker, and/or a member of MACC's command staff, with final policymaking, supervisory, and/or command authority over the County's law enforcement agents—Defendant Chief Deputy Martin exerted influential power over the culture, actions, and professional standards of the County's law enforcement agents. Additionally, and/or in the alternative, Chief Deputy Martin used her role to exert influential power over the culture, actions, and professional standards of MACC law enforcement agents.

518. Chief Deputy Martin's influence over the County's law enforcement response to the Wright protests extends to policies, practices, and customs governing the use of force and press freedom. Additionally, and/or in the alternative, Chief Deputy Martin's influence over MACC's law enforcement response to the Wright protests extends to policies, practices, and customs governing the use of force and press freedom.

519. Chief Deputy Martin used her influence to create the implicit and explicit policies, practices, and customs of MACC, and worked together with each of the MACC Defendants in their use of chemical agents and less-lethal projectiles, crowd control techniques, and the tactical deployment of law enforcement agents responding to the Wright protests that resulted in the violation of Plaintiff's constitutional rights.

520. In her role, Chief Deputy Martin was aware of the arrests, assaults, and mistreatment of journalists, and directly participated in the constitutional violations.

521. Chief Deputy Martin had the capacity to change law enforcement tactics over the course of the Wright protests, yet Chief Deputy Martin did not take any action to curtail

173

the repeated constitutional violations happening against members of the press. This failure
to act resulted in the violation of Plaintiff's constitutional rights.

522.    Chief Deputy Martin did nothing to quell the law enforcement misconduct
and instead ratified and/or tacitly authorized it in an ongoing failure of supervision that
resulted in the copious constitutional violations identified throughout this Complaint.

523.    Further, the unchecked unconstitutional conduct of the County's law
enforcement agents at the Daunte Wright protests reflects Chief Deputy Martin's failure to
train and supervise the County's law enforcement agents with respect to the First
Amendment rights of journalists, resulting in a pattern and practice of targeting members
of the press in retaliation for their exercise of First Amendment rights.

524.    Chief Deputy Martin conspired with each of the other MACC Defendants
and reached an agreement of how they would respond to the Daunte Wright protests and
the press reporting on them ("conspiracy" or "plan"). The conspiracy plan involved:

    i. suppressing reporting activity by Plaintiff and members of the press;

    ii. targeting Plaintiff and members of the press for unlawful reprisals; and/or

    iii. depriving Plaintiff and members of the press of their constitutional rights.

525.    As a co-conspirator in the conspiracy plan, Chief Deputy Martin engaged in
the overt acts described throughout this Complaint in furtherance of the conspiracy.
Additionally, and/or in the alternative, Chief Deputy Martin instructed employees,
subordinates, and/or agents to take actions in furtherance of the conspiracy.

526. Chief Deputy Martin is a Hennepin County law enforcement official with final policymaking, supervisory, and/or command authority, and took action that led to Plaintiff's constitutional violations and injuries.

## H. NAMED-DEFENDANT DEPARTMENT OF PUBLIC SAFETY COMMISSIONER JOHN HARRINGTON

527. Minnesota Department of Public Safety's Commissioner John Harrington ("Commissioner Harrington") committed the acts and omissions set forth below.

528. In 2008, Amy Goodman—host of "Democracy Now!"—and her crew were arrested during the Republican National Convention in St. Paul, despite posing no threat and complying with police orders.[288] Defendant John Harrington, the Saint Paul Police Department ("SPPD") Chief of Police at the time, brushed off the First Amendment concerns. Dozens of other journalists were arrested and/or assaulted by SPPD officers under Defendant John Harrington's command during these protests, including an AP photographer and a journalist from the New York Post, in incidents strikingly similar to those that occurring during the Floyd protests of 2020 and Wright protests of 2021. Goodman and her crew filed a federal civil rights lawsuit against various law enforcement agencies, including the SPPD and the MPD based on these unconstitutional actions. The lawsuit settled in 2011, with a monetary payment to the affected journalists, as well as an agreement by the SPPD to implement new training aimed at educating officers regarding

---

[288] https://www.minnpost.com/politics-policy/2008/09/amy-goodmans-arrest-when-journalists-are-story/

the First Amendment rights of the press covering demonstrations.[289] The Saint Paul Police
Department also agreed to make its own training available to law enforcement state-wide.
On information and belief, the Minnesota State Patrol did not avail itself to the press
freedom training and education offered by SPPD, nor did any other MACC-participating
law enforcement agency.

529.    During the Floyd protests of 2020, MACC was in control of the law
enforcement response to the civil unrest. As a matter of public record, Commissioner
Harrington was "the MACC's leader."[290] As MACC's leader, Commissioner Harrington
was personally involved in MACC and had command, control, and final policymaking
authority over MACC's operations. As such, law enforcement agents participating in
MACC operations became agents of the State and/or subordinates of Commissioner
Harrington.

530.    In July of 2020, after the Floyd protests, the City of Minneapolis created a
"[preparation] for potential protests" plan called Operation Safety Net.[291] In his role as
Commissioner of Minnesota's Department of Public Safety,[292] Homeland Security Advisor
to Governor Walz,[293] and the leader of MACC, Commissioner Harrington was personally
involved in the review and the changes of OSN in January 2021.[294] Commissioner

[289] https://www.youtube.com/watch?v=1VtmmFFhTxk

[290] *Goyette*, 2021 U.S. Dist. LEXIS 141793 at 24

[291] *Goyette*, ECF No. 219-1, "Exhibit A" at 170:23—171:2

[292] *supra*, n.291 at 147:9—23

[293] *supra*, n.291 at 161:25—162:4

[294] *supra*, n.291 at 171:3—6

176

Harrington helped develop the plan further to include additional resources such as the deployment of MNG guardsmen, MSP troopers, DNR officers, and others.[295] Commissioner Harrington's personal involvement in OSN—as well has his lead role in MACC's law enforcement response to the Floyd protests—demonstrates that law enforcement leaders in Minnesota view Commissioner Harrington as an official policymaker separate and distinct from their own agency command structure.

531.    Consistent with this perception, the Minnesota Senate's *Judiciary and Public Safety Committee* and *Transportation, Finance, and Policy Committee* held a joint hearing on July 15, 2020 regarding "Local Law Enforcement Response to Riots and Lawlessness." It invited law enforcement representatives from MACC to testify and answer questions to explain the official actions of law enforcement during the George Floyd protests, and to make legislative and policy recommendations. Interestingly, MPD Chief Arrandondo, Mayor Frey, nor anyone from the Mayor's staff or the MPD command structure were called to testify. In contrast, Commissioner Harrington and Colonel Langer—those with actual command responsibility over MACC and MACC's law enforcement response to the protests—were called to testify and answer questions about the law enforcement response.[296]

---

[295] *supra*, n.291 at 171:6—13

[296] https://www.senate.mn/committees/2019-
2020/3102_Committee_on_Transportation_Finance_and_Policy/Agenda%20-
%20Joint%20Hearing%204.pdf

177

532. During the Wright protests. Commissioner Harrington continued his personal involvement in MACC, and retained his command, control, and final policymaking authority over MACC and MACC's law enforcement response. As such, law enforcement agents participating in MACC operations became agents of the State and/or subordinates of Commissioner Harrington.

533. On April 11, 2021, Commissioner Harrington—along with the Department of Public Safety, Minnesota State Patrol, and other agencies under his command—responded immediately to Hennepin County's and Brooklyn Center's request for assistance in protecting the City and maintaining order by enforcing the law. This response was part of a joint law enforcement operation under the umbrella of MACC's Operation Safety Net.

534. The operational command of MACC law enforcement agents at the protest scene outside of the Brooklyn Center Police Department occurred as part of Commissioner Harrington's MACC function. As such, Commissioner Harrington worked in concert with each of the other MACC Defendants.

535. Commissioner Harrington had final policymaking authority over the State's law enforcement training and supervision. If the State's law enforcement training and supervision was deficient, inadequate, or insufficient, it was Commissioner Harrington's duty to improve the training and supervision. Additionally, and/or in the alternative, Commissioner Harrington had final policymaking authority over MACC's law enforcement training and supervision. If MACC's law enforcement training and supervision was deficient, inadequate, or insufficient, Commissioner Harrington had a duty to improve the training and supervision.

178

536.     By April 16, Commissioner Harrington—in his role as Commissioner of

Minnesota's Department of Public Safety, Homeland Security Advisor, a State official with

final policymaking authority, leader of MACC's law enforcement response to the Wright

protests in Brooklyn Center, a member of MACC's command staff directly contributing to

MACC's law enforcement response during the Wright protests in Brooklyn Center, and/or

a MACC policymaker—had notice of multiple instances of unconstitutional conduct by the

State and MACC law enforcement agents responding to the civil unrest in Minnesota. This

notice—in the form of broad news reporting, direct outreach by reporters, and social media

monitoring—described the repeated and targeted misconduct against members of the press.

In other words, Commissioner Harrington knew law enforcement agents deployed in the

State—and acting as MACC's law enforcement agents—were targeting members of the

press for unlawful reprisals.

537.     Additionally, the coordinated effort of the State and MACC law enforcement

agents deployed around the Brooklyn Center Police Department acting in concert and

coordinated fashion with one another—displayed by the tactical lines, synchronized

movements, kettle tactics, and systemic deployment of chemical spray, flash-bang

grenades, concussion grenades, and/or less-lethal projectiles—demonstrates that

Commissioner Harrington was on notice of and sanctioned unconstitutional conduct.

538.     Commissioner Harrington—even after actual and/or constructive knowledge

of unconstitutional violations against members of the press by State and MACC law

enforcement agents in Brooklyn Center—chose an impermissible way of operating by

allowing the persistent pattern and practice of constitutional violations by law enforcement

179

against members of the press to continue. In other words, Commissioner Harrington engaged in a pattern of decisions that violated the constitutional rights of the Plaintiff and members of the press.

539.    Commissioner Harrington had a duty to supervise State and MACC law enforcement agents deployed in Brooklyn Center and participating in MACC operations. It is clear, by failing to take any corrective action, Commissioner Harrington tacitly authorized and condoned the actions of the State and MACC law enforcement agents.

540.    Commissioner Harrington maintained a final policymaking, supervisory, and/or command authority over the State's law enforcement response to the protests, had notice of a pattern of unconstitutional acts, and was deliberately indifferent to the unconstitutional acts. Additionally, Commissioner Harrington shared a final policymaking, supervisory, and/or command authority over the MACC's law enforcement response to the protests, had notice of a pattern of unconstitutional acts, and was deliberately indifferent to the unconstitutional acts.

541.    At no time during the Wright protests did Commissioner Harrington address State and MACC law enforcement agents regarding their unconstitutional conduct against members of the press. Additionally, Commissioner Harrington did not withdraw himself as MACC's leader, remove any State and MACC law enforcement agents from MACC's law enforcement response, or take any affirmative action to stop unconstitutional conduct by State and MACC law enforcement agents against members of the press.

542.    Commissioner Harrington had the authority to improve law enforcement training and/or supervision, yet failed to improve the law enforcement training and/or

180

supervision of the State law enforcement agents after receiving notice of unconstitutional acts by State agents or agents they worked in concert with. Additionally, as MACC's leader, Commissioner Harrington failed to improve MACC's law enforcement training or supervision after receiving notice of the unconstitutional acts by MACC law enforcement agents despite having the authority to do so.

543.    In his role, Commissioner Harrington made a decision to take no corrective action to stop unconstitutional conduct against members of the press. Additionally, Commissioner Harrington's deliberate choice to ignore MACC's and/or the State's constitutional violations against members of the press by taking no corrective action was the moving force behind the Plaintiff's injuries.

544.    Commissioner Harrington observed or intended the use of excessive force by State and MACC law enforcement agents against the Plaintiff and other members of the press, and did not intervene to halt it.

545.    Commissioner Harrington had the authority to direct State and MACC law enforcement agents deployed in Brooklyn Center not to harm members of the press, and failed to prevent the harm suffered by the Plaintiff.

546.    By April 16, 2021—after receiving sufficient notice—Commissioner Harrington permitted constitutional violations against members of the press to continue.

547.    By April 16, Commissioner Harrington had a policy, practice, and/or custom

of:

    i. failing to provide warnings and/or lawful orders before deploying crowd control weapons—including chemical agents and injurious less-lethal munitions—against members of the press in Brooklyn Center during the Wright protests;

    ii. authorizing the deployment of crowd control weapons and/or less-lethal munitions in an unconstitutional manner;

    iii. unlawful indiscriminate use of less-lethal projectiles;

    iv. permitting constitutional violations—including, but not limited to, excessive force—against members of the press;

    v. targeting members of the press for unlawful reprisals;

    vi. delegating law enforcement responsibility to non-employees without maintaining adequate supervision; and/or

    vii. inaction in light of notice that the State and MACC law enforcement response to the Daunte Wright protests was causing and would continue to cause constitutional violations against members of the press.

548.    Commissioner Harrington was personally involved in creating, applying, and/or interpreting policy related to the State's law enforcement response to the Wright protests. Additionally, and/or in the alternative, Commissioner Harrington was personally involved in creating, applying, and/or interpreting policy related to MACC's law enforcement response to the Wright protests.

549.   Commissioner Harrington issued and/or relayed orders that allowed employees, subordinates, and agents to use excessive force against the Plaintiff and members of the press.

550.   Commissioner Harrington communicated with, and was in contact with, each of the other MACC Defendants through formal and informal channels during the Wright protests.

551.   Commissioner Harrington worked together, in concert and coordinated fashion, with each of the other MACC Defendants during the Wright protests.

552.   In his role—as the Minnesota Department of Public Safety's Commissioner, the Homeland Security Advisor to Governor Walz, a MACC policymaker, and/or MACC's leader, with final policymaking, supervisory, and/or command authority over MACC law enforcement agents—Defendant Commissioner Harrington exerted influential power over the culture, actions, and professional standards of the State's law enforcement agents. Additionally, and/or in the alternative, Commissioner Harrington used his role to exert influential power over the culture, actions, and professional standards of MACC law enforcement agents.

553.   Commissioner Harrington's influence over the State's law enforcement response to the Wright protests extends to policies, practices, and customs governing the use of force and press freedom. Additionally, and/or in the alternative, Commissioner Harrington's influence over MACC's law enforcement response to the Wright protests extends to policies, practices, and customs governing the use of force and press freedom.

554. Commissioner Harrington used his influence to create implicit and explicit policies, practices, and/or customs of MACC, and worked together with each of the MACC Defendants in their use of chemical agents and less-lethal projectiles, crowd control techniques, and the tactical deployment of law enforcement agents responding to the Wright protests that resulted in the violation of Plaintiff's constitutional rights.

555. In his role, Commissioner Harrington was aware of the arrests, assaults, and mistreatment of journalists, and directly participated in the constitutional violations.

556. Commissioner Harrington had the capacity to change law enforcement tactics over the course of the Wright protests, yet Commissioner Harrington did not take any action to curtail the repeated constitutional violations happening against members of the press. This failure to act resulted in the violation of Plaintiff's constitutional rights.

557. Commissioner Harrington did nothing to quell the law enforcement misconduct and instead ratified and/or tacitly authorized it in an ongoing failure of supervision that resulted in the copious constitutional violations identified throughout this Complaint.

558. Further, the unchecked unconstitutional conduct of State and MACC law enforcement agents at the Floyd and Wright protests reflects Commissioner Harrington's failure to train and supervise State and MACC law enforcement agents with respect to the First Amendment rights of journalists, resulting in a pattern and practice of targeting members of the press in retaliation for their exercise of First Amendment rights.

559.    For example, Commissioner Harrington testified that he did not recall seeing the video of CNN's Omar Jimenez May 30, 2020 arrest, and that he did not recall Jimenez's arrest specifically.[297] However, Commissioner Harrington did recall general discussion of a CNN news crew being arrested,[298] and remembers clearly hearing from Governor Walz "his displeasure at having news media arrested."[299] Commissioner Harrington professed concern about the arrests of journalists,[300] testifying that "even in the context of what was a fairly massive amount of civil unrest, it still was concerning that it happened,"[301] but he also testified that no internal investigation had been conducted concerning Jimenez's arrest.[302] Commissioner Harrington's rationale for the lack of any investigation of this internationally notorious event was that CNN did not file a formal complaint.[303] The agency's failure to conduct even a cursory investigation of this unconstitutional arrest—which was so obvious and extreme it required an immediate apology from Governor Walz on national television—speaks volumes about Commissioner Harrington's lack of seriousness with respect to addressing the misconduct against journalists by MSP troopers and MACC law enforcement agents.

---

[297] *Goyette*, ECF No. 219-1, "Exhibit A" at 187:21—188:2

[298] *supra*, n.297 at 188:3—6

[299] *supra*, n.297 at 188:16—19

[300] *supra*, n.297 at 189:5—7

[301] *supra*, n.297 at 189:15—16

[302] *supra*, n.297 at 189:24—190:1

[303] *supra*, n.297 at 189:18—23

560.     Commissioner Harrington conspired with each of the other MACC Defendants and reached an agreement of how they would respond to the Daunte Wright protests and the press reporting on them ("conspiracy" or plan"). The conspiracy plan involved:

    i. suppressing reporting activity by Plaintiff and members of the press;

    ii. targeting Plaintiff and members of the press for unlawful reprisals; and/or

    iii. depriving Plaintiff and members of the press of their constitutional rights.

561.     As a co-conspirator in the conspiracy plan, Commissioner Harrington engaged in the overt acts described throughout this Complaint in furtherance of the conspiracy. Additionally, and/or in the alternative, Commissioner Harrington instructed employees, subordinates, and/or agents to take actions in furtherance of the conspiracy.

562.     Commissioner Harrington was the State of Minnesota's official with final policymaking, supervisory, and/or command authority and took action that led to Plaintiff's constitutional violations and injuries.

## I. NAMED-DEFENDANT DEPARTMENT OF PUBLIC SAFETY ASSISTANT COMMISSIONER BOOKER HODGES

563. Minnesota Department of Public Safety's Assistant Commissioner Booker Hodges ("Assistant Commissioner Hodges") committed the acts and omissions set forth below.

564. Assistant Commissioner Hodges is second-in-command at the Department of Public Safety, and shares supervisory responsibility with Commissioner Harrington over the State's law enforcement agents.

565. Assistant Commissioner Hodges was personally involved in MACC, worked side-by-side with Commissioner Harrington, and in concert with MACC Defendants.

566. Assistant Commissioner Hodges shared supervisory control over MACC and MACC law enforcement agents who responded to the Wright protests.

567. As Commissioner Harrington's second-in-command, Assistant Commissioner Hodges assisted with the leadership over MACC and assisted in the command, control, and policymaking of MACC and MACC's law enforcement response.

568. Assisting in the operational command of MACC law enforcement agents at the protest scene outside of the Brooklyn Center Police Department occurred as part of Assistant Commissioner Hodges's MACC function.

569. Assistant Commissioner Hodges shared authority over the State's law enforcement training and supervision. If the State's law enforcement training and supervision was deficient, inadequate, or insufficient, Assistant Commissioner Hodges had a duty to improve the training and supervision. Additionally, and/or in the alternative,

187

Assistant Commissioner Hodges shared authority over MACC's law enforcement training and supervision. If MACC's law enforcement training and supervision was deficient, inadequate, or insufficient, Assistant Commissioner Hodges had a duty to improve the training and supervision.

570. By April 16, Assistant Commissioner Hodges—in his role as Assistant Commissioner of Minnesota's Department of Public Safety, a State official with final policymaking authority, sharing leadership with Commissioner Harrington over MACC's law enforcement response to the Wright protests in Brooklyn Center, a member of MACC's command staff directly contributing to MACC's law enforcement response during the Wright protests in Brooklyn Center, and/or a MACC policymaker—had notice of multiple instances of unconstitutional conduct by the MACC law enforcement agents responding to the civil unrest in Minnesota. This notice—in the form of broad news reporting, direct outreach by reporters, and social media monitoring—described the repeated and targeted misconduct against members of the press. In other words, Assistant Commissioner Hodges knew law enforcement agents deployed in the State—and acting as MACC's law enforcement agents—were targeting members of the press for unlawful reprisals.

571. Additionally, the coordinated effort of the State's law enforcement agents deployed around the Brooklyn Center Police Department acting in concert and coordinated fashion with one another—displayed by the tactical lines, synchronized movements, kettle tactics, and systemic deployment of chemical spray, flash-bang grenades, concussion

grenades, and/or less-lethal projectiles—demonstrates that Assistant Commissioner Hodges was on notice of and sanctioned unconstitutional conduct.

572. Assistant Commissioner Hodges—even after actual and/or constructive knowledge of unconstitutional violations against members of the press by MACC law enforcement agents in Brooklyn Center—chose an impermissible way of operating by allowing the persistent pattern and practice of constitutional violations by law enforcement against members of the press to continue. In other words, Assistant Commissioner Hodges engaged in a pattern of decisions that violated the constitutional rights of the Plaintiff and members of the press.

573. Assistant Commissioner Hodges had a duty to supervise State and MACC law enforcement agents. It is clear, by failing to take any corrective action, Assistant Commissioner Hodges tacitly authorized and condoned the actions of the State and MACC law enforcement agents.

574. Assistant Commissioner Hodges shared a final policymaking and supervisory authority over the State's law enforcement response to the protests, had notice of a pattern of unconstitutional acts, and was deliberately indifferent to the unconstitutional acts. Additionally, Assistant Commissioner Hodges shared a final policymaking, supervisory, and/or command authority over the MACC's law enforcement response to the protests, had notice of a pattern of unconstitutional acts, and was deliberately indifferent to the unconstitutional acts.

575. At no time during the Wright protests did Assistant Commissioner Hodges address State and MACC law enforcement agents regarding their unconstitutional conduct

189

against members of the press. Additionally, Assistant Commissioner Hodges did not withdraw himself from MACC, remove any State and MACC law enforcement agents from MACC's law enforcement response, or take any affirmative action to stop unconstitutional conduct by State and MACC law enforcement agents against members of the press.

576.    Assistant Commissioner Hodges had the authority to improve law enforcement training and/or supervision, yet failed to improve the law enforcement training and/or supervision of the State law enforcement agents after receiving notice of unconstitutional acts by State agents or agents they worked in concert with. Additionally, as a member of MACC's command staff, Assistant Commissioner Hodges failed to improve MACC's law enforcement training or supervision after receiving notice of the unconstitutional acts by MACC law enforcement agents despite having the authority to do so.

577.    In his role, Assistant Commissioner Hodges made a decision to take no corrective action to stop unconstitutional conduct against members of the press. Additionally, Assistant Commissioner Hodges's deliberate choice to ignore MACC's and/or the State's constitutional violations against members of the press by taking no corrective action was the moving force behind the Plaintiff's injuries.

578.    Assistant Commissioner Hodges observed or intended the use of excessive force by State and MACC law enforcement agents against the Plaintiff and other members of the press, and did not intervene to halt it.

579. Assistant Commissioner Hodges had the authority to direct State and MACC law enforcement agents deployed in Brooklyn Center not to harm members of the press, and failed to prevent the harm suffered by the Plaintiff.

580. By April 16, 2021—after receiving sufficient notice—Assistant Commissioner Hodges permitted constitutional violations against members of the press to continue.

581. By April 16, Assistant Commissioner Hodges had a policy, practice, and/or custom of:

    i. failing to provide warnings and/or lawful orders before deploying crowd control weapons—including chemical agents and injurious less-lethal munitions—against members of the press in Brooklyn Center during the Wright protests;

    ii. authorizing the deployment of crowd control weapons and/or less-lethal munitions in an unconstitutional manner;

    iii. unlawful indiscriminate use of less-lethal projectiles;

    iv. permitting constitutional violations—including, but not limited to, excessive force—against members of the press;

    v. targeting members of the press for unlawful reprisals;

    vi. delegating law enforcement responsibility to non-employees without maintaining adequate supervision; and/or

191

**vii.** inaction in light of notice that the State and MACC law enforcement response to the Daunte Wright protests was causing and would continue to cause constitutional violations against members of the press.

582. Assistant Commissioner Hodges was personally involved in creating, applying, and/or interpreting policy related to the State's law enforcement response to the Wright protests. Additionally, and/or in the alternative, Assistant Commissioner Hodges was personally involved in creating, applying, and/or interpreting policy related to MACC's law enforcement response to the Wright protests.

583. Assistant Commissioner Hodges issued and/or relayed orders that allowed employees, subordinates, and agents to use excessive force against the Plaintiff and members of the press.

584. Assistant Commissioner Hodges communicated with, and was in contact with, each of the other MACC Defendants through formal and informal channels during the Wright protests.

585. Assistant Commissioner Hodges worked together, in concert and coordinated fashion, with each of the other MACC Defendants during the Wright protests.

586. In his role—as second-in-command for the State's law enforcement response to the Wright protests sharing leadership over MACC's law enforcement response during the Wright Protests, a MACC policymaker, and/or a member of MACC's command staff, with final policymaking, supervisory, and/or command authority—Defendant Assistant Commissioner Hodges exerted influential power over the culture, actions, and professional standards of the State's law enforcement agents. Additionally, and/or in the alternative,

192

Assistant Commissioner Hodges used his role to exert influential power over the culture, actions, and professional standards of MACC law enforcement agents.

587.    Assistant Commissioner Hodges's influence over the State's law enforcement response to the Wright protests extends to policies, practices, and customs governing the use of force and press freedom. Additionally, and/or in the alternative, Assistant Commissioner Hodges's influence over MACC's law enforcement response to the Wright protests extends to policies, practices, and customs governing the use of force and press freedom.

588.    Assistant Commissioner Hodges used his influence to create implicit and explicit policies, practices, and/or customs of MACC, and worked together with each of the MACC Defendants in their use of chemical agents and less-lethal projectiles, crowd control techniques, and the tactical deployment of law enforcement agents responding to the Wright protests that resulted in the violation of Plaintiff's constitutional rights.

589.    In his role, Assistant Commissioner Hodges was aware of the arrests, assaults, and mistreatment of journalists, and directly participated in the constitutional violations.

590.    Assistant Commissioner Hodges had the capacity to change law enforcement tactics over the course of the Wright protests, yet Assistant Commissioner Hodges did not take any action to curtail the repeated constitutional violations happening against members of the press. This failure to act resulted in the violation of Plaintiff's constitutional rights.

591.    Assistant Commissioner Hodges did nothing to quell the law enforcement misconduct and instead ratified and/or tacitly authorized it in an ongoing failure of

supervision that resulted in the copious constitutional violations identified throughout this Complaint.

592. Further, the unchecked unconstitutional conduct of State and MACC law enforcement agents at the Daunte Wright protests reflects Assistant Commissioner Hodges's failure to train and supervise State and MACC law enforcement agents with respect to the First Amendment rights of journalists, resulting in a pattern and practice of targeting members of the press in retaliation for their exercise of First Amendment rights.

593. Assistant Commissioner Hodges conspired with each of the other MACC Defendants and reached an agreement of how they would respond to the Daunte Wright protests and the press reporting on them ("conspiracy" or "plan"). The conspiracy plan involved:

    **i.** suppressing reporting activity by Plaintiff and members of the press;

    **ii.** targeting Plaintiff and members of the press for unlawful reprisals; and/or

    **iii.** depriving Plaintiff and members of the press of their constitutional rights.

594. As a co-conspirator in the conspiracy plan, Assistant Commissioner Hodges engaged in the overt acts described throughout this Complaint in furtherance of the conspiracy. Additionally, and/or in the alternative, Assistant Commissioner Hodges instructed employees, subordinates, and/or agents to take actions in furtherance of the conspiracy.

595. Assistant Commissioner Hodges was a State of Minnesota law enforcement official with final policymaking, supervisory, and/or command authority and took action that led to Plaintiff's constitutional violations and injuries.

194

## J. NAMED-DEFENDANT MINNESOTA STATE PATROL COLONEL MATTHEW LANGER

596. Minnesota State Patrol's Colonel Matthew Langer ("Colonel Langer") committed the acts and omissions set forth below.

597. The Minnesota State Patrol is composed of 886 employees, of which 591 are uniformed personnel of sworn officers.[304] Structurally, many of the sworn officers appear to be troopers, while the sergeants generally hold investigative roles. There are also lieutenants and captains, who maintain supervisory responsibility over the troopers and sergeants. All of the State Patrol personnel ultimately report to Colonel Langer, Chief of the Minnesota State Patrol.

598. General Orders instructing MSP troopers are issued and/or approved by Colonel Langer, a final policymaker for the Minnesota State Patrol.[305]

599. Colonel Langer has policymaking authority to establish policies, practices, and customs for the Minnesota State Patrol.

600. During the Floyd and Wright protests, Colonel Langer was personally involved in MACC, worked side-by-side with Commissioner Harrington as MACC's *de facto* second-in-command, and assisted in the command, control, and policymaking of MACC and MACC's law enforcement response.

---

[304] As of May 19, 2022

[305] *Goyette*, Doc 121-1, "Exhibit 3"

195

601.    Colonel Langer shared both command and supervisory control over MACC, and the MACC law enforcement agents who responded to the Floyd and Wright protests.

602.    Consistent with this perception, the Minnesota Senate's *Judiciary and Public Safety Committee* and *Transportation, Finance, and Policy Committee* held a joint hearing on July 15, 2020 regarding "Local Law Enforcement Response to Riots and Lawlessness." It invited law enforcement representatives from MACC to testify and answer questions to explain the official actions of law enforcement during the George Floyd protests, and to make legislative and policy recommendations. Interestingly, MPD Chief Arrandondo, Mayor Frey, nor anyone from the Mayor's staff or the MPD command structure were called to testify. In contrast, Commissioner Harrington and Colonel Langer—those with actual command responsibility over MACC and MACC's law enforcement response to the protests—was called to testify and answer questions about the law enforcement response.[306]

603.    On April 11, 2021, Colonel Langer—along with the Minnesota State Patrol—responded immediately to Hennepin County's and Brooklyn Center's request for assistance in protecting the City and maintaining order by enforcing the law. This response was part of a joint law enforcement operation under the umbrella of MACC's Operation Safety Net.

---

[306] https://www.senate.mn/committees/2019-
2020/3102_Committee_on_Transportation_Finance_and_Policy/Agenda%20-
%20Joint%20Hearing%204.pdf

196

604. Assisting in the operational command of MACC law enforcement agents at the protest scene outside of the Brooklyn Center Police Department occurred as part of Colonel Langer's MACC function. As such, Colonel Langer worked in concert with each of the other MACC Defendants.

605. Colonel Langer had final policymaking authority over MSP's law enforcement training and supervision. If MSP's law enforcement training and supervision was deficient, inadequate, or insufficient, it was Colonel Langer's duty to improve the training and supervision. Additionally, and/or in the alternative, Colonel Langer shared policymaking authority over MACC's law enforcement training and supervision. If MACC's law enforcement training and supervision was deficient, inadequate, or insufficient, Colonel Langer had a duty to improve the training and supervision.

606. By April 16, Colonel Langer—in his role as MSP Chief, a State official with final policymaking authority, second-in-command of MACC's law enforcement response to the Wright protests in Brooklyn Center, a member of MACC's command staff directly contributing to MACC's law enforcement response during the Wright protests in Brooklyn Center, and/or a MACC policymaker—had notice of multiple instances of unconstitutional conduct by the MACC law enforcement agents responding to the civil unrest in Minnesota. This notice—in the form of broad news reporting, direct outreach by reporters, and social media monitoring—described the repeated and targeted misconduct against members of the press. In other words, Colonel Langer knew law enforcement agents deployed in Brooklyn Center—and acting as MACC's law enforcement agents—were targeting members of the press for unlawful reprisals.

197

607. Additionally, the coordinated effort of MSP troopers and MACC law enforcement agents deployed around the Brooklyn Center Police Department acting in concert and coordinated fashion with one another—displayed by the tactical lines, synchronized movements, kettle tactics, and systemic deployment of chemical spray, flash-bang grenades, concussion grenades, and/or less-lethal projectiles—demonstrates that Colonel Langer was on notice of and sanctioned unconstitutional conduct.

608. Colonel Langer—even after actual and/or constructive knowledge of unconstitutional violations against members of the press by MSP troopers and MACC law enforcement agents in Brooklyn Center—chose an impermissible way of operating by allowing the persistent pattern and practice of constitutional violations by law enforcement against members of the press to continue. In other words, Colonel Langer engaged in a pattern of decisions that violated the constitutional rights of the Plaintiff and members of the press.

609. Colonel Langer had a duty to supervise MSP troopers and MACC law enforcement agents deployed in Brooklyn Center and participating in MACC operations. It is clear, by failing to take any corrective action, Colonel Langer tacitly authorized and condoned the actions of MSP troopers and MACC law enforcement agents.

610. Colonel Langer shared final policymaking, supervisory, and/or command authority over the State's law enforcement response to the protests, had notice of a pattern of unconstitutional acts, and was deliberately indifferent to the unconstitutional acts. Additionally, Colonel Langer shared final policymaking, supervisory, and/or command authority over the MACC's law enforcement response to the protests, had notice of a

198

pattern of unconstitutional acts, and was deliberately indifferent to the unconstitutional acts.

611. At no time during the Wright protests did Colonel Langer address MSP troopers and MACC law enforcement agents regarding their unconstitutional conduct against members of the press. Additionally, Colonel Langer did not withdraw himself as MACC's second-in-command, remove any MSP troopers and MACC law enforcement agents from MACC's law enforcement response, or take any affirmative action to stop unconstitutional conduct by MSP troopers and MACC law enforcement agents against members of the press.

612. Colonel Langer had the authority to improve law enforcement training and/or supervision, yet failed to improve the law enforcement training and/or supervision of the MSP troopers after receiving notice of unconstitutional acts by MSP troopers or agents they worked in concert with. Additionally, as a member of MACC's command staff, Colonel Langer failed to improve MACC's law enforcement training or supervision after receiving notice of the unconstitutional acts by MACC law enforcement agents despite having the authority to do so.

613. In his role, Colonel Langer made a decision to take no corrective action to stop unconstitutional conduct against members of the press. Additionally, Colonel Langer's deliberate choice to ignore MACC's constitutional violations against members of the press by taking no corrective action was the moving force behind the Plaintiff's injuries.

614.    Colonel Langer observed or intended the use of excessive force by MSP troopers and MACC law enforcement agents against the Plaintiff and other members of the press, and did not intervene to halt it.

615.    Colonel Langer had the authority to direct MSP troopers and MACC law enforcement agents deployed in Brooklyn Center not to harm members of the press, and failed to prevent the harm suffered by the Plaintiff.

616.    By April 16, 2021—after receiving sufficient notice—Colonel Langer permitted constitutional violations against members of the press to continue.

617.    By April 16, Colonel Langer had a policy, practice, and/or custom of:

   i.  failing to provide warnings and/or lawful orders before deploying crowd control weapons—including chemical agents and injurious less-lethal munitions—against members of the press in Brooklyn Center during the Wright protests;

   ii.  authorizing the deployment of crowd control weapons and/or less-lethal munitions in an unconstitutional manner;

   iii.  unlawful indiscriminate use of less-lethal projectiles;

   iv.  permitting constitutional violations—including, but not limited to, excessive force—against members of the press;

   v.  targeting members of the press for unlawful reprisals;

   vi.  delegating law enforcement responsibility to non-employees without maintaining adequate supervision; and/or

200

> vii. inaction in light of notice that the Minnesota State Patrol and MACC law enforcement response to the Daunte Wright protests was causing and would continue to cause constitutional violations against members of the press.

618. Colonel Langer was personally involved in creating, applying, and/or interpreting policy related to the Minnesota State Patrol's law enforcement response to the Wright protests. Additionally, and/or in the alternative, Colonel Langer was personally involved in creating, applying, and/or interpreting policy related to MACC's law enforcement response to the Wright protests.

619. Colonel Langer issued and/or relayed orders that allowed employees, subordinates, and agents to use excessive force against the Plaintiff and members of the press.

620. Colonel Langer communicated with, and was in contact with, each of the other MACC Defendants through formal and informal channels during the Wright protests.

621. Colonel Langer worked together, in concert and coordinated fashion, with each of the other MACC Defendants during the Wright protests.

622. In his role—as Chief of the Minnesota State Patrol, MACC's second-in-command during the Wright Protests, a MACC policymaker, and/or a member of MACC's command staff, with final policymaking, supervisory, and/or command authority—Defendant Colonel Langer exerted influential power over the culture, actions, and professional standards of MSP troopers and State law enforcement agents. Additionally, and/or in the alternative, Colonel Langer used his role to exert influential power over the culture, actions, and professional standards of MACC law enforcement agents.

623. Colonel Langer's influence over the State's and MSP's law enforcement response to the Wright protests extends to policies, practices, and customs governing the use of force and press freedom. Additionally, and/or in the alternative, Colonel Langer's influence over MACC's law enforcement response to the Wright protests extends to policies, practices, and customs governing the use of force and press freedom.

624. Colonel Langer used his influence to create implicit and explicit policies, practices, and/or customs of MACC, and worked together with each of the MACC Defendants in their use of chemical agents and less-lethal projectiles, crowd control techniques, and the tactical deployment of law enforcement agents responding to the Wright protests that resulted in the violation of Plaintiff's constitutional rights.

625. In his role, Colonel Langer was aware of the arrests, assaults, and mistreatment of journalists, and directly participated in the constitutional violations.

626. Colonel Langer had the capacity to change law enforcement tactics over the course of the Wright protests, yet Colonel Langer did not take any action to curtail the repeated constitutional violations happening against members of the press. This failure to act resulted in the violation of Plaintiff's constitutional rights.

627. Colonel Langer did nothing to quell the law enforcement misconduct and instead ratified and/or tacitly authorized it in an ongoing failure of supervision that resulted in the copious constitutional violations identified throughout this Complaint.

628. Further, the unchecked unconstitutional conduct of MSP troopers and MACC law enforcement agents at the Floyd and Wright protests reflects Colonel Langer's failure to train and supervise MSP troopers and MACC law enforcement agents with

respect to the First Amendment rights of journalists, resulting in a pattern and practice of targeting members of the press in retaliation for their exercise of First Amendment rights.

629.    Colonel Langer conspired with each of the other MACC Defendants and reached an agreement of how they would respond to the Daunte Wright protests and the press reporting on them ("conspiracy" or "plan"). The conspiracy plan involved:

   i. suppressing reporting activity by Plaintiff and members of the press;

   ii. targeting Plaintiff and members of the press for unlawful reprisals; and/or

   iii. depriving Plaintiff and members of the press of their constitutional rights.

630.    As a co-conspirator in the conspiracy plan, Colonel Langer engaged in the overt acts described throughout this Complaint in furtherance of the conspiracy. Additionally, and/or in the alternative, Colonel Langer instructed employees, subordinates, and/or agents to take actions in furtherance of the conspiracy.

631.    Colonel Langer was the State of Minnesota's official with final policymaking, supervisory, and/or command authority and took action that led to Plaintiff's constitutional violations and injuries.

203

## K. NAMED-DEFENDANT MINNESOTA STATE PATROL MAJOR JOSEPH DWYER

632. Minnesota State Patrol's Major Joseph Dwyer ("Major Dwyer") committed the acts and omissions set forth below.

633. Defendant Major Dwyer has been involved in MSP's field force operations since 2008, and holds federal credentials issued by the Center for Domestic Preparedness ("CDP"). Additionally, Major Dwyer instructs for the CDP related to crowd control and field force operations.[307]

634. During the George Floyd protests in 2020 and the Daunte Wright protests in 2021, Major Dwyer was in command of the Minnesota State Patrol's Mobile Response Team ("MRT").

635. The MRT has primary responsibility at the State Patrol for providing crowd control and responding to protests or incidents of civil unrest, and did provide crowd control at both the Floyd and Wright protests. The MRT contains a separate unit of troopers trained in and tasked with the use of chemical and less-lethal weapons for crowd control purposes, and which did use such weapons under Major Dwyer's supervision at both the Floyd and Wright protests.

636. Major Dwyer was responsible for the training and supervision of the MRT. The rampant unconstitutional conduct by MRT troopers at the George Floyd and Daunte Wright protests, some of which have been detailed throughout this Complaint,[308]

---

[307] *Goyette*, ECF No. 219-1, "Exhibit A" at 229:5—20

[308] see *Cole v. Dwyer*, Case No. 21-CV-1282

demonstrates his complete failure of supervision and training with respect to the First Amendment rights of journalists, news media, and members of the press.

637.    Shortly after the George Floyd protests ended, Major Dwyer intentionally destroyed his email and text message communications to avoid their disclosure. Major Dwyer's destruction of electronic records violated Department of Public Safety policy and constituted intentional spoliation of evidence, given his knowledge at the time of destruction that litigation had commenced regarding the State Patrol's misconduct against members of the press during the George Floyd protests. Major Dwyer's intentional destruction of these records reflects his knowledge of wrongdoing and his malice toward members of the press.

638.    According to testimony at a preliminary injunction hearing in the *Goyette* case, not only did Major Dwyer delete his own email and text message correspondence immediately after the George Floyd protests, so did the vast majority of State Troopers, reflecting a coordinated, agency-wide attempt to destroy evidence and engage in a coverup of the State Defendants' widespread misconduct, which confirms State Defendants' malice toward the First Amendment rights of the Plaintiff and other members of the press.

639.    Additionally, Major Dwyer knowingly submitted an exaggerated—if not completely false—declaration in *Goyette*, stating that "[a]pproximately one-third of the crowd on any given evening during the April 2021 protests claimed media status."[309] The

---

[309] *Goyette*, ECF No. 219-1, "Exhibit A" at 297:5—298:23

205

State Defendants have not provided reports, video, or any other single piece of evidence to support Major Dwyer's inaccurate and misleading statement.

640.     Major Dwyer has final policymaking authority to establish policies, practices, and customs for Minnesota State Patrol troopers responding to civil unrest.

641.     The Minnesota State Patrol—including MRT troopers—was an integral part of MACC and MACC's law enforcement response to the Floyd and Wright protests.

642.     During the Floyd and Wright protests, Major Dwyer was personally involved in MACC as command staff, and worked side-by-side with Colonel Langer as a federally-trained expert in crowd control and field force operations. Major Dwyer's involvement directly contributed to the command, control, and policymaking of MACC and MACC's law enforcement response.

643.     As a member of MACC's command staff, Major Dwyer shared both command and supervisory control over MACC, and the MACC law enforcement agents who responded to the Floyd and Wright protests.

644.     On April 11, 2021, Major Dwyer—along with the Minnesota State Patrol's MRT—responded immediately to Hennepin County's and Brooklyn Center's request for assistance in protecting the City and maintaining order by enforcing the law. This response was part of a joint law enforcement operation under the umbrella of MACC's Operation Safety Net.

645.     Assisting in the operational command of MACC law enforcement agents at the protest scene outside of the Brooklyn Center Police Department occurred as part of

Major Dwyer's MACC function. As such, Major Dwyer worked in concert with each of the other MACC Defendants.

646.    Major Dwyer shared policymaking authority over MSP's law enforcement training and supervision related to crowd control and field force operations. If MSP's law enforcement training and supervision was deficient, inadequate, or insufficient, it was Major Dwyer's duty to improve the training and supervision. Additionally, and/or in the alternative, Major Dwyer shared policymaking authority over MACC's law enforcement training and supervision. If MACC's law enforcement training and supervision was deficient, inadequate, or insufficient, Major Dwyer had a duty to improve the training and supervision.

647.    By April 16, Major Dwyer—in his role as a senior officer in the Minnesota State Patrol, commander of MSP's Mobile Response Team, and a member of MACC's command staff directly contributing to MACC's law enforcement response during the Wright protests in Brooklyn Center, and/or a MACC policymaker—had notice of multiple instances of unconstitutional conduct by MSP troopers and MACC law enforcement agents responding to the civil unrest in Minnesota. This notice—in the form of broad news reporting, direct outreach by reporters, and social media monitoring—described the repeated and targeted misconduct against members of the press. In other words, Major Dwyer knew MSP troopers and MACC law enforcement agents deployed in Brooklyn Center were targeting members of the press for unlawful reprisals.

648.     Additionally, the coordinated effort of MSP troopers, the MRT, and MACC law enforcement agents deployed around the Brooklyn Center Police Department acting in concert and coordinated fashion with one another—displayed by the tactical lines, synchronized movements, kettle tactics, and systemic deployment of chemical spray, flash-bang grenades, concussion grenades, and/or less-lethal projectiles—demonstrates that Major Dwyer was on notice of and sanctioned unconstitutional conduct.

649.     Major Dwyer—even after actual and/or constructive knowledge of unconstitutional violations against members of the press by MSP troopers and MACC law enforcement agents in Brooklyn Center—chose an impermissible way of operating by allowing the persistent pattern and practice of constitutional violations by law enforcement against members of the press to continue. In other words, Major Dwyer engaged in a pattern of decisions that violated the constitutional rights of the Plaintiff and members of the press.

650.     Major Dwyer had a duty to supervise MSP troopers and MACC law enforcement agents participating in crowd control and field force operations deployed in Brooklyn Center. It is clear, by failing to take any corrective action, Major Dwyer tacitly authorized and condoned the actions of the MSP troopers and MACC law enforcement agents participating in crowd control and field force operations deployed in Brooklyn Center.

651.     Major Dwyer shared final policymaking, supervisory, and/or command authority over the Minnesota State Patrol's law enforcement response to the protests, had notice of a pattern of unconstitutional acts, and was deliberately indifferent to the unconstitutional acts. Additionally, Major Dwyer shared final policymaking, supervisory,

208

and/or command authority over the MACC's law enforcement response to the protests, had notice of a pattern of unconstitutional acts, and was deliberately indifferent to the unconstitutional acts.

652.    At no time during the Wright protests did Major Dwyer address MSP troopers and MACC law enforcement agents regarding their unconstitutional conduct against members of the press. Additionally, Major Dwyer did not withdraw himself from MACC, remove any MSP troopers and MACC law enforcement agents from MACC's law enforcement response, or take any affirmative action to stop unconstitutional conduct by MSP troopers and MACC law enforcement agents against members of the press.

653.    Major Dwyer had the authority to improve Minnesota State Patrol's law enforcement training and/or supervision related to crowd control and field force operations, yet failed to improve crowd control and field force operations training and/or supervision after receiving notice of unconstitutional acts by MSP troopers or agents they worked in concert with. Additionally, as a member of MACC's command staff, Major Dwyer failed to improve MACC's law enforcement training or supervision after receiving notice of the unconstitutional acts by MACC law enforcement agents despite having the authority to do so.

654.    In his role, Major Dwyer made a decision to take no corrective action to stop unconstitutional conduct against members of the press. Additionally, Major Dwyer's deliberate choice to ignore MACC's constitutional violations against members of the press by taking no corrective action was the moving force behind the Plaintiff's injuries.

209

655. Not only did Major Dwyer assist in the development of plans related to MACC's law enforcement response executed during the Wright protests—specifically on April 13, 14, and 16 of 2021—but he also carried out commands given by MACC.

656. Major Dwyer was "on the ground" at the Wright protests,[310] and was in communication with his supervisors[311]—including Colonel Langer—and other MACC policymakers. While on the ground, Major Dwyer would "progress past the line of troopers to gain a better vantage point[.]"[312]

657. Additionally, Major Dwyer and the rest of the Minnesota State Patrol "worked cooperatively, collaboratively" with each of the law enforcement agencies participating in MACC to "quell the unrest."[313]

658. Major Dwyer, while engaging in MACC's law enforcement operations deployed throughout Wright protests, implemented a previously communicated plan that involved depriving members of the press—including the Plaintiff—of their constitutional rights.[314]

659. Major Dwyer did not care about press freedom during the Daunte Wright protests "even though they may not be engaged in [riotous acts.]"[315] Instead, he wanted to "clear the streets" and ignore the constitutional protections given to members of the press.

---

[310] *Goyette*, ECF No. 219-1, "Exhibit A" at 238:7—9

[311] *Goyette*, ECF No. 219-1, "Exhibit A" at 296:11—297:1

[312] *Goyette*, ECF No. 219-1, "Exhibit A" at 299:2—4

[313] *Goyette*, ECF No. 219-1, "Exhibit A" at 239:20—239:25

[314] *Goyette*, ECF No. 219-1, "Exhibit A" at 293:11—17

[315] *Goyette*, ECF No. 219-1, "Exhibit A" at 308:3—18

660.    Actions taken on April 13, 14 and 16 by MSP troopers under Major Dwyer's supervision include—but are not limited to—forming a tactical line, cutting off routes of egress, displaying a show of authority, and using spotlights to target the Plaintiff for unlawful reprisals. These actions, and other similar actions, made it clear these tactics were planned and that Major Dwyer not only had notice of but actually sanctioned the conduct.

661.    On April 16, Major Dwyer and the MSP troopers under his command were aware of, and collaborated in, the assault on the Plaintiff because they had a clear vantage point of MACC law enforcement agents—including other MSP troopers—targeting the Plaintiff for an unlawful reprisal and watched it unfold, yet failed to intervene despite the opportunity and ability to do so.

662.    The MSP trooper line that had marched north—including John Does #4 and #5—was under the supervision and control of Major Dwyer, and participated in orders to "clear the streets[.]"

663.    Major Dwyer was aware that the actions of both his subordinates and MACC law enforcement agents created a substantial risk of serious harm, yet failed to intervene to mitigate this risk of harm.

664.    Major Dwyer observed or intended the use of excessive force by MSP troopers and MACC law enforcement agents against the Plaintiff and other members of the press, and did not intervene to halt it.

665.    Major Dwyer had the authority to direct MSP troopers and MACC law enforcement agents deployed in Brooklyn Center not to harm members of the press, and failed to prevent the harm suffered by the Plaintiff.

211

666.    By April 16, 2021—after receiving sufficient notice—Major Dwyer permitted constitutional violations against members of the press to continue.

667.    By April 16, Major Dwyer had a policy, practice, and/or custom of:

   i. failing to provide warnings and/or lawful orders before deploying crowd control weapons—including chemical agents and injurious less-lethal munitions—against members of the press in Brooklyn Center during the Wright protests;

   ii. authorizing the deployment of crowd control weapons and/or less-lethal munitions in an unconstitutional manner;

   iii. unlawful indiscriminate use of less-lethal projectiles;

   iv. permitting constitutional violations—including, but not limited to, excessive force—against members of the press;

   v. targeting members of the press for unlawful reprisals;

   vi. delegating law enforcement responsibility to non-employees without maintaining adequate supervision; and/or

   vii. inaction in light of notice that the Minnesota State Patrol and MACC law enforcement response to the Daunte Wright protests was causing and would continue to cause constitutional violations against members of the press.

212

668.     Major Dwyer was personally involved in creating, applying, and/or interpreting policy related to the Minnesota State Patrol's law enforcement response to the Wright protests. Additionally, and/or in the alternative, Major Dwyer was personally involved in creating, applying, and/or interpreting policy related to MACC's law enforcement response to the Wright protests.

669.     Major Dwyer issued and/or relayed orders that allowed employees, subordinates, and agents to use excessive force against the Plaintiff and members of the press.

670.     Major Dwyer communicated with, and was in contact with, each of the other MACC Defendants through formal and informal channels during the Wright protests.

671.     Major Dwyer worked together, in concert and coordinated fashion, with each of the other MACC Defendants during the Wright protests.

672.     In his role—as a senior officer in the Minnesota State Patrol; commander of the Mobile Response Team; a law enforcement leader specifically trained in, and holding federal credentials in, crowd control and field force operations; an instructor at a federal facility that trains law enforcement agents in crowd control and field force operations; a MACC policymaker; and/or a member of MACC's command staff during the Wright Protests with final policymaking, supervisory, and command authority—Defendant Major Dwyer exerted influential power over the culture, actions, and professional standards of MSP troopers. Additionally, and/or in the alternative, Major Dwyer used his role to exert influential power over the culture, actions, and professional standards of MACC law enforcement agents.

213

673. Major Dwyer's influence over the MSP's law enforcement response to the Wright protests extends to policies, practices, and customs governing the use of force and press freedom. Additionally, and/or in the alternative. Major Dwyer's influence over MACC's law enforcement response to the Wright protests extends to policies, practices, and customs governing the use of force and press freedom.

674. Major Dwyer used his influence to create implicit and explicit policies, practices, and/or customs of MACC, and worked together with each of the MACC Defendants in their use of chemical agents and less-lethal projectiles, crowd control techniques, and the tactical deployment of law enforcement agents responding to the Wright protests that resulted in the violation of Plaintiff's constitutional rights.

675. In his role, Major Dwyer was aware of the arrests, assaults, and mistreatment of journalists, and directly participated in the constitutional violations.

676. Major Dwyer had the capacity to change law enforcement tactics over the course of the Wright protests, yet Major Dwyer did not take any action to curtail the repeated constitutional violations happening against members of the press. This failure to act resulted in the violation of Plaintiff's constitutional rights.

677. Major Dwyer did nothing to quell the law enforcement misconduct and instead ratified and/or tacitly authorized it in an ongoing failure of supervision that resulted in the copious constitutional violations identified throughout this Complaint.

678. Further, the unchecked unconstitutional conduct of MSP troopers and MACC law enforcement agents at the Floyd and Wright protests reflects Major Dwyer's failure to train and supervise MSP troopers and MACC law enforcement agents with

214

respect to the First Amendment rights of journalists, resulting in a pattern and practice of targeting members of the press in retaliation for their exercise of First Amendment rights.

679. Major Dwyer conspired with each of the other MACC Defendants and reached an agreement of how they would respond to the Daunte Wright protests and the press reporting on them ("conspiracy" or "plan"). The conspiracy plan involved:

    i. suppressing reporting activity by Plaintiff and members of the press;

    ii. targeting Plaintiff and members of the press for unlawful reprisals; and/or

    iii. depriving Plaintiff and members of the press of their constitutional rights.

680. As a co-conspirator in the conspiracy plan, Major Dwyer engaged in the overt acts described throughout this Complaint in furtherance of the conspiracy. Additionally, and/or in the alternative, Major Dwyer instructed employees, subordinates, and/or agents to take actions in furtherance of the conspiracy.

681. Major Dwyer was a State of Minnesota law enforcement official with final policymaking, supervisory, and/or command authority and took action that led to Plaintiff's constitutional violations and injuries.

215

## L. NAMED-DEFENDANT CRYSTAL POLICE CHIEF STEPHANIE REVERING

682. Crystal Police Chief and Hennepin County Chiefs of Police Association President Stephanie Revering ("Chief Revering") committed the acts and omissions set forth below.

683. In preparation for the Chauvin trial—and prior to the start of the Wright protests—the HCCPA and WMC joined into and became a part of MACC and Chief Revering joined into MACC as a MACC policymaker. Additionally, and/or in the alternative, Chief Revering was a member of MACC's command staff.

684. On April 11, 2021, Chief Revering responded immediately to the County's and the City's request for assistance, and deployed WMC mobile field force officers in Brooklyn Center. This response was part of MACC's joint law enforcement operation: Operation Safety Net.

685. To coordinate HCCPA and WMC into MACC's law enforcement response during the Wright protests, Chief Revering was in regular communication with each of the other MACC Defendants. In other words, Chief Revering was personally involved in MACC and worked side-by-side with MACC Defendants.

686. As a MACC policymaker and/or a member of MACC's command staff, Chief Revering assisted in the operational command of MACC law enforcement agents at the protest scene outside of the Brooklyn Center Police Department, which occurred as part of Chief Revering's MACC function. As such, Chief Revering worked—in concert and coordinated fashion—with each of the other MACC Defendants, sharing command and

216

control over MACC and MACC law enforcement agents deployed during the Wright protests.

687.    Chief Revering was in command of WMC, and has final policymaking authority to establish policies, practices, and customs for the HCCPA's West Mobile Command while participating in MACC operations. The WMC was an integral part of MACC and MACC's law enforcement response to the Wright protests.

688.    Chief Revering's involvement directly contributed to the command and control of MACC and MACC's law enforcement response.

689.    Chief Revering had final policymaking authority over WMC's law enforcement training and supervision related to civil unrest. If WMC's law enforcement training and supervision was deficient, inadequate, or insufficient, it was Chief Revering's duty to improve the training and supervision. Additionally, and/or in the alternative, Chief Revering shared final policymaking authority over MACC's law enforcement training and supervision. If MACC's law enforcement training and supervision was deficient, inadequate, or insufficient, Chief Revering had a duty to improve the training and supervision.

690.    By April 16, Chief Revering—in her role as President of the HCCPA, commander of WMC, a law enforcement official with final policymaking authority, a member of MACC's command staff directly contributing to MACC's law enforcement response during the Wright protests in Brooklyn Center, and/or a MACC policymaker—had notice of multiple instances of unconstitutional conduct by WMC mobile field force officers and/or MACC law enforcement agents responding to the civil unrest in Minnesota.

217

This notice—in the form of broad news reporting, direct outreach by reporters, and social media monitoring—described the repeated and targeted misconduct against members of the press. In other words, Chief Revering knew WMC mobile field force officers and/or MACC law enforcement agents deployed in Brooklyn Center were targeting members of the press for unlawful reprisals.

691. Additionally, the coordinated effort of WMC mobile field force officers and MACC law enforcement agents deployed around the Brooklyn Center Police Department acting in concert and coordinated fashion with one another—displayed by the tactical lines, synchronized movements, kettle tactics, and systemic deployment of chemical spray, flash-bang grenades, concussion grenades, and/or less-lethal projectiles—demonstrates that Chief Revering was on notice of and sanctioned unconstitutional conduct.

692. Chief Revering—even after actual and/or constructive knowledge of unconstitutional violations against members of the press by WMC mobile field force officers and/or MACC law enforcement agents in Brooklyn Center—chose an impermissible way of operating by allowing the persistent pattern and practice of constitutional violations by law enforcement against members of the press to continue. In other words, Chief Revering engaged in a pattern of decisions that violated the constitutional rights of the Plaintiff and members of the press.

693. Chief Revering had a duty to supervise WMC mobile field force officers and MACC law enforcement agents participating in crowd control and field force operations deployed in Brooklyn Center. It is clear, by failing to take any corrective action, Chief Revering tacitly authorized and condoned the actions of the WMC mobile field force

218

CASE 0:23-cv-00917-NEB-LIB   Doc. 21   Filed 07/20/23   Page 219 of 338

officers and MACC law enforcement agents participating in crowd control and field force operations deployed in Brooklyn Center.

694. Chief Revering had final policymaking, supervisory, and/or command authority over the HCCPA and WMC law enforcement response to the protests, had notice of a pattern of unconstitutional acts, and was deliberately indifferent to the unconstitutional acts. Additionally, Chief Revering shared final policymaking, supervisory, and/or command authority over the MACC's law enforcement response to the protests, had notice of a pattern of unconstitutional acts, and was deliberately indifferent to the unconstitutional acts.

695. At no time during the Wright protests did Chief Revering address WMC mobile field force officers and MACC law enforcement agents regarding their unconstitutional conduct against members of the press. Additionally, Chief Revering did not withdraw herself from MACC, remove any WMC mobile field force officers or MACC law enforcement agents from MACC's law enforcement response, or take any affirmative action to stop unconstitutional conduct by WMC mobile field force officers or MACC law enforcement agents against members of the press.

696. Chief Revering had the authority to improve WMC's training and/or supervision related to crowd control, yet failed to improve crowd control training and/or supervision after receiving notice of unconstitutional acts by WMC mobile field force officers or agents they worked in concert with. Additionally, as a member of MACC's command staff, Chief Revering failed to improve MACC's law enforcement training or

219

supervision after receiving notice of the unconstitutional acts by MACC law enforcement agents despite having the authority to do so.

697.    In her role, Chief Revering made a decision to take no corrective action to stop unconstitutional conduct against members of the press. Additionally, Chief Revering's deliberate choice to ignore MACC's constitutional violations against members of the press by taking no corrective action was the moving force behind the Plaintiff's injuries.

698.    Chief Revering observed or intended the use of excessive force by WMC mobile field force officers and MACC law enforcement agents against the Plaintiff and other members of the press, and did not intervene to halt it.

699.    Chief Revering had the authority to direct WMC mobile field force officers and MACC law enforcement agents deployed in Brooklyn Center not to harm members of the press, and failed to prevent the harm suffered by the Plaintiff.

700.    By April 16, 2021—after receiving sufficient notice—Chief Revering permitted constitutional violations against members of the press to continue.

701.    By April 16, Chief Revering had a policy, practice, and/or custom of:

i.   failing to provide warnings and/or lawful orders before deploying crowd control weapons—including chemical agents and injurious less-lethal munitions—against members of the press in Brooklyn Center during the Wright protests;

ii.  authorizing the deployment of crowd control weapons and/or less-lethal munitions in an unconstitutional manner;

iii. unlawful indiscriminate use of less-lethal projectiles;

iv. permitting constitutional violations—including, but not limited to, excessive force—against members of the press;

v. targeting members of the press for unlawful reprisals;

vi. delegating law enforcement responsibility to non-employees without maintaining adequate supervision; and/or

vii. inaction in light of notice that the West Metro Command and MACC law enforcement response to the Daunte Wright protests was causing and would continue to cause constitutional violations against members of the press.

702. Chief Revering was personally involved in creating, applying, and/or interpreting policy related to the HCCPA and WMC law enforcement response to the Wright protests. Additionally, and/or in the alternative, Chief Revering was personally involved in creating, applying, and/or interpreting policy related to MACC's law enforcement response to the Wright protests.

703. Chief Revering issued and/or relayed orders that allowed employees, subordinates, and agents to use excessive force against the Plaintiff and members of the press.

704. Chief Revering communicated with, and was in contact with, each of the other MACC Defendants through formal and informal channels during the Wright protests.

705. Chief Revering worked together, in concert and coordinated fashion, with each of the other MACC Defendants during the Wright protests.

706. In her role—as HCCPA's President, commander of WMC, a MACC policymaker, and/or a member of MACC's command staff, with final policymaking,

221

supervisory, and/or command authority—Defendant Chief Revering exerted influential power over the culture, actions, and professional standards of WMC mobile field force officers and MACC law enforcement agents.

707.    Chief Revering's influence over the WMC's law enforcement response to the Wright protests extends to policies, practices, and customs governing the use of force and press freedom. Additionally, and/or in the alternative, Chief Revering's influence over MACC's law enforcement response to the Wright protests extends to policies, practices, and customs governing the use of force and press freedom.

708.    Chief Revering used her influence to create implicit and explicit policies, practices, and/or customs of MACC, and worked together with each of the MACC Defendants in their use of chemical agents and less-lethal projectiles, crowd control techniques, and the tactical deployment of law enforcement agents responding to the Wright protests that resulted in the violation of Plaintiff's constitutional rights.

709.    In her role, Chief Revering was aware of the arrests, assaults, and mistreatment of journalists, and directly participated in the constitutional violations.

710.    Chief Revering had the capacity to change law enforcement tactics over the course of the Wright protests, yet Chief Revering did not take any action to curtail the repeated constitutional violations happening against members of the press. This failure to act resulted in the violation of Plaintiff's constitutional rights.

711.    Chief Revering did nothing to quell the law enforcement misconduct and instead ratified and/or tacitly authorized it in an ongoing failure of supervision that resulted in the copious constitutional violations identified throughout this Complaint.

712.   Further, the unchecked unconstitutional conduct of WMC mobile field force officers and MACC law enforcement agents at the Wright protests reflects Chief Revering's failure to train and supervise WMC mobile field force officers and MACC law enforcement agents with respect to the First Amendment rights of journalists, resulting in a pattern and practice of targeting members of the press in retaliation for their exercise of First Amendment rights.

713.   Chief Revering conspired with each of the other MACC Defendants and reached an agreement of how they would respond to the Daunte Wright protests and the press reporting on them ("conspiracy" or "plan"). The conspiracy plan involved:

    **i.**  suppressing reporting activity by Plaintiff and members of the press;

    **ii.** targeting Plaintiff and members of the press for unlawful reprisals; and/or

    **iii.** depriving Plaintiff and members of the press of their constitutional rights.

714.   As a co-conspirator in the conspiracy plan, Chief Revering engaged in the overt acts described throughout this Complaint in furtherance of the conspiracy. Additionally, and/or in the alternative, Chief Revering instructed employees, subordinates, and/or agents to take actions in furtherance of the conspiracy.

715.   Chief Revering was a law enforcement official with final policymaking, supervisory, and/or command authority and took action that led to Plaintiff's constitutional violations and injuries.

223

## M. STATE DEFENDANTS

716.     State Defendants played a key role in MACC during the Floyd and Wright protests. State Defendants' actions during the Wright protests were the same or similar actions State Defendants performed during the Floyd protests.

717.     During the State Defendants' response to the civil unrest that occurred after the murder of George Floyd in May of 2020, a State Patrol Lieutenant emailed Major Dwyer "[a]fter the first two days of battling these evil people and allowing them to win, I made the decision it is time to change some things … [and I] began to draft a plan to take over the city."

718.     This State Patrol Lieutenant "credits" his "Chief" for convincing the Governor to approve this "plan to take over the city," because, admittedly, this plan "would mean that [law enforcement] will look very aggressive and not so nice to the protestors." But, according to the same Lieutenant, once State Patrol received the clear from the Governor, this "plan" was implemented by MACC and "the cops went on the offensive[.]"

719.     According to this Lieutenant, the approval of the State Patrol's "offensive" plan came about on May 30, 2020.

720.     In *Goyette*, Major Dwyer testified he was informed of this change in "posture" that—at the direction of MACC, and in concert and coordinated fashion with MACC-participating agencies—the Minnesota State Patrol would be implementing.

721.     Using "prior knowledge" to effect a "mass arrest" on May 30, Major Dwyer testified that tactics used during the Floyd protests were part of the larger "strategy that

224

was discussed ... to restore some sort of order to a chaotic environment that had infected the city."[316]

722.    Major Dwyer testified the "intent" of MACC's plan was "to clear the entire landscape," regardless of whether the media was considered exempt from the curfew order. Details of Major Dwyer's plan were discussed at MACC's "command level" and then communicated down the chain of command. MACC's plan was also discussed with troopers during a briefing conducted right before MACC law enforcement agents were deployed to the area of the Fifth Precinct on May 30. Same or similar actions were taken and/or executed by MACC and MACC-participating agencies on April 13, 14 and 16 of 2021.

723.    The Minnesota State Patrol has written policies regarding the use of force, First Amendment assemblies (General Order 21-10-013), and the media (General Order 10-10-53), that have been blatantly and repeatedly violated by MSP troopers with no discipline or consequence to the troopers. This confirms that the true First Amendment policy, practice, and/or custom at the Minnesota State Patrol is the unwritten policy of impunity for the arrest and abuse of clearly identifiable members of the press, in addition to other policies, practices, and/or customs that mirror MACC.

724.    In 2015, the Minnesota State Patrol arrested KMSP-TV reporter Jack Highberger while he reported on protests regarding the MPD's killing of Jamar Clark.[317]

---

[316] *Goyette*, ECF No. 219-1, "Exhibit A" at 302:22—303:1

[317] https://www.usnews.com/news/articles/2015/11/17/reporter-arrested-covering-minnesota-highway-protest-over-jamar-clark-shooting

Video shows Highberger in the middle of a live shot, speaking into his microphone, reporting on the State patrol beginning to arrest protesters.[318] An MSP trooper walked up to Highberger, said "You wanna be next?" and cuffed him seconds later. The MSP incident report from Highberger's arrest states that State Patrol Lt. Stricker instructed the arresting trooper, Bowman, to "first arrest [the] male with a video camera"—Highberger—before arresting anyone else.[319] Hundreds of protesters and other members of the press were peacefully milling about when Highberger was arrested. Highberger was clearly targeted for arrest *because* he was in the act of reporting. Highberger was booked, charged, and jailed, despite his obvious status as a journalist.[320] Highberger's arrest received national media attention and was widely reported locally.[321] On information and belief, the Minnesota State Patrol did not discipline any troopers as a result of Highberger's arrest.

725.    In 2017, the Minnesota State Patrol arrested City Pages journalist Susan Du and Minneapolis Daily City editor David Clarey during the protests following the Philando Castile killing. Troopers seized Du's phone, camera, keys, notes, and laptop. The State Patrol detained Du and Clarey for nine hours, even though they had attempted to comply with troopers' directions to disperse. Du and Clarey had identified themselves as members

---

[318] https://facebook.com/JackHighbergerJournalist/videos/as-some-of-you-may-know-i-was-arrested-this-evening-while-covering-a-protest-for/981050458623682/

[319] https://www.unicornriot.ninja/wp-content/uploads/2016/05/pdf20160111_11310735-final.pdf

[320] https://twitter.com/JackHighberger/status/666643697581166593

[321] https://money.cnn.com/2015/11/17/media/tv-reporter-arrested-black-lives-matter-minneapolis/index.html

of the press but were detained nonetheless. On information and belief, no MSP troopers were investigated or disciplined for these unlawful arrests, nor did the Minnesota State Patrol implement any new training in the wake of these arrests.

726.    Commissioner Harrington and Colonel Langer each have participated in establishing a policy, practice, and/or custom of violating the constitutional rights of members of the press and have been deliberately indifferent to such constitutional violations by their officers, employees, and/or agents as discussed herein. Additionally, and/or in the alternative, Commissioner Harrington and Colonel Langer each have participated in establishing a policy, practice, and/or custom of targeting members of the press for unlawful reprisals.

727.    The officials with final policymaking, decision-making, and/or supervisory authority in command and control of the Department of Public Safety, the Minnesota State Patrol, and by extension, the Multi-Agency Command Center, were on notice of law enforcement's policies, practices, and/or customs related to unlawful retaliation and/or actions against journalists, including the indiscriminate use of less-lethal weapons during the Floyd protests, and—again—during the Wright protests.

728.    In addition to social media, the pattern of violence against journalists by the State Defendant's had also garnered significant traditional media attention by the time Plaintiff was shot. The State Defendants, and the law enforcement agencies they were working in concert with, were on notice from that news coverage that law enforcement agents responding to civil unrest in Minnesota were engaged in a policy, practice, and/or

227

custom of constitutional violations against members of the press, including the use of excessive force, by the time Plaintiff was shot.

729. Furthermore, the State Defendants each have been deliberately indifferent to unconstitutional uses of chemical agents and less-lethal ballistics by their officers, employees, and/or agents deployed against members of the press.

730. The actions by State Defendants during and after the Floyd protests further confirm their policies, practices, and/or customs of targeting and retaliating against journalists during the Wright protests.

731. On June 3, 2020 the State Defendants were served in the *Goyette* lawsuit, triggering a duty to preserve potentially discoverable evidence.[322]

732. Despite this, on or around June 7, 2020, Major Dwyer—who was at the Floyd and Wright protests, served as a commander of MSP's Mobile Response Team, and was a member of MACC's command staff—along with a "vast majority" of MSP troopers manually purged their emails and text messages related to the Floyd protests.[323]

733. Major Dwyer attempted to explain the mass destruction of evidence by characterizing it as a routine part of "a recommended practice" of the Minnesota State Patrol. The purge was neither accidental, automated, nor routine. The purge did not happen because of a file destruction or retention policy. No one reviewed the purged

---

[322] *Goyette*, ECF No. 20

[323] *Goyette*, ECF No. 219-1, "Exhibit A" at 210:10—11; 259:17—264:21

communications before they were deleted to determine whether the materials were relevant to *Goyette* litigation.[324]

734.    The impact of this purge is compounded by the fact that, during the Floyd protests, MACC directed MSP troopers not to complete use of force reports and/or told that such reports were not required. Major Dwyer testified that, to his knowledge, after that instruction was given, not a single use of force report about the protests was completed. The absence of both contemporaneous communications and documentation makes it nearly impossible to track the State Patrol's behavior, apparently by design.[325] This, of course, contributes to the lack of transparency regarding MACC's law enforcement operations and shields MACC participants from accountability.

735.    The official reports that do exist are not credible. Major Dwyer personally completed an official summary report that he referred to as a "commander's report," in which he lied about the events of May 30, 2020. In that document, Dwyer reported that on May 30, 2020, Troopers were "taking large amounts of projectiles" hurled by a riotous crowd before firing less-lethal weapons into the crowd. Major Dwyer testified that this included rocks, bricks, fireworks, water bottles, glass bottles, construction debris, and metal. Major Dwyer testified that the troopers responded to the "large amounts" of incoming debris by issuing dispersal orders, followed by the use of munitions, and then the line of troopers moved forward. But the video that captured the event shows no

---

[324] *Goyette*, ECF No. 219-1, "Exhibit A" at 261:1—264:13

[325] *Goyette*, ECF No. 219-1, "Exhibit A" at 266:3—267:15

construction debris, no water bottles, no rocks, no metal, and no spent fireworks prior to the issuance of the dispersal order, the use of less-lethal munitions, or the MSP troopers advancing on and assaulting the group of journalists huddled in the alcove.[326] When asked to explain, Major Dwyer retreated from the narrative in his report and eventually admitted that State Defendants had developed a plan to disperse the crowd toward the Kmart parking lot to conduct a mass arrest even before the MSP troopers arrived on the scene.[327]

736.   "*An External Review of the State's Response to the Civil Unrest in Minnesota from May 26-June 7, 2020*" prepared by Wilder Research reports the State Patrol's strategy in responding to the Floyd protests was to employ a tactic called "shock and awe[.]" This strategy involves using "significant crowd dispersal methods[.]" As evidenced by Ou's video, the "shock and awe" tactic equated to deploying massive amounts of less-lethal munitions on a peaceful crowd. One state law enforcement official reported that the tactic communicated through the chain of command was to "go down there and give them everything you got." According to the report, anywhere from 2,500 to 3,000 people were affected by this strategy, including countless members of the press.

737.   Eerily echoing the Floyd protests in 2020, the State Defendants—in concert and coordinated fashion with other MACC participants—targeted members of the press during the Wright protests of 2021. Plaintiffs in *Goyette* were forced to seek emergency relief as law enforcement continued its attacks on clearly-identifiable members of the press.

---

[326] *Goyette*, ECF No. 185, "Plaintiff Exhibit 14" at 0:25—1:11

[327] *Goyette*, ECF No. 219-1, "Exhibit A" at 267:12—280:11

738. In one particularly egregious incident involving MSP during the Wright protests, troopers assaulted and arrested CNN producer Carolyn Sung. As with Major Dwyer's fabricated report about the events of May 30, 2020, MSP troopers lied in their official reports about Sung to justify their misconduct. Specifically, Sgt. Andrew Derungs of the State Patrol wrong in the State of Probable Cause used to detain Sung:

> Sung defied several dispersal orders (four) in the City of Brooklyn Center and was part of an antagonistic crowd outside the Brooklyn Center Police Dept. Sung was actively defiant, refused to leave the area, participated in vandalizing and rioting activity and ultimately had to be restrained by several officers.[328]

These *sworn* statements by Derungs were wholly, knowingly false and a fabricated pretext to arrest and detain Sung in violation of the First Amendment. Sung was not violent, defiant, part of an antagonistic crowd, or a participant in any rioting or vandalizing. She was reporting.

739. Dwyer testified about Sung at the hearing and sought to minimize the constitutional violations inflected on her, claiming she had been briefly detained then reunited her with her reporting team. Again, this was patently untrue. The knowingly false statements by State Patrol leaders in official reports, from Dwyer's report on the May 30, 2020 incident, to the arrest of Carolyn Sung in April 2021, reveal a deeply embedded culture of mendacity at the agency—and MACC—that is highly troubling.

---

[328] *Goyette*, ECF No. 219-2, "Exhibit B"

740.    The only mention of the press in the publicly available reports by Major Dwyer, a member of MACC's command staff, is the following general statement: "Several reporters were encountered in the protest ground – many of them with credentials were identified and released once they were confirmed who they were." This statement is proof positive that the MACC Defendants—having seized members of the press and releasing them—were targeting the press and violating the Constitution by acting first and asking questions later.

741.    State Defendants' witnesses in *Goyette* testified that State Troopers: 1) intentionally destroyed relevant emails and text messages despite knowing litigation was pending; 2) concocted false reports to justify the arrest, assault, and use of less-lethal weapons against journalists; and 3) ignored the Governor's order exempting journalists from curfew restrictions. Additionally, statements, testimony, and declarations made by State Defendants confirm unlawful tactics used during the Floyd and Wright protests were not random or isolated incidents, but were in fact part of a willfully deployed plan by MACC and MACC-participating agencies.

742.    It is clear, the actions taken by State Defendants—including the failure to act—led to the Plaintiff's constitutional rights being violated on April 13, 14, and 16 of 2021.

232

## N.    MACC and MACC DEFENDANTS

743.    The Multi-Agency Command Center ("MACC") is an unincorporated association of law enforcement agencies that assembled toward the beginning of the George Floyd protests. MACC was responsible for the coordinated law enforcement response during the Floyd protests, and other events that occurred afterwards, such as the Chauvin trial, and the Wright protests.

744.    MACC operated under the command, control, and direction of government officials (collectively, "MACC policymakers"). Additionally, MACC policymakers worked in concert and coordinated fashion with senior law enforcement officials (collectively, "MACC command staff"). All MACC policymakers and MACC command staff shared final policymaking authority over MACC's law enforcement response.

745.    At all times, MACC was a coordinated effort.

746.    At all times, MACC operated as a singular cohesive unit.

747.    At all times, any law enforcement agency that participated in MACC's law enforcement operations ("MACC-participating agency") acted at the direction of MACC. For example, MACC provided the instructions to deputies from Anoka County to slash tires in Hennepin County when they arrived on scene to participate in MACC's coordinated efforts.[329] In another example, MACC provided instruction to MSP troopers that they did not need to complete use of force reports.[330] In both examples, the MACC-participating

---

[329] *supra*, n.17

[330] *Goyette*, ECF No. 219-1, "Exhibit A" at 266:3—9 and 267:12—15

agencies submitted to MACC's authority, and the law enforcement agents of these MACC-participating agencies were acting as agents of MACC (collectively, "MACC law enforcement agents"). In other words, law enforcement agencies participating—formally or informally—in MACC operations acquiesced to MACC's command and control, and law enforcement agents participating in MACC operations became subordinates of MACC's policymakers and command staff.

748. Any liability and/or culpability resulting from commands, orders, instruction, and/or direction issued or relayed by MACC rests with each and every MACC policymaker and member of MACC's command staff, "because [in] unified command, we all are working together, we're in the same room, we're making decisions together."[331]

749. At the creation of MACC during the George Floyd protests, MACC's policymakers include—but are not limited to—Defendants Commissioner Harrington, Assistant Commissioner Hodges, Colonel Langer, Major Dwyer, Sheriff Hutchinson, and Chief Deputy Martin. These policymakers continued their participation in MACC after the Floyd protests and remained MACC policymakers throughout the Wright protests. Additionally, and/or in the alternative, Commissioner Harrington, Assistant Commissioner Hodges, Colonel Langer, Major Dwyer, Sheriff Hutchinson, and Chief Deputy Martin were members of MACC's command staff.

750. From the onset of MACC's law enforcement operations during the Floyd protests, MACC had a policy, practice, and/or custom of targeting members of the press

---

[331] *supra*, n.199 at 7:37—7:45

234

for unlawful reprisals. Each and every policymaker, command staff, decisionmaker, supervisor, agency, and law enforcement agent that joined into—and/or worked in concert with—MACC acquiesced to, participated in, and/or adopted MACC's policy, practice, and/or custom.

751.    Consistent with MACC's polices, practices, and/or customs, the Minnesota State Patrol—a MACC-participating agency—issued the following statement dismissing the rights of journalists after the barrage of international criticism arising out of their illegal detention of Jimenez and his crew:

> "In the course of clearing the streets and restoring order at Lake Street and Snelling Avenue, four people were arrested by State Patrol troopers, including three members of a CNN crew. The three were released once they were confirmed to be members of the media."

Of course, it was obvious from the outset that these individuals were members of the press, clearly posed no threat to anyone, and sought to accommodate the State Patrol in its mission, because at the time they were broadcasting on live TV and repeatedly sought guidance on where to go. Arresting them had nothing to do with "restoring order" and everything to do with retaliating against and intimidating the press. The State Patrol's clearly false statement demonstrated the State Patrol's—including Colonel Langer and Major Dwyer—reckless and deliberate indifference to the constitutional rights of the press and the violations of those rights by MACC-participating agencies engauged in MACC's law enforcement operations.

752.    MACC's policy, practice, and/or custom of targeting members of the press for unlawful reprisals persisted beyond the Floyd protests.

753. Shortly after the end of the Floyd protests, MACC's policymakers developed a plan—Operation Safety Net ("OSN")—to prepare for crowd control operations during future protests, expected to occur throughout Derek Chauvin's trial for the murder of George Floyd and the trials of other involved MPD officers.

754. Operation Safety Net became synonymous for MACC.

755. MACC, and by extension OSN, is formally comprised of the Hennepin County Sheriff's Office, the Minneapolis Police Department, the St. Paul Police Department, the Ramsey County Sheriff's Department, Metro Transit Police, the Minnesota State Patrol, the Minnesota Department of Public Safety, the Minnesota Department of Natural Resources, the Minnesota Department of Homeland Security and Emergency Management, and the Minnesota National Guard.

756. However, while not listed formally, additional parallel organizations, law enforcement agencies, and police departments were joined into MACC. One such parallel organization is the Hennepin County Chiefs of Police Association and West Metro Command. In other words, additional policymakers were joined into MACC including— but not limited to—Defendant Chief Revering. Additionally, and/or in the alternative, Chief Revering was a member of MACC's command staff.

757. Following the death of Daunte Wright on April 11, 2021, MACC placed their Operation Safety Net into "Phase 3" of the plan and MACC deployed in Brooklyn Center.

This "Phase 3" of MACC's operational plan involved "plans that [MACC policymakers] had put in place over the last few months[.]"[332]

758.    MACC's Operation Safety Net included a plan on how to deal with members of the press that would be on-scene covering MACC's law enforcement response the civil unrest and protests.

759.    Because the civil unrest and Wright protests were concentrated in the City of Brooklyn Center, Mayor Elliot and Interim Chief Gruenig joined into MACC as MACC policymakers. Additionally, and/or in the alternative, Mayor Elliot and Interim Chief Gruenig were members of MACC's command staff.

760.    State Defendants refer to MACC policymakers and members of MACC's command staff collectively as "OSN officials[.]"[333]

761.    Each of the MACC Defendants—collectively, in concert and coordinated fashion with one another—was in command and control over the law enforcement response to the Wright protests and civil unrest in Brooklyn Center.

762.    While participating in MACC, each of the MACC Defendants—as MACC's command staff and/or MACC policymakers—shared equal responsibility and ownership over all law enforcement actions deployed under MACC.

---

[332] *supra*, n.159 at 4:53—5:00

[333] *Goyette*, ECF No. 102 at p. 19 ("… which obviously subjected them to a risk of harm while OSN officials attempted to restore peace."

237

763.    MACC Defendants made it clear, time and time again, in multiple press conferences held at the OSN podium, that an action taken by one was an action taken by all.

764.    The law enforcement officers, deputies, troopers, and agents—working in concert and coordinated fashion with one another under the direction of MACC—became "MACC law enforcement agents" collectively. To be sure, even State witnesses[334] and State Defendants[335] called any law enforcement agent participating in MACC's law enforcement operations as "OSN officers" with no individual agency distinction.

765.    MACC Defendants and their command staff were "in the same room" with radios, cellphones, and other real-time communications while "paying close attention" to the events unfolding in Brooklyn Center. MACC's additional real-time surveillance of the public spaces near the Brooklyn Center Police Department included, but was not limited to, cameras, drones, helicopters, airplanes, and live video feeds—some of which included thermal, low-light, and/or night vision technologies.

766.    The ability to observe and communicate in real-time provided each of the MACC Defendants the opportunity to order, direct, and/or instruct MACC law enforcement agents to change tactics, cease certain activity, or otherwise stand-down.

---

[334] *Goyette*, ECF No. 104 at 4—6 (e.g. "[T]he media was not exempt from lawful orders from OSN officers" and "OSN officers, however, did not immediately act to enforce the curfew."

[335] *Goyette*, ECF No. 102 at pp. 5—6, 10

767. In their role—as MACC policymakers and/or command staff—each of the MACC Defendants gave tactical input through formal and informal channels, and directly contributed to the coordinated law enforcement response in Brooklyn Center and the Wright protests.

768. In their role, each of the MACC Defendants had the authority to change law enforcement tactics. By April 16—well after sufficient notice of MACC law enforcement agents participating in the relevant unlawful policies, practices, and/or customs that would ultimately deprive the press of their constitutional rights in a continuing, widespread, and persistent pattern—each of the MACC Defendants failed to intervene and prevent the unconstitutional harms suffered by the Plaintiff.

769. Each of the MACC Defendants shared equal responsibility over the entire law enforcement response by MACC, including its supervision. In other words, each of the MACC Defendants had an obligation to take corrective action and stop ongoing constitutional violations occurring at the hands of MACC's law enforcement agents.

770. MACC Defendants set up MACC's deficient training program in which MACC law enforcement agents—including John Doe #1, Supervisory Agents, Targeting Agents, Onlooking Agents, and John Doe #16—received minimal instruction and training. Further, MACC Defendants participated directly in MACC's instruction and training programs and set the tone of MACC's instruction and training programs.

771. Commissioner Harrington, as MACC's leader, knew that law enforcement "training is very much necessary" to "change behaviors" and that it takes "lots of repetitions to train" law enforcement agents. However, meaningful training and "lots of

239

repetitions" was not required by MACC law enforcement agents prior to, or during, participation in MACC's Operation Safety Net. Further, even after notice of repeated unconstitutional conduct by MACC's law enforcement agents, no meaningful training involving lots of repetitions was implemented for MACC law enforcement agents in an effort to change their unconstitutional behavior.

772.    Instead, while under the command and control of MACC Defendants, disciplinary procedures within the subordinate law enforcement agencies deployed under MACC had broken down to the point of being disregarded. Additionally, or in the alternative, MACC Defendants and subordinate law enforcement agencies involved during the Floyd and Wright protests tacitly approved and/or turned a blind eye to any unconstitutional conduct by MACC and MACC law enforcement agents.

773.    MACC Defendants, in exercising general authority over matters of supervision and discipline of MACC law enforcement agents, established a pattern of condonation, cover up, and disregard to the reported misconduct by MACC law enforcement agents.

774.    MACC policymakers involved during the Floyd protests—knowing that members of the press would be on scene—issued and/or relayed orders to "clear the entire landscape"[336] in Minneapolis. To accomplish this task, MACC policymakers permitted the use of excessive force with no regard to the constitutional rights of the press day after day by MACC law enforcement agents.

---

[336] *Goyette*, ECF No. 219-1, "Exhibit A" at 224:8—16

240

775. Less than a year later, during the Wright protests, each of the MACC Defendants, knowing that members of the press would be on scene, adopted same or similar strategies MACC deployed—"much like in the city of Minneapolis"—during the Floyd protests.[337] Orders issued, relayed, and communicated through MACC—by MACC Defendants to MACC's policymakers, command staff, and/or law enforcement agents— included that public areas, including the streets and sidewalks around the Brooklyn Center Police Department, "needed to be cleared[.]"[338] To accomplish this task, MACC Defendants permitted the use of excessive force with no regard to the constitutional rights of the press, including the Plaintiff. These orders were carried out by MACC and MACC law enforcement agents on multiple days during the Wright protests, including April 13, 14, and 16.

776. During the Floyd and Wright protests, dozens—if not hundreds—of news articles in the local, national, and international press ran every day regarding the abuse and arrest of journalists by MACC and MACC's policymakers and command staff. Yet, by April 16, MACC Defendants took no affirmative action to curb the rampant unconstitutional conduct or discipline those involved.

777. MACC Defendants advocated not only the use of excessive force by MACC law enforcement agents—in dealing with members of the press while enforcing dispersal

---

[337] *Goyette*, ECF No. 219-1, "Exhibit A" at 242:10—17

[338] *supra*, n.274

orders and/or curfew orders—but also that corrective action should not be taken to punish or prevent its continuation.

778. Further, MACC Defendants condoned and/or encouraged MACC law enforcement agents to first use intimidation and force, then to find out what the situation was later.

779. MACC law enforcement agents were either positively encouraged by training and deliberate cover-up to engage in uses of excessive force; or were tacitly encouraged to continue self-developed practices of this type by the deliberate failure of responsible municipal officials to exercise discipline or corrective supervision to halt widespread, known practices; or were encouraged or authorized by both in combination.

780. Throughout the Wright protests, in the days leading up to the assault on Plaintiff, MACC and MACC Defendants intentionally targeted members of the press with unlawful orders, unjustified arrests, excessive force, threats, and other retaliatory actions as demonstrated by the very similar incidents in this Complaint.

781. In addition, on at least 7 occasions—if not more—prior to the Plaintiff's assault, reporters working for the Freedom of the Press Foundation's "U.S. Press Freedom Tracker" contacted the MACC Defendants seeking comment on the specific instances of unconstitutional conduct against journalists detailed above. Although MACC Defendants did not respond to these inquires, these attempts—and others like it—put MACC Defendants on notice that MACC law enforcement agents were engaged in policies, practices, and/or customs resulting in constitutional violations and unlawful reprisals

242

against members of the press, including the use of excessive force, by the time Plaintiff was shot.

782. The MACC and MACC Defendants' failure to properly supervise and train MACC's law enforcement agents in the wake of past incidents of unconstitutional conduct and hostility against the press, their unlawful use of force against the press, and their inaction—despite ample notice during the Floyd and Wright protests that journalists' constitutional rights were being violated—demonstrates a reckless and deliberate indifference to and/or a tacit authorization of violations against members of the press and the Plaintiff's constitutional rights by each of the MACC Defendants.

783. Every law enforcement agency that participated in MACC's Operation Safety Net—whether formally or informally—got their information and their direction from MACC policymakers and command staff, and specifically, MACC Defendants.

784. MACC and its constituent agencies referred to MACC and/or OSN as a "joint working group" and a "unified command" among other things.

785. The MACC-participating agencies "acted in concert" with one another during the Daunte Wright protests, according to hearing testimony from Commissioner Harrington.

786. All MACC-participating agencies, acting in concert and coordinated fashion, communicated and coordinated both tactics and operations on the ground during the Wright protests in Brooklyn Center.

243

787. MACC— and by extension Operation Safety Net—operated as a vehicle by which each of the Defendants conspired to, and did, violate the Plaintiff's constitutional rights.

788. For at least 5 days prior to MACC law enforcement agents shooting the Plaintiff multiple times with less-lethal projectiles, the MACC and MACC Defendants' pattern of unlawful force against members of the press had been widely shared on social media and in the press.

789. By April 16, 2021—after receiving sufficient notice—each of the MACC Defendants permitted constitutional violations against members of the press to continue.

790. By April 16, each of the MACC Defendants—separately and collectively— had a policy, practice, and/or custom of:

   i. failing to provide warnings and/or lawful orders before deploying crowd control weapons—including chemical agents and injurious less-lethal munitions—against members of the press in Brooklyn Center during the Wright protests;

   ii. authorizing the deployment of crowd control weapons and/or less-lethal munitions in an unconstitutional manner;

   iii. unlawful indiscriminate use of less-lethal projectiles;

   iv. permitting constitutional violations—including, but not limited to, excessive force—against members of the press;

   v. targeting members of the press for unlawful reprisals;

244

- **vi.** delegating law enforcement responsibility to non-employees without maintaining adequate supervision; and/or
- **vii.** inaction in light of notice that MACC's law enforcement response to the Daunte Wright protests was causing and would continue to cause constitutional violations against members of the press.

791.     In addition to the policy, practice, and/or custom of ignoring their own agency's written use of force policies, each of the MACC Defendants failed to adequately train on those policies, failed to supervise their agents with respect to those policies, and failed to discipline their agents who violated those written policies in the past—all of which contributed to the unlawful acts of violence against members of the press and the Plaintiff described above.

792.     The actions taken by MACC law enforcement agents were discussed, agreed upon, sanctioned, and/or tacitly authorized by each of the MACC Defendants, MACC policymakers and command staff, and by each MACC-participating law enforcement agency.

793.     Each of the MACC Defendants—in concert with MACC's policymakers and command staff—created MACC's implicit and explicit policies, practices, customs, and culture, which in turn directed and/or influenced the policies, practices, customs, and culture of each law enforcement agency as it participated in MACC and MACC's law enforcement operations. This is evidenced by each of the law enforcement agencies and their law enforcement agents working together, side by side, in concert and coordinated fashion.

794. In their role—as law enforcement leaders, MACC policymakers and/or command staff with final policymaking, supervisory, and/or command authority—each of the MACC Defendants exerted influential power over the culture, actions, and professional standards of MACC's law enforcement agents.

795. Each of the MACC Defendants' influence over MACC's law enforcement response to the Wright protests extends to policies, practices, and customs governing the use of force and press freedom.

796. Each of the MACC Defendants worked together—in concert with MACC policymakers and command staff—in their use of chemical agents and less-lethal projectiles, crowd control techniques, and the tactical deployment of law enforcement agents responding to the Wright protests that resulted in the violation of Plaintiff's constitutional rights.

797. In their role, each of the MACC Defendants was aware of the arrests, assaults, and mistreatment of journalists, and directly participated in the constitutional violations.

798. By April 16, each of the MACC Defendants had failed to stop the unconstitutional conduct against members of the press.

799. MACC Defendants did not instruct any of MACC's law enforcement agents—including their own employees, subordinates, or agents—to stop their unlawful conduct against members of the press. Additionally, MACC Defendants did not instruct MACC's law enforcement agents—including their own employees, subordinates, or agents—to intervene, document, report, or otherwise stop the repeated constitutional

246

violations against members of the press should they observe such conduct. These failures to instruct directly contributed to the Plaintiff's constitutional rights being violated on April 16, 2021.

800. MACC included an intelligence arm that was active on social media, and was monitoring social media activity, live streams, and other digital sources of information. Each of the MACC Defendants were on notice from that monitoring that their law enforcement agents were engaged in a custom of constitutional violations against members of the press, including the use of excessive force, by the time Plaintiff was shot.

801. One of the social media platforms monitored by MACC was Twitter, and MACC Defendants, policymakers, and command staff were aware of posts that included hashtags such as #DaunteWright and #BrooklynCenter.

802. Each of the MACC Defendants, individually and collectively, had the authority—as a form of discipline—to dismiss or remove any individual MACC law enforcement agent, or MACC-participating agency, from participating in MACC's law enforcement operations.

803. Each of the MACC Defendants were, at all times relevant to this Complaint, fully cognizant of the constitutional rights they failed to protect. Each of the MACC Defendants had ample notice that law enforcement agents—their officers, deputies, troopers, and/or others working in concert as MACC law enforcement agents—were violating journalists' constitutional rights during the Daunte Wright protests, yet they utterly failed to exercise any supervision or discipline to curb the lawless and unconstitutional acts of their law enforcement agents.

247

804. On information and belief, none of the MACC Defendants have disciplined, suspended, or taken affirmative action against any law enforcement employee, subordinate, or agent involved in any of the unlawful conduct described in this Complaint, nor has any meaningful training been implemented to prevent similar incidents in the future.

805. Each of the MACC Defendants were on notice of their relevant policies, practices, and/or customs connected to the unconstitutional conduct against journalists covering protests, and they had ample reason to believe that their training and supervision regarding these issues was inadequate.

806. Pursuant to established customs and policies-in-practice, MACC—including each of the MACC Defendants—participated in the unconstitutional conduct of targeting members of the press for unlawful reprisals during the Daunte Wright protests.

807. Major Dwyer, a senior law enforcement agent in MACC with 24 years of experience,[339] admitted that a four-inch by eight-inch identifier would be enough to make someone "readily identifiable[.]"[340] In other words, a member of the press wearing "discernable markings"—such as a four-inch by eight-inch PRESS identifier—would "identify that individual as press. Even if they were standing side by side" with a "bad actor[.]"[341]

808. Either the officers, deputies, troopers, and other MACC law enforcement agents were told explicitly to disregard journalists' rights, or there has been a failure of

---

[339] *Goyette*, ECF No. 219-1, "Exhibit A" at 201:3—5

[340] *Goyette*, ECF No. 219-1, "Exhibit A" at 233:1—4

[341] *Goyette*, ECF No. 219-1, "Exhibit A" at 234:9—17

248

command to supervise and discipline officers, deputies, troopers, and other MACC law enforcement agents regarding violations of those rights.

809.    There is a culture of hostility to members of the press among officers, deputies, troopers, and other law enforcement agents that MACC Defendants have taken no steps to curb, and in some instances have encouraged.

810.    In 2015, protests erupted in North Minneapolis after the MPD killing of Jamar Clark. The MPD's violent response to the protests was widely criticized, and the City of Minneapolis asked the Department of Justice to prepare an "after-action" report based on a comprehensive review of the protests and the law enforcement response. The report, released in 2017, was entitled "Maintaining First Amendment Rights and Public Safety in North Minneapolis."[342] The DOJ Report made many recommendations, including some regarding crowd control and use-of-force.

811.    While the report's recommendations were based on the MPD's actions, the recommendations were clearly relevant to any and all Minnesota law enforcement agencies, and served as a notice that training on "First Amendment rights and protections, legitimacy, and procedural justice" should be implemented and/or improved to avoid future unconstitutional actions by law enforcement.

812.    When the Department of Justice stated that the MPD "did not have adequate department-wide training on crowd control management, negotiated resolution, de-

---

[342] https://policefoundation.org/wp-content/uploads/2017/03/Maintaining-First-Amendment-Rights-and-Public-Safety-in-North-Minneapolis.pdf

249

escalation, the use of personal protective equipment or the use of less-lethal instruments…"
it provided notice to every law enforcement agency in the State.

813.    In their policy manuals, each of the MACC Defendants—at all times relevant
to this Complaint—provided no instruction or guidance on how to identify members of the
press and ensure their First Amendment rights are respected. Additionally, their policy
manuals do not discuss in detail how to safeguard press freedoms at protests.

814.    MACC law enforcement agents—including officers, deputies, troopers,
and/or others—either do not know, or do not care, about the press's First Amendment
rights. Or, in some cases, law enforcement agents are actively hostile towards those rights.
Regardless, this state of affairs reflects an unconstitutional law enforcement policy,
practice, and/or custom regarding the rights of the press, and a failure by MACC
Defendants and their command structure to train and supervise regarding the rights of the
press and the First Amendment generally.

815.    After the widely reported SPPD lawsuit settled in 2011, not one law
enforcement agency participating in MACC would complete the training and education—
regarding the First Amendment rights of the press covering demonstrations—even after the
SPPD offered it to all the Minnesota law enforcement agencies.

816.    MACC Defendants has demonstrated the inability to recognize their own
violations of internal policy and the constitutional rights of members of the press.

817.    Each of the MACC Defendants—and the command staffs of the Brooklyn
Center Police Department, Hennepin County Sheriff's Office, Minnesota State Patrol, and
other MACC-participating law enforcement agencies—acted in concert during the Daunte

250

Wright protests, maintaining regular communication and coordinating operations regarding crowd control technologies, tactical deployment of officers, troopers, and deputies, in addition to the protest responses that resulted in the violation of constitutional rights of the Plaintiff and members of the press.

818.    Each of the MACC Defendants are ultimately vested with the duty, power, and authority to train, supervise, discipline, intervene or otherwise control any law enforcement agent that participated in MACC's joint law enforcement operation and responded to civil unrest during the Wright protests. The Defendants failed in their duty to so train, supervise, discipline, and/or intervene, in general and specifically, so as to conform their conduct within constitutional requirements. Specifically, the MACC Defendants failed to adequately train, supervise, and discipline law enforcement agents engaged in crowd control and response to civil unrest in the proper and lawful contact with members of the press; failed to train, supervise, and discipline individuals with regard to the duty to intervene and/or report transgressions, and to truthfully respond to inquiries. Additionally, and/or in the alternative, the Defendants effectively abrogated the power to train, supervise, discipline, and control MACC law enforcement agents deployed in OSN which resulted in the constitutional deprivations to the Plaintiff and other members of the press.

819.    By April 16, MACC Defendants—who had knowledge of repeated allegations of abusive and unconstitutional behavior towards members of the press by MACC law enforcement agents—repeatedly failed to enforce procedures insuring the safety of individual members of the press; failed to discipline MACC law enforcement

agents who had been found to have committed abusive and unconstitutional behavior towards members of the press; failed and refused to competently investigate allegations of abuse and assault by MACC law enforcement agents; covered up acts of misconduct and abuse of authority by individual MACC law enforcement agents and officials; rewarded and commended MACC law enforcement agents who displayed aggressive, abusive, and assaultive behavior towards members of the press; repeatedly failed to adequately train and educate MACC law enforcement agents in the use of reasonable force and proper use of authority, and; repeatedly failed to adequately supervise the actions of MACC law enforcement agents and officials under their control and supervision.

820.    MACC operated as a vehicle where each of the MACC Defendants conspired with each other, and the MACC Defendants reached an agreement of how they would respond to the Daunte Wright protests and the press reporting on them ("conspiracy" or "plan"). The conspiracy plan involved:

   i.  suppressing reporting activity by Plaintiff and members of the press;

   ii. targeting Plaintiff and members of the press for unlawful reprisals; and/or

   iii. depriving Plaintiff and members of the press of their constitutional rights.

821.    To achieve the conspiracy plan's goals, each of the MACC Defendants— using MACC as a vehicle—met in the same room, utilized radios, cellphones, computers, and other formal and/or informal communication channels to reach an understanding among them. Further, MACC Defendants ordered, instructed, and/or directed employees, subordinates, and/or agents to take actions in furtherance of the conspiracy.

822.    Part of the conspiracy agreement—made by each of the MACC Defendants—included that various law enforcement agencies would work in conjunction with each other, systematically, and that all law enforcement actions taken are choreographed.[343]

823.    MACC law enforcement agents were actively involved in the development and execution of MACC's law enforcement response—including the deployment of less-lethal munitions—by relaying information, to MACC, about people and activity near the Brooklyn Center Police department.

---

[343] *Goyette*, ECF No. 219-1, "Exhibit A" at 220:6—13

253

## VI. CAUSES *of* ACTION

## COUNT I
### First Amendment—Violation of Free Speech, Free Press, and Free Assembly
### (42 U.S.C. § 1983)
*vs. each of the Defendants*

824. The Plaintiff restates, realleges, and incorporates by reference herein each and every allegation contained in each paragraph of this Complaint as if fully set forth herein.

825. In April of 2021, Plaintiff had a right, secured by the Constitution of the United States under the First Amendment, to observe, record, and report on events of public interest, which include public demonstrations, protests, civil unrest, and the conduct of law enforcement agents on duty in a public place ("First Amendment rights").

826. On April 13, 14, and 16 of 2021, Plaintiff exercised his First Amendment rights and engaged in the constitutionally-protected acts of observing, recording, and reporting on events of public interest, including public demonstrations, protests, civil unrest, and the conduct of law enforcement agents on duty in a public place ("constitutionally-protected activity").

827. On April 13, 14, and 16, Plaintiff was deprived of his First Amendment rights by Defendants[344], and each of the Defendants was personally involved in one or more of the deprivations.

---

[344] MACC Defendants, Onlooking Agents, Targeting Agents, Assault Agents, Supervisory Agents, and John Does #17-100

254

828. Each of the Defendants was acting under color of law when they deprived Plaintiff of his First Amendment rights, despite Plaintiff identifying himself as a member of the press.

829. On April 13, 14, and 16, MACC Defendants[345] violated Plaintiff's First Amendment rights by broadcasting dispersal orders at the Wright protests and unlawfully ordering that members of the press must leave the area or face arrest.

830. At the time dispersal orders and threats of arrest unlawfully targeting members of the press was broadcasted by MACC Defendants, Plaintiff was exercising his First Amendment rights and engaged in constitutionally-protected activity.

831. The targeted dispersal orders and threats of arrest was broadcasted on long-range acoustical devices by MACC law enforcement agents pursuant to commands, orders, instruction, and/or direction issued through MACC by MACC Defendants and Supervisory Agents[346].

832. Broadcasting dispersal orders and threats of arrest unlawfully targeting members of the press were adverse actions, taken under color of law, that would chill a person of ordinary firmness from continuing to speak, report, assemble, and/or engage in constitutionally-protected activity. These adverse acts by MACC Defendants and

---

[345] City of Brooklyn Center, Hennepin County, Commissioner Harrington, Assistant Commissioner Hodges, Colonel Langer, Major Dwyer, Sheriff Hutchinson, Chief Deputy Martin, Mayor Elliot, Interim Chief Gruenig, and Chief Revering

[346] John Does #9-10 and #14-15

Supervisory Agents did, in fact, chill Plaintiff from continuing to exercise First Amendment rights and engage in constitutionally-protected activity.

833. MACC Defendants were motivated to broadcast dispersal orders and threats of arrest unlawfully targeting the Plaintiff and other members of the press, at least in part, by Plaintiff exercising his First Amendment rights and/or his engagement in constitutionally-protected activity, which caused Plaintiff's First Amendment rights to be violated as set forth in Count II below.

834. MACC Defendants used a show of authority while broadcasting dispersal orders and threats of arrest unlawfully targeting Plaintiff and other members of the press, acts that were objectively unreasonable and restrained the Plaintiff's liberty, which caused Plaintiff's First Amendment rights to be violated as set forth in Count III below.

835. MACC Defendants deprived Plaintiff the right to due process, by broadcasting dispersal orders and threats of arrest unlawfully targeting Plaintiff and other members of the press, which caused Plaintiff's First Amendment rights to be violated as set forth in Count IV below.

836. By the time dispersal orders and threats of arrest unlawfully targeting members of the press was broadcasted, each of the MACC Defendants and Supervisory Agents had notice of a pre-existing pattern of unconstitutional conduct against members of the press by MACC and MACC law enforcement agents, was deliberately indifferent and/or tacitly authorized the conduct, and failed to take sufficient remedial action, which caused Plaintiff's First Amendment rights to be violated as set forth in Count VI below.

256

837.     MACC Defendants broadcasting dispersal orders and threats of arrest that unlawfully targeted Plaintiff and other members of the press is part of a pattern or practice of unconstitutional conduct, which caused Plaintiff's First Amendment rights to be violated as set forth in Count VII below.

838.     MACC Defendants broadcasting dispersal orders and threats of arrest that unlawfully targeted Plaintiff and other members of the press are overt actions taken in furtherance of a conspiracy plan, which caused Plaintiff's First Amendment rights to be violated as set forth in Count VIII below.

839.     Broadcasting dispersal orders and threats of arrest unlawfully targeting a limited, precisely definable group—such as members of the press—put Plaintiff at a significant risk of serious, immediate, and proximate harm, which caused Plaintiff's First Amendment rights to be violated as set forth in Count IX below.

840.     On April 14, John Doe #1 violated Plaintiff's First Amendment rights by maliciously targeting Plaintiff, threatened him with a large canister of pepper-spray, and suppressed Plaintiff's ability to engage in constitutionally-protected activity.

841.     At the time John Doe #1 targeted and threatened Plaintiff with pepper-spray, Plaintiff was exercising his First Amendment rights and engaged in constitutionally-protected activity. Plaintiff had not committed a crime, did not pose a threat to the safety of anyone, and did not actively resist arrest or attempt to evade arrest by flight.

842.     Targeting and threatening the Plaintiff with pepper-spray were adverse actions, taken under color of law, that would chill a person of ordinary firmness from continuing to speak, report, assemble, and/or engage in constitutionally-protected activity.

257

These hostile acts by John Doe #1 did, in fact, chill Plaintiff from continuing to exercise First Amendment rights and engage in constitutionally-protected activity.

843.   John Doe #1 was motivated to target and threaten Plaintiff with pepper-spray, at least in part, by Plaintiff exercising his First Amendment rights and/or his engagement in constitutionally-protected activity, which caused Plaintiff's First Amendment rights to be violated as set forth in Count II below.

844.   John Doe #1 used a show of authority while targeting and threatening Plaintiff with pepper-spray, acts that were objectively unreasonable and restrained the Plaintiff's liberty, which caused Plaintiff's First Amendment rights to be violated as set forth in Count III below.

845.   John Doe #1 deprived Plaintiff the right to due process, by targeting and threatening Plaintiff with pepper-spray, which caused Plaintiff's First Amendment rights to be violated as set forth in Count IV below.

846.   By the time John Doe #1 targeted and threatened Plaintiff with pepper-spray, each of the MACC Defendants and Supervisory Agents had notice of unconstitutional conduct against members of the press by MACC and MACC law enforcement agents, was deliberately indifferent and/or tacitly authorized the conduct, and failed to take sufficient remedial action, which caused Plaintiff's First Amendment rights to be violated as set forth in Count VI below.

847.   John Doe #1 targeting and threatening Plaintiff with pepper-spray is part of a pattern or practice of unconstitutional conduct against members of the press, which caused Plaintiff's First Amendment rights to be violated as set forth in Count VII below.

848.     John Doe #1 targeting and threatening Plaintiff with pepper-spray are overt actions taken in furtherance of a conspiracy plan, which caused Plaintiff's First Amendment rights to be violated as set forth in Count VIII below.

849.     On April 16, John Doe #11, #12, and #13—Assault Agents—each used weapons and munitions provided by a MACC-participating law enforcement agency to shoot Plaintiff with less-lethal projectiles.

850.     John Doe #11 intentionally pulled the weapon's trigger to shoot Plaintiff in the calf.

851.     John Doe #12 intentionally pulled the weapon's trigger to shoot Plaintiff in the buttocks.

852.     John Doe #13 intentionally pulled the weapon's trigger to shoot Plaintiff in the knee.

853.     Each of the Assault Agents, acting under color of law, applied physical force to Plaintiff maliciously, sadistically, and for the purpose of causing harm by shooting him with less-lethal projectiles.

854.     John Doe #2, #3, #4, and #5—Targeting Agents—willfully participated in shooting Plaintiff by targeting him with high-powered spotlights from multiple locations.

855.     Assault Agents, with the assistance of Targeting Agents, shot Plaintiff pursuant to commands, orders, instruction, and/or direction issued through MACC by MACC Defendants and Supervisory Agents.

856. At the time he was shot—by MACC Defendants, Supervisory Agents, Targeting Agents, and Assault Agents working in concert—Plaintiff was exercising his First Amendment rights and engaged in constitutionally-protected activity.

857. Shooting Plaintiff in the calf, buttocks, and knee with less-lethal projectiles were adverse actions, taken under color of law, that would chill a person of ordinary firmness from continuing to speak, report, assemble, and/or engage in constitutionally-protected activity. These hostile acts—by MACC Defendants, Supervisory Agents, Targeting Agents, and Assault Agents working in concert—did, in fact, chill Plaintiff from continuing to exercise First Amendment rights and engage in constitutionally-protected activity.

858. Each of the MACC Defendants, Supervisory Agents, Targeting Agents, and Assault Agents were motivated to shoot Plaintiff, at least in part, by Plaintiff exercising his First Amendment rights and/or his engagement in constitutionally-protected activity, as set forth in Count II below.

859. Each of the MACC Defendants, Supervisory Agents, Targeting Agents, and Assault Agents participated in the use of excessive force by shooting Plaintiff with less-lethal projectiles, acts that were objectively unreasonable and restrained the Plaintiff's liberty, which caused Plaintiff's First Amendment rights to be violated as set forth in Count III below.

860. Each of the MACC Defendants, Supervisory Agents, Targeting Agents, and Assault Agents deprived Plaintiff the right to due process when they shot him without probable cause, and did so without warning and/or opportunity to disperse in a way that a

260

person of ordinary intelligence could understand and comply with, which caused Plaintiff's First Amendment rights to be violated as set forth in Count IV below.

861. Each of the MACC Defendants, Supervisory Agents, Onlooking Agents[347], Targeting Agents, Assault Agents, and other John Doe[348] law enforcement agents stood by without intervening to prevent or stop Plaintiff being shot, which caused Plaintiff's First Amendment rights to be violated as set forth in Count V below.

862. By the time Plaintiff was shot multiple times with less-lethal projectiles by MACC Defendants, Supervisory Agents, Targeting Agents, and Assault Agents working in concert, each of the MACC Defendants and Supervisory Agents had notice of a pre-existing pattern of unconstitutional conduct against members of the press by MACC and MACC law enforcement agents, was deliberately indifferent and/or tacitly authorized the conduct, and failed to take sufficient remedial action, which caused Plaintiff's First Amendment rights to be violated as set forth in Count VI below.

863. Shooting Plaintiff with less-lethal projectiles is part of a pattern or practice of unconstitutional conduct against members of the press, which caused Plaintiff's First Amendment rights to be violated as set forth in Count VII below.

864. Shooting Plaintiff with less-lethal projectiles are overt actions taken in furtherance of a conspiracy plan, which caused Plaintiff's First Amendment rights to be violated as set forth in Count VIII below.

---

[347] John Does #6-8

[348] John Does #17-100

261

865. Each of the MACC Defendants took action that placed Plaintiff in harm's way, by creating a dangerous situation, which caused Plaintiff's First Amendment rights to be violated as set forth in Count IX below.

866. On April 16, Plaintiff's First Amendment rights were further violated when John Doe #16—with a show of authority—physically grabbed and shoved Plaintiff while threatening to arrest him if Plaintiff did not cease his constitutionally-protected activity and leave the public streets, sidewalks, and/or public space near the Brooklyn Center Police Department.

867. Grabbing, shoving, and threatening Plaintiff with arrest was an adverse action, taken under color of law, that would chill a person of ordinary firmness from continuing to speak, report, assemble, and/or engage in constitutionally-protected activity. These hostile acts by John Doe #16 did, in fact, chill Plaintiff from continuing to exercise First Amendment rights and engage in constitutionally-protected activity.

868. John Doe #16 was motivated to grab, shove, and threaten Plaintiff with arrest, at least in part, by Plaintiff exercising his First Amendment rights and/or his engagement in constitutionally-protected activity, which caused Plaintiff's First Amendment rights to be violated as set forth in Count II below.

869. Without reasonable suspicion, John Doe #16 seized Plaintiff and restrained his liberty by using excessive force to grab and shove Plaintiff, acts that were objectively unreasonable, which caused Plaintiff's First Amendment rights to be violated as set forth in Count III below.

870. John Doe #16 deprived Plaintiff the right to due process, by restraining Plaintiff's liberty without reasonable suspicion, and without providing a warning and/or opportunity to disperse in a way that a person of ordinary intelligence could understand and comply with, which caused Plaintiff's First Amendment rights to be violated as set forth in Count IV below.

871. Each of the MACC Defendants, Supervisory Agents, and Onlooking agents observed or had reason to know Plaintiff's First Amendment rights would be further violated—by use of force from MACC law enforcement agents including John Doe #16— and failed to intervene, which caused Plaintiff's First Amendment rights to be violated as set forth in Count V below.

872. By the time Plaintiff was grabbed, shoved, and threatened with arrest by John Doe #16, each of the MACC Defendants and Supervisory Agents had notice of a pre-existing pattern of unconstitutional conduct against members of the press by MACC and MACC law enforcement agents, was deliberately indifferent and/or tacitly authorized the conduct, and failed to take sufficient remedial action, which caused Plaintiff's First Amendment rights to be violated as set forth in Count VI below.

873. Grabbing, shoving, and threatening the Plaintiff with arrest is part of a pattern or practice of unconstitutional conduct against members of the press, which caused Plaintiff's First Amendment rights to be violated as set forth in Count VII below.

874. Grabbing, shoving, and threatening Plaintiff with arrest are overt acts taken in furtherance of a conspiracy plan, which caused Plaintiff's First Amendment rights to be violated as set forth in Count VIII below.

263

875. The harm caused by Defendants' assault on Plaintiff is not limited to the physical and mental injuries sustained during the Wright protests. Rather, every instance in which Plaintiff—a member of the press—was sent home, avoided public spaces, or was otherwise suppressed and/or deterred from observing, recording, and reporting on the protests because of the chilling impact of Defendants' behavior on April 13, 14, and 16 reflects an injury to Plaintiff's First Amendment rights.

876. Each harm to Plaintiff's First Amendment rights caused by Defendants was a result of overt acts in furtherance of the conspiracy plan set forth in Count VIII below.

877. The Plaintiff suffered physical injuries, emotional injuries, and violations of his constitutional rights as a direct and proximate result of the foregoing unconstitutional conduct by the Defendants.

878. Defendants are jointly and severally liable to the Plaintiff.

## COUNT II
### First Amendment—Retaliation
### (42 U.S.C. § 1983)
*vs. each of the Defendants*

879.   The Plaintiff restates, realleges, and incorporates by reference herein each and every allegation contained in each paragraph of this Complaint as if fully set forth herein.

880.   On April 13, 14, and 16 of 2021, Defendants[349] violated Plaintiff's First Amendment rights and deprived him from engaging in constitutionally-protected activity, as set forth in Count I above.

881.   On April 13, 14, and 16, Plaintiff was retaliated against by Defendants for exercising his First Amendment rights and/or engaging in constitutionally-protected activity, and each of the Defendants was personally involved in one or more First Amendment retaliations against Plaintiff.

882.   Each of the Defendants was acting under color of law when they retaliated against Plaintiff, despite Plaintiff identifying himself as a member of the press.

883.   On April 13, 14, and 16, MACC Defendants[350] targeted Plaintiff in retaliation by broadcasting dispersal orders at the Wright protests and unlawfully ordering that members of the press must leave the area or face arrest.

---

[349] MACC Defendants, Onlooking Agents, Targeting Agents, Assault Agents, Supervisory Agents, and John Does #17-100

[350] City of Brooklyn Center, Hennepin County, Commissioner Harrington, Assistant Commissioner Hodges, Colonel Langer, Major Dwyer, Sheriff Hutchinson, Chief Deputy Martin, Mayor Elliot, Interim Chief Gruenig, and Chief Revering

884.    At the time retaliatory dispersal orders and threats of arrest unlawfully targeting members of the press was broadcasted by MACC Defendants, Plaintiff was exercising his First Amendment rights and engaged in constitutionally-protected activity.

885.    The retaliatory dispersal orders and threats of arrest was broadcasted on long-range acoustical devices by MACC law enforcement agents pursuant to commands, orders, instruction, and/or direction issued through MACC by MACC Defendants and Supervisory Agents.

886.    Broadcasting dispersal orders and threats of arrest that unlawfully targeted members of the press were retaliatory actions, taken under color of law, that would chill a person of ordinary firmness from continuing to speak, report, assemble, and/or engage in constitutionally-protected activity. These retaliatory acts by MACC Defendants did, in fact, chill Plaintiff from continuing to exercise First Amendment rights and engage in constitutionally-protected activity.

887.    MACC Defendants were motivated to broadcast dispersal orders and threats of arrest unlawfully targeting Plaintiff and other members of the press, at least in part, by Plaintiff exercising his First Amendment rights and/or engaging in constitutionally-protected activity. In other words, Plaintiff was singled out in retaliation by MACC Defendants because he exercised his First Amendment rights and/or engaged in constitutionally-protected activity.

888.    Further, on April 13, 14, and 16, Plaintiff reasonably feared deployment of chemical agents and less-lethal projectiles, unlawful seizure, excessive force, and other

266

retaliatory acts without warning by each of the Defendants if he was to continue exercising his First Amendment rights and/or engage in constitutionally-protected activity.

889.    This fear of retaliatory acts would chill a reasonable person from continuing to exercise their First Amendment rights and/or engage in constitutionally-protected activity. This fear of retaliatory acts by each of the Defendants did, in fact, chill Plaintiff from continuing to exercise his First Amendment rights and engage in constitutionally-protected activity on April 13, 14, and 16.

890.    MACC Defendants, with a show of authority, singled out Plaintiff and members of the press with dispersal orders and threats of arrest, acts that are objectively unreasonable and restrained the Plaintiff's liberty, which caused the First Amendment retaliation against Plaintiff as set forth in Count III below.

891.    MACC Defendants deprived Plaintiff the right to due process by retaliating against him with targeted dispersal orders and threats of arrest, which caused the First Amendment retaliation against Plaintiff as set forth in Count IV below.

892.    By the time retaliatory dispersal orders and threats of arrest targeting members of the press was broadcasted, each of the MACC Defendants and Supervisory Agents had notice of a pre-existing pattern of retaliatory conduct against members of the press by MACC and MACC law enforcement agents, was deliberately indifferent and/or tacitly authorized the conduct, and failed to take sufficient remedial action, which caused the First Amendment retaliation against Plaintiff as set forth in Count VI below.

893.    MACC Defendants retaliating against Plaintiff with targeted dispersal orders and threats of arrest is part of a pattern or practice of unconstitutional retaliatory conduct

267

against members of the press, which caused the First Amendment retaliation against Plaintiff as set forth in Count VII below.

894. MACC Defendants retaliating against Plaintiff and other members of the press with targeted dispersal orders and threats of arrest are overt actions taken in furtherance of a conspiracy plan, which caused the First Amendment retaliation against Plaintiff as set forth in Count VIII below.

895. MACC Defendants broadcasting retaliatory dispersal orders and threats of arrest targeting a limited, precisely definable group—such as members of the press—put Plaintiff at a significant risk of serious, immediate, and proximate harm, which caused the First Amendment retaliation against Plaintiff as set forth in Count IX below.

896. On April 14, John Doe #1 retaliated against Plaintiff for exercising his First Amendment rights and/or engaging unconstitutionally-protected activity by maliciously targeting Plaintiff, threatening him with a large canister of pepper-spray, and suppressing Plaintiff's ability to engage in constitutionally-protected activity.

897. Targeting and threatening Plaintiff with pepper-spray were retaliatory actions, taken under color of law, that would chill a person of ordinary firmness from continuing to speak, report, assemble, and/or engage in constitutionally-protected activity. These retaliatory acts by John Doe #1 did, in fact, chill Plaintiff from continuing to exercise First Amendment rights and engage in constitutionally-protected activity.

898. John Doe #1 was motivated to retaliate against Plaintiff, at least in part, by Plaintiff exercising his First Amendment rights and/or his engagement in a constitutionally-protected activity. In other words, Plaintiff was singled out in retaliation

268

by John Doe #1 because Plaintiff exercised his First Amendment rights and/or engaged in constitutionally-protected activity.

899.    John Doe #1, with a show of authority, singled out Plaintiff with retaliatory intent by targeting and threatening him with pepper-spray, acts that were objectively unreasonable and restrained the Plaintiff's liberty, which caused the First Amendment retaliation against Plaintiff as set forth in Count III below.

900.    John Doe #1 deprived Plaintiff the right to due process, by targeting and threatening him with pepper-spray in retaliation, which caused the First Amendment retaliation against Plaintiff as set forth in Count IV below.

901.    By the time John Doe #1 retaliated against Plaintiff by targeting and threatening him with pepper-spray, each of the MACC Defendants and Supervisory Agents had notice of a pre-exiting pattern of retaliatory conduct against members of the press by MACC and MACC law enforcement agents, was deliberately indifferent and/or tacitly authorized the conduct, and failed to take sufficient remedial action, which caused the First Amendment retaliation against Plaintiff as set forth in Count VI below.

902.    The targeting and threatening of Plaintiff with pepper-spray in retaliation by John Doe #1 is part of a pattern or practice of retaliatory conduct against members of the press, which caused the First Amendment retaliation against Plaintiff as set forth in Count VII below.

903.    The targeting and threatening of Plaintiff with pepper-spray in retaliation by John Doe #1 are overt actions taken in furtherance of a conspiracy plan, which caused the First Amendment retaliation against Plaintiff as set forth in Count VIII below.

269

904.    On April 16, John Doe #11, #12, and #13—Assault Agents—each used weapons and munitions provided by a MACC-participating law enforcement agency to retaliate against Plaintiff by shooting him with less-lethal projectiles.

905.    John Doe #11, with retaliatory intent, pulled the weapon's trigger to shoot the Plaintiff in the calf.

906.    John Doe #12, with retaliatory intent, pulled the weapon's trigger to shoot the Plaintiff in the buttocks.

907.    John Doe #13, with retaliatory intent, pulled the weapon's trigger to shoot the Plaintiff in the knee.

908.    In retaliation, each of the Assault Agents, acting under color of law, applied physical force to Plaintiff maliciously, sadistically, and for the purpose of causing harm by shooting him with less-lethal projectiles.

909.    With retaliatory intent, John Doe #2, #3, #4, and #5—Targeting Agents— willfully participated in shooting the Plaintiff by targeting him with high-powered spotlights from multiple locations.

910.    Assault Agents, with the assistance of Targeting Agents, retaliated against Plaintiff pursuant to commands, orders, instruction, and/or direction issued through MACC by MACC Defendants and Supervisory Agents[351].

---

[351] John Does #9-10 and #14-15

911. At the time he was shot in retaliation—by MACC Defendants, Supervisory Agents, Targeting Agents, and Assault Agents working in concert—Plaintiff was exercising his First Amendment rights and engaged in constitutionally-protected activity.

912. Shooting Plaintiff in the calf, buttocks, and knee with less-lethal projectiles was a retaliatory action, taken under color of law, that would chill a person of ordinary firmness from continuing to speak, report, assemble, and/or engage in constitutionally-protected activity. These retaliatory acts—by MACC Defendants, Supervisory Agents, Targeting Agents, and Assault Agents working in concert—did, in fact, chill Plaintiff from continuing to exercise First Amendment rights and engage in constitutionally-protected activity.

913. Each of the MACC Defendants, Supervisory Agents, Targeting Agents, and Assault Agents were motivated to shoot Plaintiff in retaliation, at least in part, by Plaintiff exercising his First Amendment rights and/or his engagement in constitutionally-protected activity.

914. Each of the MACC Defendants, Supervisory Agents, Targeting Agents, and Assault Agents participated in retaliating against Plaintiff with the use of excessive force, by shooting him with less-lethal projectiles, acts that were objectively unreasonable and restrained the Plaintiff's liberty, which caused the First Amendment retaliation as set forth in Count III below.

915. Each of the MACC Defendants, Supervisory Agents, Targeting Agents, and Assault Agents lacked probable cause to shoot Plaintiff, and did so in retaliation without providing a warning and/or opportunity to disperse in a way that a person of ordinary

271

intelligence could understand and comply with, which caused the First Amendment retaliation as set forth in Count IV below.

916.   Each of the MACC Defendants, Supervisory Agents, Onlooking Agents[352], Targeting Agents, Assault Agents, and other John Doe[353] law enforcement agents stood by without intervening to prevent or stop Plaintiff being shot in retaliation, which caused the First Amendment retaliation against Plaintiff as set forth in Count V below.

917.   By the time Plaintiff was shot in retaliation—by MACC Defendants, Supervisory Agents, Targeting Agents, and Assault Agents working in concert—each of the MACC Defendants and Supervisory Agents had notice of a pre-existing pattern of retaliatory conduct against members of the press by MACC and MACC law enforcement agents, was deliberately indifferent and/or tacitly authorized the conduct, and failed to take sufficient remedial action, which caused the First Amendment retaliation against Plaintiff, which caused the First Amendment retaliation against Plaintiff as set forth in Count VI below.

918.   Retaliating against Plaintiff by shooting him with less-lethal projectiles is part of a pattern or practice of unconstitutional conduct against members of the press, which caused the First Amendment retaliation against Plaintiff as set forth in Count VII below.

---

[352] John Does #6-18

[353] John Does #17-100

919. Retaliating against Plaintiff by shooting him with less-lethal projectiles are overt actions taken in furtherance of a conspiracy plan, which caused the First Amendment retaliation against Plaintiff as set forth in Count VIII below.

920. Each of the MACC Defendants took retaliatory action that placed Plaintiff in harm's way, by creating a dangerous situation, which caused the First Amendment retaliation against Plaintiff as set forth in Count IX below.

921. On April 16, Plaintiff suffered further First Amendment retaliation when John Doe #16—with a show of authority—physically grabbed and shoved the Plaintiff while threatening to arrest him if Plaintiff did not cease his constitutionally-protected activity and leave the public streets, sidewalks, and/or public space near the Brooklyn Center Police Department.

922. Grabbing, shoving, and threatening Plaintiff with arrest was a retaliatory action, taken under color of law, that would chill a person of ordinary firmness from continuing to speak, report, assemble, and/or engage in constitutionally-protected activity. These retaliatory acts by John Doe #16 did, in fact, chill Plaintiff from continuing to exercise First Amendment rights and engage in constitutionally-protected activity.

923. John Doe #16 was motivated to grab, shove, and threaten Plaintiff with arrest in retaliation, at least in part, by Plaintiff's exercise of his First Amendment Rights and/or engagement in constitutionally-protected activity.

924. Without reasonable suspicion, John Doe #16 seized Plaintiff and restrained Plaintiff's liberty in retaliation by using excessive force to grab and shove Plaintiff, acts

273

that were objectively unreasonable and restrained Plaintiff's liberty, which caused the First Amendment retaliation as set forth in Count III below.

925.    John Doe #16 deprived Plaintiff of his right to due process in retaliation, by lacking reasonable suspicion to restrain Plaintiff's liberty, and without providing a warning and/or opportunity to disperse in a way that a person of ordinary intelligence could understand and comply with, which caused the First Amendment retaliation as set forth in Count IV below.

926.    Each of the MACC Defendants, Supervisory Agents, and Onlooking agents observed or had reason to know Plaintiff's would suffer against retaliatory excessive force by MACC law enforcement agents—including John Doe #16—and failed to intervene, which caused the First Amendment retaliation against Plaintiff as set forth in Count V below.

927.    By the time Plaintiff was grabbed, shoved, and threatened with arrest in retaliation by John Doe #16, each of the MACC Defendants and Supervisory Agents had notice of a pre-existing pattern of unlawful retaliatory conduct against members of the press by MACC and MACC law enforcement agents, was deliberately indifferent and/or tacitly authorized the conduct, and failed to take sufficient remedial action, which caused the First Amendment retaliation against Plaintiff, which caused the First Amendment retaliation against Plaintiff as set forth in Count VI below.

928.    Grabbing, shoving, and threatening Plaintiff with arrest in retaliation is part of a pattern or practice of unconstitutional retaliatory conduct against members of the press,

274

which caused the First Amendment retaliation against Plaintiff as set forth in Count VII below.

929. Grabbing, shoving, and threatening Plaintiff with arrest in retaliation are overt acts taken in furtherance of a conspiracy plan, which caused the First Amendment retaliation against Plaintiff as set forth in Count VIII below.

930. The harm caused by Defendants' retaliatory behavior against the Plaintiff is not limited to the physical and mental injuries sustained during the Wright protests. Rather, every instance in which Plaintiff—a member of the press—was sent home, avoided public spaces, or was otherwise suppressed and/or deterred from observing, recording, and reporting on the protests because of the chilling impact of Defendants' behavior on April 13, 14, and 16 reflects an injury to Plaintiff's First Amendment rights.

931. Each harm caused by Defendants' First Amendment retaliation was a result of overt acts in furtherance of the conspiracy plan set forth in Count VIII below.

932. The Plaintiff suffered physical injuries, emotional injuries, and violations of his constitutional rights as a direct and proximate result of the foregoing retaliatory acts by the Defendants.

933. The fear of future retaliation establishes an ongoing and continuous injury by chilling his exercise of his First Amendment rights, which will not be remedied by any alleged policy changes voluntarily undertaken by the Defendants.

934. Defendants are jointly and severally liable to the Plaintiff.

275

## COUNT III
### Fourth Amendment—Unlawful Seizure & Use of Excessive Force
### (42 U.S.C. § 1983)
*vs. each of the Defendants*

935.    The Plaintiff restates, realleges, and incorporates by reference herein each and every allegation contained in each paragraph of this Complaint as if fully set forth herein.

936.    In April of 2021, Plaintiff had a right, secured by the Constitution of the United States under the Fourth Amendment, to be free from unreasonable seizures and the use of excessive force ("Fourth Amendment rights").

937.    On April 13, 14, and 16 of 2021, Defendants[354] violated Plaintiff's First Amendment rights and deprived him from engaging in constitutionally-protected activity when they unlawfully seized him, restrained his liberty, and/or used excessive force against him, as set forth in Count I above.

938.    On April 13, 14, and 16, Defendants retaliated against Plaintiff by unlawfully seizing him, restraining his liberty, and/or using excessive force against him, as set forth in Count II above.

939.    On April 13, 14, and 16, Plaintiff was deprived of his Fourth Amendment rights by Defendants, and each of the Defendants was personally involved in one or more of the deprivations.

---

[354] MACC Defendants, Onlooking Agents, Targeting Agents, Assault Agents, Supervisory Agents, and John Does #17-100

940.    Each of the Defendants was acting under color of law when they deprived Plaintiff of his Fourth Amendment rights, despite Plaintiff identifying himself as a member of the press.

941.    At all times relevant to this Complaint—on April 13, 14, and 16—Plaintiff had not committed a serious crime, nor did any Defendant suspect Plaintiff of committing a serious crime. Additionally, Plaintiff had not threatened anyone, and was neither fleeing nor resisting arrest.

942.    On April 13, 14, and 16, MACC Defendants[355] violated Plaintiff's Fourth Amendment rights by broadcasting dispersal orders at the Wright protests and unlawfully ordering that members of the press must leave the area or face arrest.

943.    At the time dispersal orders and threats of arrest unlawfully targeting members of the press were was broadcasted by MACC Defendants, Plaintiff was exercising his First Amendment rights and engaged in constitutionally-protected activity.

944.    The targeted dispersal orders and threats of arrest—with intent to restrain— was broadcasted on long-range acoustical devices by MACC law enforcement agents pursuant to commands, orders, instruction, and/or direction issued through MACC by MACC Defendants and Supervisory Agents[356].

---

[355] City of Brooklyn Center, Hennepin County, Commissioner Harrington, Assistant Commissioner Hodges, Colonel Langer, Major Dwyer, Sheriff Hutchinson, Chief Deputy Martin, Mayor Elliot, Interim Chief Gruenig, and Chief Revering

[356] John Does #9-10 and #14-15

277

945.   Broadcasting targeted dispersal orders and threats of arrest with a show of authority was an adverse action, taken under color of law, that would chill a person of ordinary firmness from continuing to speak, report, assemble, and/or engage in constitutionally-protected activity. These adverse acts by MACC Defendants did, in fact, chill Plaintiff from continuing to exercise First Amendment rights and engage in constitutionally-protected activity.

946.   MACC Defendants were motivated to broadcast targeted dispersal orders and threats of arrest with a show of authority, at least in part, by Plaintiff exercising his First Amendment rights and/or his engagement in constitutionally-protected activity.

947.   Dispersal orders and threats of arrest unlawfully targeting Plaintiff and other members of the press were issued with a show of authority. This show of authority by MACC Defendants include, but are not limited to, the threatening presence of numerous MACC law enforcement agents, displays of weaponry and chemical agents by numerous MACC law enforcement agents, the use of language and tone of voice demanding compliance with MACC Defendants' unlawful request, and activation of emergency lights on militaristic law enforcement vehicles.

948.   Plaintiff, reasonably fearing arrest and/or physical harm, voluntarily submitted to MACC Defendants' show of authority, and no longer felt free to exercise First Amendment rights or move freely on the public sidewalks, streets, or other public spaces in the area. In other words, MACC Defendants caused Plaintiff to experience substantial anxiety through an unsettling show of authority, which triggered Plaintiff to feel he was not at liberty to ignore the law enforcement presence and freely go about his business.

278

949.    MACC Defendants deprived Plaintiff the right to due process by broadcasting targeted dispersal orders and threats of arrest with a show of authority, which caused Plaintiff's Fourth Amendment rights to be violated as set forth in Count IV below.

950.    By the time targeted dispersal orders and threats of arrest was broadcasted with a show of authority, each of the MACC Defendants and Supervisory Agents had notice of a pre-existing pattern of unconstitutional conduct against members of the press by MACC and MACC law enforcement agents, was deliberately indifferent and/or tacitly authorized the conduct, and failed to take sufficient remedial action, which caused Plaintiff's Fourth Amendment rights to be violated as set forth in Count VI below.

951.    MACC Defendants broadcasting dispersal orders and threats of arrest that unlawfully targeted Plaintiff and other members of the press is part of a pattern or practice of unconstitutional conduct, which caused Plaintiff's Fourth Amendment rights to be violated as set forth in Count VII below.

952.    Using a show of authority to broadcast dispersal orders and threats of arrest, which unlawfully targeted Plaintiff and other members of the press, was overt actions taken in furtherance of a conspiracy plan, which caused Plaintiff's Fourth Amendment rights to be violated as set forth in Count VIII below.

953.    Broadcasting targeted dispersal orders and threats of arrest with a show of authority against a limited, precisely definable group—such as members of the press—put Plaintiff at a significant risk of serious, immediate, and proximate harm, which caused Plaintiff's Fourth Amendment rights to be violated as set forth in Count IX below.

954. On April 14, John Doe #1—with a show of authority and intent to restrain liberty—violated Plaintiff's Fourth Amendment rights by intentionally targeting Plaintiff, threatening him with a large canister of pepper-spray, and did, in fact, restrain the Plaintiff's liberty.

955. At the time John Doe #1 targeted and threatened Plaintiff with pepper-spray, Plaintiff was exercising his First Amendment rights and engaged in constitutionally-protected activity.

956. Targeting and threatening the Plaintiff with pepper-spray were adverse actions, taken under color of law, that would chill a person of ordinary firmness from continuing to speak, report, assemble, and/or engage in constitutionally-protected activity. These hostile acts by John Doe #1 did, in fact, chill Plaintiff from continuing to exercise First Amendment rights and engage in constitutionally-protected activity.

957. John Doe #1 was motivated to use a show of authority while targeting Plaintiff and threatening him with pepper-spray, at least in part, by Plaintiff exercising his First Amendment rights and/or his engagement in constitutionally-protected activity.

958. John Doe #1 using a show of authority, while targeting Plaintiff and threatening him with pepper-spray, was objectively unreasonable, as Plaintiff had not committed a crime, did not pose a threat to the safety of anyone, and did not actively resist arrest or attempt to evade arrest by flight.

959. Targeting and threatening Plaintiff with pepper-spray was a show of authority. Additionally, the threatening presence of numerous MACC law enforcement

agents, working in concert with John Doe #1 while displaying and firing militaristic weapons on nearby citizens, contributed to John Doe #1's show of authority.

960. Plaintiff, reasonably fearing physical harm and/or arrest, voluntarily submitted to John Doe #1's show of authority, and no longer felt free to exercise First Amendment rights or move freely in the public space nearby. In other words, John Doe #1 caused Plaintiff to experience substantial anxiety through an unsettling show of authority, which triggered Plaintiff to feel he was not at liberty to ignore his law enforcement presence and freely go about his business.

961. John Doe #1 clearly knew that his actions against Plaintiff would not be lawful in light of clearly established Minnesota laws, Constitutional rights, and the information possessed by John Doe #1.

962. John Doe #1 deprived Plaintiff the right to due process, by using a show of authority while targeting Plaintiff and threatening him with pepper-spray, which caused Plaintiff's Fourth Amendment rights to be violated as set forth in Count IV below.

963. By the time John Doe #1 used a show of authority to target and threaten Plaintiff with pepper-spray, each of the MACC Defendants and Supervisory Agents had notice of unconstitutional conduct against members of the press by MACC and MACC law enforcement agents, was deliberately indifferent and/or tacitly authorized the conduct, and failed to take sufficient remedial action, which caused Plaintiff's Fourth Amendment rights to be violated as set forth in Count VI below.

964. John Doe #1 using a show of authority to target and threatening Plaintiff with pepper-spray is part of a pattern or practice of unconstitutional conduct against members

281

of the press, which caused Plaintiff's Fourth Amendment rights to be violated as set forth in Count VII below.

965. John Doe #1 using a show of authority to target and threaten Plaintiff with pepper-spray are overt actions taken in furtherance of a conspiracy plan, which caused Plaintiff's Fourth Amendment rights to be violated as set forth in Count VIII below.

966. On April 16, John Doe #11, #12, and #13—Assault Agents—each used weapons and munitions provided by a MACC-participating law enforcement agency to use excessive force and restrain the liberty of Plaintiff by shooting him with less-lethal projectiles.

967. John Doe #11 intentionally pulled the weapon's trigger to shoot Plaintiff in the calf.

968. John Doe #12 intentionally pulled the weapon's trigger to shoot Plaintiff in the buttocks.

969. John Doe #13 intentionally pulled the weapon's trigger to shoot Plaintiff in the knee.

970. Each of the Assault Agents, acting under color of law, applied physical force to Plaintiff maliciously, sadistically, and for the purpose of causing harm by shooting him with less-lethal projectiles.

971. John Doe #2, #3, #4, and #5—Targeting Agents—willfully participated in restraining the liberty of Plaintiff, by targeting him with high-powered spotlights from multiple locations, so he could be shot by Assault Agents with less-lethal projectiles.

282

972.     Assault Agents, with the assistance of Targeting Agents, restrained the liberty of Plaintiff with the use of excessive force pursuant to commands, orders, instruction, and/or direction issued through MACC by MACC Defendants and Supervisory Agents.

973.     The Plaintiff was seized by MACC Defendants, Supervisory Agents, Targeting Agents, and Assault Agents working in concert, when they intentionally, through the use of force with less-lethal projectiles, terminated his freedom of movement, and violated the Plaintiff's Fourth Amendment rights.

974.     The amount of force used against the Plaintiff—on April 16 by MACC Defendants, Supervisory Agents, Targeting Agents, and Assault Agents working in concert—was objectively unreasonable under the circumstances. Each of the MACC Defendants, Supervisory Agents, Targeting Agents, Assault Agents, Onlooking Agents, and other MACC law enforcement agents on the scene had no reason to fear for their lives, no other lives were in danger, and no felonies were being committed. The Plaintiff did not pose an immediate threat to the safety of the agents or anyone else by exercising his First Amendment rights to observe, record, and report on events of public interest. The Plaintiff was not actively resisting arrest or attempting to evade arrest by flight when less-lethal projectiles were used against him.

975.     Additionally, and in the alternative, the use of force applied to Plaintiff on April 16 was objectively unreasonable because under the circumstances—in which Plaintiff was standing peacefully apart from protesters while reporting on the protest and law enforcement activity—it was not reasonably necessary for any purpose. The Curfew

Orders exempted members of the press, including Plaintiff, from curfew. Plaintiff was not posing a threat to the safety of the Defendants or others, he had not committed any severe or violent crime, and was neither actively resisting arrest nor attempting to evade arrest by flight. In light of the relationship between the need, if any, for use of force to the amount of force used, the extent of the injuries to Plaintiff, the inadequacy of the efforts, if any, by Defendants to temper or limit the amount of force used against members of the press, the absence of a security problem posed by Plaintiff, the absence of conduct from Plaintiff that was capable of being reasonably perceived by Defendants as a threat, and the absence of efforts by Defendants to arrest Plaintiff met with active resistance, the Defendants' use of force against the Plaintiff was objectively unreasonable.

976.    Each of the MACC Defendants, Supervisory Agents, Targeting Agents, Assault Agents, Onlooking Agents, and other MACC law enforcement agents on the scene clearly knew that actions taken against Plaintiff would not be lawful in light of clearly established Minnesota laws, Constitutional rights, and the information possessed by each of the Defendants.

977.    Instead, each of the MACC Defendants, Supervisory Agents, Targeting Agents, Assault Agents, Onlooking Agents, and other MACC law enforcement agents on the scene observed or intended the use of excessive force against the Plaintiff and other members of the press, and none intervened to halt it.

978.    Each of the MACC Defendants and Supervisory Agents knew of, and deliberately executed, the plan to "clear the streets" where the Plaintiff and other members

of the press were engaged in their constitutionally-protected activity, and with reckless disregard for whether their rights would be violated, failed to intervene.

979.    The coordinated effort to "clear the streets" by officers, troopers, deputies, and other MACC law enforcement agents acting in concert and coordinated fashion— displayed by the tactical lines, synchronized movements, kettle tactics, and systemic deployment of chemical spray, flash-bang grenades, concussion grenades, and/or less-lethal projectiles—confirm the Targeting Agents and Assault Agents were following commands, orders, instruction, and/or direction issued through MACC by MACC Defendants and Supervisory Agents.

980.    Plaintiff, after being shot multiple times with less-lethal projectiles, reasonably feared further physical harm and/or arrest—by MACC Defendants, Supervisory Agents, Targeting Agents, and Assault Agents working in concert—voluntarily submitted to Defendants' show of authority, and no longer felt free to exercise First Amendment rights or move freely on the sidewalks, streets, or other public spaces in the area. In other words, each of the MACC Defendants, Supervisory Agents, Targeting Agents, and Assault Agents caused Plaintiff to experience substantial anxiety through an unsettling show of authority, which triggered Plaintiff to feel he was not at liberty to ignore their law enforcement presence and freely go about his business.

981.    At the time he was shot by MACC Defendants, Supervisory Agents, Targeting Agents, and Assault Agents working in concert, Plaintiff was exercising his First Amendment rights and engaged in constitutionally-protected activity.

982. Shooting Plaintiff in the calf, buttocks, and knee with less-lethal projectiles were adverse actions, taken under color of law, that would chill a person of ordinary firmness from continuing to speak, report, assemble, and/or engage in constitutionally-protected activity. These hostile acts—by MACC Defendants, Supervisory Agents, Targeting Agents, and Assault Agents working in concert—did, in fact, chill Plaintiff from continuing to exercise First Amendment rights and engage in constitutionally-protected activity.

983. Each of the MACC Defendants, Supervisory Agents, Targeting Agents, and Assault Agents were motivated to use excessive force against Plaintiff, at least in part, by Plaintiff exercising his First Amendment rights and/or his engagement in constitutionally-protected activity.

984. Each of the MACC Defendants, Supervisory Agents, Targeting Agents, and Assault Agents deprived Plaintiff the right to due process when they shot him without probable cause, and did so without warning and/or opportunity to disperse in a way that a person of ordinary intelligence could understand and comply with, which caused Plaintiff's Fourth Amendment rights to be violated as set forth in Count IV below.

985. Each of the MACC Defendants, Supervisory Agents, Onlooking Agents[357], Targeting Agents, Assault Agents, and other John Doe[358] law enforcement agents stood by

---

[357] John Does #6-8

[358] John Does #17-100

without intervening to prevent or stop Plaintiff being shot, which caused Plaintiff's Fourth Amendment rights to be violated as set forth in Count V below.

986. By the time Plaintiff was shot multiple times with less-lethal projectiles—by MACC Defendants, Supervisory Agents, Targeting Agents, and Assault Agents working in concert—each of the MACC Defendants and Supervisory Agents had notice of a pre-existing pattern of unconstitutional conduct against members of the press by MACC and MACC law enforcement agents, was deliberately indifferent and/or tacitly authorized the conduct, and failed to take sufficient remedial action, which caused Plaintiff's Fourth Amendment rights to be violated as set forth in Count VI below.

987. Shooting Plaintiff with less-lethal projectiles is part of a pattern or practice of unconstitutional conduct against members of the press, which caused Plaintiff's Fourth Amendment rights to be violated as set forth in Count VII below.

988. Shooting Plaintiff with less-lethal projectiles are overt actions taken in furtherance of a conspiracy plan, which caused Plaintiff's Fourth Amendment rights to be violated as set forth in Count VIII below.

989. Each of the MACC Defendants took action that placed Plaintiff in harm's way, by creating a dangerous situation, which caused Plaintiff's Fourth Amendment rights to be violated as set forth in Count IX below.

990. On April 16, Plaintiff's Fourth Amendment rights were further violated when John Doe #16—with a show of authority and intent to restrain—physically grabbed and shoved Plaintiff while threatening to arrest him if Plaintiff did not cease his

287

constitutionally-protected activity and leave the public streets, sidewalks, and/or public space near the Brooklyn Center Police Department.

991.    At the time he was seized by John Doe #16 physically and with a show of authority, Plaintiff was exercising his First Amendment rights and engaged in constitutionally-protected activity.

992.    John Doe #16 unreasonably seized Plaintiff pursuant to commands, orders, instruction, and/or direction issued through MACC by MACC Defendants and Supervisory Agents.

993.    Using a show of authority while grabbing, shoving, and threatening arrest are adverse actions, taken under color of law, that would chill a person of ordinary firmness from continuing to speak, report, assemble, and/or engage in constitutionally-protected activity. These hostile acts by John Doe #16 did, in fact, chill Plaintiff from continuing to exercise First Amendment rights and engage in constitutionally-protected activity.

994.    Plaintiff was seized by John Doe #16 when he intentionally, through the use of force, terminated Plaintiff's freedom of movement by grabbing Plaintiff, and violated Plaintiff's Fourth Amendment rights.

995.    Having been shot multiple times with less-lethal projectiles earlier that day by fellow MACC law enforcement agents, Plaintiff reasonably feared further physical harm and/or arrest by John Doe #16, and voluntarily submitted to John Doe #16's show of authority because Plaintiff no longer felt free to exercise First Amendment rights or move freely on the sidewalks, streets, or other public spaces in the area. In other words, John Doe #16 caused Plaintiff to experience substantial anxiety through an unsettling show of

288

authority, which triggered Plaintiff to feel he was not at liberty to ignore his law enforcement presence and freely go about his business.

996. John Doe #16, acting under color of law, applied physical force to Plaintiff— without reasonable suspicion—for the purpose of preventing him from exercising his First Amendment rights and engagement in constitutionally-protected activity.

997. The amount of force used against the Plaintiff—on April 16 by John Doe #16—was objectively unreasonable under the circumstances. John Doe #16 and other MACC law enforcement agents on the scene had no reason to fear for their lives, no other lives were in danger, and no felonies were being committed. The Plaintiff did not pose an immediate threat to the safety of the agents or anyone else by exercising his First Amendment rights to observe, record, and report on events of public interest. The Plaintiff was not actively resisting arrest or attempting to evade arrest by flight when he was grabbed, shoved, and threatened with arrest.

998. Additionally, and in the alternative, the use of force applied to Plaintiff on April 16 was objectively unreasonable because under the circumstances—in which Plaintiff was standing peacefully on a public street while reporting on law enforcement activity—it was not reasonably necessary for any purpose. The Curfew Orders exempted members of the press, including Plaintiff, from curfew. Plaintiff was not posing a threat to the safety of John Doe #16 or others, he had not committed any severe or violent crime, and was neither actively resisting arrest nor attempting to evade arrest by flight. In light of the relationship between the need, if any, for use of force to the amount of force used, the inadequacy of the efforts by John Doe #16 to temper or limit the amount of force used

289

against Plaintiff, the absence of a security problem posed by Plaintiff, the absence of conduct from Plaintiff that was capable of being reasonably perceived by John Doe #16 as a threat, and the absence of efforts by John Doe #16 to arrest Plaintiff met with active resistance, John Doe #16's use of force against the Plaintiff was objectively unreasonable.

999. John Doe #16 clearly knew that his actions against Plaintiff would not be lawful in light of clearly established Minnesota laws, Constitutional rights, and the information possessed by John Doe #16.

1000. MACC Defendants, Supervisory Agents, Onlooking Agents, and other MACC law enforcement agents on the scene observed or intended the use of John Doe #16's excessive force against the Plaintiff, and none intervened to halt it.

1001. Each of the MACC Defendants and Supervisory Agents knew of, and deliberately executed, the plan to "clear the streets" where the Plaintiff and other members of the press were engaged in their constitutionally-protected activity, and with reckless disregard for whether their rights would be violated, failed to intervene.

1002. The coordinated effort to "clear the streets" by John Doe #16 and other MACC law enforcement agents working in concert and coordinated fashion—displayed by the tactical lines, synchronized movements, kettle tactics, and systemic deployment of chemical spray, flash-bang grenades, concussion grenades, and/or less-lethal projectiles— confirm John Doe #16 was following commands, orders, instruction, and/or direction issued through MACC by MACC Defendants and Supervisory Agents.

1003. John Doe #16 deprived Plaintiff of his right to due process, by restraining Plaintiff's liberty without reasonable suspicion, and without providing a warning and/or

290

opportunity to disperse in a way that a person of ordinary intelligence could understand and comply with, which caused Plaintiff's Fourth Amendment rights to be violated as set forth in Count IV below.

1004. By the time John Doe #16 used a show of authority—while grabbing, shoving, and threatening Plaintiff with arrest—each of the MACC Defendants and Supervisory Agents had notice of a pre-existing pattern of unconstitutional conduct against members of the press by MACC and MACC law enforcement agents, was deliberately indifferent and/or tacitly authorized the conduct, and failed to take sufficient remedial action, which caused Plaintiff's Fourth Amendment rights to be violated as set forth in Count VI below.

1005. Using a show of authority to grab, shove, and threaten Plaintiff with arrest is part of a pattern or practice of unconstitutional conduct against members of the press, which caused Plaintiff's Fourth Amendment rights to be violated as set forth in Count VII below.

1006. Using a show of authority to grab, shove, and threaten Plaintiff with arrest are overt acts taken in furtherance of a conspiracy plan, which caused Plaintiff's Fourth Amendment rights to be violated as set forth in Count VIII below.

1007. The harm caused by Defendants' assault on Plaintiff is not limited to the physical and mental injuries sustained during the Wright protests. Rather, every instance in which Plaintiff—a member of the press—was sent home, avoided public spaces, or was otherwise suppressed and/or deterred from observing, recording, and reporting on the protests because of the Defendants' show of authority on April 13, 14, and 16 reflects an injury to Plaintiff's Fourth Amendment rights.

291

1008. Each harm to Plaintiff's Fourth Amendment rights caused by Defendants was a result of overt acts in furtherance of the conspiracy plan set forth in Count VIII below.

1009. The Plaintiff suffered physical injuries, emotional injuries, and violations of his constitutional rights as a direct and proximate result of the foregoing unlawful conduct by the Defendants.

1010. Defendants are jointly and severally liable to the Plaintiff.

## COUNT IV
### Fourteenth Amendment—Violation of Due Process
### (42 U.S.C. § 1983)
*vs. each of the Defendants*

1011.   The Plaintiff restates, realleges, and incorporates by reference herein each and every allegation contained in each paragraph of this Complaint as if fully set forth herein.

1012.   The Plaintiff has a right, secured by the Constitution of the United States under the Fourteenth Amendment, against deprivation of liberty by government action without first going through the constitutionally-required due process ("Due Process rights").

1013.   On April 13, 14, and 16 of 2021, Defendants[359] violated Plaintiff's First Amendment rights and deprived him from engaging in constitutionally-protected activity when they unlawfully seized him, restrained his liberty, and/or used excessive force against him, as set forth in Count I above.

1014.   On April 13, 14, and 16, Defendants retaliated against Plaintiff by unlawfully seizing him, restraining his liberty, and/or using excessive force against him, as set forth in Count II above.

1015.   On April 13, 14, and 16, Defendants violated Plaintiff's Fourth Amendment rights, by unlawfully seizing him, restraining his liberty, and/or using excessive force against him, as set forth in Count III above.

---

[359] MACC Defendants, Onlooking Agents, Targeting Agents, Assault Agents, Supervisory Agents, and John Does #17-100

293

1016. On April 13, 14, and 16, Defendants violated Plaintiff's Fourteenth Amendment rights, and each of the Defendants was personally involved in one or more of the deprivations.

1017. Each of the Defendants was acting under color of law when they deprived Plaintiff of his Fourteenth Amendment rights, despite Plaintiff identifying himself as a member of the press.

1018. At all times relevant to this Complaint—on April 13, 14, and 16—Plaintiff had not committed a serious crime, nor did any Defendant suspect Plaintiff of committing a serious crime. Additionally, Plaintiff had not threatened anyone, and was neither fleeing nor resisting arrest.

1019. Plaintiff's Due Process rights were violated on April 13, 14, and 16 when MACC Defendants[360]—in concert and coordinated fashion with MACC policymakers, MACC command staff, and their MACC law enforcement agents—used a show of authority to restrain Plaintiff's liberty, by broadcasting unlawful dispersal orders targeting Plaintiff and threatening arrest.

1020. Plaintiff's Due Process rights were violated on April 13 when John Doe #1 used a show of authority to restrain Plaintiff's liberty, by targeting and threatening Plaintiff with a large canister of pepper-spray, despite Plaintiff identifying himself as a member of the press.

---

[360] City of Brooklyn Center, Hennepin County, Commissioner Harrington, Assistant Commissioner Hodges, Colonel Langer, Major Dwyer, Sheriff Hutchinson, Chief Deputy Martin, Mayor Elliot, Interim Chief Gruenig, and Chief Revering

1021. Plaintiff's Due Process rights were violated on April 16 when MACC Defendants—in concert and coordinated fashion with MACC policymakers, MACC command staff, Supervisory Agents[361], Targeting Agents[362], and Assault Agents[363]—deployed less-lethal projectiles without providing warning and opportunity to disperse in a way that a person of ordinary intelligence could understand and comply with.

1022. Plaintiff's Due Process rights were violated on April 16 when MACC Defendants—in concert and coordinated fashion with MACC policymakers, MACC command staff, Supervisory Agents, Targeting Agents, and Assault Agents—shot Plaintiff multiple times with less-lethal projectiles, without probable cause, despite Plaintiff identifying himself as a member of the press.

1023. Plaintiff's Due Process rights were violated on April 16 when MACC Defendants and their Assault Agents fired less-lethal projectiles at him—striking him at least three times—without notice and an opportunity to disperse in a way that a person of ordinary intelligence could understand and comply with.

1024. Plaintiff's Due Process rights were violated on April 16 when Onlooking Agents[364] and other John Doe[365] law enforcement agents failed to intervene to stop and/or prevent Plaintiff being shot with less-lethal projectiles.

---

[361] John Does #9-10 and #14-15

[362] John Does #2-5

[363] John Does #11-13

[364] John Does #6-8

[365] John Does #17-100

295

1025.   Plaintiff's Due Process rights were violated on April 16 when John Doe #16 used a show of authority to restrain Plaintiff's liberty, by grabbing Plaintiff without reasonable suspicion and threatening him with arrest, despite Plaintiff identifying himself as a member of the press.

1026.   Plaintiff's Due Process rights were violated on April 16 when John Doe #16 restrained Plaintiff's liberty by grabbing him without notice and an opportunity to disperse in a way that a person of ordinary intelligence could understand and comply with.

1027.   At the time Plaintiff was deprived of his right to due process—by MACC Defendants, Supervisory Agents, Targeting Agents, Assault Agents, John Doe #1, and John Doe #16 working in concert—Plaintiff was exercising his First Amendment rights and engaged in constitutionally-protected activity.

1028.   Depriving Plaintiff of his right to due process were adverse actions, taken under color of law, that would chill a person of ordinary firmness from continuing to speak, report, assemble, and/or engage in constitutionally-protected activity. These adverse acts— by MACC Defendants, Supervisory Agents, Targeting Agents, Assault Agents, John Doe #1, and John Doe #16 working in concert—did, in fact, chill Plaintiff from continuing to exercise First Amendment rights and engage in constitutionally-protected activity.

1029.   Each of the MACC Defendants, Supervisory Agents, Targeting Agents, Assault Agents, John Doe #1, and John Doe #16 were motivated to deprive Plaintiff of his Fourteenth Amendment rights, at least in part, by Plaintiff exercising his First Amendment rights and/or his engagement in constitutionally-protected activity.

296

1030. Each of the MACC Defendants, Supervisory Agents, Onlooking Agents, Targeting Agents, and Assault Agents stood by without intervening to prevent or stop Plaintiff being shot, which caused Plaintiff's Fourteenth Amendment rights to be violated as set forth in Count V below.

1031. By the time Plaintiff was deprived of his right to due process—by MACC Defendants, Supervisory Agents, Targeting Agents, Assault Agents, John Doe #1, and John Doe #16 working in concert—each of the MACC Defendants and Supervisory Agents had notice of a pre-existing pattern of unconstitutional conduct against members of the press by MACC and MACC law enforcement agents, was deliberately indifferent and/or tacitly authorized the conduct, and failed to take sufficient remedial action, which caused Plaintiff's Fourteenth Amendment rights to be violated as set forth in Count VI below.

1032. Depriving Plaintiff of his right to due process is part of a pattern or practice of unconstitutional conduct against members of the press, which caused Plaintiff's Fourteenth Amendment rights to be violated as set forth in Count VII below.

1033. Depriving Plaintiff of his right to due process are overt actions taken in furtherance of a conspiracy plan, which caused Plaintiff's Fourteenth Amendment rights to be violated as set forth in Count VIII below.

1034. Each of the MACC Defendants took action that placed Plaintiff in harm's way, by creating a dangerous situation, which caused Plaintiff's Fourteenth Amendment rights to be violated as set forth in Count IX below.

1035.   The Plaintiff reasonably fears further violation of the Fourteenth Amendment in the future if he was to continue to observe, record, or engage in constitutionally-protected activity.

1036.   Each harm caused by Defendants to the Plaintiff's Fourteenth Amendment Due Process rights was an overt act in furtherance of the conspiracy plan set forth in Count VIII below.

1037.   The Plaintiff suffered physical injuries, emotional injuries, and violations of his constitutional rights as a direct and proximate result of the foregoing unlawful conduct by the Defendants.

1038.   Defendants are jointly and severally liable to the Plaintiff.

## COUNT V
### Failure to Intervene
### (42 U.S.C. § 1983)

*vs. each of the MACC Defendants, Onlooking Agents, Targeting Agents,*
*Assault Agents, Supervisory Agents, and John Does #17-100*

1039.   The Plaintiff restates, realleges, and incorporates by reference herein each
and every allegation contained in each paragraph of this Complaint as if fully set forth
herein.

1040.   During the constitutional violations described in this Complaint, each of
MACC Defendants[366], Targeting Agents[367], Onlooking Agents[368], Assault Agents[369],
Supervisory Agents[370], MACC policymakers, MACC command staff, and other John
Doe[371] law enforcement agents individually stood by without intervening to prevent the
misconduct.

1041.   Each of the Defendants[372] had a duty to intervene to prevent the constitutional
harms and personal injuries described in this Complaint.

---

[366] City of Brooklyn Center, Hennepin County, Commissioner Harrington, Assistant
Commissioner Hodges, Colonel Langer, Major Dwyer, Sheriff Hutchinson, Chief Deputy
Martin, Mayor Elliot, Interim Chief Gruenig, and Chief Revering

[367] John Does #2-5

[368] John Does #6-8

[369] John Does #11-13

[370] John Does #9-10 and #14-15

[371] John Does #17-100

[372] MACC Defendants, Onlooking Agents, Targeting Agents, Assault Agents,
Supervisory Agents, and John Does #17-100

1042. Each of the Defendants had the authority to intervene to prevent the constitutional harms and personal injuries described in this Complaint.

1043. Each of the Defendants had a reasonable opportunity to prevent the constitutional harms and personal injuries described in this Complaint but failed to do so.

1044. Each of the Defendants acted with reckless and deliberate indifference to the constitutional rights of the Plaintiff and other members of the press when they failed to intervene to prevent the constitutional harms and personal injuries described in this Complaint.

1045. Each of the MACC Defendants, Onlooking Agents, Targeting Agents, Supervisory Agents, MACC policymakers, and MACC command staff was aware of, and collaborated in, the assault on Plaintiff because they had a clear vantage point of the attack on the Plaintiff and watched it unfold, yet failed to intervene despite the opportunity and ability to do so.

1046. The misconduct described in this Count was undertaken under color of state law, and Defendants acted at all times under the color of state law when they failed to intervene to prevent the constitutional harms and personal injuries described in this Complaint.

1047. The MACC's, MACC Defendants', and Supervisory Agents' failure to train and supervise MACC law enforcement agents—including their employees, subordinates, and/or agents—with respect to the First, Fourth, and Fourteenth Amendment rights of the Plaintiff, amounts to reckless and deliberate indifference to the constitutional rights of the Plaintiff and other members of the press.

300

1048. Additionally, their failure to investigate and/or discipline MACC law enforcement agents for constitutional violations and unlawful reprisals, their failure to issue corrective instructions after violations and unlawful conduct were brought to light, and their failure to intervene amounts to reckless and deliberate indifference to the rights of the Plaintiff and other members of the press.

1049. The pattern of similar constitutional violations and/or unlawful reprisals against Plaintiff and other members of the press, which occurred all throughout the Floyd and Wright protests, demonstrates reckless and deliberate indifference—by each of the MACC Defendants, Onlooking Agents, Targeting Agents, Supervisory Agents, MACC policymakers, and MACC command staff—to the rights of Plaintiff and other members of the press.

1050. Given the multiple constitutional violations and/or unlawful reprisals documented above; MACC and MACC Defendants' lengthy past pattern and practice of such violations; the multiple past federal lawsuits arising out of such violations; the multiple Department of Justice reports recommending changes in Minnesota law enforcement supervision and training protocol regarding individuals' constitutional rights; direct outreach by members of the press; and relevant public statements repeated over and over by Governor Walz; the need for more supervision or training was so obvious, and the inadequacy of the training and supervision so likely to result in the violation of constitutional rights, that MACC and each of the MACC Defendants, Supervisory Agents, MACC policymakers, and MACC command staff demonstrated their reckless and deliberate indifference to the need for such training and supervision.

1051. Further, the excessive and unlawful use of force, the rampant constitutional violations, and the targeting of the press for unlawful reprisals were so widespread, well-known, and obvious to each of the Defendants, that Defendants' continued use of excessive force and/or targeting the Plaintiff and members of the press for unlawful reprisals, and continued retaliatory violation of constitutional rights was willful and recklessly indifferent to the rights of the Plaintiff and other members of the press.

1052. The Defendants' failure to intervene is pursuant to MACC and MACC Defendants' policy, practice, and/or custom of permitting constitutional violations—including, but not limited to, excessive force—against members of the press.

1053. The relevant policy, practice, and/or custom was continuing, persistent, and widespread within the MACC and MACC Defendants' response to the civil disturbances that followed the death of Daunte Wright.

1054. By the actions described in this Complaint, each of the Defendants, under color of law, directly participated in the constitutional violations—set forth in Counts I, II, III, and IV above—which deprived the Plaintiff of his clearly established and well-settled civil rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution.

1055. The failure to intervene by Defendants contributed to Plaintiff's First Amendment rights being violated, as set forth in Count I above.

1056. The failure to intervene by Defendants contributed to Plaintiff suffering retaliation for exercising his First Amendment rights and/or engaging in constitutionally-protected activity, as set forth in Count II above.

1057. The failure to intervene by Defendants contributed to Plaintiff being seized and having excessive force used against him, as set forth in Count III above.

1058. The failure to intervene by Defendants contributed to Plaintiff being deprived of his right to due process, as set forth in Count IV above.

1059. The failure to intervene by Defendants contributed to a deficiency in training and supervision which led to Plaintiff's constitutional rights being violated, as set forth in Count VI below.

1060. The failure to intervene by Defendants was part of a pattern and practice of unconstitutional conduct, and additionally, contributed to unconstitutional policies, practices, and/or customs being permitted to exist, both of which led to Plaintiff's constitutional rights being violated, as set forth in Count VII below.

1061. The failure to intervene by Defendants was a result of actions taken in furtherance of a conspiracy plan, as set forth in Count VIII below.

1062. The failure to intervene by Defendants put Plaintiff and other individuals belonging to a limited, precisely definable group at a significant risk of serious, immediate, and proximate harm, which caused Plaintiff's constitutional rights to be violated as set forth in Count IX below.

1063. The Plaintiff suffered physical injuries, emotional injuries, and violations of his constitutional rights as a direct and proximate result of the foregoing unlawful conduct by the Defendants.

1064. Defendants are jointly and severally liable to the Plaintiff.

## COUNT VI
### Failure to Train and/or Supervise
### (42 U.S.C. § 1983)
*vs. each of the MACC Defendants and Supervisory Agents*

1065.    The Plaintiff restates, realleges, and incorporates by reference herein each and every allegation contained in each paragraph of this Complaint as if fully set forth herein.

1066.    During the Wright protests and upon the deployment of MACC, each of the Municipal Defendants[373] had effectively delegated authority to act for the municipality in the policy matter of training and supervising their respective law enforcement agents to each of the MACC Defendants[374].

1067.    Each one of the MACC Defendants and Supervisory Agents[375] had notice of a pattern and practice of unconstitutional acts by subordinate MACC law enforcement agents deployed in Brooklyn Center and engaged in MACC operations.

1068.    Each of the MACC Defendants and Supervisory Agents were deliberately indifferent to those acts, and failed to take sufficient remedial action that would cease the repeated constitutional deprivations occurring.

---

[373] City of Brooklyn Center and Hennepin County

[374] City of Brooklyn Center, Hennepin County, Commissioner Harrington, Assistant Commissioner Hodges, Colonel Langer, Major Dwyer, Sheriff Hutchinson, Chief Deputy Martin, Mayor Elliot, Interim Chief Gruenig, and Chief Revering

[375] John Does #9-10 and #14-15

1069.  This failure, by Defendants[376], to train and/or supervise MACC law enforcement agents was the proximate cause of Plaintiff's injury.

1070.  Each of the MACC Defendants and Supervisory Agents—individually and collectively—had customs, polices, and practices in place regarding the training, supervision, control, monitoring, and disciplining of MACC law enforcement agents, which exhibited deliberate indifference to the care and safety of the press, and led to Plaintiff's injuries.

1071.  When MACC law enforcement agents, working in concert and coordinated fashion, took up arms to engage members of the press as if they were enemy combatants with militaristic displays of force and weaponry, MACC law enforcement agents were acting under the direction and control of MACC, and pursuant to the policies, practices, and customs of MACC implemented by MACC Defendants and Supervisory Agents.

1072.  Given the known frequency with which MACC law enforcement agents would come into contact with members of the press during civil unrest such as the Wright protests, and the predictability that a law enforcement agent lacking the specific tools, training, or knowledge to handle that situation will likely violate their rights, the decision by each of the MACC Defendants and Supervisory Agents—individually and collectively—not to train MACC law enforcement agents about constitutional limits on use of force against members of the press reflects the Defendants' deliberate indifference to

---

[376] MACC Defendants and Supervisory Agents

the highly predictable consequence, namely, unconstitutional violations against members of the press.

1073.   Each of the MACC Defendants and Supervisory Agents allowed MACC's developed customs and usages to continue.

1074.   Each of the MACC Defendants and Supervisory Agents had actual or constructive knowledge of the existence of relevant customs and usages.

1075.   Each of the MACC Defendants and Supervisory Agents, with specific intent or deliberate indifference, failed to correct or stop the unconstitutional practices by MACC law enforcement agents.

1076.   Each of the MACC Defendants and Supervisory Agents disregarded the known and obvious consequence of their actions.

1077.   Each of the MACC Defendants and Supervisory Agents had command and control over the Targeting Agents, Assault Agents, and other involved MACC law enforcement agents that prepared for, and subsequently executed, MACC's plan to "clear the streets" where the Plaintiff and other members of the press were engaged in First Amendment activity.

1078.   Each of the MACC Defendants and Supervisory Agents knew that many members of the press would be present virtually at all times during the Wright protests.

1079.   Each of the MACC Defendants and Supervisory Agents knew that members of the press, including the Plaintiff, were exempt from any curfew orders in place during the Wright Protests, and specifically on April 13, 14, and 16 of 2021. Therefore, the

nonviolent and easily identifiable Plaintiff and other members of the press had an unfettered right to be present, in a public space, where the events at issue occurred.

1080. Each of the MACC Defendants and Supervisory Agents observed Plaintiff and other members of the press who were present in the area where Targeting Agents, Assault Agents, and other MACC law enforcement agents were executing orders to "clear the streets" surrounding the Brooklyn Center Police Department.

1081. Each of the MACC Defendants and Supervisory Agents allowed and/or facilitated use of excessive force by MACC law enforcement agents against Plaintiff and other members of the press. MACC Defendants and Supervisory Agents directly participated in the violation of Plaintiff's constitutional rights by creating, applying, and/or interpreting MACC's plan by ordering, instructing, directing, and/or commanding the Targeting Agents and Assault Agents to "clear the streets" with the use of less-lethal projectiles, which resulted in the unconstitutional use of force against the free press— including the Plaintiff.

1082. Each of the MACC Defendants and Supervisory Agents directly participated in the violation of the Plaintiff's constitutional rights by facilitating such unconstitutional use of force; knowing the force would not be subject to proper reporting or disciplinary action.

1083. Each of the MACC Defendants and Supervisory Agents knew that members of the press, including the Plaintiff, had well-established First and Fourth amendment rights to observe, record, and report the events on April 13, 14, and 16 of 2021—following the death of Daunte Wright—without being subjected to unprovoked attacks and unlawful

307

reprisals by Assault Agents, Targeting Agents, John Doe #1, John Doe #16, and generally, MACC law enforcement agents.

1084. It was the relevant policies, practices, and/or customs of MACC, MACC Defendants, and Supervisory Agents—as well as their failure to issue corrective instructions after violations were brought to light, their failure to train and supervise their agents who were working in concert and coordinated fashion with one another, and their failure to intervene—that caused the physical, emotional, and constitutional harms against Plaintiff and other members of the press.

1085. The failure—by MACC, MACC Defendants, and Supervisory Agents—to train and/or supervise MACC law enforcement agents with respect to the First, Fourth, and Fourteenth Amendment rights of Plaintiff, amounts to reckless and deliberate indifference to the constitutional rights of Plaintiff and other members of the press. Additionally, their failure to investigate and/or discipline MACC law enforcement agents for constitutional violations and unlawful reprisals, their failure to issue corrective instructions after violations and unlawful conduct were brought to light, and their failure to intervene amounts to reckless and deliberate indifference to the rights of the Plaintiff and other members of the press.

1086. The pattern of similar constitutional violations and/or unlawful reprisals against members of the press, which occurred during the Floyd and Wright protests, demonstrates the reckless and deliberate indifference to the rights of the Plaintiff and other members of the press by MACC as a whole, and—specifically in regards to the Wright protests—each of the MACC Defendants and Supervisory Agents.

1087. Given the multiple constitutional violations and/or unlawful reprisals documented above; MACC and MACC Defendants' lengthy past pattern and practice of such violations; the multiple past federal lawsuits arising out of such violations; the multiple Department of Justice reports recommending changes in Minnesota law enforcement supervision and training protocol regarding individuals' constitutional rights; direct outreach by members of the press; and relevant public statements repeated over and over by Governor Walz; the need for more supervision or training was so obvious, and the inadequacy of the training and supervision so likely to result in the violation of constitutional rights, each of the MACC Defendants and Supervisory Agents demonstrated their reckless and deliberate indifference to the need for such training and supervision.

1088. Further, the rampant constitutional violations and unlawful reprisals were so widespread, well-known, and obvious to MACC Defendants and Supervisory Agents, that Defendants' continued use of excessive force and/or unlawful reprisals in retaliation against Plaintiff and other members of the press, and Defendants' continued violation of constitutional rights, was willful and recklessly indifferent to the rights of the Plaintiff and other members of the press.

1089. MACC law enforcement agents had reason to believe that they were generally free to use excessive force in any encounters with members of the press without fear of sanction by MACC Defendants, who had either intentionally or by deliberate indifference so mis-trained or failed to supervise MACC law enforcement agents, or both,

309

and as a direct result of this informal policy, practice, or custom, Assault Agents and John Doe #16 unjustifiably assaulted Plaintiff.

1090.   By the actions described in this Complaint, each of the MACC Defendants and Supervisory Agents, under color of law, directly participated in the constitutional violations—set forth in Counts I, II, III, and IV above—which deprived the Plaintiff of his clearly established and well-settled civil rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution.

1091.   The failure to train and/or supervise by MACC Defendants and Supervisory Agents contributed to Plaintiff's First Amendment rights being violated, as set forth in Count I above.

1092.   The failure to train and/or supervise by MACC Defendants and Supervisory Agents contributed to Plaintiff suffering retaliation for exercising his First Amendment rights and/or engaging in constitutionally-protected activity, as set forth in Count II above.

1093.   The failure to train and/or supervise by MACC Defendants and Supervisory Agents contributed to Plaintiff being seized and having excessive force used against him, as set forth in Count III above.

1094.   The failure to train and/or supervise by MACC Defendants and Supervisory Agents contributed to Plaintiff being deprived of his right to due process, as set forth in Count IV above.

310

1095. The failure to train and/or supervise by MACC Defendants and Supervisory Agents contributed to Defendants[377] failing to intervene to stop or prevent Plaintiff's constitutional rights from being violated, as set forth in Count V above.

1096. The failure to train and/or supervise by MACC Defendants and Supervisory Agents contributed to the unconstitutional policies, practices, and/or customs that were permitted to exist, as set forth in Count VII below.

1097. The failure to train and/or supervise by MACC Defendants and Supervisory Agents was a result. at least in part, of actions taken of actions taken in furtherance of a conspiracy plan, as set forth in Count VIII below.

1098. The failure to train and/or supervise by MACC Defendants and Supervisory Agents contributed to putting Plaintiff and other individuals belonging to a limited. precisely definable group at a significant risk of serious, immediate, and proximate harm. which caused Plaintiff's constitutional rights to be violated as set forth in Count IX below.

1099. The Plaintiff suffered physical injuries, emotional injuries, and violations of his constitutional rights as a direct and proximate result of the foregoing unlawful conduct by the Defendants.

1100. Defendants are jointly and severally liable to the Plaintiff.

---

[377] MACC Defendants, Onlooking Agents, Targeting Agents, Assault Agents, Supervisory Agents, and John Does #17-100

311

## COUNT VII
### Unconstitutional Policy, Practice, and/or Custom—Municipal Liability
### (42 U.S.C. § 1983 via *Monell*)
*vs. each of the Municipal Defendants*

1101. The Plaintiff restates, realleges, and incorporates by reference herein each and every allegation contained in each paragraph of this Complaint as if fully set forth herein.

1102. Prior to Plaintiff being shot multiple times with less-lethal projectiles, both of the Municipal Defendants[378]—along with their respective policymakers[379]—knew a continuing, widespread, persistent pattern of misconduct by law enforcement agents existed. These agents, at the request of the Municipal Defendants, were operating in the Municipal Defendants' jurisdiction and under their authority.

1103. Even after having notice of such misconduct, both of the Municipal Defendants and their respective policymakers tacitly authorized and/or remained deliberately indifferent to the misconduct of law enforcement agents operating in their jurisdiction and with their authority.

1104. By April 16, each of the Municipal Defendants—along with their respective policymakers—had a policy, practice, and/or custom of:

> i. failing to provide warnings and/or lawful orders before deploying crowd control weapons—including chemical agents and injurious less-lethal

---

[378] City of Brooklyn Center and Hennepin County

[379] Including, but not limited to, Mayor Elliot and Sheriff Hutchinson

312

munitions—against members of the press in Brooklyn Center during the Wright protests;

ii. authorizing the deployment of crowd control weapons and/or less-lethal munitions in an unconstitutional manner;

iii. unlawful indiscriminate use of less-lethal projectiles;

iv. permitting constitutional violations—including, but not limited to, excessive force—against members of the press;

v. targeting members of the press for unlawful reprisals;

vi. delegating law enforcement responsibility to non-employees without maintaining adequate supervision; and/or

vii. inaction in light of notice that MACC's law enforcement response to the Daunte Wright protests was causing and would continue to cause constitutional violations against members of the press.

1105.   The injuries endured by Plaintiff was the result of acts pursuant to the policies, practices, and/or customs of each Municipal Defendant. The policies, practices, and/or customs of each Municipal Defendant was the moving force behind the constitutional violations Plaintiff and other members of the press suffered. Additionally, or in the alternative, the injuries endured by Plaintiff was the result of acts pursuant to the policies, practices, and/or customs of Municipal Defendants' policymakers, and was the moving force behind the constitutional violations Plaintiff and other members of the press suffered.

313

1106. Each of the MACC Defendants, together with their respective policymakers, engaged in a pattern of decisions that violated the constitutional rights of Plaintiff and other members of the press.

1107. By permitting the unconstitutional conduct of MACC law enforcement agents to continue, MACC Defendants and their respective policymakers chose an impermissible way of operating.

1108. Policymaking officials for both Municipal Defendants knew of repeated allegations of abusive and unconstitutional conduct by MACC law enforcement agents— deployed in their jurisdiction and at their request—and either positively encouraged covering up the abusive misconduct or otherwise tacitly approved these tactics. In other words, both Municipal Defendants permitted excessive force against members of the press by law enforcement in their jurisdiction.

1109. Actual and/or constructive knowledge of a pre-existing pattern of similar unconstitutional conduct against members of the press put Municipal Defendants and their respective policymakers on notice that law enforcement agents—operating with authority in their jurisdiction—needed additional training and/or supervision. This need for additional training and/or supervision was plainly obvious to the Municipal Defendants and their respective policymakers, who, nevertheless, were deliberately indifferent to the need.

1110. Municipal officials with final policymaking authority took actions that led to the constitutional violations suffered by Plaintiff and other members of the press.

314

1111. Each of the Municipal Defendants had the ultimate authority and responsibility over the law enforcement response to the Wright protests, which resulted in numerous unlawful acts against Plaintiff and other members of the press. Additionally, or in the alternative, both Municipal Defendants shared authority and responsibility over the law enforcement response to the Wright protests, which resulted in numerous unlawful acts against Plaintiff and other members of the press.

1112. After receiving notice of repeated unconstitutional conduct targeting members of the press, by MACC law enforcement agents operating with authority in their jurisdiction, each of the Municipal Defendants—through their authorized decisionmakers—continued to adopt that particular course of actions which would, and did, result in more constitutional violations by MACC law enforcement agents against members of the press, including Plaintiff.

1113. Final policymakers for the Municipal Defendants' law enforcement response to the Wright protests disregarded the known and obvious consequences of their inaction, including Mayor Elliot and Sheriff Hutchinson.

1114. Municipal Defendants could have revoked the authority for a MACC-participating agency and/or individual MACC law enforcement agent to operate in their jurisdiction, in an effort to stop or prevent additional unconstitutional misconduct, but did not.

1115. By the actions described in this Complaint, each of the Municipal Defendants, under color of law, directly participated in the constitutional violations—set forth in Counts I, II, III, and IV above—which deprived the Plaintiff of his clearly

315

established and well-settled civil rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution.

1116. The policies, practices, and/or customs of the Municipal Defendants and their policymakers contributed to Plaintiff's First Amendment rights being violated, as set forth in Count I above.

1117. The policies, practices, and/or customs of the Municipal Defendants and their policymakers contributed to Plaintiff suffering retaliation for exercising his First Amendment rights and/or engaging in constitutionally-protected activity, as set forth in Count II above.

1118. The policies, practices, and/or customs of the Municipal Defendants and their policymakers contributed to Plaintiff being seized and having excessive force used against him, as set forth in Count III above.

1119. The policies, practices, and/or customs of the Municipal Defendants and their policymakers contributed to Plaintiff being deprived of his right to due process, as set forth in Count IV above.

1120. The policies, practices, and/or customs of the Municipal Defendants and their policymakers contributed to Defendants[380] failing to intervene to stop or prevent Plaintiff's constitutional rights from being violated, as set forth in Count V above.

---

[380] MACC Defendants and Supervisory Agents

1121. The policies, practices, and/or customs of the Municipal Defendants and their policymakers contributed to a deficiency in training and supervision, which led to Plaintiff's constitutional rights being violated, as set forth in Count VI above.

1122. The policies, practices, and/or customs of the Municipal Defendants and their policymakers was a result, at least in part, of actions taken in furtherance of a conspiracy plan, as set forth in Count VIII below.

1123. The policies, practices, and/or customs of the Municipal Defendants and their policymakers contributed to putting Plaintiff and other individuals belonging to a limited, precisely definable group at a significant risk of serious, immediate, and proximate harm, which caused Plaintiff's constitutional rights to be violated as set forth in Count IX below.

1124. Defendants are jointly and severally liable to the Plaintiff.

317

## COUNT VIII
### Civil Conspiracy
### (42 U.S.C. § 1983)
*vs. each of the Command Defendants*

1125.    The Plaintiff restates, realleges, and incorporates by reference herein each
and every allegation contained in each paragraph of this Complaint as if fully set forth
herein.

1126.    Prior to Mr. Wrights killing on April 11 of 2021, two or more of the
Command Defendants[381]—specifically Commissioner Harrington and Colonel Langer—
had a meeting of the minds to plan how MACC would respond to future episodes of civil
unrest ("conspiracy plan"). The first meeting occurred approximately 9 months prior to
April 11, 2021, and subsequent meetings with additional Command Defendants occurred
up to and including April 16, 2021.

1127.    In one or more of these meetings, participants reached an understanding that
in response to any future civil unrest and/or protests—much like in the City of Minneapolis,
during their previous law enforcement response to the Floyd protests—MACC would once
again deploy violent crowd control and dispersion techniques, including but not limited to,
grabbing, pushing, shoving, hitting, tackling, pepper-spray, and less-lethal projectiles
("violent crowd control and dispersion techniques").

---

[381] Commissioner Harrington, Assistant Commissioner Hodges, Colonel Langer, Major
Dwyer, Sheriff Hutchinson, Chief Deputy Martin, Mayor Elliot, Interim Chief Gruenig,
and Chief Revering

1128. Additionally, knowing that members of the press would be on scene to document, their plan included details on how MACC would respond to the press. The Command Defendants agreed the First Amendment rights of the press would be ignored when MACC deployed Phase 3 of their plan, and—much like in the City of Minneapolis during their previous law enforcement response to the Floyd protests—members of the press were subject to detention, arrest, and/or violent crowd control and dispersion techniques.

1129. Their conspiracy plan included—much like in the City of Minneapolis during their previous law enforcement response to the Floyd protests—using either curfew or unlawful assembly, or both, as a trigger to clear the entire landscape of any individual, including members of the press, from public streets, sidewalks, and spaces.

1130. In furtherance of the conspiracy plan, Command Defendants issued commands, orders, instruction, and/or direction through MACC allowing MACC law enforcement agents to disregard press passes and distinctive clothing that identified individuals as members of the press, and instead to detain, arrest, and/or engage them using violent crowd control and dispersion techniques.

1131. After the unexpected killing of Mr. Wright on April 11, the City of Brooklyn Center asked for assistance from Minnesota law enforcement agencies to protect the City.

1132. MACC responded, and with the City's consent, MACC took command and control over the law enforcement response. The County acquiesced to this course of action.

319

1133. Mayor Elliot was advised and counseled by the other Command Defendants, who brought him up to speed on the conspiracy plan, including how MACC would command, order, instruct, and/or direct MACC law enforcement agents to handle members of the press. During this meeting of the minds, one or more of the individual Command Defendants expressed that MACC was hesitant to continue its deployment in Brooklyn Center due to the City's public desire to limit police tactics, and the City's recent ban on violent crowd control and dispersion techniques, such as the use of rubber bullets. Afterall, the conspiracy plan was months in the making and—much like in the City of Minneapolis—required the use of violent crowd control and dispersion techniques to clear the streets.

1134. Mayor Elliot wished to overcome the hesitancy other Command Defendants expressed, and in order to avoid confusion, Mayor Elliot used his command authority to issue a proclamation declaring that nothing in the City's Resolution should be interpreted as limiting any MACC law enforcement agent, because the City's Resolution did not apply to MACC's Operation Safety Net.

1135. By April 16 of 2021, each and every individual Command Defendant had communicated, understood, and agreed on the conspiracy plan.

1136. The conspiracy plan included, but was not limited to, depriving members of the press of their constitutional rights, targeting members of the press for unlawful reprisals, and/or suppressing reporting activity.

1137. By April 16 of 2021, each and every individual Command Defendant directly participated in the conspiracy plan and acted in furtherance of it.

320

1138. By the actions described in this Complaint, each of the Command Defendants, under color of law, directly participated in the constitutional violations—set forth in Counts I, II, III, and IV above—which deprived the Plaintiff of his clearly established and well-settled civil rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution.

1139. The Command Defendants' conspiracy plan contributed to Plaintiff's First Amendment rights being violated, as set forth in Count I above.

1140. The Command Defendants' conspiracy plan contributed to Plaintiff suffering retaliation for exercising his First Amendment rights and/or engaging in constitutionally-protected activity, as set forth in Count II above.

1141. The Command Defendants' conspiracy plan contributed to Plaintiff being seized and having excessive force used against him, as set forth in Count III above.

1142. The Command Defendants' conspiracy plan contributed to Plaintiff being deprived of his right to due process, as set forth in Count IV above.

1143. The Command Defendants' conspiracy plan contributed to Defendants[382] failing to intervene to stop or prevent Plaintiff's constitutional rights from being violated, as set forth in Count V above.

---

[382] MACC Defendants, Onlooking Agents, Targeting Agents, Assault Agents, Supervisory Agents, and John Does #17-100

1144.  The Command Defendants' conspiracy plan contributed to a deficiency in training and supervision which led to Plaintiff's constitutional rights being violated, as set forth in Count VI above.

1145.  The Command Defendants' conspiracy plan contributed to unconstitutional policies, practices, and/or customs being permitted to exist, as set forth in Count VII above.

1146.  The Command Defendants' conspiracy plan contributed to putting Plaintiff and other individuals belonging to a limited, precisely definable group at a significant risk of serious, immediate, and proximate harm, which caused Plaintiff's constitutional rights to be violated as set forth in Count IX below.

1147.  Defendants are jointly and severally liable to the Plaintiff.

## COUNT IX
### State-created Danger
### (42 U.S.C. § 1983)
*vs. MACC Defendants*

1148. The Plaintiff restates, realleges, and incorporates by reference herein each and every allegation contained in each paragraph of this Complaint as if fully set forth herein.

1149. The Plaintiff was, at all times relevant to this Complaint, identifiable as a member of the press—which is a limited, precisely definable group.

1150. MACC Defendants commands, orders, instruction, and/or direction to "clear the streets" using violent crowd control and dispersion techniques—with a conscious disregard to Plaintiff's constitutional rights—rendered the Plaintiff more vulnerable to danger. Additionally, or in the alternative, MACC Defendants placed Plaintiff in harm's way by issuing commands, orders, instruction, and/or direction through MACC allowing MACC law enforcement agents to disregard press passes and distinctive clothing that identified individuals as members of the press, and instead to detain, arrest, and/or engage them using violent crowd control and dispersion techniques. In other words, if not for the MACC Defendants affirmative actions, the plaintiff would not have faced a significant risk of serious, immediate, and proximate harm.

1151. Plaintiff was separated from other persons—at some distance away from protesters and law enforcement—exercising his First Amendment rights, engaged in constitutionally-protected activity, and as a member of the press, was not subject to Curfew Orders. Yet, MACC Defendants—after deliberation—decided to continue with courses of

323

action that involved targeting Plaintiff and other members of the press with violent crowd control and dispersion techniques.

1152.   Deploying violent crowd control and dispersion techniques, such as less-lethal projectiles, came with an obvious and known risk of injury to targeted individuals, including Plaintiff and other members of the press.

1153.   Targeting the free press—surrogates for the public who provide information that is essential to democracy—with violent crowd control and dispersion techniques, such as less-lethal projectiles, is conscious-shocking behavior.

1154.   By the actions described in this Complaint, each of the MACC Defendants, under color of law, directly participated in the constitutional violations—set forth in Counts I, II, III, and IV above—which deprived the Plaintiff of his clearly established and well-settled civil rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution.

1155.   The danger created by MACC Defendants contributed to Plaintiff's First Amendment rights being violated, as set forth in Count I above.

1156.   The danger created by MACC Defendants contributed to Plaintiff suffering retaliation for exercising his First Amendment rights and/or engaging in constitutionally-protected activity, as set forth in Count II above.

1157.   The danger created by MACC Defendants contributed to Plaintiff being seized and having excessive force used against him, as set forth in Count III above.

1158. The danger created by MACC Defendants contributed to Plaintiff being deprived of his right to due process, as set forth in Count IV above.

1159. The danger created by MACC Defendants contributed to Defendants[383] failing to intervene to stop or prevent Plaintiff's constitutional rights from being violated, as set forth in Count V above.

1160. The danger created by MACC Defendants contributed to a deficiency in training and supervision which led to Plaintiff's constitutional rights being violated, as set forth in Count VI above.

1161. The danger created by MACC Defendants contributed to unconstitutional policies, practices, and/or customs being permitted to exist, as set forth in Count VII above.

1162. The danger created by MACC Defendants was a result, at least in part, of actions taken in furtherance of a conspiracy plan, as set forth in Count VIII above.

1163. Defendants are jointly and severally liable to the Plaintiff.

---

[383] MACC Defendants and Supervisory Agents

325

## COUNT X
### Negligence and/or Negligence Per Se
### (Common Law Tort)
*vs. each of the Defendants*

1164. The Plaintiff restates, realleges, and incorporates by reference herein each and every allegation contained in each paragraph of this Complaint as if fully set forth herein.

1165. Each of the individual Defendants[384] were in a position to protect against, and should be expected to protect against, the unlawful use of excessive force applied under the color of law against the Plaintiff and other members of the press exercising First Amendment rights lawfully and peacefully.

1166. The Defendants had a legal duty, to Plaintiff and other members of the press, not to turn them into combat targets by physically assaulting and terrorizing them.

1167. The Defendants had a legal duty to make every reasonable effort to protect and not interfere with the press freedoms afforded to Plaintiff and other members of the press.

1168. Any reasonable law enforcement agent would have foreseen the risk of using excessive force against unarmed members of the press—including Plaintiff—by shooting them with less-lethal projectiles.

---

[384] MACC Defendants, Onlooking Agents, Targeting Agents, Assault Agents, John Doe #1, John Doe #16, and John Does #17-100

326

1169. The risk of depriving the Plaintiff and other members of the press of their constitutional rights by using excessive force against them was recklessly, wantonly, and/or willfully ignored by the Defendants, and thereby, negligent.

1170. The risk including—but not limited to—cuts, lacerations, bruises, broken bones, loss of eye-sight, brain damage, permanent disability, and/or death was recklessly, wantonly, and/or willfully ignored by the Defendants, and thereby, negligent.

1171. There was a breach of duty by Defendants that was reckless, wanton, and/or willful by choosing to ignore the risks involved, and instead, Defendants targeted and physically attacked the Plaintiff and other members of the press.

1172. The Plaintiff suffered physical injuries, emotional injuries, and violations of his constitutional rights as a direct and proximate result of the foregoing unlawful conduct by the Defendants.

1173. Defendants are jointly and severally liable to the Plaintiff.

327

## COUNT XI
### Assault—Minn. Stat. § 609.02
### (State Law Claim)

*vs. Command Defendants, Supervisory Agents, John Doe #1,*
*Targeting Agents, Assault Agents, and John Doe #16*

1174.   The Plaintiff restates, realleges, and incorporates by reference herein each and every allegation contained in each paragraph of this Complaint as if fully set forth herein.

1175.   Command Defendants[385]  and Supervisory Agents[386] intended to, and did in fact, cause Plaintiff to fear imminent bodily harm by targeting him with dispersal orders and threats of arrest while displaying a show of authority, militaristic displays of force, and weaponry.

1176.   John Doe #1 intended to, and did in fact, cause Plaintiff to fear imminent bodily harm by targeting him with a large canister of pepper-spray while surrounded by militaristic displays of force and weaponry.

1177.   Targeting Agents[387] intended to, and did in fact, cause Plaintiff to fear imminent bodily harm by targeting him with high-powered spotlights from separate, multiple locations.

1178.   Command Defendants and Supervisory Agents intended to, and did in fact, cause Plaintiff to fear imminent bodily harm by issuing commands, orders, instruction,

---

[385] Commissioner Harrington, Assistant Commissioner Hodges, Colonel Langer, Major Dwyer, Sheriff Hutchinson, Chief Deputy Martin, Mayor Elliot, Interim Chief Gruenig, and Chief Revering

[386] John Does #9-10 and #14-15

[387] John Does #2-5

328

and/or direction to MACC law enforcement agents, including Assault Agents, to "clear the streets" with violent crowd control and dispersion techniques.

1179.   Each of the Assault Agents[388] intended to, and did in fact, cause Plaintiff to fear additional and imminent bodily harm by shooting him with .68 caliber and 40mm less-lethal projectiles.

1180.   Objectively, the use of .68 caliber, 40mm, and/or other less-lethal projectiles was excessive and unreasonable force under the circumstances.

1181.   John Doe #11 intentionally inflicted bodily harm upon Plaintiff by striking Plaintiff in the calf with a .68 caliber and/or other less-lethal projectile.

1182.   John Doe #12 intentionally inflicted bodily harm upon Plaintiff by striking Plaintiff in the buttocks with a .68 caliber and/or other less-lethal projectile.

1183.   John Doe #13 intentionally inflicted bodily harm upon Plaintiff by striking Plaintiff in the knee with a 40mm and/or other less-lethal projectile.

1184.   John Doe #16 intended to, and did in fact, cause Plaintiff to fear imminent bodily harm by grabbing and shoving him, while using a show of authority and issuing threats of arrest.

1185.   The Plaintiff suffered physical injuries, emotional injuries, and violations of his constitutional rights as a direct and proximate result of the foregoing unlawful conduct by the Defendants.

---

[388] John Does #11-13

1186. Defendants[389] are jointly and severally liable to the Plaintiff.

1187. Defendant City of Brooklyn Center is liable for the assaults committed by Command Defendants, John Doe #1, Targeting Agents, Assault Agents, and John Doe #16 because they were committed in the course and scope of their duties as a law enforcement agent of the Brooklyn Center Police Department and/or the City. *See* Minn. Stat. § 466.02.

1188. Defendant Hennepin County is liable for the assaults committed by Command Defendants, John Doe #1, Targeting Agents, Assault Agents, and John Doe #16 because they were committed in the course and scope of their duties as a law enforcement agent of the Hennepin County Sheriff's Office and/or Hennepin County. *See* Minn. Stat. § 466.02.

1189. Each of the Command Defendants and Supervisory Agents are liable as co-conspirators in the assaults committed by John Doe #1, Targeting Agents, Assault Agents, and John Doe #16 because, as alleged above, they combined with John Doe #1, Targeting Agents, Assault Agents, and John Doe #16 to accomplish the unlawful purpose of retaliation against members of the press and journalists for the exercise of their First Amendment rights. In the alternative, each of the Command Defendants and Supervisory Agents combined with John Doe #1, Targeting Agents, Assault Agents, and John Doe #16 to accomplish the lawful purpose of maintaining public order by the unlawful means of violating constitutional rights and committing assaults, as set out above. *See Harding v. Ohio Cas. Ins. Co. of Hamilton, Ohio*, 41 N.W.2d 818, 824-25 (Minn. 1950).

---

[389] Command Defendants, John Doe #1, Targeting Agents, Assault Agents, and John Doe #16

## COUNT XII
### Battery–Minn. Stat. § 609.06
### (State Law Claim)
*vs. Assault Agents and John Doe #16*

1190. The Plaintiff restates, realleges, and incorporates by reference herein each and every allegation contained in each paragraph of this Complaint as if fully set forth herein.

1191. Assault Agents[390] and John Doe #16 physically assaulted Plaintiff, without justification or provocation.

1192. Assault Agents intentionally caused physical contact with Plaintiff by shooting him .68 caliber and 40mm less-lethal projectiles.

1193. Objectively, the use of .68 caliber, 40mm, and/or other less-lethal projectiles was excessive and unreasonable force under the circumstances.

1194. Being struck in the calf with a .68 caliber and/or other less-lethal projectile is a contact that a reasonable person would find harmful and/or offensive.

1195. Being struck in the buttocks with a .68 caliber and/or other less-lethal projectile is a contact that a reasonable person would find harmful and/or offensive.

1196. Being struck in the knee with a 40mm and/or other less-lethal projectile is a contact that a reasonable person would find harmful and/or offensive.

1197. John Doe #16 intentionally caused physical contact with Plaintiff by grabbing and shoving him.

---

[390] John Does #11-13

331

1198.   Objectively, the use of force by grabbing and shoving Plaintiff was excessive and unreasonable force under the circumstances.

1199.   Being grabbed and pushed is a contact that a reasonable person would find harmful and/or offensive.

1200.   The Plaintiff suffered physical injuries, emotional injuries, and violations of his constitutional rights as a direct and proximate result of the foregoing unlawful conduct by the Defendants.

1201.   Defendants are jointly and severally liable to the Plaintiff.

1202.   Defendant City of Brooklyn Center is liable for the battery committed by Assault Agents and John Doe #16 because they were committed in the course and scope of their duties as a law enforcement agent of the Brooklyn Center Police Department and/or the City. *See* Minn. Stat. § 466.02.

1203.   Defendant Hennepin County is liable for the battery committed by Assault Agents and John Doe #16 because they were committed in the course and scope of their duties as a law enforcement agent of the Hennepin County Sheriff's Office and/or Hennepin County. *See* Minn. Stat. § 466.02.

1204.   Each of the Command Defendants[391] and Supervisory Agents[392] are liable as co-conspirators in the battery committed by Assault Agents and John Doe #16 because,

---

[391] Commissioner Harrington, Assistant Commissioner Hodges, Colonel Langer, Major Dwyer, Sheriff Hutchinson, Chief Deputy Martin, Mayor Elliot, Interim Chief Gruenig, and Chief Revering

[392] John Does #9-10 and #14-15

as alleged above, they combined with Assault Agents and John Doe #16 to accomplish the unlawful purpose of retaliation against Plaintiff and other members of the press for the exercise of their First Amendment rights. In the alternative, each of the Command Defendants and Supervisory Agents combined with Assault Agents and John Doe #16 to accomplish the lawful purpose of maintaining public order by the unlawful means of violating constitutional rights and committing battery, as set out above. *See Harding v. Ohio Cas. Ins. Co. of Hamilton, Ohio*, 41 N.W.2d 818, 824-25 (Minn. 1950).

## COUNT XIII
### Intentional Infliction of Emotional Distress
### (Common Law Tort)
*vs. MACC Defendants and Assault Agents*

1205. The Plaintiff restates, realleges, and incorporates by reference herein each and every allegation contained in each paragraph of this Complaint as if fully set forth herein.

1206. The unconstitutional conduct by MACC Defendants[393] and Assault Agents[394], using excessive force against Plaintiff by shooting him multiple times with less-lethal projectiles, after he identified himself as a member of the press both visually and verbally, was both extreme and outrageous.

1207. The unconstitutional conduct by Defendants[395], using excessive force against Plaintiff by shooting him multiple times with less-lethal projectiles, after he identified himself as a member of the press both visually and verbally, was willful, intentional, and/or reckless.

1208. The unconstitutional conduct by Defendants, using excessive force against Plaintiff by shooting him multiple times with less-lethal projectiles, after he identified himself as a member of the press both visually and verbally, caused Plaintiff emotional distress.

---

[393] City of Brooklyn Center, Hennepin County, Commissioner Harrington, Assistant Commissioner Hodges, Colonel Langer, Major Dwyer, Sheriff Hutchinson, Chief Deputy Martin, Mayor Elliot, Interim Chief Gruenig, and Chief Revering

[394] John Does #11-13

[395] MACC Defendants and Assault Agents

334

1209. The emotional distress suffered by Plaintiff while being intentionally targeted by Defendants, and then shot multiple times with less-lethal projectiles, was so severe that no reasonable person could be expected to endure it.

1210. The emotional distress suffered by Plaintiff still affects him to this day, triggering episodes of anxiety, nightmares, sleeplessness, and more.

1211. The Plaintiff suffered physical injuries, emotional injuries, and violations of his constitutional rights as a direct and proximate result of the foregoing unlawful conduct by the Defendants.

1212. Defendants are jointly and severally liable to the Plaintiff.

1213. Defendant City of Brooklyn Center is liable for the intentional infliction of emotional distress committed by Assault Agents because they were committed in the course and scope of their duties as a law enforcement agent of the Brooklyn Center Police Department and/or the City. *See* Minn. Stat. § 466.02.

1214. Defendant Hennepin County is liable for the intentional infliction of emotional distress committed by Assault Agents because they were committed in the course and scope of their duties as a law enforcement agent of the Hennepin County Sheriff's Office and/or Hennepin County. *See* Minn. Stat. § 466.02.

1215. Each of the Command Defendants and Supervisory Agents are liable as co-conspirators in the intentional infliction of emotional distress committed by Assault Agents because, as alleged above, they combined with Assault Agents to accomplish the unlawful purpose of retaliation against Plaintiff and other members of the press for the exercise of their First Amendment rights. In the alternative, each of the Command Defendants and

335

Supervisory Agents combined with Assault Agents to accomplish the lawful purpose of maintaining public order by the unlawful means of violating constitutional rights and committing intentional infliction of emotional distress, as set out above. *See Harding v. Ohio Cas. Ins. Co. of Hamilton, Ohio*, 41 N.W.2d 818, 824-25 (Minn. 1950).

## VII. **PRAYER** *for* **RELIEF**

WHEREFORE, the Plaintiff prays for relief as follows:

- **a.** That this Court find that the Defendants committed acts and omissions violating the First, Fourth, and Fourteenth Amendments to the United States, actionable under 42 U.S.C. § 1983;

- **b.** A declaration that Defendants' actions violated Plaintiff's rights under the First, Fourth, and Fourteenth Amendments;

- **c.** A permanent injunction prohibiting each of the Defendants, and those acting in concert with Defendants, from violating Plaintiff's First, Fourth, and Fourteenth Amendment rights, including retaliating against his newsgathering activities and/or the use of excessive force;

- **d.** A permanent injunction requiring all agencies involved with or in cooperation with MACC, past or present, to implement additional policies, recurring training, and monitoring mechanisms design to 1) protect the rights of journalists during crowd control and other law enforcement activities, 2) ensure that law enforcement agents respect constitutional limits on the use of less-lethal projectiles during crowd control and other law enforcement activities, 3) ensure that individual law enforcement agents are easily and readily identifiable during crowd control and other law enforcement activities, and 4) require all law enforcement agents deployed during crowd control and other law enforcement activities are using body-worn cameras correctly;

e. For each Count above, a money judgement against Defendants for damages compensating Plaintiff—for his physical, mental, and constitutional injuries—in the amount of $225,000;

f. For each Count above, a money judgement against Defendants for punitive damages to be determined by a jury;

g. Prejudgment interest;

h. Reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

i. Such other further relief as this Court may deem just and proper.

## VIII. DEMAND FOR JURY TRIAL

The Plaintiff demands a trial by jury of all issues triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: July 13, 2023

Bjorn Iverson
MCF-Moose Lake #263301
1000 Lake Shore Drive
Moose Lake, MN 55767

*Plaintiff Pro Se*

338